Nancy Ribaudo, Texas Bar No. 24026066
Joseph D. Austin, Texas Bar No. 24101470
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 878-9377
Facsimile (817) 878-9280
Nancy.Ribaudo@kellyhart.com
Joseph.Austin@kellyhart.com

*Counsel for Michael A. McConnell,*
*Chapter 11 Trustee*

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROMANS HOUSE, LLC,<br>26-2917877<br>2601 Tandy Avenue<br>Fort Worth, TX 76103<br><br>       Debtor. | Case No.:  19-45023-ELM-11<br>Case No.:  19-45024-ELM-11<br><br>Chapter:   11 |
| IN RE:<br><br>HEALTHCORE   SYSTEM<br>MANAGEMENT, LLC, 20-2708191<br>4608 E. California Parkway<br>Fort Worth, TX 76103<br>       Debtor. | JOINTLY ADMINISTERED UNDER:<br>Case No.:  19-45023-ELM-11 |

**TRUSTEE'S MOTION TO APPROVE (I)(A) PROCEDURES FOR THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) PROCEDURES FOR TO THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, (C) SELECTION OF STALKING HORSE BIDDER, (D) SCHEDULING AN AUCTION IF NECESSARY AND SALE HEARING (E)APPROVING FORM AND MANNER OF NOTICES RELATING THERETO AND, (II)(A) APPROVING THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (C) GRANTING RELATED RELIEF**

   Michael A. McConnell, the Chapter 11 Trustee (the "<u>Trustee</u>") for Romans House, LLC

("<u>Romans</u>") and Healthcore System Management, LLC ("<u>Healthcore</u>" and collectively, the

"<u>Debtors</u>") in the above-captioned chapter 11 cases (the "<u>Chapter 11 Cases</u>"), hereby moves (this

"Motion") the Bankruptcy Court for the Northern District of Texas (this "Court"), pursuant to §§ 105(a), 363, and 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 4001, 6004, 6006, 9007 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), for approval of procedures for entry of an order the ("Bid Procedures Order") (a) approving the proposed bidding procedures, by which the Trustee will solicit and select the highest or otherwise best offer for the sale of substantially all of the Debtors' assets ("Purchased Assets" or "Assets"); (b) authorizing and approving procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure; (c) approving the form and manner of notice with respect to certain procedures, protections, schedules, and agreements described herein and attached hereto; (d) approving the Trustee's selection of the stalking horse bidders; (e) scheduling an auction if necessary and final hearing to approve the proposed sale; and (f) granting related relief.  In support of this Motion, the Trustee respectfully represents as follows:

## I.  RELIEF REQUESTED

By this Motion, the Trustee requests entry of the following:

(a)     Entry of a Bid Procedures Order substantially in the form attached hereto as **Exhibit A**;

(i)     authorizing and approving the bidding procedures attached as Schedule 1 to the proposed Bid Procedures Order ("Bidding Procedures");[1]

(ii)    authorizing and approving assumption and assignment procedures amounts (the "Assumption and Assignment Procedures") for the assumption and assignment of certain executory contracts and unexpired leases;

(iii)   authorizing and approving the Trustee's selection of the Stalking Horse Bidders (defined herein);

(iv)    scheduling the auction ("Auction"), if necessary, to be held on **October 22, 2021, at 12:00 noon** (Central Time);

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures.

     (v)      scheduling the final hearing (<u>Sale Hearing</u>") to be held on **October 25, 2021, at 1:30 p.m.** (Central Time);

     (vi)     approving the form and manner of service of notices in connection with the sale and assumption and assignment procedures, described herein; and

     (vii)    granting related relief; and

(b)     following the Sale Hearing, entry of final order ("<u>Sale Order</u>"):

     (i)      approving the sale ("<u>Sale</u>") to the successful bidder (or backup bidder), free and clear of all liens, claims, encumbrances, and other interests;

     (ii)     approving the assumption and assignment of certain executory contracts and unexpired leases; and

     (iii)    granting related relief.

## II.     PRELIMINARY STATEMENT

1.     From the outset, the Trustee's primary goal has been to explore value maximizing alternatives for resolving Debtors' cases, with the goal of continued operations for the benefit of residents at the Debtors' assisted living facilities. Following his appointment, the Trustee became aware of significant deferred maintenance and other repairs required for the Debtors' assisted living facilities to meet regulatory and licensing requirements. The Trustee has spent significant time working with the state to identify needed repairs and develop a plan of correction to correct deficiencies and satisfy state licensing requirements.

2.     From the time of his appointment, the Trustee has worked with representatives of the Pender Entities (defined herein), certain of which are the Debtors' primary prepetition and post-petition secured lenders, to meet Debtors' cash needs, first by extending Debtors' authorization to use cash collateral, and later by negotiating a post-petition secured financing facility to make repairs and continue operations at least through August 31, 2021, which the

Court approved on a final basis on July 30 2021. The Trustee and Pender[2] later agreed to extend the post-petition financing facility through September 30, and recently through October 31, 2021.

3.     Since his appointment, the Trustee also negotiated and the Court approved a settlement with the Pender Entities that contemplates a resolution of these chapter 11 cases and satisfaction of Pender's claims against the Debtors through, among other things, a sale of Debtors' assets. The Court approved the proposed settlement on July 30, 2021.

4.     Following approval of that settlement, the Trustee turned his attention to negotiating with Pender, the terms of a proposed sale of Debtors' assets that allows for the transfer of operations once certain licensing issues are resolved with Texas Health Human Services. The Trustee, on behalf of the Debtors, and Pender, through its affiliates, 2601 Tandy ABL I Holdings, LLC, 2601 Tandy ABL I Operations, LLC, and 4607 East California ABL I Operations, LLC (collectively, the "Stalking Horse Bidders"), have now reached agreement as to terms for the purchase of and transfer of substantially all of the Debtors' assets and operations in exchange for consideration, including (i) a credit bid in the initial amount of $4,250,000 representing a portion of Pender's prepetition and post-petition claims and (ii) the assumption of certain liabilities ("Stalking Horse Bid").

5.     While the Stalking Horse Bid represents the best offer for the sale of Debtors' assets the Trustee has received to date and the Trustee is unaware of any other party having a material interest in the Debtors' Assets aside from those already well-acquainted with the Assets, the Trustee—consistent with his overarching objective of maximizing the value of the Debtors'

---

[2] As used herein, "Pender" or "Pender Entities" means, individually or collectively as appropriate, Pender Capital Asset Based Lending Fund I, LP, Pender ABL I Holdings UBI, LLC, Pender West Credit 1 REIT, L.L.C., 2601 Tandy ABL I Holdings, LLC, 2601 Tandy ABL I Operations, LLC, 4607 East California ABL I Operations, LLC, and their respective affiliates.

estates for the benefit of all stakeholders—desires to conduct a bid and auction process to further "market check" the Stalking Horse Bid and for these reasons, now seeks approval of the proposed Bidding Procedures (and related assumption and noticing procedures) for the solicitation of bids for the sale of Debtors' Assets.

6.      The proposed sale transaction - whether to the Stalking Horse Bidders or to an another bidder selected in accordance with the Bidding Procedures - are expected to have several concrete benefits to the Debtors' estates, creditors, and other stakeholders, including the residents of the assisted living facilities operated by the Debtors.  First, the proposed sale transactions will allow for financing of the Debtors' assisted living facilities by the buyer, rather than the Debtors and their estates, following closing.  The Trustee believes that such financing is essential for repairs required by state and regulatory authorities for the continued licensure and operation of the assisted living facilities.  Further, the consummation of the proposed sale transactions will avoid a shut down and displacement of vulnerable residents and will also allow for continued employment for many of the dedicated and hard-working staff at the facilities.

7.      Given cash shortages and the impending maturity date under the Financing Facility (defined herein), that Pender provided to Debtors, and to minimize repair costs and other cash outlays associated with the facilities, the Trustee seeks to complete the final, in-court stage of the marketing efforts and obtain approval of a sale of the Assets by October 31, 2021.

8.      As set forth more fully in the Bidding Procedures, upon receipt of any other bids, the Trustee will analyze all proposed sale transactions to determine whether there are any Qualified Bids other than the Stalking Horse Bid.  If so, the Trustee will hold an auction to identify the highest and best offer.  Following which the Trustee will seek approval by the Court at the Sale Hearing of the sale to the Successful Bid whether it be the Stalking Horse Bid or

alternative bidder. Once the Sale has closed, the Trustee intends to conclude these cases as expeditiously as possible.

### III. JURISDICTION AND VENUE

9. This Court has jurisdiction to consider the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (G), (M) and (N). Venue of these cases and this Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

10. The legal predicates for the relief requested herein are §§ 105(a), 363(b), (f), and (m), 364, 365, 503 and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 4001, 6004, 6006, 9007 and 9014.

### IV. BACKGROUND

11. The Debtors operate two assisted living facilities located in Fort Worth. Romans House owns and operates the Tandy Village Assisted Living facility, located at 2601 Tandy Avenue, Fort Worth, Texas (the "Tandy Village Facility"). Healthcore operates the Vincent Victoria Village Assisted Living facility, located at 4607 E. California Parkway, Fort Worth, Texas. (the "Vincent Victoria Facility," and together with the Tandy Village Facility, the "Facilities").

12. Prepetition, Debtors' original prepetition lender, Pender West Credit 1 REIT, L.L.C. ("PWC1 REIT"), acquired all of the real and personal property associated with the Vincent Victoria Facility via a non-judicial foreclosure sale. Following foreclosure, Healthcore, entered into a short-term lease with PWC1 REIT for the Vincent Victoria Facility, which expired prior to the Petition Date (defined below).

13. On December 9, 2019 (the "Petition Date"), each Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, commencing these cases. By order entered on December 23, 2019, the Court directed that the Debtors' bankruptcy cases be jointly

administered under Case No. 19-45023-ELM (the "Chapter 11 Cases"). No official committee of unsecured creditors has been appointed in the Chapter 11 Cases.

14. The Debtors continued to operate and manage their businesses as debtors in possession until confirmation of the Debtors' Second Amended Joint Plan of Reorganization on July 8, 2020 [Dkt. No.150]. The Plan, however, was not consummated and the Order of Confirmation was ultimately vacated on October 21, 2020 [Dkt. No. 212].

15. On May 14, 2021, the Court entered an order directing the United States Trustee (the "U.S. Trustee") to appoint a chapter 11 trustee for both Debtors [Dkt. No. 441]. On May 14, 2021, the U.S. Trustee filed notice of the appointment and application requesting Court approval of the appointment of Michael A. McConnell as Trustee [Dkt. Nos. 442, 444]. By order entered on May 17, 2021, the Court approved Mr. McConnell's appointment [Dkt. No. 445]. Since that time, the Trustee has been managing the Debtors' affairs.

16. Since his appointment, the Trustee was made aware of significant deferred maintenance and other repairs required at the Facilities, including significant repairs and renovations needed to comply with applicable regulatory and licensing requirements. Critically, significant and urgent repairs and renovations were needed for the Tandy Village Facility to comply with state regulatory and licensing requirements. The Trustee spent significant time working with the state to identify needed repairs and develop a plan of correction to correct deficiencies and satisfy state licensing requirements.

17. The Trustee worked with representatives of Pender to meet Debtors' cash needs by extending Debtors' authorization to use cash collateral, and later by negotiating a post-petition secured financing facility (the "Financing Facility"), to provide the Debtors with

additional liquidity essential to finance state-mandated repairs and renovations to continue operations.

18. From the time of his appointment, the Trustee began a dialogue with the Pender Entities about potential value maximizing alternatives for resolving these Chapter 11 Cases, with emphasis on those alternatives that would allow the Facilities to continue operating as going concerns and avoid putting vulnerable residents of the Facilities at risk. After extensive good faith and arms'-length negotiations, the Trustee and the Pender Entities ultimately agreed (subject to Court approval) upon a three-pronged approach that, in the reasoned business judgment of the Trustee, has the greatest likelihood of bringing these Chapter 11 Cases to a successful resolution.

19. First, Pender agreed to provide the Debtors with the post-petition Financing Facility to provide the Debtors with additional liquidity essential for continued operations as going concerns and to finance state-mandated repairs and renovations at least through August 31.

20. Second, the Pender Entities agreed to acquire the Debtors' assisted living facilities and related assets in a series of related transactions described herein (the "Sale Transaction") through their affiliated Stalking Horse Buyers. Importantly, the Pender Entities have agreed to subject the proposed Sale Transaction to a Court-supervised bidding and auction process that will serve as a market check concerning whether there are any higher or better offers available for the Purchased Assets.

21. Third, the Trustee (on behalf of the Debtors and their estates) and the Pender Entities, negotiated a settlement agreement that provides that if the Sale Transaction is fully consummated, the Debtors will be relieved of all further liability for any Prepetition Obligations

and Postpetition Obligations[3] owing to any Pender Entity, either through the release of such claims or assumption of such liabilities.

22. The Trustee filed his motion requesting approval of the Post-petition Financing Facility pursuant to the *Trustee's Motion for Entry of Interim and Final Orders (I) Authorizing Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing; and (V) Granted Related Relief,* on July 8, 2021 [Dkt. No. 471] ("Financing Motion"), which the Court approved on an interim basis and later, on a final basis on July 29, 2021 [Dkt. Nos. 485 and 503] ("Financing Orders"). Since then the Trustee and Pender have agreed to two amendments, which provided additional funding through October 31, 2021 [Dkt. Nos. 511, 520]. As of September 30, 2021, the Debtors are indebted to PWC1 REIT under the Financing Facility in the principal amount of $503,589.43, plus interest, fees and charge, with additional financing through the month of October in the amount of $92,669.88.

23. The Trustee filed his *Motion to Approve Settlement Agreement with the Pender Entities* on July 14, 2021 [Dkt. No. 487]. The Court approved the proposed Settlement Agreement attached thereto as Exhibit 1 by Order entered on July 30, 2021 [Dkt. No. 504]. Under the terms of the Settlement Agreement, the Trustee and Pender agreed, among other things, that, subject to the terms and conditions thereof including the closing of the Sale Transaction with the Stalking Horse Bidders, the Pender Entities would not be entitled to any further distributions from the Debtors' estates on account of any portion of the Pender Entities'

---

[3] As defined in the Settlement Agreement, dated July 14, 2021 (the "Settlement Agreement"), attached as Exhibit 1 to the *Order Granting Chapter 11 Trustee's Motion to Approve Settlement Agreement with Pender Entities* [Dkt. No. 504] ("9019 Order").

claims that had not been credit bid by the Pender Entities in connection with the Sale Transaction.

24.     With this Motion, the Trustee now seeks approval of the proposed Sale Transaction and marketing process, including bidding and assumption and assignment procedures, approval of the Stalking Horse Bidders, and following the sale process, approval of the proposed Sale Transaction or an alternative transaction if the Trustee determines it to be the highest and best offer for the Debtors' assets following the sale process and auction.

## V.     THE BIDDING PROCEDURES[4]

25.     The Bidding Procedures are designed to promote participation and active bidding and to ensure an orderly marketing process for the sale of Debtors' Assets consistent with the funding timeline available to the Trustee under the Financing Facility.  The proposed Bidding Procedures describe, among other things, the procedures for interested parties to access due diligence, the process for written, irrevocable offers ("Bids"), the manner in which bidders and bids become "qualified," the receipt and negotiation of Bids received, the conduct of any auction, the selection and approval of any ultimately successful bidders, and the deadlines with respect to the foregoing.  The Bidding Procedures allow the Trustee to conduct a sale process in a controlled, fair, and open manner to maximize value for all stakeholders.

26.     Each Stalking Horse Bidder is a "Qualified Bidder", and the Stalking Horse Purchase Agreements a "Qualified Bid."  In the event that no other Qualified Bids are submitted by the Bid Deadline, the Stalking Horse Bidders shall be the Successful Bidder and no Auction shall take place.

---

[4] For the avoidance of doubt, the summary of the Bidding Procedures contained in this Sale Motion is qualified in its entirety by reference to the Bidding Procedures themselves. The terms of the Bidding Procedures and the Bid Procedures Order shall control in the event of any conflict with the summary thereof contained in this Motion.

27.     The Bidding Procedures provides that each Bid must provide for a Purchase Price equal to or greater than (i) $4,550,000, which is the aggregate of the cash and Credit Bid Amount purchase price components set forth in the Tandy Stalking Horse REPA, *plus* (ii) the amount necessary to repay in full the "Post-petition Obligations",[5] *plus* (iii) $200,000 on account of the Expense Reimbursement Amount, *plus* the minimum overbid amount of $100,000.00 (the "Minimum Bid Amount").

28.     In accordance with the Settlement Agreement and the Financing Orders, the Stalking Horse Bidders shall have the right to credit bid all or any portion of the Allowed Secured Claim in the amount of $10,953,560.80 and all or any portion of the Post-petition Obligations (as defined in the Settlement Agreement).  Further, in the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but not obligated, to submit overbids, including in the form of additional or increased credit bids of any remaining value of the Allowed Secured Claim and the Post-petition Obligations.

29.     The Trustee will conduct and preside over any auction, which will be held via Zoom or other videoconference platform, or by such other means and/or at such later date and time as the Trustee may approve with the consent of the Pender Entities.  The Auction will be conducted openly and all parties in interest will be permitted to attend subject to their compliance with the notice and other procedures set forth in the Bidding Procedures required in advance for attendance.

30.     Pursuant to the proposed Bid Procedures Order, the Expense Reimbursement Amount of $200,000, shall be allowed as a superpriority administrative expense claim under §§

---

[5] As of the date of filing of this Motion, the Debtors owed principal in the amount of $503,589.43, plus interest, fees and charges in connection with the Postpetition Financing Facility, and is expected to fund an additional $92,669.88 in October 2021, resulting in an anticipated principal balance of $596,259.31.

503(b) and 507 of the Bankruptcy Code for which both Debtors and their estates are jointly and severally liable. Upon consummation of a Sale Transaction with a purchaser or purchasers other than the Stalking Horse Bidders, the Expense Reimbursement Amount shall be payable without further order of the Court to the Stalking Horse Bidders in accordance with the terms of the Bid Procedures Order and the Tandy Stalking Horse REPA (defined below).

31. The below chart further summarizes the proposed Bidding Procedures and procedures for conducting the Auction, all of which are more specifically set forth in the Bidding Procedures annexed as Schedule 1 to the proposed Bid Procedures Order:

| **Bid Deadline.** | **12:00 noon (Central time) on October 21, 2021**. |
|---|---|
| **Potential Bidders** | To participate in the bidding process, a person or entity interested in consummating a Sale (each, a "Potential Bidder") must deliver:<br><br>(a) an executed confidentiality agreement on terms acceptable to the Trustee; and<br><br>(b) if requested by the Trustee, the most current audited and latest unaudited financial statements (collectively, the "Financials") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, (i) Financials of the equity holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Trustee and his advisors, (ii) a written commitment acceptable to the Trustee and his advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction. |
| **Qualified Bidders** | A "Qualified Bidder" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), demonstrate the financial capability to consummate the Sale, as determined in the Trustee's reasonable business judgment; and (ii) whose Bid is a Qualified Bid. On or before the date that is one (1) business days after the Bid Deadline, the Trustee's advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to counsel to the Stalking Horse Bidder. The Stalking Horse Bidder shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all |

| | |
|---|---|
| | times. |
| | If any Potential Bidder is determined by the Trustee not to be a Qualified Bidder, the Trustee will refund such Potential Bidder's Deposit and all accumulated interest thereon on or within three (3) business days after the Bid Deadline. |
| | Between the date that the Trustee notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Trustee may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Purchase Agreements, without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid; *provided* that any Qualified Bid may be improved at the Auction. Any improved Qualified Bid must continue to comply with the Bidding Procedures. Bids must remain open offers capable of being accepted until entry of the Sale Order or, in the case of a Backup Bid, until the Backup Bidder closes the Sale Transaction. |
| **Qualified Bids** | A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the requirements set forth in the Bidding Procedures (collectively, the "Bid Requirements"), as determined by the Trustee in his reasonable business judgment shall constitute a "Qualified Bid." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Purchase Agreements will be deemed a Qualified Bid and the Stalking Horse Bidders will be deemed Qualified Bidders for all purposes and at all times. The form of a Bid must include proposed definitive transaction documents in substantially the form of the Stalking Horse Purchase Agreements, as applicable (each a, "Bid Agreement" and collectively, the "Bid Agreements") duly executed by the potential Bidder and must also include a redline comparing any Bid Agreements to the corresponding Stalking Horse Purchase Agreements. |
| **Credit Bid** | The Stalking Horse Bidders shall have the absolute right to credit bid all or any portion of the Allowed Secured Claim (as defined in the Settlement Agreement) in the amount of $10,953,560.80 and all or any portion of the Postpetition Obligations (as defined in the Settlement Agreement). Further, in the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but not obligated, to submit overbids, including in the form of additional or increased credit bids of any remaining value of the Allowed Secured Claim and/or the Postpetition Obligations. |

| | |
|---|---|
| **Minimum Overbid** | the minimum incremental amount over the Baseline Bid at Auction is $100,000 (a "Minimum Overbid Increment") in cash payable at the closing; *provided, however,* that the Stalking Horse Bidders shall be entitled to make its Overbids in the form of Credit Bids up to the full amount available under the Bid Procedures Order and these Bidding Procedures |
| **Closing with Alternative Backup Bidders** | The Auction shall continue until there is only one Bid, as applicable, that the Trustee determines, in his reasonable business judgment, is the highest or otherwise best Bid. Such Bid or Joint Bid, as applicable, shall be declared the "Successful Bid," and such Qualified Bidder (or Qualified Bidders, in the event of a Joint Bid) the "Successful Bidder(s)," at which point the Auction will be closed. The Trustee shall notify the Qualified Bidders of the Successful Bid within one (1) business day following such selection. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Trustee of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid. |
| **Date, Time, Place, and Notice of Auction** | The Auction, if necessary, shall take place on **October 22, 2021, at 12:00 noon (Central Time)**, or at such later date and time as the Trustee may approve with the consent of the Pender Entities. The Auction shall be held by Zoom or other videoconference platform, and all entities entitled to attend the Auction shall receive instructions on attending the Auction via videoconference on or before the date of the Auction. |
| **No Collusion** | Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder(s). All Potential Bidders and all Qualified Bidders will immediately disclose to the Trustee and the U.S. Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Trustee or the Debtors |
| **Auction Participants** | Except as provided herein, only the Trustee, the Debtors, Qualified Bidders, the U.S. Trustee, Susan Goodman (in her capacity as the Patient Care Ombudsman), the Texas Health and Human Services Commission, and each of their respective legal and financial advisors shall be entitled to attend the Auction. Only Qualified Bidders shall be entitled to bid at the Auction. Bids at the Auction will be transcribed. Other creditors of the Debtors and parties in interest in the Chapter 11 Cases may observe the Auction (collectively, "Other Interested Parties"), but only if such other Interested Party has made a timely written request (which request shall identify the Other Interested Party seeking to observe the |

| | |
|---|---|
| | auction and provide names, titles, and email addresses for its proposed auction attendees) to the Trustee so that such request is received by the Trustee's counsel (at the contact information listed above) at least three (3) business days prior to the initial scheduled date and time of the Auction. Each such Other Interested Party shall be limited to a maximum of two Auction attendees on its behalf. |
| **Transcription or Video Recording** | Bidding at the Auction will be transcribed. |

32.     The anticipated timeline for the sale process under the proposed Bidding Procedures is as follows:

| Event | Date / Deadline |
|---|---|
| Sale Notice Mailing Date | Within one (1) business day after entry of the Bid Procedures Order |
| Bid Deadline | 12:00 noon (Central Time) on October 21, 2021 |
| Sale Objection Deadline | 4:00 p.m. (Central time) on October 20, 2021 |
| Auction (if necessary) | 12:00 noon. (Central Time) on October 22, 2021 |
| Assumption Notice Date | Within one (1) Business Day after Entry of the Bid Procedures Order |
| Assumption Objection Deadline | Seven (7)  days following the Assumption Notice Date |
| Alternative Transaction Adequate Assurance Objection Deadline | Prior to commencement of the Sale Hearing |
| Sale Reply Deadline | 12:00 noon (Central Time) one business day prior to the Sale Hearing |
| Sale Hearing | 1:30 p.m. (Central Time) on October 25, 2021 |

33.     The Trustee reserves the right, with the consent of the Pender Entities, to modify the above timeline in accordance with the provisions of the Bidding Procedures.

## VI.     THE STALKING HORSE PURCHASE AGREEMENTS

34.     Following extensive, good-faith negotiations, with the Pender Entities, the Trustee has agreed to enter into the following transactions, subject to the Trustee's consideration of other potential Qualified Bidders and Qualified Bids (as defined in the Bidding Procedures):[6]

(a)     <u>Tandy Stalking Horse REPA</u>: that certain *Real Estate and Asset Purchase Agreement (Tandy Village)*, dated October __, 2021, attached hereto as **Exhibit B** by and between the Trustee for and on behalf of Romans, as Seller, and 2601 Tandy ABL I Holdings, LLC, as the Buyer (the "<u>Tandy Buyer</u>") (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Tandy Stalking Horse REPA</u>");

(b)     <u>Tandy Stalking Horse OTA</u>: that certain *Operations Transfer Agreement (Tandy Village),* dated October __, 2021, by and between the Trustee for and on behalf of Romans, as Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "<u>Tandy New Operator</u>"), attached hereto as **Exhibit C** (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Tandy Stalking Horse OTA</u>"); and

(c)     <u>Vincent Stalking Horse OTA</u>: that certain *Operations Transfer Agreement (Vincent Victoria Village),* dated August __, 2021, by and between the Trustee for and on behalf of Healthcore, as Existing Operator, and 4607 East California ABL I Operations, LLC, as New Operator (the "<u>Victoria Village New Operator</u>"), attached hereto **Exhibit D** (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Vincent Victoria Stalking Horse OTA</u>," and together with the Tandy Stalking Horse REPA and the Tandy Stalking Horse OTA, the "<u>Stalking Horse Purchase Agreements</u>").

35.     In addition, to accommodate the time required after closing for each buyer to acquire licenses from the state to operate the Facilities, the Trustee and the Pender Entities contemplate entering into the following  sublease and interim management agreements for each Debtor to take effect from closing until new licenses are issued to the buyer of each Facility:

(d)     <u>Tandy Interim Sublease</u>*: Interim Sublease Agreement* dated October __, 2021, by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations,

---

[6] For the avoidance of doubt, the summaries of the Stalking Horse Purchase Agreements contained in this Sale Motion are qualified in their entirety by reference to the Stalking Horse Purchase Agreements themselves. The terms of the respective Stalking Horse Purchase Agreements shall control in the event of any conflict with the summary thereof contained in this Motion.

LLC, as Sublandlord, (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy Interim Sublease"), attached hereto as **Exhibit E**;

(e) Tandy Interim Management Agreement: *Interim Management Agreement (Tandy Village),* dated October __, 2021, by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as Manager (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy Interim Management Agreement"), attached hereto as **Exhibit F**;

(f) Vincent Interim Sublease*: Interim Sublease Agreement* dated October __, 2021, by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as Sublandlord (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Interim Sublease"), attached hereto as **Exhibit G**; and

(g) Vincent Interim Management Agreement: *Interim Management Agreement (Vincent Victoria),* dated October __, 2021, by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as Manager (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Interim Management Agreement"), attached hereto as **Exhibit H**.

36.     As noted, the Stalking Horse Purchase Agreements contemplate the acquisition of the substantially all of the Debtors' Assets and transfer of Debtors' operations (upon acquisition of new licenses), while also permitting the Trustee to attempt to solicit other bids in accordance with the Bidding Procedures. In the event the Stalking Horse Bidders are deemed the Successful Bidder, the Trustee's marketing process will terminate, and the Trustee will pursue the Sale Transaction in accordance with the terms of the Stalking Horse Purchase Agreements.

37.     The following table sets forth a summary of the material terms and conditions of the Stalking Horse Purchase Agreements:[7]

---

[7] If there are any inconsistencies between the summary set forth herein and the Stalking Horse Purchase Agreements, the terms and conditions of the Stalking Horse Purchase Agreements shall govern.

| Term<br>(Agreement Citation) | Detail |
|---|---|
| **Sellers** | The Debtors: Romans House, LLC, dba Tandy House Assisted Living Facility and Healthcore System Management LLC |
| **Stalking Horse Bidders** | 2601 Tandy ABL I Holdings, LLC; 2601 Tandy ABL I Operations, LLC; 4607 East California ABL I Operations, LLC |
| **Assets to be Purchased** | Substantially all assets of the Debtors including real and personal property of Romans and personal property of Healthcore and all operations and personal property related thereto |
| **Consideration** | (i) a credit bid in the amount of $4,250,000 representing a portion of Pender's prepetition and post-petition claims and (ii) the assumption of certain liabilities |
| **Agreements with Management** | None. Westerncare Management may enter into an agreement with buyer to continue management of the Facilities. Trustee is not involved with any of those discussions |
| **Good Faith Deposit** | $275,000 |
| **Use of Proceeds** | To satisfy secured claims of Pender and any senior secured prepetition liens. |
| **Sale of Avoidance Actions** | No |
| **Successor Liability** | Excluded from acquired liabilities |
| **Free and Clear of Unexpired Leases or Other Rights** | Requested |
| **Relief from Bankruptcy Rule 6004(h)** | Requested |

## VII.     ASSUMPTION AND ASSIGNMENT PROCEDURES

38.     The Trustee is also seeking approval of the Assumption and Assignment Procedures to facilitate the fair and orderly assumption and assignment of certain executory contracts and unexpired leases in connection with the Sale.  The Assumption and Assignment Procedures are as set forth below.

39. **Assumption Notice**. Within one (1) business day after entry of the Bid Procedures Order ("Assumption Notice Date"), the Trustee shall file with the Court the Notice of Assumption and Assignment, which includes a list that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Available Contracts"), including the name of and address for each non-Debtor counterparty to such Available Contract (the "Contract Counterparty")[8]; and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Available Contract (the "Cure Costs"). The Trustee shall serve, via first class mail, the Notice of Assumption and Assignment, in substantially the form attached hereto as **Exhibit I**, on all Contract Counterparties and, for Facility residents, shall serve via posting the Notice of Assumption and Assignment for Residents ("Resident Assumption Notice"), in substantially the form attached hereto as **Exhibit J**.

40. **Assumption Objections**. A Contract Counterparty listed on the Notice of Assumption may file an objection ( "Assumption Objection") to the proposed assumption and assignment of the applicable Available Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidders to provide adequate assurance of future performance. All Assumption Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the following parties by no later than 4:00 p.m. (Central time) on the date that is seven

---

[8] To the extent a contract counterparty is a resident at Tandy Village or Vincent Victoria Village, the Trustee shall file and serve the Notice of Assumption and Assignment for Residents and may refer to Residents generally or reference their name as "Resident No. ___" to comply with privacy and non-disclosure requirements under applicable federal and state laws.

(7) days after the Assumption Notice Date (the "<u>Assumption Objection Deadline</u>") upon the following (the "<u>Objection Recipients</u>"): (a) the Trustee and counsel for the Trustee, Kelly Hart & Hallman LL, 201 Main Street, Suite 2500, Fort Worth, TX 76102 (Attn: Michael A. McConnell, Nancy Ribaudo and Joseph D. Austin); (b) counsel to the Pender Entities, (i) Benesch, Friedlander, Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801 (Attn: Michael J. Barrie and Gregory W. Werkheiser), and (ii) Ross and Smith, P.C., 700 N. Pearl Street, Suite 1610, Dallas, TX 75201 (Attn: Frances Smith); and (c) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, TX 75242 (Attn: Erin Marie Schmidt).

41.     Objections to the ability of a Successful Bidder(s) other than the Stalking Horse Bidder to provide adequate assurance of future performance (an "<u>Adequate Assurance Objection</u>") shall be raised prior to commencement of the Sale Hearing (the "<u>Alternative Transaction Adequate Assurance Objection Deadline</u>").

42.     **Supplemental Assumption Notice**.  Although the Trustee intends to make a good-faith effort to identify in the Assumption Notice all Available Contracts that may be assumed and assigned in connection with a Sale Transaction, the Trustee may discover that certain executory contracts were inadvertently omitted from the Available Contracts Notice, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Sale Transaction.  Accordingly, the Trustee reserves the right at any time after the Assumption Notice Deadline and the Sale Hearing to (i) supplement the list of Available Contracts with previously omitted Available Contracts, (ii) remove Available Contracts from the list of Available Contracts that a Successful Bidder proposes be assumed and assigned, and/or (iii) modify the previously stated Cure Cost associated with any Available

Contract. In the event the Trustee exercises any of these reserved rights, the Trustee will promptly file with the Court and serve, by overnight delivery on the applicable counterparties, a revised Assumption Notice (a **"<u>Supplemental Assumption Notice</u>"**), as applicable, and such counterparties shall file any Assumption Objection not later than (a) the Assumption Objection Deadline in the event that such Supplemental Assumption Notice was filed and served at least seven (7) days prior to the Assumption Objection Deadline, and (b) seven (7) days from the date such Supplemental Assumption Notice was filed and served, in the event that such Supplemental Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing. In the event that the Supplemental Assumption Notice is filed and served less than seven (7) days prior to the commencement of the Sale Hearing, the Trustee shall file with the Court a proposed order authorizing the assumption and assignment of the newly added Available Contracts no later than fourteen (14) days after the date of service of such revised Assumption Notice, which order shall provide (a) that the assumption of the proposed newly added Available Contracts is approved, final and effective, pursuant to § 365 of the Bankruptcy Code, and (b) that the Successful Bidder provided adequate assurance of future performance under such newly added Available Contract in accordance with § 365(f)(2)(B) of the Bankruptcy Code.

43. If a Contract Counterparty files an Assumption Objection and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, or such later hearing date that the Trustee determines in his discretion, with the consent of the Successful Bidder(s), or such other date determined by this Court.

44.     If the Contract Counterparty does not file and serve an Assumption Objection, (a) the Cure Costs, if any, set forth in the Notice of Assumption shall be controlling, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Available Contract and the Cure Costs, if any, and will be forever barred from asserting any objection with regard to such assumption and assignment, including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder; (ii) any and all defaults under such Available Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code § 365(b)(1)(A) and (B) upon payment of the Cure Costs set forth in the Assumption Notice for such Available Contract, and such counterparty shall be forever barred from asserting any objection with regard thereto; (iii) the Cure Amount set forth in the Assumption Notice for such Available Contract shall be controlling, notwithstanding anything to the contrary in such Available Contract, or any other related document, and such counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Available Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Assumption and Assignment Objections and the Sale Order; and (iv) such counterparty shall be deemed to have consented to the Transaction and to any related relief.

45.     The inclusion of an Available Contract on the Notice of Assumption (or any Supplemental Assumption Notice) will not: (a) obligate the Trustee or the Debtors to assume any Available Contract listed thereon or the Stalking Horse Bidders or any other Successful Bidder(s) to take assignment of such Available Contract; or (b) constitute any admission or agreement of the Trustee or the Debtors that such Available Contract is an executory contract.

Only those Available Contracts that are included on a schedule of assumed and acquired contracts and leases attached to one or more of the Stalking Horse Purchase Agreements, as applicable, at Closing (or the final asset purchase agreement with the Successful Bidder(s) at Closing), if any (including amendments or modifications to such schedules in accordance with the Stalking Horse Purchase Agreements or asset purchase agreement, as applicable), will be assumed and assigned to the applicable Stalking Horse Bidder (or other Successful Bidder(s) following the Auction, if any).

## VIII.      NOTICE PROCEDURES

46.    **Sale Notice.**  Within one business day after entry of the Bid Procedures Order, or as soon thereafter as practicable (the **"**Mailing Date"), the Trustee shall serve a sale notice, substantially in the form annexed hereto as **Exhibit K** (the "Sale Notice") by first-class mail, postage prepaid or, for those parties who have consented to receive notice by the ECF system, by ECF, upon (a) all entities known to the Trustee to have expressed an interest in a transaction with respect to some or all of the Purchased Assets during the past twelve (12) months; (b) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (c) known counterparties to the Available Contracts (as defined herein); (d) the Debtors; (e) the Office of the United States Trustee for the Northern District of Texas; (f) counsel to the Pender Entities; (g) the Office of the United States Attorney for the Northern District of Texas; (h) the Internal Revenue Service; (i) the Texas Department of Health and Human Services; (j) the top 20 unsecured creditors of each Debtor; (k) all known secured creditors of the Debtors; (l) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrixes; and (m) any other party that has requested notice pursuant to Local Rule 2002-1 (collectively, the "Notice Parties").

47. **Notice of Successful Bidder.** As soon as reasonably practicable after the conclusion of the Auction (or the cancellation thereof if no Auction is necessary), the Trustee shall file on the docket, but not serve, a notice which shall identify the Successful Bidder and Backup Bidder, if any, substantially in the form attached hereto as **Exhibit L** ("Post-Auction Notice").

## IX. BASIS FOR RELIEF AND APPLICABLE AUTHORITY

### A. A Section 363 Asset Sale Represents A Sound Exercise Of The Trustee's Business Judgment.

48. Selling the Assets as proposed herein is critical to maximizing value of the Debtors' estates and, therefore, should be approved as reflecting a sound exercise of the Trustee's business judgment. Section 363(b) of the Bankruptcy Code provides, in relevant part, that a trustee "may use, sell, or lease, other than in the ordinary course of business, property of the estate" after notice and a hearing. 11 U.S.C. § 363(b)(1). Generally, the trustee is only required to "show that a sound business purpose" justifies the proposed use of property. *In re Montgomery Ward Holding Corp.*, 242 B.R. 147, 153 (D. Del. 1999); *see also In re Phx. Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (requiring "good business reason" for use under section 363(b) of the Bankruptcy Code). This standard prohibits other parties from second-guessing the trustee's business judgment if the trustee has shown that the proposed use will benefit the debtor's estate. *See In re Johns-Manville Corp.*, 60 B.R. 612, 616 (Bankr. S.D.N.Y. 1986) ("Where the debtor articulates a reasonable basis for its business decisions (as distinct from a decision made arbitrarily or capriciously), courts will generally not entertain objections to the debtor's conduct."); *see also In re Tower Air, Inc.*, 416 F.3d 229, 238 (3d Cir. 2005) ("Overcoming the presumptions of the business judgment rule on the merits is a near-Herculean task.").

49. The Trustee determined to sell substantially all of the Debtors' assets after careful consideration of all potential alternatives, and consultation with the Debtors' primary prepetition secured lender. Of the available restructuring paths, the sale of assets to the Stalking Horse Bidders was and remains the most efficient means to obtaining the greatest value for the Debtors' Assets and continued operation of the Debtors' two assisted living facilities for the benefit of residents. The Trustee already has a floor-setting Stalking Horse Bid and now seeks a marketing process with the benefits of the § 363 sale process available to interested bidders. After this market check, the Trustee, the Debtors' creditors, and other parties in interest can be confident that the Trustee will have obtained the highest and best value for the Purchased Assets.

**B.     Approval Of The Sale Notice Procedures And Bidding Procedures Is Appropriate And In The Best Interests Of The Debtors' Estates.**

**1.     The Proposed Notice of Sale, Bidding Procedures, Auction and Sale Hearing, and the Sale Objection Deadline Are Appropriate**.

50. The Trustee submits that the procedures for noticing the sale and the Sale Objection Deadline comply fully with Bankruptcy Rule 2002 and this Court's prior orders,[9] including, and are reasonably calculated to provide timely and adequate notice of the Bidding Procedures, the Auction, the Sale Hearing, and the Sale to the Debtors' creditors and other parties in interest, and, if the Trustee believes that additional entities have a legitimate interest, then also to those who have expressed an interest, or may express an interest, in bidding on the Assets. Based upon the foregoing, the Trustee respectfully requests that this Court approve the procedures for noticing the Sale and the Sale Objection Deadline proposed above.

---

[9] *See Order Granting Motion to Limit Not*ice, dated July 12, 2021 [Dkt. No. 483].

2. **The Bidding Procedures Are Appropriate and Will Maximize Value Received in Sale of Assets.**

51. Courts have made clear that a trustee's business judgment is entitled to substantial deference with respect to the procedures to be used in selling assets of the estate. *See, e.g.*, *In re Efoora, Inc.*, 472 B.R. 481, 488 (Bankr. N.D. Ill. 2012) ("A trustee has considerable discretion when it comes to the sale of estate assets, and that discretion is entitled to great judicial deference as long as a sound business reason is given.") (internal quotations and citations omitted).

52. The paramount goal in any proposed sale of property of the estate is to maximize the proceeds received by the estate. *See, e.g.*, *Corp. Assets, Inc. v. Paloian*, 368 F.3d 761, 765 (7th Cir. 2004) (in a bankruptcy sale, the "governing principle . . . is to secure the highest price for the benefit of the estate and creditors"). To that end, courts uniformly recognize that procedures intended to enhance competitive bidding are consistent with the goal of maximizing the value received by the estate and, therefore, are appropriate in the context of bankruptcy sales. *See, e.g.*, *Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 537 (3d Cir. 1999); *Official Comm. of Subordinated Bondholders v. Integrated Res. Inc. (In re Integrated Res. Inc.)*, 147 B.R. 650, 659 (S.D.N.Y. 1992) (observing that Bidding Procedures "encourage bidding and . . . maximize the value of the debtor's assets.").

53. The Trustee believes that the Bidding Procedures will establish sound parameters by which the Purchase Price for the Purchased Assets under the Staling Horse Agreements may be tested at the Auction, as well as the ensuing Sale Hearing, and evaluated as described herein. Such procedures will increase the likelihood that the Trustee will receive the greatest possible consideration for the Assets in a sale because they will ensure a competitive and fair bidding process. The Bidding Procedures will also allow the Trustee to undertake the Auction process in

an orderly fashion, which the Trustee believes is essential to maintaining and maximizing the value of the Debtors' estates.

54.    The Trustee believes that the Auction and proposed Bidding Procedures promote active bidding from seriously interested parties and will dispel any doubt as to the best or otherwise highest offer reasonably available at this time for the purchase of the Assets. Moreover, the proposed Bidding Procedures will allow the Trustee to conduct the Auction in a controlled, fair, and open fashion that will encourage participation by financially capable bidders who demonstrate the ability to close a transaction.  The Trustee believes that the Bidding Procedures will encourage bidding for the Assets, are consistent with other procedures previously approved by courts in this and other circuits, and are appropriate under the relevant standards governing auction proceedings and bidding incentives in bankruptcy proceedings.

55.    Thus, the proposed Bidding Procedures are reasonable, appropriate, and within the Trustee's sound business judgment under the circumstances because they will serve to maximize the value that the Trustee will obtain on account of the Sale of the Purchased Assets.

**C.    The Initial And Subsequent Overbid Amounts Are Appropriate.**

56.    The Trustee submits that the proposed requirements for a valid overbid are appropriate and should be approved.  Courts frequently authorize trustees to require bidders to submit minimum initial bids to ensure that the trustee receives the highest and best offers possible in asset sales.  *See, e.g.*, *In re Grede Foundries, Inc.*, Case No. 09-14337 (RDM) (Bankr. W.D. Wis. Nov. 25, 2009) (authorizing minimum initial bid of $500,000, or .47% of purchase price, plus break-up fees and certain other costs and expenses of approximately $1.95 million).

57.    In addition, the Trustee intends to conduct the Auction such that each bid at the Auction is higher or otherwise better than the previous bid.  To this end, incorporating the

concept of overbids in the Bidding Procedures is reasonable under the circumstances and will enable the Trustee to maximize the value for the sale of the Debtors' assets while limiting any chilling effect on the Sale process.

**D.    The Proposed Assumption And Assignment Procedures Are Appropriate.**

58.    In connection with the Sale, the Trustee believes it is necessary to establish a process by which: (a) the Trustee and counterparties to the Available Contracts can reconcile the Cure Amounts proposed by the Trustee, if any, in accordance with § 365 of the Bankruptcy Code; and (b) the counterparties to such contracts can object to the assumption and assignment of the Available Contracts and/or related proposed Cure Amounts.  As described above, the proposed Assumption and Assignment Procedures comply with Bankruptcy Rule 2002 and provide all counterparties to Available Contracts with due and adequate notice of the potential assumption and assignment of their contracts, objection deadlines, and the time and place for the Sale Hearing.  Accordingly, the Trustee requests that the Assumption and Assignment Procedures be approved.

**E.    Approval Of The Proposed Sale Transaction Is Appropriate And In The Best Interest Of The Debtors' Estates.**

59.    In accordance with Bankruptcy Rule 6004(f)(1), sales of property rights outside the ordinary course of business may be by private sale or public auction.  The Trustee determined that a sale subject to higher and better bids and action will enable the Trustee to obtain the highest or otherwise best offer in a sale of the Debtors' Assets at this time and is in the best interests of the Debtors, their estates, and their creditors.

1.      **The Sale of Assets and Designated Contracts Free and Clear of Interests Is Authorized by Section 363(f) of the Bankruptcy Code.**

60.     The Trustee further submits that it is appropriate to sell the Assets and to assign the Designated Contracts free and clear of all Interests, other than any Assumed Obligations as set forth in the Purchase Agreement.

61.     Section 363(f) of the Bankruptcy Code authorizes a trustee to sell assets free and clear of liens, claims, interests, and encumbrances if:

      i.      applicable non-bankruptcy law permits sale of such property free and clear of such interest;

      ii.     such entity consents;

      iii.    such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      iv.     such interest is in *bona fide* dispute; or

      v.      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f).

62.     The Trustee believes that one or more of the tests of § 363(f) are satisfied with respect to the transfer of the Assets and the assignment of the Available Contracts pursuant to the Stalking Horse Purchase Agreements or an applicable purchase agreement of another Successful Bidder.  In particular, the Trustee believes that at least § 363(f)(2) of the Bankruptcy Code will be met in connection with the transactions proposed under the Stalking Horse Purchase Agreements because the Trustee expects that the Debtors' prepetition secured lenders and any other party asserting an interest in the Assets will consent to the Sale or, absent any objection to this Motion, will be deemed to have consented to the Sale.

**2.      If the Trustee Consummates the Sale of the Assets, Such Assets Should Be Sold or Assumed Free and Clear of Successor Liability**.

63.      The Successful Bidder is unlikely to be liable for any of the Debtors' liabilities as a successor to the Debtors' business or otherwise, unless the Successful Bidder expressly assumes such liabilities.   However, a provision that any sale is free and clear of successor liability relating to the Debtors' businesses, except as may be expressly assumed by the Successful Bidder pursuant to the applicable sale agreement, would ensure that any claims premised on the theory that the Successful Bidder is a successor in interest to one or more of the Debtors are directed to the proceeds of the sale, if any, and may not be asserted against the Successful Bidder.

64.      Courts have consistently held that a buyer of a debtor's assets pursuant to a Bankruptcy Code § 363 sale takes free and clear from successor liability relating to the debtor's business.   *See, e.g.*, *In re Trans World Airlines, Inc.*, 322 F.3d 283, 288–93 (3d Cir. 2003) (sale of assets pursuant to section 363(f) barred successor liability claims for employment discrimination and rights under travel voucher program); *United Mine Workers of Am. 1992 Benefit Plan v. Leckie Smokeless Coal Co. (In re Leckie Smokeless Coal Co.)*, 99 F.3d 573, 585–87 (4th Cir. 1996) (affirming the sale of debtors' assets free and clear of certain taxes); *Amphenol Corp. v. Shandler (In re Insilco Techs., Inc.)*, 351 B.R. 313, 322 (Bankr. D. Del. 2006) (stating that a 363 sale permits a buyer to take ownership of property without concern that a creditor will file suit based on a successor liability theory); *see also In re Gen. Motors Corp.*, 407 B.R. 463, 505–06 (Bankr. S.D.N.Y. 2009) (holding that "[t]he law in this Circuit and District is clear; the Court will permit GM's assets to pass to the purchaser free and clear of successor liability claims, and in that connection, will issue the requested findings and associated injunction."); *In re Chrysler LLC*, 405 B.R. 84, 111 (Bankr. S.D.N.Y. 2009) ("*[I]n personam*

claims, including any potential state successor or transferee liability claims against New Chrysler, as well as *in rem* interests, are encompassed by section 363(f) and are therefore extinguished by the Sale.").

65. The purpose of an order authorizing the transfer of assets free and clear of all liens, claims, encumbrances and all other interests would be frustrated if claimants could thereafter use the transfer as a basis to assert claims arising from the Debtors' pre-sale conduct against the Successful Bidder. Moreover, without such assurances, the Trustee would run the risk that potential bidders may not enter the Auction or, if they do, may do so with lower bid amounts than otherwise. To that end, the Successful Bidder should not be liable under any theory of successor liability relating to the Debtors' businesses, but should hold the Assets free and clear, except to the extent specifically set forth in the applicable purchase agreement.

### 3. The Stalking Horse Bidders Are Good Faith Purchasers Entitled to the Full Protections of the Bankruptcy Code.

66. The Debtors believe that the Stalking Horse Agreements have been submitted in good faith and has been, and will continue to be, negotiated in good faith and at arm's-length. Thus, the Stalking Horse Bidders are entitled to the full protections of § 363(m) of Bankruptcy Code, which provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

11 U.S.C. § 363(m).

67. While the Bankruptcy Code does not define "good faith," several Circuit Courts have determined that:

> The requirement that a purchaser act in good faith . . . speaks to the integrity of his conduct in the court of the sale proceedings. Typically, the misconduct that would destroy a purchaser's good faith status at a judicial sale involves fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders.

*In re Andy Frain Servs., Inc.*, 798 F.2d 1113, 1125 (7th Cir. 1986) (quoting *In re Rock Indus. Machinery Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 147 (3d Cir. 1986). There has been no fraud, improper insider dealing, or collusion in connection with the negotiation or submission of the Stalking Horse Agreements.

68. The Stalking Horse Bidder(s) or other Successful Bidder(s) should receive the protections afforded good faith purchasers by § 363(m) of the Bankruptcy Code. Accordingly, the Trustee requests that the Court make a finding at the Sale Hearing and in the Sale Order that the purchase agreements reached with the Stalking Horse Bidders or any other Successful Bidder(s) was at arm's-length and is entitled to the full protections of § 363(m) of the Bankruptcy Code.

**F.     Credit Bidding Should Be Authorized Under § 363(k) of the Bankruptcy Code.**

69. A secured creditor is allowed to "credit bid" the amount of its claim in a sale. Section 363(k) of the Bankruptcy Code provides, in relevant part, that unless the court for cause orders otherwise, the holder of a claim secured by property that is the subject of the sale "may bid at such sale, and, if the holder of such claim purchases such property, such holder may offset such claim against the purchase price of such property." 11 U.S.C. § 363(k). Even if a secured creditor is undersecured as determined in accordance with § 506(a) of the Bankruptcy Code, § 363(k) allows such secured creditor to bid the total face value of its claim and does not limit the credit bid to the claim's economic value. *See Cohen v. KB Mezzanine Fund II, LP (In re Submicron Sts. Corp.)*, 432 F. 3d 448, 459-60 (3d Cir. 2006) (stating that interpreting section

363(k) of the Bankruptcy Code to cap credit bids at the economic value of the underlying collateral "is theoretically nonsensical").

70.     The Bidding Procedures are consistent with the Financing Orders and the Settlement Agreement approved by the 9019 Order, that already provide the Pender Entities or their designees with the absolute right to credit bid all or a portion of their Allowed Claims under the Settlement Agreement to the fullest extent permitted by § 363(k).  As such, the Credit Bid is permissible, and the aspect of the Bidding Procedures providing for such rights should be approved.  In any event, the Trustee is not aware of any facts that would give rise to "cause" under § 363(k) of the Bankruptcy Code to restrict or deny Pender the right to credit bid its claims.

## G.     Assumption and Assignment of the Designated Contracts Is Authorized by the Bankruptcy Code.

71.     Sections 365(a) and (b) of the Bankruptcy Code authorize a trustee to assume, subject to the court's approval, executory contracts or unexpired leases of the debtor.  Under § 365(a) of the Bankruptcy Code, a trustee, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor, providing that:

> If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee—
>
> (A)     cures, or provides adequate assurance that the trustee will promptly cure, such default . . . ;
>
> (B)     compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C)    provides adequate assurance of future performance under
>        such contract or lease.

11 U.S.C. § 365(b)(1).

72.    The standard applied by courts to determine whether an executory contract or
unexpired lease should be assumed is the "business judgment" test, which requires a trustee to
determine that the requested assumption or rejection would be beneficial to the debtor's estate.
*See ReGen Capital I, Inc. v. UAL Corp.* (*In re UAL Corp.*), 635 F.3d 312, 319 (7th Cir. 2011)
("The bankruptcy court reviews the debtor's business judgment with respect to the proposed
assumption to determine if it would be beneficial or burdensome to assume the executory
contract by evaluating whether assumption would serve the reorganization or whether it would
take away funds available to other creditors.") (citing *Orion Pictures Corp. v. Showtime
Networks, Inc.* (*In re Orion Pictures Corp.*), 4 F.3d 1095, 1099 (2d Cir. 1993)); *In re Network
Access Sols., Corp.*, 330 B.R. 67, 75 (Bankr. D. Del. 2005).

**H.    Relief Under Bankruptcy Rules 6004(h) And 6006(i) Is Appropriate.**

73.    Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or
lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the
court orders otherwise." Fed. R. Bankr. P. 6004(h). Additionally, Bankruptcy Rule 6006(d)
provides that an "order authorizing the trustee to assign an executory contract or unexpired lease
. . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders
otherwise." Fed. R. Bankr. P. 6006(d). The Trustee requests that each of the Bid Procedures
Order and the Sale Order be effective immediately upon its entry by providing that the fourteen-
day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

74.    The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient
time for an objecting party to request a stay pending appeal before an order can be implemented.

*See* Fed R. Bankr. P. 6004(h), 6006(d) advisory committee's note to 1999 amendment. The stay pursuant to Bankruptcy Rule 6004(h) may be waived to allow a sale to close immediately "where there has been no objection to the procedure." *See* 10 COLLIER ON BANKRUPTCY 6004.11 (16th ed. 2016). Furthermore, if an objection is filed and overruled, and the objecting party informs the court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file an appeal. *Id.*

75. Following the Sale Hearing, the Trustee seeks to close the Sale as soon as possible in order to maximize value received for the Assets and preserve the Facilities as going concerns. The Debtors' estates are thinly capitalized and the Debtors have only been able to continue operating the Facilities to date with Pender's consent to use of cash collateral and the additional funding Pender has provided under the Financing Facility. If the Sale and related transactions do not close promptly, the Debtors may not have the resources to continue operating. Further, the Trustee believes that no other party in interest is likely to be prejudiced by the waiver of the fourteen-day stay. Accordingly, the Trustee hereby requests that the Court waive the fourteen-day stay period under Bankruptcy Rules 6004(h) and 6006(d).

## X. NOTICE

76. Notice of this Motion will be provided to: (i) the Debtors; (ii) the Office of the United States Trustee; (iii) counsel to the Pender Entities; (iv) governmental entities having a regulatory or statutory interest in these cases (v) Office of the United States Attorney for the Northern District of Texas; (vi) the Internal Revenue Service; (vi) the Texas Department of Health and Human Services; (vii) the top 20 unsecured creditors of each Debtor; (viii) all secured creditors of the Debtors; and (ix) any other arty that as requested notice pursuant to Local Rule 2002-1. The Trustee respectfully submits that no further notice of this Motion is required under the circumstances.

## XI.    CONCLUSION

77.    The Trustee respectfully requests that this Court enter the Bid Procedures Order

substantially in the form attached hereto as Exhibit A and, following the Sale Hearing, the Sale

Order substantially in the form attached hereto as **Exhibit M**, granting the relief sought herein

and granting such other and further relief as may be just and proper.

Respectfully submitted,

By:    */s/ Nancy Ribaudo*
Nancy Ribaudo, Texas Bar No. 24026066
Joseph D. Austin, Texas Bar No. 24101470
Kelly Hart & Hallman LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 878-9377
Facsimile (817) 878-9280
Nancy.Ribaudo@kellyhart.com
Joseph.Austin@kellyhart.com

*Counsel for Michael A. McConnell,
as Chapter 11 Trustee*

## CERTIFICATE OF SERVICE

I hereby certify that on October 7, 2021, I caused to be served true and correct copy of the
following document via ECF notification, where available, and via U.S. First Class Mail upon all
parties listed in the attached service list (attached to Court filed copy only).

*/s/ Nancy Ribaudo*
Nancy Ribaudo

3399053v4

## **EXHIBITS**

| | |
|---|---|
| A | Bid Procedures Order and Schedule 1 Bidding Procedures |
| B | Tandy Stalking Horse REPA |
| C | Tandy Stalking Horse OTA |
| D | Vincent Victoria Stalking Horse OTA |
| E | Tandy Sublease Agreement |
| F | Tandy Interim Management Agreement |
| G | Vincent Sublease Agreement |
| H | Vincent Interim Management Agreement |
| I | Notice of Assumption |
| J | Resident Assumption Notice |
| K | Sale Notice |
| L | Post-Auction Notice |
| M | Final Sale Order |