**EXHIBIT A**

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROMANS HOUSE, LLC,<br>26-2917877<br>2601 Tandy Avenue<br>Fort Worth, TX 76103<br><br><div align="right">Debtor.</div> | Case No.: 19-45023-ELM-11<br>Case No.: 19-45024-ELM-11<br><br>Chapter: 11 |
| IN RE:<br><br>HEALTHCORE SYSTEM<br>MANAGEMENT, LLC, 20-2708191<br>4608 E. California Parkway<br>Fort Worth, TX 76103<br><br><div align="right">Debtor.</div> | JOINTLY ADMINISTERED UNDER:<br>Case No.: 19-45023-ELM-11 |

**ORDER (A) ESTABLISHING BIDDING PROCEDURES RELATING TO
THE SALE OF SUBSTANTIALLY ALL OF DEBTORS' ASSETS, (B)
ESTABLISHING PROCEDURES RELATING TO THE ASSUMPTION
AND ASSIGNMENT OF EXECUTORY CONTRACTS AND UNEXPIRED
LEASES, (C) APPROVING FORM AND MANNER OF NOTICES
RELATING THERETO, (D) SCHEDULING A HEARING TO CONSIDER
THE PROPOSED SALE, AND (E) GRANTING RELATED RELIEF**

Upon consideration of the motion (the "Motion") of Michael A. McConnell, as chapter 11

trustee (the "Trustee") for the above-captioned debtors and debtors in possession (the "Debtors")

for, among other relief, the entry of an order (this "Order" or "Bid Procedures Order"):[1] (a)

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Motion.

approving the bidding procedures attached as **Schedule 1** (the "Bidding Procedures"), by which

the Trustee will solicit and select the highest or otherwise best offer for some or all of the Debtors'

right, title and interest in and to the assets and other interests in property proposed to be sold,

conveyed, assigned or otherwise transferred to any of the Stalking Horse Bidders (as defined

herein) pursuant to the terms of the Stalking Horse Purchase Agreements (as defined herein) (such

assets and interests in property, (the "Assets" or "Purchased Assets"); (b) authorizing and

approving procedures for the assumption and assignment of executory contracts and unexpired

leases, including notice of proposed cure amounts (the "Assumption and Assignment

Procedures"); (c) approving the form and manner of notice with respect to certain procedures,

protections, schedules, and agreements described herein; (d) approving the Trustee's selection of

the following stalking horse transactions and bidders, subject to the Trustee's consideration of

other potential Qualified Bidders and Qualified Bids (as defined in the Bidding Procedures), in

accordance with the terms of this Order:

(i) that certain *Real Estate and Asset Purchase Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit B to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy REPA") by and between the Trustee for and on behalf of Romans, as Seller, and 2601 Tandy ABL I Holdings, LLC, as Buyer (the "Tandy Buyer");

(ii) that certain *Operations Transfer Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit C to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy OTA"), by and between the Trustee for and on behalf of Romans, as Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy New Operator");

(iii) that certain *Interim Management Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit F to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy IMA"), by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy Manager");

(iv) that certain *Interim Sublease Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit E to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy Sublease"), by and between

the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as Sublandlord (the "Tandy Sublandlord");

(v) that certain *Operations Transfer Agreement (Vincent Victoria Village),* dated October __, 2021 attached as Exhibit D to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria OTA"), by and between the Trustee for and on behalf of Healthcore, as Existing Operator, and 4607 East California ABL I Operations, LLC, as New Operator (the "Vincent Victoria New Operator");

(vi) that certain *Interim Management Agreement (Vincent Victoria Village),* dated October __, 2021, attached as Exhibit H to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria IMA"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as the New Operator (the "Vincent Victoria Manager"); and

(vii) that certain *Interim Sublease Agreement (Vincent Victoria Village),* dated October __, 2021, attached as Exhibit G to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria Sublease," and together with the Tandy REPA, the Tandy OTA, the Tandy IMA, the Tandy Sublease, the Vincent Victoria OTA, and the Vincent Victoria IMA, the "Stalking Horse Purchase Agreements"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as Sublandlord (the "Vincent Victoria Sublandlord," and together with the Tandy Buyer, the Tandy New Operator, the Tandy Manager, the Tandy Sublandlord, the Vincent Victoria New Operator, and the Vincent Victoria Manager, each a "Stalking Horse Bidder" and, collectively, the "Stalking Horse Bidders");

(e) scheduling a final hearing (the "Sale Hearing") to approve the proposed Sale; and (f) granting related relief; and the Court having found that it has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334; and the Court having found that this is a core proceeding pursuant to 28 U.S.C. § 157(b)(2); and the Court having found that venue of this proceeding and the Motion in this District is proper pursuant to 28 U.S.C. §§ 1408 and 1409; and the Court having found that the relief requested in the Motion is in the best interests of the Debtors, their estates, their creditors, and other parties in interest; and the Court having found that the Trustee provided appropriate notice of the Motion and the opportunity for a hearing on the Motion under the circumstances. The Court having reviewed the Motion and having heard the statements in support of the relief requested therein at  hearing, if any, before the Court; and the Court having determined that the legal and factual bases set forth in the Motion and at the hearing establish just cause for the relief

granted herein; and upon all of the proceedings had before the Court; and after due deliberation and sufficient cause appearing therefor, **THE COURT HEREBY FINDS THAT:**

A. The findings of fact and conclusions of law herein constitute the Court's findings of fact and conclusions of law for the purposes of Bankruptcy Rule 7052, made applicable pursuant to Bankruptcy Rule 9014. To the extent any findings of facts are conclusions of law, they are adopted as such. To the extent any conclusions of law are findings of fact, they are adopted as such.

B. This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2). Venue in this Court is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

C. The statutory bases for the relief requested in the Motion are §§ 105, 363, 364, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002(a)(2), 4001, 6004, 6006, 9007, and 9014. The legal and factual bases set forth in the Motion establish just cause for the relief granted herein. Entry of this Bid Procedures Order is in the best interests of the Debtors and their respective estates, creditors, and all other parties-in-interest.

D. Notice of the Motion, hearing, and the proposed entry of this Bid Procedures Order was adequate and sufficient under the circumstances of these Chapter 11 cases, and such notice complied with all applicable requirements of the Bankruptcy Code, the Bankruptcy Rules, and the Local Rules for the Northern District of Texas. Notice of the Motion has been given to: (i) all entities known to the Trustee to have expressed an interest in a transaction with respect to some or all of the Purchased Assets during the past twelve (12) months; (ii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion; (iii) known counterparties to the Available Contracts (as defined

herein); (iv) the Debtors; (v) the Office of the United States Trustee for the Northern District of Texas; (vi) counsel to the Stalking Horse Bidders, Pender Capital Asset Based Lending Fund I, LP, Pender ABL I Holdings UBI, LLC, and Pender West Credit 1 REIT, L.L.C. (collectively, the "Pender Entities"); (vii) the Office of the United States Attorney for the Northern District of Texas; (viii) the Internal Revenue Service; (ix) the Texas Department of Health and Human Services; (x) the top 20 unsecured creditors of each Debtor; (xi) all secured creditors of the Debtors; (xii) to the extent not already included above, all parties in interest listed on the Debtors' creditor matrixes; and (m) any other party that has requested notice pursuant to Local Rule 2002-1 (collectively, the "Notice Parties").  Accordingly, no further notice of the Motion or this Bid Procedures Order is necessary or required.

E.      The Trustee has demonstrated a compelling and sound business justification for the Court to grant the relief requested in the Motion, including, without limitation: (i) approval of the Bidding Procedures; (ii) approval of the Trustee's selection of the Stalking Horse Bidders; (iii) approval of the Assumption and Assignment Procedures; (iv) approval of the form and manner of notice of all procedures, protections, schedules, and agreements described in the Motion and attached thereto; (v) the scheduling of a date for the Sale Hearing; and (vi) all related relief as set forth herein.  Such compelling and sound business justification, which was set forth in the Motion and on the record at the hearing for such Motion, are incorporated herein by reference and, among other things, form the basis for the findings of fact and conclusions of law set forth herein.

F.      Entry into the Stalking Horse Purchase Agreements with the Stalking Horse Bidders is in the best interests of the Debtors and their respective estates and creditors, and it reflects a sound exercise of the Trustee's business judgment. The Stalking Horse Purchase Agreements provide the Trustee with the opportunity to sell substantially all of the Debtors' assets

in order to preserve and realize their optimal value.

G. The Bidding Procedures, in the form attached hereto as **Schedule 1**, and incorporated herein by reference as if fully set forth in this Bid Procedures Order, are fair, reasonable, and appropriate and represent the best method for maximizing the value of the Debtors' estates.

H. The Bidding Procedures were and are a material inducement to, and express condition of, the willingness of the Stalking Horse Bidders to submit their combined bid through execution of the Stalking Horse Purchase Agreements that will serve as a minimum or floor bid on which the Trustee, the Debtors, the Debtors' creditors, suppliers, vendors, and other bidders may rely.

I. Unless it is assured that the Bidding Procedures are approved, the Stalking Horse Bidders are unwilling to be bound under the Stalking Horse Purchase Agreements (including the obligation to maintain its committed offer while such offer is subject to higher or otherwise better offers as contemplated in the Bidding Procedures). The Stalking Horse Bidders and their respective Affiliates (as defined in the Tandy Stalking Horse REPA) have provided a material benefit to the Debtors and their creditors by increasing the likelihood that the best possible purchase price for the Purchased Assets will be realized.

J. None of the Stalking Horse Bidders is an "insider" or "affiliate" of any of the Debtors, as those terms are defined in § 101 of the Bankruptcy Code, and no common identity of incorporators, directors, or controlling stakeholders exist between any Stalking Horse Bidders and any Debtor. The Bidding Procedures and the Stalking Horse Purchase Agreements were negotiated by the Trustee, the Stalking Horse Bidders, and each of their respective counsel and advisors at arms' length and in "good faith" within the meaning of Bankruptcy Code § 363(m).

K.     The Notice of Assumption, substantially in the form attached to the Motion as **Exhibit I** and incorporated herein by reference as if fully set forth in this Bid Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the potential assumption and assignment of the applicable Available Contracts in connection with the sale of the assets and the related Cure Costs, and no other or further notice is required.  The Motion, this Bid Procedures Order, and the Assumption and Assignment Procedures set forth herein are reasonably calculated to provide counterparties to any Available Contracts with proper notice of the potential assumption and assignment of their Available Contracts, the procedures in connection therewith, and any cure amounts relating thereto.

L.     The Sale Notice, substantially in the form attached to the Motion as Exhibit [__], and incorporated herein by reference as if fully set forth in this Bid Procedures Order, is appropriate and reasonably calculated to provide all interested parties with timely and proper notice of the sale of the assets, including, without limitation: (i) the date, time, and place of the Auction (if one is held); (ii) the Bidding Procedures; (iii) the deadline for filing objections to the Sale and entry of the Sale Order (as defined in the Motion), and the date, time, and place of the Sale Hearing; (iv) reasonably specific identification of the assets to be sold; (v) a description of the Sale as being free and clear of liens, claims, encumbrances, and other interests (except as may be set forth in the Sale Order and the Stalking Horse Purchase Agreements) to the fullest extent allowable under § 363(f) of the Bankruptcy Code, with all such liens, claims, encumbrances, and other interests attaching with the same validity and priority to the sale proceeds; and (vi) notice of the proposed assumption and assignment of Available Contracts to the respective Stalking Horse Bidders pursuant to their respective Stalking Horse Purchase Agreements (or to another Successful Bidder(s) arising from the Auction, if any), and no other or further notice of the Sale shall be

required.

M.      Considering all of the circumstances in these Chapter 11 Cases, the Trustee's proposed marketing and sale process has been reasonably calculated to maximize value for the benefit of all stakeholders.

**IT IS HEREBY ORDERED THAT:**

1.      The Motion is granted as provided herein.

2.      All objections to the relief requested in the Motion that have not been withdrawn, waived, or settled as announced to the Court at the hearing on the Motion or by stipulation filed with the Court, are overruled.

**I.      Timeline for the Sale**

3.      The Trustee and the Debtors are authorized to perform any obligations of the Trustee or the Debtors set forth in the Stalking Horse Purchase Agreements that are intended to be performed prior to the Sale Hearing or entry of the Sale Order. The Trustee is authorized to proceed in accordance with the Bidding Procedures and is authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures in accordance with the following timeline:

| <u>Event</u> | <u>Date / Deadline</u> |
|---|---|
| Sale Notice Service Date | Within one (1) Business Day after Entry of the Bid Procedures Order |
| Assumption Notice Date | Within one (1) Business Day after Entry of the Bid Procedures Order |
| Assumption Objection Deadline | Seven (7) days following the Assumption Notice Date |
| Bid Deadline | 12:00 noon (Central time) on October 21, 2021 |

| Auction (if necessary) | 12:00 noon (Central time) on October 22, 2021 |
|---|---|
| Sale Objection Deadline | 4:00 p.m. (Central time) on October 20, 2021 |
| Alternative Transaction Adequate Assurance Objection Deadline | Commencement of the Sale Hearing |
| Sale Reply Deadline | 12:00 noon (Central time) on October 22, 2021] |
| Sale Hearing | 1:30 p.m. (Central time) on October 25, 2021 |

4.      For the avoidance of doubt, the Trustee reserves the right, and is authorized, with the consent of the Pender Entities, to modify the above timeline and the Bidding Procedures in accordance with the provisions of the Bidding Procedures.

**II.      The Bidding Procedures**

5.      The Bidding Procedures are approved in their entirety. The Trustee and the Debtors are authorized to take any and all actions reasonably necessary or appropriate to implement the Bidding Procedures, in accordance therewith and with the Stalking Horse Purchase Agreements. The failure to specifically include or reference a particular provision of the Bidding Procedures in this Bid Procedures Order shall not diminish or impair the effectiveness of such provision, it being the intent of the Court that the Bidding Procedures be authorized and approved in their entirety.

6.      The process and requirements associated with submitting a Qualified Bid are approved as fair, reasonable, appropriate, and designed to maximize recoveries for the benefit of the Debtors' estates, creditors, and other parties in interest. As further described in the Bidding Procedures, the **Bid Deadline shall be 12:00 p.m. (Central Time) on October 21, 2021**, subject to the Bid Deadline being extended by the Trustee with the consent of Pender Entities. Any disputes or objections to the selection of Qualified Bids, Successful Bids, or Backup Bids (all as

defined in the Bidding Procedures) shall be resolved by this Court at the Sale Hearing as set forth herein.

7.      Each Stalking Horse Bidder is deemed a Qualified Bidder for all purposes, and the combined bid of the Stalking Horse Bidders as set forth in their respective Stalking Horse Purchase Agreements is deemed a Qualified Bid in all respects.  In the event that no other Qualified Bids are submitted, the Trustee shall deem the Stalking Horse Bidders to be the Successful Bidder and no Auction shall take place.

8.      The Trustee is authorized to conduct and preside over the Auction in accordance with the Bidding Procedures. **The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place starting at 12:00 p.m. (Central time) on October 22, 2021**, via Zoom or other videoconference platform, or by such other means and/or at such later date and time as the Trustee may approve with the consent of the Pender Entities. The Auction will be conducted openly and all parties in interest will be permitted to attend subject to their compliance with the notice and other procedures set forth in the Bidding Procedures.

9.      Reference is made to that certain *Settlement Agreement,* dated July 14, 2021, by and among the Trustee, and certain of the Pender Entities (the "Settlement Agreement"), attached as Exhibit 1 to the *Order Granting Chapter 11 Trustee's Motion to Approve Settlement Agreement with Pender Entities,* entered by the Court on July 30, 2021 [Dkt. No. 504].  The Stalking Horse Bidders shall have the absolute right to credit bid all or any portion of (a) the Allowed Secured Claim (as defined in the Settlement Agreement) in the amount not less than $10,953,560.80 and (b) all or any portion of the Postpetition Obligations (as defined in the Settlement Agreement). Further, in the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but

not obligated, to submit overbids, including in the form of additional or increased credit bids of any remaining value of the Allowed Secured Claim or the Postpetition Obligations.

10.     Subject to the Stalking Horse Bidders' selection as the Successful Bidder and entry of the Sale Order, for the purpose of tendering the Credit Bid Amount (as defined in the Tandy Stalking Horse REPA) in connection with the closing of the transactions set forth in the Stalking Horse Purchase Agreements, Pender Capital Asset Based Lending Fund I, LP., the current holder of the Prepetition Obligations, is hereby authorized without further notice or order of the Bankruptcy Court to assign and transfer to the Stalking Horse Bidders that portion of the Prepetition Obligations necessary to satisfy the Credit Bid Amount.

**III.    Stalking Horse Bidders, Expense Reimbursement, and Stalking Horse Purchase Agreements**

11.     The Debtors (acting by and through the Trustee) are authorized to enter into the Stalking Horse Purchase Agreements, subject to higher or otherwise better offers at the Auction. The Expense Reimbursement Amount contained in the Tandy Stalking Horse REPA is approved. The Trustee is authorized to cause the Debtors to pay any and all amounts owing to the Stalking Horse Bidders on account of the Expense Reimbursement Amount in accordance with the terms and conditions of this Bid Procedures Order and the Tandy Stalking Horse REPA upon the Debtors' consummation of an Alternative Transaction (as defined in the Tandy Stalking Horse REPA with a purchaser other than the Stalking Horse Bidders. The Expense Reimbursement Amount: (a) shall be an allowed superpriority administrative expense claim under sections 503(b) and 507 of the Bankruptcy Code for which both Debtors and their estates are liable, if triggered in accordance with the terms of this Bid Procedures Order and the Tandy Stalking Horse REPA, and (b) shall be payable in accordance with the terms of this Bid Procedures Order and the Tandy Stalking Horse REPA without further order of this Court. Except as otherwise provided in the

Tandy Stalking Horse REPA, the Debtors' obligation to pay the Expense Reimbursement Amount shall survive termination of any or all of the Stalking Horse Purchase Agreements.

**IV. Notice Procedures**

12.     The Sale Notice is approved.

**A.      Notice of Sale, Auction, and Sale Hearing**

13.      Within one (1) business day after the entry of this Bid Procedures Order, or as soon as reasonably practicable thereafter (the "Mailing Date"), the Trustee shall serve the Sale Notice by first-class mail or, for those parties who have consented to receive notice by the Electronic Case Files ("ECF") system, by ECF, upon the Notice Parties.

14.     Service of the Sale Notice as described above shall be sufficient and proper notice of the Sale with respect to known creditors and other known parties in interest.

**B.      Notice of Successful Bidder**

15.     As soon as reasonably practicable after the conclusion of the Auction (or the cancellation thereof if no Auction is necessary), the Trustee shall file on the docket, but not serve, a notice, substantially in the form attached to the Motion as **Exhibit L**, which shall identify the Successful Bidder and Backup Bidder, if any ("Notice of Successful Bidder").

**V. Assumption and Assignment Procedures**

16.     The Assumption and Assignment Procedures, which are set forth below, regarding the assumption and assignment of the executory contracts and unexpired leases proposed to be assumed by the Debtors pursuant to § 365(b) of the Bankruptcy Code and assigned to the Stalking Horse Bidders (or other Successful Bidder(s), following the Auction, if any) pursuant to § 365(f) of the Bankruptcy Code and in accordance with the Stalking Horse Purchase Agreements, as applicable, are hereby approved to the extent set forth herein.

17. **Assumption Notice**. Within one (1) business day after entry of this Order (any such date, the "Assumption Notice Date"), the Trustee shall file with the Court the Notice of Assumption and, included therewith, a list (the "Available Contracts List") that specifies: (a) each of the Debtors' executory contracts and unexpired leases that may be assumed and assigned in connection with the Sale (the "Available Contracts"), including the name of and address for each non-Debtor counterparty to such Available Contract (the "Contract Counterparty"); and (b) the proposed amount necessary, if any, to cure all monetary defaults, if any, under the Available Contract (the "Cure Costs").[2]   The Trustee shall serve, via first class mail, the Notice of Assumption, in substantially the form attached to the Motion as **Exhibit I**, on all Contract Counterparties, and **Exhibit J** on all Residents of the facilities.  Service as set forth herein shall be deemed proper, due, timely, good, and sufficient notice and no other or further notice is necessary.

18. **Assumption Objections**.  A Contract Counterparty listed on the Notice of Assumption may file an objection (an "Assumption Objection") to the proposed assumption and assignment of the applicable Available Contract, the proposed Cure Costs, if any, and the ability of the Stalking Horse Bidders to provide adequate assurance of future performance.   All Assumption Objections must: (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) **be filed and served on the following parties  on or before the date that is seven (7) days after the Assumption Notice Date (the "Assumption Objection Deadline")**: (i) the Trustee and counsel for the Trustee,

---

[2] To the extent a contract counterparty is a resident at Tandy Village or Vincent Victoria Village, the Trustee may redact their name in any filing to comply with any non-disclosure and confidentiality requirements required under applicable law, including HIPPA.

Kelly Hart & Hallman LL, 201 Main Street, Suite 2500, Fort Worth, TX 76102 (Attn: Michael A. McConnell, Nancy Ribaudo and Joseph D. Austin); (ii) counsel to the Pender Entities, (A) Benesch, Friedlander, Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801 (Attn: Michael J. Barrie and Gregory W. Werkheiser), and (B) Ross and Smith, P.C., 700 N. Pearl Street, Suite 1610, Dallas, TX 75201 (Attn: Frances Smith); and (iii) the Office of the United States Trustee for the Northern District of Texas, 1100 Commerce Street, Room 976, Dallas, TX 75242 (Attn: Erin Marie Schmidt) (collectively, the "Objection Recipients").

19.     Objections to the ability of a Successful Bidder(s) other than the Stalking Horse Bidder to provide adequate assurance of future performance (an "Adequate Assurance Objection") shall be raised by start of the Sale Hearing (the "Alternative Transaction Adequate Assurance Objection Deadline").

20.     **Supplemental Assumption Notice.**  Although the Trustee intends to make a good-faith effort to identify in the Assumption Notice all Available Contracts that may be assumed and assigned in connection with a Sale Transaction, the Trustee may discover that certain executory contracts were inadvertently omitted from the Available Contracts Notice, or the Successful Bidder may identify other executory contracts that they desire to assume and assign in connection with the Sale Transaction.  Accordingly, the Trustee reserves the right at any time after the Assumption Notice Deadline and prior to the commencement of the Sale Hearing to (i) supplement the list of Available Contracts with previously omitted Available Contracts, (ii) remove Available Contracts from the list of Available Contracts that a Successful Bidder proposes be assumed and assigned, and/or (iii) modify the previously stated Cure Cost associated with any Available Contract.  In the event the Trustee exercises any of these reserved rights, the Trustee will promptly file with the Court and serve, by overnight delivery on the applicable counterparties, a revised Assumption

Notice (a "**Supplemental Assumption Notice**"), as applicable, and such counterparties shall file any Assumption Objection not later than (a) the Assumption Objection Deadline in the event that such Supplemental Assumption Notice was filed and served at least seven (7) days prior to the Assumption Objection Deadline and (b) seven (7) days from the date such Supplemental Assumption Notice was filed and served, in the event that such Supplemental Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing. In the event that the Supplemental Assumption Notice is filed and served less than seven (7) days prior to the commencement of the Sale Hearing, the Trustee shall file with the Court a proposed order authorizing the assumption and assignment of the newly added Available Contracts no later than fourteen (14) days after the date of service of such revised Assumption Notice, which order shall provide (a) that the assumption of the proposed newly added Available Contracts is approved, final and effective, pursuant to § 365 of the Bankruptcy Code, and (b) that the Successful Bidder provided adequate assurance of future performance under such newly added Available Contract in accordance with s§365(f)(2)(B) of the Bankruptcy Code.

21.    **Assumption Objections.**    If a Contract Counterparty files an Assumption Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at the Sale Hearing, or such later hearing date that the Trustee determines in his discretion, with the consent of the Successful Bidder(s), or such other date determined by this Court.

22.    If the Contract Counterparty does not file and serve an Assumption Objection in a manner that is consistent with the requirements set forth above, (a) the Cure Costs, if any, set forth in the Notice of Assumption shall be controlling, notwithstanding anything to the contrary in any

Available Contract or any other document, and (b) the Contract Counterparty will be deemed to have consented to the assumption and assignment of the Available Contract and the Cure Costs, if any, and will be forever barred from asserting any objection with regard to such assumption and assignment, including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder; (ii) any and all defaults under such Available Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code § 365(b)(1)(A) and (B) upon payment of the Cure Costs set forth in the Assumption Notice for such Available Contract, and such counterparty shall be forever barred from asserting any objection with regard thereto; (iii) the Cure Amount set forth in the Assumption Notice for such Available Contract shall be controlling, notwithstanding anything to the contrary in such Available Contract, or any other related document, and such counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Available Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Assumption and Assignment Objections and the Sale Order; and (iv) such counterparty shall be deemed to have consented to the Transaction and to any related relief.

23.     The inclusion of an Available Contract on the Notice of Assumption (or Supplemental Assumption Notice) will not: (a) obligate the Trustee or the Debtors to assume any Available Contract listed thereon or the Stalking Horse Bidders or any other Successful Bidder(s) to take assignment of such Available Contract; or (b) constitute any admission or agreement of the Trustee or the Debtors that such Available Contract is an executory contract. Only those Available Contracts that are included on a schedule of assumed and acquired contracts and leases attached to one or more of the Stalking Horse Purchase Agreements, as applicable, at Closing (or the final

asset purchase agreement with the Successful Bidder(s) at Closing), if any (including amendments or modifications to such schedules in accordance with the Stalking Horse Purchase Agreements or asset purchase agreement, as applicable), will be assumed and assigned to the applicable Stalking Horse Bidder (or other Successful Bidder(s) following the Auction, if any).

**VI.     Replies**

24.     The Trustee and the Pender Entities shall file any replies in support of the Sale Motion, the relief requested therein, and entry of the proposed Sale Order on or before 12:00 noon (Central time) on the business day prior to the Sale Hearing.

**VII.    Sale Hearing**

25.     Sale Hearing to (a) approve the sale of the Purchased Assets to the Stalking Horse Bidders (or other Successful Bidder(s) following the Auction, if any) and (b) authorize the assumption and assignment of certain executory contracts and unexpired leases shall be held at **1:30 p.m. (Central time) on October 25, 2021,** and may be adjourned or rescheduled without further notice other than by announcement in open court on the date scheduled for the Sale Hearing or by the filing of a notice on the Court's docket. At the Sale Hearing, the Trustee will seek Bankruptcy Court approval of the Successful Bid and the Backup Bid, if any. The Sale Hearing shall be a hearing on matters relating to the Sale and there will be no further bidding at the Sale Hearing. In the event that the Successful Bidder(s) cannot or refuses to consummate the Sale, the Trustee may, in accordance with the Bidding Procedures, designate the Backup Bid to be the new Successful Bid and the Backup Bidder to be the new Successful Bidder(s), and the Trustee and the Debtors shall be authorized, but not required, to consummate the Sale Transaction with the Backup Bidder without further order of the Bankruptcy Court.

26.     Any and all objections, if any, to the Sale to the Stalking Horse Bidders (or to a Successful Bidder(s) other than the Stalking Horse Bidders) and entry of the Sale Order (a "Sale

Objection") must be filed and served on the Objection Recipients by **4:00 p.m. (Central time) on October 20, 2021** (the "Sale Objection Deadline"). Any party failing to timely file a Sale Objection will be forever barred from objecting and will be deemed to have consented to the Sale, including the transfer of the Debtors' right, title and interest in, to, and under the Purchased Assets free and clear of any and all liens, claims, interests, and encumbrances in accordance with § 363(f) of the Bankruptcy Code and the Stalking Horse Purchase Agreements or other definitive agreement for the Sale.

## VIII.    Miscellaneous

27.    The Trustee and the Debtors are authorized to take all actions necessary to effectuate the relief granted pursuant to this Bid Procedures Order.

28.    This Bid Procedures Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

29.    This Bid Procedures Order shall be binding on, among others, the Debtors, the Trustee, and any successor chapter 11 trustee or any chapter 7 trustee or other fiduciary appointed or elected for the estates of the Debtors.

30.    Those provisions of this Bid Procedures Order that relate to the Expense Reimbursement shall inure to the benefit of the Stalking Horse Bidders and its affiliates, successors, and assigns.

31.    The Stalking Horse Bidders shall have standing to appear and be heard in connection with all proceedings regarding the sale of the Purchased Assets in the Chapter 11 Cases, including the conduct of the Auction and the interpretation of the Bidding Procedures.

32.    The rights of parties in interest to object to the Court's approval of any sale are preserved.  The entry of this Bid Procedures Order and the approval of the Bidding Procedures shall not be deemed a waiver of such rights.

33.     To the extent any of the deadlines set forth in this Bid Procedures Order do not comply with the Local Rules, such Local Rules are waived and the terms of this Bid Procedures Order shall govern.

34.     This Court shall retain jurisdiction with respect to all matters arising from or related to the implementation or interpretation of this Bid Procedures Order, including, but not limited to, any matter, claim, or dispute arising from or relating to the Bidding the Stalking Horse Purchase Agreements, and the implementation of this Bid Procedures Order.

35.     Notwithstanding the possible applicability of Bankruptcy Rules 6004, 6006, 7062, or 9014 (or otherwise), the terms and conditions of this Order shall be immediately effective and enforceable.

## Schedule 1 to Bid Procedures Order

### [Bidding Procedures]

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROMANS HOUSE, LLC,<br>26-2917877<br>2601 Tandy Avenue<br>Fort Worth, TX  76103<br><br>                                Debtor. | Case No.:     19-45023-ELM-11<br>Case No.:     19-45024-ELM-11<br><br>Chapter:     11 |
| IN RE:<br><br>HEALTHCORE SYSTEM<br>MANAGEMENT, LLC, 20-2708191<br>4608 E. California Parkway<br>Fort Worth, TX  76103<br><br>                                Debtor. | JOINTLY ADMINISTERED UNDER:<br>Case No.:     19-45023-ELM-11 |

## BIDDING PROCEDURES

Romans House, LLC ("Romans"), and Healthcore Management System, LLC ("Healthcore," and together, the "Debtors") have filed chapter 11 cases pending in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court"), jointly administered under Case No. 19-45023-ELM (the "Chapter 11 Cases").

On May 14, 2021, the Court entered an Order [Dkt. No. 441] directing the United States Trustee for Region 6 (the "U.S. Trustee") to appoint a chapter 11 trustee for the Debtors.  Also, on May 14, 2021, the U.S. Trustee filed a notice [Dkt. No. 442] of the appointment, subject to Court approval, of Michael A. McConnell as the chapter 11 trustee for the Debtors and their estates (the "Trustee") and an application [Dkt. No. 444] requesting the Court's approval of such appointment. By Order entered on May 17, 2021  [Dkt. No. 445], the Court approved the Trustee's appointment.

On October 7, 2021, the Trustee filed the *Trustee's Motion To Approve (I)(A) Procedures For The Sale Of Substantially All Of Debtors' Assets, (B) Procedures For To The Assumption And Assignment Of Executory Contracts And Unexpired Leases, (C) Selection Of A Stalking Horse Bidder, (D) Scheduling An Auction If Necessary And Sale Hearing (E)Approving Form And Manner Of Notices Relating Thereto And, (II)(A) Approving The Sale Of Substantially All Of Debtors' Assets, (B) Authorizing The Assumption And Assignment Of Executory Contracts And Unexpired Leases, And (C) Granting Related Relief* [Dkt. No. [_____]] (the "Motion").

On October 7, 2021, the Bankruptcy Court entered the *Order (A) Establishing Bidding Procedures Relating to the Sale of Certain of the Debtors' Assets, Including Approving an Expense Reimbursement, (B) Establishing Procedures Relating to the Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, (C) Approving Form and Manner of Notice*

*Relating Thereto, (D) Scheduling a Hearing to Consider the Proposed Sale, and (E) Granting Related Relief* [Dkt. No. [_____]] (the "Bid Procedures Order"), by which the Bankruptcy Court approved the following procedures (the "Bidding Procedures") in connection with the sales and related transactions (collectively, the "Sale") set forth in:

(i) that certain *Real Estate and Asset Purchase Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit B to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy REPA"), by and between the Trustee for and on behalf of Romans, as Seller, and 2601 Tandy ABL I Holdings, LLC, as Buyer (the "Tandy Buyer");

(ii) that certain *Operations Transfer Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit C to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy OTA"), by and between the Trustee for and on behalf of Romans, as Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy New Operator");

(iii) that certain *Interim Management Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit F to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy IMA"), by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy Manager");

(iv) that certain *Interim Sublease Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit E to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy Sublease"), by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as Sublandlord (the "Tandy Sublandlord");

(v) that certain *Operations Transfer Agreement (Vincent Victoria Village),* dated October __, 2021 attached as Exhibit D to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria OTA"), by and between the Trustee for and on behalf of Healthcore, as Existing Operator, and 4607 East California ABL I Operations, LLC, as New Operator (the "Vincent Victoria New Operator");

(vi) that certain *Interim Management Agreement (Vincent Victoria Village),* dated October __, 2021, attached as Exhibit H to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria IMA"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as the New Operator (the "Vincent Victoria Manager"); and

(vii) that certain *Interim Sublease Agreement (Vincent Victoria Village),* dated October __, 2021, attached as Exhibit G to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Vincent Victoria Sublease," and together with the Tandy REPA, the Tandy OTA, the Tandy IMA, the Tandy Sublease, the Vincent Victoria OTA, and the Vincent Victoria IMA, the "Stalking Horse Purchase Agreements"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations,

LLC, as Sublandlord (the "<u>Vincent Victoria Sublandlord</u>," and together with the Tandy Buyer, the Tandy New Operator, the Tandy Manager, the Tandy Sublandlord, the Vincent Victoria New Operator, and the Vincent Victoria Manager, each a "<u>Stalking Horse Bidder</u>" and, collectively, the "<u>Stalking Horse Bidders</u>").

Capitalized terms used but not defined in these Bidding Procedures have the meanings given to them in the Stalking Horse Purchase Agreements, as applicable. These Bidding Procedures set forth the process by which the Trustee is authorized to conduct an auction (the "<u>Auction</u>") for the Sale of the Purchased Assets.

## I.      Submissions to the Trustee.

All submissions to the Trustee required to be made under these Bidding Procedures must be directed to the Trustee and his counsel as follows:

> *The Trustee:*
> Michael A. McConnell, as Chapter 11 Trustee
> KELLY HART & HALLMAN LLP
> 201 Main Street, Suite 2500
> Fort Worth, Texas 76102
> email:  Michael.McConnell@kellyhart.com
>
>           -and-
>
> *The Trustee's Counsel:*
> Nancy Ribaudo
> Joseph D. Austin
> KELLY HART & HALLMAN LLP
> 201 Main Street, Suite 2500
> Fort Worth, Texas 76102
> email:  Nancy.Ribaudo@kellyhart.com
>             Joseph.Austin@kellyhart.com

## II.     Potential Bidders.

To participate in the bidding process or otherwise be considered for any purpose under these Bidding Procedures, a person or entity interested in consummating a Sale (each, a "<u>Potential Bidder</u>") must deliver or have previously delivered:

(a)      an executed confidentiality agreement on terms acceptable to the Trustee (a "<u>Confidentiality Agreement</u>"); and

(b)      if requested by the Trustee, the most current audited and latest unaudited financial statements (collectively, the "<u>Financials</u>") of the Potential Bidder (or, if the Potential Bidder is an entity formed for the purpose of acquiring the Purchased Assets, (i) Financials of the equity

holder(s) of the Potential Bidder or such other form of financial disclosure as is acceptable to the Trustee and his advisors, (ii) a written commitment acceptable to the Trustee and his advisors of the equity holder(s) of the Potential Bidder to be responsible for the Potential Bidder's obligations in connection with the applicable Sale, and (iii) copies of any documents evidencing any financing commitments necessary to consummate the transaction.

## III.  **Qualified Bidders.**

(a)  A "Qualified Bidder" is a Potential Bidder: (i) whose Financials, or the Financials of its equity holder(s), as applicable, demonstrate the financial capability to consummate the Sale, as determined in the Trustee's reasonable business judgment; and (ii) whose Bid (as defined below) is a Qualified Bid (as defined below). On or before the date that is one (1) business day after the Bid Deadline (defined below), the Trustee's advisors will notify each Potential Bidder in writing whether such Potential Bidder is a Qualified Bidder, and shall provide a copy of each Qualified Bid to counsel to the Stalking Horse Bidders. The Stalking Horse Bidders shall be deemed a Qualified Bidder that has submitted a Qualified Bid at all times.

(b)  For the avoidance of doubt, two or more Potential Bidders may submit a Bid for any or all of the Purchased Assets, provided that such Bid(s), when taken as a whole (collectively, a "Joint Bid"), is determined by the Trustee, in accordance with Section 3(a) of these Bidding Procedures, to constitute a Qualified Bid; *provided, however,* that any Joint Bid must comply with section 363(n) of the Bankruptcy Code and Potential Bidders must first seek the Trustee's permission before they contact each other.

(c)  If any Potential Bidder is determined by the Trustee not to be a Qualified Bidder, the Trustee will refund such Potential Bidder's Deposit (as defined below) and all accumulated interest thereon on or within three (3) business days after the Bid Deadline.

(d)  Between the date that the Trustee notifies a Potential Bidder that it is a Qualified Bidder and the Auction, the Trustee may discuss, negotiate, or seek clarification of any Qualified Bid from a Qualified Bidder. Except as otherwise set forth in the Stalking Horse Purchase Agreements, without the written consent of the Trustee, a Qualified Bidder may not modify, amend, or withdraw its Qualified Bid, except for proposed amendments to increase the consideration contemplated by, or otherwise improve the terms of, the Qualified Bid, during the period that such Qualified Bid remains binding as specified in these Bidding Procedures; *provided* that any Qualified Bid may be improved at the Auction as set forth herein. Any improved Qualified Bid must continue to comply with the requirements for Qualified Bids set forth in these Bidding Procedures. Bids must remain open offers capable of being accepted until entry of the Sale Order or, in the case of a Backup Bid, until the Backup Bidder closes the Sale transaction.

(e)  Any disputes related to these Bidding Procedures shall be resolved by the Bankruptcy Court.

IV. **Due Diligence.**

A. **Diligence Provided to Potential Bidders.**

Only Potential Bidders that have entered into a Confidentiality Agreement shall be eligible to receive due diligence information and access to additional non-public information regarding the Debtors and their respective property. No Potential Bidder will be permitted to conduct any due diligence without entering into a Confidentiality Agreement. The Trustee will provide to each Potential Bidder that has entered into a Confidentiality Agreement reasonable due diligence information, as requested by such Potential Bidder in writing, as soon as reasonably practicable after such request. For all Potential Bidders other than the Stalking Horse Bidders, the due diligence period will end on the Bid Deadline and subsequent to the Bid Deadline, the Debtors shall have no obligation to furnish any due diligence information.

The Trustee shall not furnish any confidential information relating to the Purchased Assets, the Debtors' liabilities, or the Sale ("Confidential Sale Information") to any person, except to a Potential Bidder that has entered into a Confidentiality Agreement or to such Potential Bidder's duly-authorized representatives, in each case, to the extent provided in the applicable Confidentiality Agreement. The Trustee and his advisors shall coordinate all reasonable requests from Potential Bidders for additional information and due diligence access; *provided* that the Trustee may decline to provide such information to Potential Bidders who, at such time and in the Trustee's reasonable business judgment have not established, or who have raised doubt, that such Potential Bidder intends in good faith to, or has the capacity to, consummate the Sale.

The Trustee also reserves the right to withhold from Potential Bidders any diligence materials that the Trustee determines are sensitive or otherwise not appropriate for disclosure to a Potential Bidder who the Trustee determines is a competitor of the Debtors or is affiliated with any competitor of the Debtors. Neither the Trustee nor his representatives shall be obligated to furnish information of any kind whatsoever to any person that is not approved by the Trustee as a Potential Bidder.

All due diligence requests must be directed to the Trustee's counsel using the contact information provided above.

B. **Diligence Provided by Potential Bidders.**

Each Potential Bidder shall comply with all reasonable requests for additional information and due diligence access requested by the Trustee or his advisors regarding the ability of the Potential Bidder to consummate the Sale. Failure by a Potential Bidder to comply with such reasonable requests for additional information and due diligence access may be a basis for the Trustee to determine that such Potential Bidder is not a Qualified Bidder or that a bid made by such Potential Bidder is not a Qualified Bid.

The Trustee and his advisors and representatives shall be obligated to maintain in confidence any confidential information in accordance with any applicable confidentiality agreement, except as otherwise set forth in these Bidding Procedures. Each recipient of confidential information agrees to use, and to instruct their advisors and representatives to use, such confidential information only in connection with the evaluation of Bids during the bidding

process or otherwise in connection with the Chapter 11 Cases or in accordance with the terms of any applicable confidentiality agreement.

Notwithstanding the foregoing and the provisions contained in any applicable Confidentiality Agreement, the Trustee and the Trustee's advisors may disclose confidential information: (a) with the prior written consent of such bidder; and (b) as otherwise required or allowed by any applicable confidentiality agreement with respect to a particular bidder or other agreement, law, court or other governmental order, or regulation, including, as appropriate, to regulatory agencies.

## V.  Bid Requirements.

A proposal, solicitation, or offer (each, a "Bid") by a Qualified Bidder that is submitted in writing and satisfies each of the following requirements (collectively, the "Bid Requirements"), as determined by the Trustee in his reasonable business judgment shall constitute a "Qualified Bid." For the avoidance of doubt, notwithstanding the following, the Stalking Horse Purchase Agreements will be deemed a Qualified Bid and the Stalking Horse Bidders will be deemed Qualified Bidders for all purposes and at all times. The form of a Bid must include proposed definitive transaction documents in substantially the form of the Stalking Horse Purchase Agreements, as applicable (each a, "Bid Agreement" and collectively, the "Bid Agreements") duly executed by the Potential Bidder and must also include a redline comparing any Bid Agreements to the corresponding Stalking Horse Purchase Agreements.

(a)     **Assets.** Each Bid must provide for the purchase of all or substantially all of the Purchased Assets, and must clearly state (i) which assets the Qualified Bidder is agreeing to purchase, (ii) whether the Potential Bidder intends to operate all or a portion of the Debtors' business as a going concern, or to liquidate the business, and (iii) if such Bid contemplates the discontinuation of operations at either or both of the Tandy Village or Vincent Victoria Village assisted living facilities, describe in detail (A) what steps the bidder proposes to take in order to relocate the current residents and to transfer or otherwise properly dispose of confidential medical records concerning such facilities' current and former residents, each in accordance with applicable state and federal law and (B) how the expenses associated with the activities described in clause (A) would be funded.

(b)     **Assumption of Liabilities.** Each Bid must expressly identify the liabilities it proposes to (i) assume or (subject to the terms hereof) or (ii) satisfy with cash consideration.

(c)     **Form of Bid Consideration.** Each Bid must clearly set forth the amount of the total consideration to be provided to the Debtors, including and identifying separately any cash and non-cash components; *provided, however*, that any Bid providing for a non-cash component must be accompanied by cash component which is sufficient to repay in full, in cash at closing (i) all of the "Postpetition Obligations"[1] through a repayment in full and termination of the

---

[1]     As defined in the *Settlement Agreement,* dated July 14, 2021, by and among the Trustee, Pender Capital Asset Based Lending Fund I, LP, Pender ABL I Holdings UBI, LLC, and Pender West Credit 1 REIT, L.L.C. (as amended, the "Settlement Agreement"), attached as Exhibit 1 to the *Order Granting Chapter 11 Trustee's Motion to Approve Settlement Agreement with Pender Entities,* entered by the Court on July 29, 2021 [Dkt. No. 504].

Postpetition Financing Facility and (ii) the portion of the "Prepetition Obligations"[2] that the Stalking Horse Bidders have Credit Bid (as defined below) as the "Credit Bid Amount" pursuant to the Tandy Stalking Horse REPA. The Bid must confirm that such consideration is not subject to any contingencies.

(d) **Minimum Bid.** Each Bid must provide for a Purchase Price equal to or greater than (i) [$4,550,000], which is the aggregate of the cash and Credit Bid Amount purchase price components set forth in the Tandy Stalking Horse REPA, *plus* (ii) the amount necessary to repay in full the "Postpetition Obligations", *plus* (iii) [$200,000] on account of the Expense Reimbursement, *plus* the minimum overbid amount of [$100,000] (the "Minimum Bid Amount").

(e) **Deposit.** With its Bid, each Potential Bidder must submit by wire transfer of immediately available funds, a cash deposit in the amount equal to the greater of (x) [$275,000 or (y) six percent (6%)] of the aggregate Purchase Price set forth in the Bid, to be held in an interest bearing escrow account to be identified and established by the Trustee (the "Deposit").

(f) **Same or Better Terms.** Each Bid must be on terms that are not more burdensome to the Trustee and the Debtors than the terms of the Stalking Horse Purchase Agreements, as determined by the Trustee. Each Bid must include duly executed, noncontingent transaction documents necessary to effectuate the Sale and shall include a schedule of executory contracts and unexpired leases proposed to be assumed by the Debtors and assigned to the Qualified Bidder, and a copy of the Stalking Horse Purchase Agreements clearly marked to show all changes requested by the Qualified Bidder, including those related to the respective Purchase Price and assets to be acquired by such Qualified Bidder, as well as all other material documents integral to such bid and a written commitment demonstrating to the satisfaction of the Trustee that the Qualified Bidder will be able to close the transaction proposed in its Bid on the terms and conditions set forth therein (the "Qualified Bid Documents").

(g) **Designation of Assigned Contracts and Leases.** A Bid must identify any and all executory contracts and unexpired leases of the Debtors that the bidder wishes to be assumed and assigned to the bidder at closing pursuant to a Sale, subject to modification as set forth in the Qualified Bid Documents (as defined below).

(h) **Contingencies; No Financing or Diligence Outs.** A Bid shall not be conditioned on (i) obtaining financing, (ii) shareholder, board of directors, or other internal approval, or (iii) the outcome or completion of a due diligence review by the Potential Bidder. Notwithstanding the foregoing, a Bid may be subject to (i) the accuracy at the closing of the Sale of specified representations and warranties or (ii) the satisfaction at the closing of the Sale of specified conditions, which shall not be more burdensome to the Trustee and the Debtors, as determined by the Trustee, than those set forth in the Stalking Horse Purchase Agreements.

(i) **Identity.** Each Bid must fully disclose the identity of each entity that will be bidding or otherwise participating in connection with such Bid (including each equity holder or other financial backer of the Potential Bidder if such Potential Bidder is an entity formed for the purpose of consummating the Sale), and the complete terms of any such participation. Under no

---

[2]    As defined in the Settlement Agreement.

circumstances shall any undisclosed principals, equity holders, or financial backers be associated with any Bid. Each Bid must also include contact information for the specific persons and counsel whom the Trustee and his advisors should contact regarding such Bid. Each Bid must also disclose any past or present connections or agreements with the Trustee, the Debtors, the Stalking Horse Bidders, any other Potential Bidder or Qualified Bidder and its affiliates, and/or any officer or director of the foregoing (including any current or former (within 5 years) officer, director or manager of the Debtors).

(j)     **Demonstrated Financial Capacity.** A Qualified Bidder must have, in the Trustee's reasonable business judgment, the necessary financial capacity to consummate the proposed transactions required by its Bid and provide adequate assurance of future performance under all contracts proposed to be assumed by such Bid. Each Bid must be accompanied by reasonable evidence of the Qualified Bidder's ability to operate the business related to the Purchased Assets and include a packet of information, including financial information that will be provided to the non-Debtor counterparties to Assumed Contracts sufficient to demonstrate adequate assurance of future performance.

(k)     **Committed Financing.** To the extent that a Bid is not accompanied by evidence of the Potential Bidder's capacity to consummate the sale set forth in its Bid with cash on hand, each Bid must include executed unconditional committed financing from a qualified source documented to the satisfaction of the Trustee, which demonstrates that the Potential Bidder has received sufficient debt and/or equity funding commitments to satisfy the Potential Bidder's Purchase Price and other obligations under its Bid. Such funding commitments or other financing must be unconditional and must not be subject to any internal approvals, syndication requirements, diligence, or credit committee approvals, and shall have covenants and conditions acceptable to the Trustee.

(l)     **Binding and Irrevocable.** A Qualified Bid must include a signed writing stating that the Qualified Bid is irrevocable until the later of (i) two (2) business days after the closing of the Sale(s) of all or substantially all of the Purchased Assets to another Qualified Bidder, and (ii) thirty (30) days after entry of the Sale Order (as defined in the Motion).

(m)     **Expenses; Disclaimer of Fees.** Each Bid (other than the Stalking Horse Purchase Agreements) must disclaim any right to receive a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation. For the avoidance of doubt, no Potential Bidder (other than the Stalking Horse Bidders) will be permitted to request, nor be granted by the Trustee or the Debtors, at any time, whether as part of the Auction or otherwise, a break-up fee, expense reimbursement, termination fee, or any other similar form of compensation, and by submitting its Bid is agreeing to refrain from and waive any assertion or request for reimbursement on any basis, including under section 503(b) of the Bankruptcy Code.

(n)     **Authorization.** Each Bid must contain evidence that the Potential Bidder has obtained authorization or approval from its board of directors (or a comparable governing body acceptable to the Trustee) with respect to the submission of its Bid and the consummation of the transactions contemplated in such Bid.

(o)     **As-Is, Where-Is.** Each Bid must include a written acknowledgement and representation that the Potential Bidder: (i) has had an opportunity to conduct any and all due diligence regarding the Purchased Assets prior to submitting the Bid; (ii) has relied solely upon its own independent review, investigation, and/or inspection of any documents and/or the Purchased Assets in making its Bid; and (iii) did not rely upon any written or oral statements, representations, promises, warranties, or guaranties whatsoever, whether express, implied by operation of law, or otherwise, regarding the Purchased Assets or the completeness of any information provided in connection therewith or the Auction, except as expressly stated in the Bid.

(p)     **Adherence to Bidding Procedures.** By submitting its Bid, each Potential Bidder is agreeing to abide by and honor the terms of these Bidding Procedures and agrees not to submit a Bid or seek to reopen the Auction after conclusion of the Auction. Each Bid must expressly state that the Potential Bidder agrees to serve as a Backup Bidder (as defined below) if such bidder's Qualified Bid is selected as the next highest or otherwise next best bid after the Successful Bid.

(q)     **Regulatory Approvals and Covenants.** A Bid must set forth each regulatory and third-party approval needed to consummate the Sale and the time period within which the Potential Bidder expects to receive such regulatory and third-party approvals (and in the case that receipt of any such regulatory or third-party approval is expected to take more than thirty (30) days following execution and delivery of the asset purchase agreement, those actions the Qualified Bidder will take to ensure receipt of such approvals as promptly as possible). A Bid must also state that all necessary filings under applicable regulatory, antitrust, and other laws will be made and that payment of the fees associated therewith shall be made by the Potential Bidder.

(r)     **Consent to Jurisdiction.** Each Potential Bidder must submit to the jurisdiction of the Bankruptcy Court and waive any right to a jury trial in connection with any disputes relating to Debtors' qualification of Bids, the Auction, the construction and enforcement of these Bidding Procedures, the Sale documents, and the closing of the Sale, as applicable.

(s)     **Bid Deadline.** Each Bid must be transmitted via email (in .pdf or similar format) so as to be **actually received on or before 12:00 p.m. (Central time) on October 21, 2021** (the "Bid Deadline") by the Trustee and his counsel.

The Trustee reserves the right to work with any Potential Bidder in advance of the Auction to cure any deficiencies in a Bid that is not initially deemed to be a Qualified Bid. The Trustee may accept a single Qualified Bid or multiple Bids for non-overlapping material portions of the Debtors' assets that, if taken together in the aggregate, would otherwise meet the standards for a single Qualified Bid. The Trustee may also permit otherwise Qualified Bidders who submitted Bids by the Bid Deadline for a material portion of the Debtors' assets but who are not identified as a component of a single Qualified Bid consisting of multiple Bids, to participate in the Auction and to submit higher and/or otherwise better Bids that in subsequent rounds of bidding may be considered, together with other Bids for non-overlapping portions of the Debtors' assets, as part of such a single Qualified Bid.

## VI.     Right to Credit Bid.

In connection with the Sale and at the Auction, the Stalking Horse Bidders, shall have the right to make credit bids (each a "Credit Bid") in accordance with this Section VI and the Bid Procedures Order.  Reference is made to that certain *Settlement Agreement,* dated July 14, 2021, by and among the Trustee, Pender Capital Asset Based Lending Fund I, LP, Pender ABL I Holdings UBI, LLC, and Pender West Credit 1 REIT, L.L.C. (the "Settlement Agreement").[3] The Stalking Horse Bidders shall have the absolute right to credit bid all or any portion of the Allowed Secured Claim (as defined in the Settlement Agreement) in the amount of $10,953,560.80 and all or any portion of the Postpetition Obligations (as defined in the Settlement Agreement).   Further, in the event of a competing Qualified Bid, the Stalking Horse Bidders will be entitled, but not obligated, to submit overbids, including in the form of additional or increased credit bids of any remaining value of the Allowed Secured Claim or the Postpetition Obligations.

## VII.    Auction.

If the Trustee receives a Qualified Bid, other than the Stalking Horse Purchase Agreements, the Trustee will conduct an Auction to determine the Successful Bidder(s). The Trustee shall notify the Stalking Horse Bidders if one or more Qualified Bids are received and the identity of the bidders making any such Qualified Bids. To the extent that the Stalking Horse Bidders have not previously received a copy of any Bid, the Trustee shall promptly provide a copy thereof, or copies thereof, as the case may be, to the Stalking Horse Bidders, and prior to a determination by the Trustee as to whether a Bid is a Qualified Bid. If the Trustee does not receive a Qualified Bid (other than the Stalking Horse Purchase Agreements), the Trustee will not conduct an Auction and shall designate the Stalking Horse Bidders' Bid as the Successful Bid.

On the date that is one (1) business day after the Bid Deadline or such other time as is reasonably practicable, but not later than 12:00 noon (Central time) on the day before the Auction, the Trustee will notify each Qualified Bidder of the highest or otherwise best Qualified Bid, as determined in the Debtors' sole business judgment (the "Baseline Bid"), and provide copies of the applicable Qualified Bid Documents supporting the Baseline Bid to each Qualified Bidder. The determination of which Qualified Bid constitutes the Baseline Bid and which Qualified Bid constitutes the Successful Bid shall take into account any factors the Trustee reasonably deem relevant to the value of the Qualified Bid to the Debtors' estates, which may include, among other things: (a) the number, type, and nature of any changes to the applicable Stalking Horse Purchase Agreements, if any, requested by the Qualified Bidder, including the type and amount of Purchased Assets sought to be acquired and obligations sought to be assumed in the Qualified Bid; (b) the amount and nature of the total consideration; (c) the likelihood of the Qualified Bidder's ability to close the applicable Sale and the timing thereof; (d) the net economic effect of any changes to the value to be received by the Debtors' estates from the transaction contemplated by the Qualified Bid Documents; and (e) the tax consequences of such Qualified Bid (collectively, the "Bid Assessment Criteria"). Only the Stalking Horse Bidders and other Qualified Bidders will be entitled to make any subsequent bids at the Auction. At least one (1) business day prior to the Auction, each Qualified Bidder who has timely submitted a Qualified Bid must inform the Debtors

---

[3]     See footnote 1 *supra*.

whether it intends to attend the Auction and all Qualified Bidders wishing to attend the Auction must have at least one individual representative with authority to bind such Qualified Bidder in attendance at the Auction. **The Auction, to the extent that an Auction is necessary under the Bidding Procedures, shall take place at 12:00 p.m. (Central time) on October 21, 2021,** or at such later date and time as the Trustee may approve with the consent of the Pender Entities. The Auction shall be held by Zoom or other videoconference platform, and all entities entitled to attend the Auction shall receive instructions on attending the Auction via videoconference on or before the date of the Auction.

Except as provided herein, only the Trustee, the Debtors, Qualified Bidders, the U.S. Trustee, Susan Goodman (in her capacity as the Patient Care Ombudsman), the Texas Health and Human Services Commission, and each of their respective legal and financial advisors shall be entitled to attend the Auction. Only Qualified Bidders shall be entitled to bid at the Auction. Bids at the Auction will be transcribed. Other creditors of the Debtors and parties in interest in the Chapter 11 Cases may observe the Auction (collectively, "Other Interested Parties"), but only if such other Interested Party has made a timely written request (which request shall identify the Other Interested Party seeking to observe the auction and provide names, titles, and email addresses for its proposed auction attendees) to the Trustee so that such request is received by the Trustee's counsel (at the contact information listed above) at least three (3) business days prior to the initial scheduled date and time of the Auction. Each such Other Interested Party shall be limited to a maximum of two Auction attendees on its behalf.

### A.      The Trustee Will Conduct the Auction, If Any.

The Trustee and his professionals shall direct and preside over the Auction. At the start of the Auction, the Trustee (or his counsel) shall describe the terms of the Baseline Bid. All incremental Bids basis, and all material terms of each Overbid shall be fully disclosed to all other Qualified Bidders who submitted Bids. The Trustee shall maintain a written transcript of all Bids made and announced at the Auction, including the Baseline Bid, all applicable Overbids, and the Successful Bid.

The Auction will be conducted openly and, subject to compliance with the procedures set forth herein, all creditors and parties in interest in the Chapter 11 Cases will be permitted to attend in accordance with the procedures set forth herein.

### B.      Terms of Overbids.

As used herein, "Overbid" means any bid made at the Auction by a Qualified Bidder (or Qualified Bidders in the event of a permitted Joint Bid) subsequent to the Trustee's announcement of the Baseline Bid. Each Overbid must comply with the following conditions:

1.      **Minimum Overbid Increment.** The initial Overbid, if any, shall provide for total consideration to the Debtors with a value that exceeds the value of the consideration under the Baseline Bid by an incremental amount that is not less than the $100,000 (a "Minimum Overbid Increment"). Additional consideration in excess of the amount set forth in the applicable Baseline Bid must consist of cash payable at the closing of the transactions that are the subject of such Overbid; *provided, however,*

that the Stalking Horse Bidders shall be entitled to make its Overbids in the form of Credit Bids up to the full amount of value that the Stalking Horse Bidders has available to Credit Bid in accordance with the terms and conditions set forth in the Bid Procedures Order and these Bidding Procedures.

2.    **Conclusion of Each Overbid Round.** Upon the solicitation of each round of applicable Overbids, the Trustee may announce a deadline (as the Trustee may, in his reasonable business judgment, extend from time to time, the "Overbid Round Deadline") by which time any Overbids must be submitted to the Trustee.

3.    **Overbid Alterations.** An applicable Overbid may contain alterations, modifications, additions, or deletions of any terms of the Bid no less favorable to the Debtors' estates than any prior Bid or Overbid, as determined in the Trustee's reasonable business judgment, but shall otherwise comply with the terms of these Bidding Procedures. Any Overbid must comply with the conditions for a Qualified Bid.

4.    **Announcing Highest Bid.** Subsequent to each Overbid Round Deadline, the Trustee shall announce whether the Trustee has identified in the initial applicable Overbid round, an Overbid as being higher or otherwise better than the Baseline Bid for the Purchased Assets, or in subsequent rounds, the Overbid previously designated by the Trustee as the prevailing highest or otherwise best Bid for the Purchased Assets (the "Prevailing Highest Bid"). The Trustee shall describe to all Qualified Bidders the material terms of any new Overbid designated by the Trustee as the Prevailing Highest Bid as well as the value attributable by the Debtors to such Prevailing Highest Bid.

C.    **Closing the Auction.**

The Auction shall continue until there is only one Bid, as applicable, that the Trustee determines, in his reasonable business judgment, is the highest or otherwise best Bid. Such Bid or Joint Bid, as applicable, shall be declared the "Successful Bid," and such Qualified Bidder (or Qualified Bidders, in the event of a Joint Bid) the "Successful Bidder(s)," at which point the Auction will be closed. The Auction shall not close unless and until all Qualified Bidders have been given a reasonable opportunity to submit an Overbid at the Auction to the then Prevailing Highest Bid. Such acceptance by the Trustee of the Successful Bid is conditioned upon approval by the Bankruptcy Court of the Successful Bid.

The Trustee shall not consider any Bids or Overbids submitted after the conclusion of the Auction, and any such Bids or Overbids shall be deemed untimely and shall under no circumstances constitute a Qualified Bid.

As soon as reasonably practicable after closing the Auction, the Trustee shall file on the docket, but not serve, a notice, which shall identify the Successful Bidder(s) and Backup Bidder.

### D.    No Collusion; Good-Faith Offer.

Each Qualified Bidder participating at the Auction will be required to confirm on the record at the Auction that: (i) it has not engaged in any collusion with respect to the bidding; and (ii) its Bid is a good-faith offer and it intends to consummate the Sale if selected as the Successful Bidder(s). All Potential Bidders and all Qualified Bidders will immediately disclose to the Trustee and the U.S. Trustee any discussions regarding employment of or offers to retain or employ any officer or insider of the Trustee or the Debtors.

## VIII.   Backup Bidder.

(a)    Notwithstanding anything in these Bidding Procedures to the contrary, if an Auction is conducted, the Qualified Bidder with the next-highest or otherwise second-best Bid at the Auction, as determined by the Trustee in his discretion (the "Backup Bid"), shall be required to serve as a backup bidder (the "Backup Bidder"), and each Qualified Bidder shall agree and be deemed to agree to be the Backup Bidder if so designated by the Trustee.

(b)    The identity of the Backup Bidder and the amount and material terms of the Backup Bid shall be announced by the Trustee at the conclusion of the Auction at the same time the Trustee announces the identity of the Successful Bidder(s). The Backup Bidder shall be required to keep its Bid (or if the Backup Bidder submits one or more Overbids at the Auction, its final Overbid) open and irrevocable, until the closing of the Sale with the Successful Bidder(s). The Backup Bidder's Deposit shall be held in escrow until the closing of the transaction with the Successful Bidder(s) and shall thereafter be returned within five (5) business days.

(c)    If a Successful Bidder(s) fails to consummate the approved transactions contemplated by its Successful Bid, the Trustee may select the applicable Backup Bidder as the Successful Bidder(s), and such Backup Bidder shall be deemed a Successful Bidder(s) for all purposes. The Trustee and the Debtors will be authorized, but not required, to consummate all transactions contemplated by the Backup Bid without further order of the Bankruptcy Court or notice to any party.  In such case, the defaulting Successful Bidder(s)'s Deposit shall be forfeited to the Trustee (for the Debtors' estates). The Trustee specifically reserves the right to seek all available remedies against the defaulting Successful Bidder(s), including with respect to specific performance.

(d)    Notwithstanding anything to the contrary in this Section VIII or the Bid Procedures Order, if the Stalking Horse Bidders are required to serve as Backup Bidder, the terms and conditions of such service shall be governed by the Stalking Horse Purchase Agreements.

## IX.    Reservation of Rights.

Without prejudice to the rights of the Stalking Horse Bidders under the terms the Stalking Horse Purchase Agreements, or the rights of any rights of the Postpetition Lender in respect of any sale-related milestones set forth in Financing Orders or the Financing Term Sheet attached thereto, the Trustee reserves his rights to modify these Bidding Procedures in his reasonable business judgment in any manner that will best promote the goals of the bidding process, or impose, at or prior to the Auction, additional customary terms and conditions on the sale of the Purchased Assets, including, without limitation: (a) extending the deadlines set forth in these Bidding

Procedures; (b) adjourning the Auction at the Auction and/or adjourning the Sale Hearing in open court without further notice; (c) adding procedural rules that are reasonably necessary or advisable under the circumstances for conducting the Auction; (d) canceling the Auction; and (e) rejecting any and all bids or Bids (other than the Stalking Horse Bidders' Bid as set forth in the Stalking Horse Purchase Agreements.

## X.    Sale Hearing.

A hearing to consider approval of the Sale of the Purchased Assets to the Successful Bidder(s) (or to approve the Stalking Horse Purchase Agreements if no Auction is held) (the "Sale Hearing") is currently scheduled to take place at **1:30 p.m. (Central time) on October 25, 2021**, before the Honorable Edward L. Morris, via Webex, as follows:

- Hearing link: https://us-courts.webex.com/meet/morris

- WebEx Hearing Instructions may be obtained from Judge Morris' hearing/calendar site by clicking the following link: https://www.txnb.uscourts.gov/judges-info/hearing-dates/judge-morris-hearing-dates-0.

**The Sale Hearing may be continued to a later date by the Trustee by sending notice prior to, or making an announcement at, the Sale Hearing. No further notice of any such continuance will be required to be provided to any party.**

At the Sale Hearing, the Trustee shall present the Successful Bid to the Bankruptcy Court for approval.

## XI.    Return of Deposit.

The Deposit of the Successful Bidder(s) shall be applied to the Purchase Price of the transaction at closing. The Deposits for each Qualified Bidder shall be held in one or more interest-bearing escrow accounts on terms acceptable to the Trustee in his reasonable business judgment and shall be returned (other than with respect to the Successful Bidder(s) and the Backup Bidder) on or within five (5) business days after the Auction.

If the Successful Bidder(s) fails to consummate the Sale because of a breach by the Successful Bidder(s), the Trustee will not have any obligation to return the Deposit deposited by the Successful Bidder(s), which may be retained by the Trustee for the Debtors' estates as liquidated damages, in addition to any and all rights, remedies, or causes of action that may be available to the Trustee or the Debtors (and subject to the Stalking Horse Purchase Agreements, as to the Stalking Horse Bidders), and the Trustee shall be free to consummate the Sale with the Backup Bidder without the need for an additional hearing or order of the Bankruptcy Court, in which case the Backup Bidder's Deposit shall be applied to the Purchase Price.

## XII.    Fiduciary Out.

Nothing in these Bidding Procedures shall require the Trustee to take any action, or to refrain from taking any action, with respect to these Bidding Procedures, to the extent the Trustee determines, based on the advice of counsel, that taking such action, or refraining from taking such

action, as applicable, is required to comply with applicable law or their fiduciary obligations under applicable law; *provided* that in the event of any such action, all rights and remedies of the Stalking Horse Bidders in these Bidding Procedures, the Stalking Horse Purchase Agreements, and/or applicable law shall be reserved and preserved.

3417598.2

# EXHIBIT B

## REAL ESTATE AND ASSET PURCHASE AGREEMENT

### (Tandy Village)

THIS REAL ESTATE AND ASSET PURCHASE AGREEMENT (this "Tandy REPA"), is entered into as of the _____ day of _____, 2021 (the "Contract Date"), by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Seller" or "Romans"), and 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company ("Buyer," and together with Seller, the "Parties").

## RECITALS

A.      Seller is a debtor under Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") having filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 9, 2019 (the "Petition Date"), in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court").

B.      By Order entered on December 23, 2019 [Dkt. No. 28], the Bankruptcy Court directed that Seller's bankruptcy case be jointly administered with the bankruptcy case of Seller's affiliate, Healthcore System Management, LLC ("Healthcore," and with Seller, the "Debtors"), under Case No. 19-45023-ELM (the "Bankruptcy Cases").

C.      On May 14, 2021, the Bankruptcy Court entered an Order [Dkt. No. 441] directing the United States Trustee for Region 6 (the "U.S. Trustee") to appoint a chapter 11 trustee for both Debtors. Also, on May 14, 2021, the U.S. Trustee filed a notice [Dkt. No. 442] of the appointment, subject to Bankruptcy Court approval, of Michael A. McConnell as the Trustee and an application [Dkt. No. 444] requesting the Court's approval of such appointment. By Order entered on May 17, 2021 [Dkt. No. 445], the Bankruptcy Court approved the Trustee's appointment.

D.      Seller is the owner of the land and the improvements located thereon commonly known as 2601 Tandy Avenue, Fort Worth, Texas 76103, and consisting of an assisted living facility operating under the name "Tandy Village Assisted Living" (the "Facility"). The current operator of the Facility is Romans.

E.      Prior to the Petition Date, Pender West Credit 1 REIT, L.L.C. ("Original Lender") and the Debtors entered into and consummated a series of related transactions to, among other benefits provided to the Debtors, enable Romans to refinance and retire certain existing indebtedness (such transactions, the "March 2019 Refinancing"). The March 2019 Refinancing included the Original Lender's provision to Romans of a senior secured loan facility (the "Prepetition Loan Facility") in the original principal amount of $9,450,000.00, which loan was made to Romans, as Borrower, by Original Lender, as Lender, pursuant to the terms of that certain Loan Agreement, dated as of March __, 2019 (as modified, amended, or supplemented, the "Prepetition Loan Agreement"). In connection with the Prepetition Loan Facility, Original Lender and Romans executed and delivered various other documents and agreements, including documents granting and perfecting the Prepetition Liens (as defined below) securing the payment and performance of Romans' obligations thereunder and agreements and documents relating to or

evidencing any other indebtedness of Romans in connection with the Prepetition Loan Facility (collectively, as modified, amended, or supplemented, the "Prepetition Loan Documents")

F.    On or about December 15, 2020, the Original Lender executed that certain *Transfer and Assignment of Note, Lien and Other Documents* (the "Transfer Agreement")*,* pursuant to which Original Lender transfer and assigned to Pender Capital Asset Based Lending Fund I, LP. ("Current Lender"), an affiliate of the Original Lender, *inter alia,* all of Original Lender's right, title and interest in and to the Promissory Note, the other obligations of the RH Debtor identified therein, and the Security Instruments (as defined therein and described on Schedule I thereto). The Transfer Agreement has been recorded by the Tarrant County, Texas Clerk in Official Public Records, as Document No. D221028892 in connection with the First Lien DOT and Document No. D221028892 in connection with the Second Lien DOT (together, the "Recorded Transfer Agreements"). In addition, to evidence the assignments, amendments to the previously filed and recorded UCC-1 financing statements were duly executed, filed, and recorded for the benefit of the Current Lender. In addition, on February 23, 2021, in accordance with Fed. R. Bankr. P. 3001(e)(2), Current Lender filed and served that certain *Notice of Transfer of Claim Other Than for Security* [Dkt. No. 279] (the "Transfer Notice," and collectively, with the Transfer Agreements and the Recorded Transfer Agreements, the "Transfer Documents") in the RH Debtor's bankruptcy case. The time for objections to the Transfer Notice has expired with no objections thereto having been filed.

G.    Simultaneously herewith, the Trustee, for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, a Delaware limited liability company ("Tandy New Operator"), the Tandy OTA providing for, among other things, the orderly transfer of operations of the Facility and the sale of certain related assets to Tandy New Operator on the Tandy Operation Transfer Date.

H.    Upon entry of the Sale Order, the Trustee, for and on behalf of Romans, and Tandy New Operator will enter into the Tandy Interim Management Agreement for the orderly operation of the Facility by Romans between the Tandy Interim Contract Date and the Tandy Operation Transfer Date.

I.    At the REPA Closing, the Trustee, for and on behalf of Romans, and Tandy New Operator will enter into the Tandy Interim Sublease for continued operation of the Facility by Romans between the REPA Closing Date and the Tandy Operation Transfer Date.

J.    Also simultaneously herewith, Healthcore, and 4607 East California ABL I Operations, LLC, have entered into the Vincent OTA, providing for, among other things, the orderly transfer of operations of the Vincent Victoria Village assisted living facility and the sale of certain related assets to 4607 East California ABL I Operations, LLC.

K.    Upon entry of the Sale Order, the Trustee, for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC will enter into the Vincent Interim Sublease and the Vincent Interim Management Agreement for the orderly operation of the Vincent Victoria Village assisted living facility by Healthcore between the Vincent Interim Contract Date and the Vincent Operation Transfer Date.

L.     Subject to the approval of the Bankruptcy Court and the other terms and conditions set forth herein, Seller desires to sell, transfer and assign to Buyer, and Buyer desires to buy, acquire and assume from Seller pursuant to, *inter alia*, Sections 105 and 363 of the Bankruptcy Code, the Acquired Assets (as defined herein) on the terms and conditions set forth in this Tandy REPA.

NOW, THEREFORE, the Parties agree as follows:

1.     <u>Certain Definitions</u>.

A.     "<u>9019 Order</u>" means the Bankruptcy Court's Order Granting Chapter 11 Trustee's Motion to Approve Settlement Agreement with Pender Entities, entered on the docket of the Bankruptcy Cases on July 30, 2021 [Dkt. No. 504].

B.     "<u>9019 Motion</u>" means the motion was filed as Dkt. No. 487 on July 14, 2021.

C.     "<u>Action</u>" means any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which Liability, if any, or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Entity.

D.     "<u>Affiliate</u>" means, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

E.     "<u>Alternative Transaction</u>" means any transaction (or series of transaction), whether direct or indirect, concerning a sale, merger, lease, acquisition, issuance, financing, recapitalization, reorganization, liquidation or disposition of Seller or any portion of the equity interests or any material portion of the assets thereof (in any form of transaction, whether by merger, sale of assets or equity or otherwise).

F.     "<u>Acquired Assets</u>" shall have the meaning ascribed to it in Section 2 of this Tandy REPA.

G.  "Assigned Contracts" means the contracts and leases of the Debtors to be assumed by the applicable Debtor and assigned to Buyer in accordance with the terms of the Tandy OTA or the Vincent OTA, as applicable.

H.  "Assumed Liabilities" shall have the meaning set forth in Section 3 of this Tandy REPA.

I.  "Assumed Tarrant County Tax Liabilities" means Seller's Liability to Tarrant County, Texas for ad valorem property Taxes arising out of Seller's ownership of the Real Property and any taxable furniture, fixtures equipment, or personal property located at the Real Property.

J.  "Auction" shall have the meaning ascribed to such term in the Bidding Procedures Order.

K.  "Backup Bidder" shall have the meaning set forth in Section 13A(v) of this Tandy REPA

L.  "Bankruptcy Cases" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

M.  "Bankruptcy Code" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

N.  "Bankruptcy Court" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

O.  "Bidding Procedures Order" means an Order substantially in the form agreed to by the Trustee and the Pender Entities attached as Exhibit G.

P.  "Buyer" shall mean 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company

Q.  "Chosen Courts" shall have the meaning set forth in Section 27 of this Tandy REPA.

R.  "Claim" has the meaning ascribed to the term "claim' in Section 101(5) of the Bankruptcy Code.

S.  "Contract Date" shall have the meaning set forth in the opening paragraph of this Tandy REPA.

T.  "Credit Bid Amount" shall have the meaning set forth in Section 5A of this Tandy REPA.

U.  "Credit Bid Portion" shall have the meaning set forth in Section 5A of this Tandy REPA.

15079507 v4

V.      "Current Lender" shall mean Pender Capital Asset Based Lending Fund I, L.P.

W.      "Debtors" has the meaning ascribed to such term in the recitals to this Tandy REPA.

X.      "Deeds" shall have the meaning set forth in Section 8 of this Tandy REPA.

Y.      "Due Diligence Period" shall have the meaning set forth in Section 9.A. of this Tandy REPA.

Z.      "Encumbrance" means any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrance of any kind.

AA.     "Environmental Laws" means all applicable Laws concerning pollution or protection of the environment or concerning public or worker health or safety (with respect to exposure to Hazardous Substances), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, control, or cleanup of any Hazardous Substances.

BB.     "Excluded Liabilities" shall have the meaning set forth in Section 4 of this Tandy REPA.

CC.     "Excluded Personal Property" means Seller's Personal Property (as defined herein) described in Exhibit B to this Tandy REPA.

DD.     "Excluded Liabilities" shall have the meaning set forth in Section 4 of this Tandy REPA.

EE.     "Existing Survey" shall have the mean set forth Section 6C of this Tandy REPA.

FF.     "Expense Reimbursement Amount" means the dollar amount equal to the lesser of (a) [$200,000] and (b) the aggregate amount of all reasonable and documented out of pocket costs, expenses and fees incurred by any Pender Entity in connection with any Stalking Horse Purchase Agreement or any transaction contemplated hereby and thereby, as applicable, in connection with evaluating, negotiating, documenting and performing the transactions contemplated by this Tandy REPA or any other Stalking Horse Purchase Agreement, including fees, costs and expenses of any professionals (including financial advisors, outside legal counsel, accountants, experts

5

and consultants) retained by any Pender Entity in connection with or related to the authorization, preparation, investigation, negotiation, execution and performance of this Tandy REPA or any other Stalking Horse Purchase Agreement, the transactions contemplated hereby or thereby, including the Chapter 11 Cases and other judicial and regulatory proceedings related to such transactions, which amount shall constitute an administrative expense priority claim under Section 503(b)(1)(A) and Section 507(a)(2) of the Bankruptcy Code against each of the Debtors and shall be payable as set forth in Section 13.B.

GG.     "Facility" shall mean Tandy Village Assisted Living.

HH.     "Financing Order" or "Financing Orders" means, as applicable, (a) that certain Amended Interim Order (I) Authorizing Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, (IV) Scheduling a Final Hearing; and (V) Granted Related Relief, entered by the Bankruptcy Court on the docket of the Bankruptcy Cases on July 14, 2021 [Dkt. No. 485], (b) that certain Final Order (I) Authorizing Post-Petition Financing, (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granted Related Relief, entered by the Bankruptcy Court on the docket of the Bankruptcy Cases on July 30, 2021 [Dkt. No. 503] (the "Final Financing Order"), and (c) any additional interim orders or Final Orders of the Bankruptcy Court, in form and substance acceptable to Buyer, authorizing and approving the Postpetition Financing Facility (as defined in the Final Financing Order).".

II.     "Final Order" means an order or judgment of the Bankruptcy Court (or any other court of competent jurisdiction) entered by the clerk of the Bankruptcy Court (or such other court) on the docket in the Bankruptcy Cases (or the docket of such other court), which has not been modified, amended, reversed, vacated or stayed and as to which (i) the time to appeal, petition for certiorari, or move for a new trial, reargument or rehearing has expired and as to which no appeal, petition for certiorari or motion for new trial, reargument or rehearing shall then be pending or (ii) if an appeal, writ of certiorari new trial, reargument or rehearing thereof has been sought, such order or judgment of the Bankruptcy Court (or other court of competent jurisdiction) shall have been affirmed by the highest court to which such order was appealed, or certiorari shall have been denied, or a new trial, reargument or rehearing shall have been denied or resulted in no modification of such order, and the time to take any further appeal, petition for certiorari or move for a new trial, reargument or rehearing shall have expired, as a result of which such order shall have become final in accordance with Rule 8002 of the Federal Rules of Bankruptcy Procedure; provided that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Bankruptcy Code, may be filed relating to such order, shall not cause an order not to be a Final Order.

6

JJ.    "<u>Governmental Entity</u>" shall mean any (a) federal, state, county or municipal government, or city, town, borough, village, district or other jurisdiction; (b) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); and (c) anybody exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

KK.    "<u>Hazardous Substance</u>" means any substance, material or waste defined, listed, regulated or characterized as "toxic," "hazardous," a "pollutant" or a "contaminant" under or pursuant to any Environmental Laws or which could form the basis of any liability under Environmental Laws because of its dangerous or deleterious properties or characteristics, including petroleum and its by-products, asbestos, polychlorinated biphenyls, per- and polyfluoroalkyl substances, explosives, radioactive materials, and solid wastes that pose imminent and substantial endangerment to health or the environment.

LL.    "<u>Health Care Laws</u>" means: (a) all Applicable Laws related to billing or submission of claims, reimbursement or fraud and abuse including, without limitation, (i) the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), (ii) the federal Physician Self-Referral Prohibition (commonly referred to as the "Stark Law")(42 U.S.C. § 1395nn), (iii) the federal False Claims Act (31 U.S.C. §§ 3729 et seq.), (iv) the federal Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), (v) the federal Exclusion Laws (42 U.S.C.§ 1320a-7), (vi) the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), (vii) 42 U.S.C. § 1320a-7k(d), (viii) the regulations promulgated pursuant to each of the foregoing statutes, and (ix) applicable state Laws similar to any of the foregoing; (b) all Applicable Laws related to medical records and patient privacy and security, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (42 U.S.C. §§ 1320d-1320d-9), and its implementing regulations, including the Standards for Electronic Transaction and Code Set (45 C.F.R. Parts 160 and 162), the Standards for Privacy of Individually Identifiable Health Information (45 C.F.R. Parts 160 and 164), the Security Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and 164), and Breach Notification for Unsecured Protected Health Information Rules (45 C.F.R. Parts 164.402 through 164.408), and any similar state laws; (c) the Patient Protection and Affordable Care Act (Pub. L. 111−148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111−152), and the regulations promulgated pursuant to each of the foregoing; (d) Medicaid (Title XIX of the Social Security Act), as amended and the regulations promulgated thereunder, including, without limitation, all conditions of participation; (e) all Applicable Laws related to the obtaining or maintenance of any

15079507 v4

License required for the operation of the Facility; and (f) Applicable Laws regulating the ownership and operation of an assisted living facility or assets used in connection therewith.

MM. "<u>Healthcore</u>" has the meaning ascribed to such term in the recitals to this Tandy REPA.

NN. "<u>Improvements</u>" shall have the meaning set forth in Section 2 of this Tandy REPA.

OO. "<u>Indemnified Party</u>" shall have the meaning set forth in Section 31 of this Tandy REPA.

PP. "<u>Indemnifying Party</u>" shall have the meaning set forth in Section 31 of this Tandy REPA.

QQ. "<u>Liability</u>" or "<u>Liabilities</u>" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

RR. "<u>License</u>" shall have the meaning set forth in Section 14.B.v. of this Tandy REPA.

SS. "<u>Loan Agreement Indebtedness</u>" means all Prepetition Obligations outstanding as of the Contract Date under the Prepetition Loan Agreement and the other Prepetition Loan Documents, including all interest due and owing thereunder and all accrued and unpaid fees and expenses. As of the Contract Date, the Loan Agreement Indebtedness is held by Current Lender in an amount not less than ten million nine hundred fifty-three thousand five hundred sixty dollars ($10,953,560).

TT. "<u>March 2019 Refinancing</u>" shall have the meaning as set forth in Recitals Section E of this Tandy REPA.

UU. "<u>Original Lender</u>" shall mean Pender West Credit 1 REIT, L.L.C.

VV. "<u>Outside Back-Up Date</u>" means the date that is twenty-one (21) days after the date of the Sale Hearing (as defined in the Bidding Procedures Order).

WW. "<u>Outside Date</u>" shall have the meaning set forth in Section 17A.(ii) of this Tandy REPA.

8

XX.     "Parties" has the meaning ascribed to such term in the recitals to this Tandy REPA.

YY.     "Pender Entities" means Pender Capital Asset Based Lending Fund I, LP, Pender ABL I Holdings UBI, LLC, Pender West Credit 1 REIT, L.L.C., Buyer, 4607 East California ABL I Operations, LLC, 2601 Tandy ABL I Holdings, LLC, Operating Company: 2601 Tandy ABL I Operations, LLC, and each of their respective Affiliates.

ZZ.     "Permitted Designee" shall have the meaning set forth in Section 19B.

AAA.    "Permitted Encumbrances" means (i) Encumbrances on account of the Assumed Tarrant County Tax Liabilities; (ii) statutory Encumbrances for Taxes not yet due or payable; (iii) with respect to the Real Property, easements, rights of way and similar non-monetary Encumbrances (that would be disclosed by an accurate survey of the real property and otherwise affecting title to the Real Property) which do not, individually or in the aggregate, adversely affect the use or occupancy of such Real Property as it relates to the Acquired Assets; (iv) applicable zoning laws, building codes, land use restrictions and other similar restrictions imposed by law which are not violated by the current use or occupancy, or the current or previous use or occupancy in the ordinary course, of such Real Property; (v) materialmans', mechanics', artisans', shippers', warehousemans' or other similar common law or statutory liens incurred in the ordinary course and securing obligations incurred by the Trustee as Chapter 11 Trustee for Seller on or after May 17, 2021 and prior to the REPA Closing Date for amounts not yet due or payable; (vi) such other Encumbrances or title exceptions as Buyer may approve in writing in its sole discretion; (vii) the general printed exceptions contained in the title policy; (viii) all other exceptions and limitations disclosed in the Title Commitment and not objected to by Buyer pursuant to Section 6.A; (ix) all matters shown on the Existing Survey (as defined in Section 6(c)); and (x) any Encumbrances that will be removed or released by operation of the Sale Order with no Liability to Buyer or any Pender Entity.

BBB.    "Person" shall mean an individual, partnership, corporation, business trust, limited liability company, limited partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Entity.

CCC.    "Personal Property" shall have the meaning set forth in Section 2.

DDD.    "Petition Date" has the meaning ascribed to such term in the recitals to this Tandy REPA.

EEE.    "Pre-REPA Closing Tax Period" means any Tax period ending on or before the REPA Closing Date and with respect to any taxable period that includes

9

but does not end on the REPA Closing Date, the portion thereof ending on the REPA Closing Date

FFF. "<u>Prepetition Loan Agreement</u>" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

GGG. "<u>Prepetition Loan Documents</u>" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

HHH. "<u>Prepetition Loan Facility</u>" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

III. "<u>Prepetition Obligations</u>" means (i) the due and punctual payment of (a) the principal of and interest and default interest on loans and extensions of credit made pursuant to the Prepetition Loan Agreement, when and as due, whether at maturity, by acceleration, upon one or more dates set for prepayment or otherwise, and (b) all other monetary obligations of Romans, as, as borrower, and Healthcare, as an additional obligor, under the Prepetition Loan Agreement and/or any other Prepetition Loan Document, including fees, costs, expenses and indemnities, whether primary, secondary, direct, contingent, fixed or otherwise, and (ii) the due and punctual performance of all other obligations of the Debtors under or pursuant to the Prepetition Loan Agreement and/or any Prepetition Loan Document.

JJJ. "<u>Property" and "Properties</u>" shall have the meaning set forth in Section 2 of this Tandy REPA.

KKK. "<u>Property Conditions</u>" shall have the meaning set forth in Section 9E of this Tandy REPA.

LLL. "<u>Purchase Price</u>" shall have the meaning as set forth in Section 5A of this Tandy REPA.

MMM. "<u>Recorded Transfer Agreement</u>" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

NNN. "<u>Release</u>" means actual or threatened spilling, leaking, pumping, pouring, releasing, emitting, emptying, discharging, injecting, escaping, dumping, disposing, depositing, dispersing, leaching or migrating of any Hazardous Substance into or through the indoor or outdoor environment.

OOO. "<u>REPA Closing</u>" shall have the meaning set forth in Section 15 of this Tandy REPA.

PPP. "<u>REPA Closing Date</u>" shall have the meaning set forth in Section 15 of this Tandy REPA.

10

QQQ. "Representatives" shall have the meaning set forth in Section 9D of this Tandy REPA.

RRR. "Romans" shall mean Romans House, LLC d/b/a Tandy Village Assisted Living.

SSS. "Sale and Bidding Procedures Motion" means the motion in form and substance satisfactory to Buyer and the Trustee, each in their reasonable discretion, to be filed by the Trustee with the Bankruptcy Court seeking the following relief from the Bankruptcy Court: (a) authorization of the sale of the assets to be acquired pursuant to the Stalking Horse Sale Agreements to the Buyer (or its designee(s) thereunder) or, if not to the Buyer or to a Successful Bidder (as defined in the Bidding Procedures Order), as applicable, free and clear of all Encumbrances and other interests, other than Permitted Encumbrances, (b) approval of the Stalking Horse Sale Agreements or, if the Buyer is not the Successful Bidder, the proposed purchase agreements between Trustee on behalf of the Debtors and the Successful Bidder, (c) authorization of Trustee and the Debtors to cause the REPA Closings under the Stalking Horse Sale Agreements (or other applicable agreements if the Buyer is not the Successful Bidder) to occur as soon as practicable after the entry of the Sale Order, (d) because the Pender Entities have expended considerable time and expense in connection with the Stalking Horse Sale Agreements and the negotiation thereof, and the identification and quantification of assets to be included in the transactions that are the subject of the Stalking Horse Sale Agreements, approval of the Expense Reimbursement Amount as an administrative priority expense under Sections 503(b)(1)(A) and 507(a)(2) of the Bankruptcy Code, (e) entry of the Bidding Procedures Order (including approval of the Bidding Procedures annexed thereto), and (f) related relief.

TTT. "Sale Order" means an order of the Bankruptcy Court approving and authorizing the sale of the Acquired Assets to Buyer substantially in the form attached as Exhibit H hereto, with such changes as may be required by the Bankruptcy Court that are in form and substance satisfactory to Buyer.

UUU. "Seller" shall mean Romans House, LLC d/b/a Tandy Village Assisted Living.

VVV. "Seller Indemnities" shall have the meaning set forth in Section 9B of this Tandy REPA.

WWW. "Settlement Agreement" means that certain Settlement Agreement, dated July 14, 2021, annexed to the 9019 Motion, as such agreement may be amended from time to time in accordance with its terms.

XXX. "Stalking Horse Sale Agreements" means this Tandy REPA, the Tandy OTA, and the Vincent OTA.

11

YYY. "Sublessee" shall mean Romans House, LLC d/b/a Tandy Village Assisted Living.

ZZZ. "Sublessor" shall mean 2016 Tandy ABL I Operations, LLC, a Delaware limited liability company.

AAAA. "Tandy Interim Contract Date" means the date on which Trustee, for and on behalf of Romans, and Tandy New Operator enter into the Tandy Interim Management Agreement.

BBBB. "Tandy Interim Management Agreement" means that certain Interim Management Agreement dated _____, 2021 by and between the Trustee for and on behalf of Romans, as existing operator, and Tandy New Operator, as interim manager.

CCCC. "Tandy Interim Sublease" means that certain Interim Sublease dated _____, 2021 by and between the Trustee for and on behalf of Romans, as sublessee, and 2601 Tandy ABL I Operations, LLC, as sublessor.

DDDD. "Tandy New Operator" shall mean 2016 Tandy ABL I Operations, LLC, a Delaware limited liability company.

EEEE. "Tandy Operation Transfer Date" shall mean the date of REPA Closing of the transactions contemplated under the Tandy OTA.

FFFF. "Tandy OTA" means that certain Operations Transfer Agreement (Tandy Village), dated _____, 2021, by and between the Trustee for and on behalf of Romans, as existing operator, and 2601 Tandy ABL I Operations, LLC, as new operator.

GGGG. "Tandy REPA" shall mean this Real Estate and Asset Purchase Agreement.

HHHH. "Tax" or "Taxes" means any federal, state, local, or foreign tax or other duty, fee, assessment or other charge in the nature of taxes of any kind whatsoever (whether imposed directly or through withholding and whether or not disputed) including income, gross receipts, capital, capital stock, franchise, profits, withholding, social security, unemployment, disability, real property, ad valorem/personal property, inventory, license, payroll, employment, social security, severance, intangibles, environmental, customs duties, stamp, excise, occupation, sales, use, transfer, value added, import, export, alternative minimum or estimated tax, including any interest, penalty, additions to tax or additional amounts with respect thereto (or attributable to the nonpayment thereof).

IIII. "Title Commitments" shall have the meaning as set forth in Section 6A of this Tandy REPA.

12

JJJJ. "Title Company" means_____.

KKKK. "Title Policies" shall have the meaning set forth in Section 5B of this Tandy REPA.

LLLL. "Transfer Agreement" shall mean that certain Transfer and Assignment of Note, Lien and Other Documents executed by the Original Lender dated December 15, 2020.

MMMM. "Transfer Documents" has the meaning ascribed to such term in the recitals to this Tandy REPA.

NNNN. "Transfer Notice" has the meaning ascribed to such term in the recitals to this Tandy REPA.

OOOO. "Trustee" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

PPPP. "U.S. Trustee" has the meaning ascribed to such term in the Recitals of this Tandy REPA.

QQQQ. "Vincent OTA" means that certain Operations Transfer Agreement (Vincent Victoria Village), dated July __, 2021, by and between the Trustee for and on behalf of Healthcore, as the existing operator, and 4607 East California ABL I Operations, LLC, as the new operator.

RRRR. "Vincent Interim Contract Date" means the date that Trustee, for an on behalf of Healthcore, and 4607 East California ABL I Operations, LLC enter into the Vincent Interim Management Agreement and the Vincent Interim Sublease.

SSSS. "Vincent Interim Management Agreement" means that certain Interim Management Agreement dated _____, 2021 by and between the Trustee for and on behalf of Healthcore, as existing operator, and 4607 East California ABL I Operations, LLC, as interim manager.

TTTT. "Vincent Interim Sublease" means that certain Interim Sublease dated _____, 2021 by and between the Trustee for and on behalf of Romans, as sublessee, and 4607 East California ABL I Operations, LLC, as sublessor.

UUUU. "Vincent Operation Transfer Date" shall mean the date of REPA Closing of the transactions contemplated under the Vincent OTA.

VVVV. "Willful Breach" means material breach of this Tandy REPA that is a consequence of an act or failure to act with the actual knowledge that the taking of the act or failure to act would result in a material breach of this Tandy REPA.

13

2.    <u>Purchase and Sale of Acquired Assets</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, at the REPA Closing, Seller shall sell, transfer, assign, convey, and deliver to Buyer, and Buyer shall purchase, acquire, and accept from Seller, all of Seller's right, title and interest in and to (A) the parcel of land described in <u>Exhibit A</u> attached hereto (the "<u>Land</u>"), together with (i) the Facility and all other improvements located thereon ("<u>Improvements</u>"), (ii) all rights, benefits, privileges, easements, tenements, and appurtenances thereon or in anywise appertaining thereto, and (iii) without warranty, all right, title, and interest of Sellers, if any, in and to any land lying in the bed of any street, road or alley, open or proposed, adjoining such Land (each, a "<u>Property</u>" and, collectively, the "<u>Properties</u>"); and (B) all tangible and intangible personal property owned by Sellers and used in connection with the ownership and/or operation of the Properties (the "<u>Personal Property</u>," and collectively, with the Land, the Improvements, and the Properties, the "<u>Acquired Assets</u>"), other than the Excluded Personal Property, as of the REPA Closing, free and clear of all Encumbrances other than Permitted Encumbrances.

3.    <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the REPA Closing, Buyer shall assume from Seller (and from and after the REPA Closing pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Seller shall convey, transfer, and assign to Buyer only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Seller), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the REPA Closing (collectively, the "<u>Assumed Liabilities</u>"):

    A.    The Assumed Tarrant County Tax Liabilities; and

    B.    All Liabilities, if any, set forth on <u>Exhibit C</u> of this Tandy REPA.

The assumption by Buyer of any Assumed Liability shall not, in any way, expand the rights of any third party relating thereto.

4.    <u>Excluded Liabilities</u>. Except as expressly provided in this Tandy REPA as to the Assumed Liabilities or in the Sale Order, Buyer shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Seller or relating to the Acquired Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the REPA Closing Date (as herein defined) or arising thereafter as a result of any act, omission, or circumstances taking place prior to the REPA Closing, other than the Assumed Liabilities, and Seller shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "<u>Excluded Liabilities</u>"):

    A.    all Liabilities arising out of, relating to or otherwise in respect of the Acquired Assets or the operation of the business of Seller arising on or prior to the REPA Closing;

B.     all Liabilities to the extent relating to or otherwise arising, whether before, on or after the REPA Closing, out of, or in connection with, any of the Excluded Personal Property;

C.     all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Seller or any of its Affiliates (including, for the avoidance of doubt, any Action related to malpractice, fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Seller or any of its Affiliates, or any of their respective directors, officers, managers, or employees), or related to the Acquired Assets, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the REPA Closing Date (including any breach, default, failure to perform, torts related to performance, violations of law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Entity or other person or entity, and whether commenced, filed, initiated, or threatened prior to, on or following the REPA Closing;

D.     all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-REPA Closing Tax Period, (ii) owed by Seller (whether or not relating to a Pre-REPA Closing Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which Seller (or any Affiliate thereof) is obligated under or a party to, and (iii) Taxes arising from or in connection with any Excluded Personal Property, in each case, other than to the extent such Tax is an Assumed Tarrant County Tax Liability;

E.     all Liabilities of Seller arising under or pursuant to Health Care Laws except to the extent arising as a result of the management of the Facility by Tandy New Operator after the REPA Closing pursuant to the Tandy Interim Management Agreement; and

F.     all Liabilities of Seller arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Seller (including the Real Property), including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the REPA Closing, whether known or unknown as of the REPA Closing.

5.      <u>Consideration; Payment</u>.

A.      The aggregate consideration (collectively, the "<u>Purchase Price</u>") to be paid by Buyer for the purchase of the Acquired Assets shall be: (i) the assumption by Buyer of Assumed Liabilities, (ii) the credit bid of [$4,250,000] of the Loan Agreement Indebtedness (the "<u>Credit Bid Amount</u>") (such portion of the Purchase Price, the "<u>Credit Bid Portion</u>") which amount shall be satisfied by discharging the Loan Agreement Indebtedness pursuant to Section 363(k) of the Bankruptcy Code (but without prejudice to any remaining portion of the Loan Agreement Indebtedness or other Claims of Buyer).

B.      In accordance with Section 5.A of this Tandy REPA, Buyer shall satisfy it obligation at REPA Closing as to the Credit Bid Portion by discharging Seller, and Seller and Healthcore and their bankruptcy estates shall be deemed to be discharged, from the Loan Agreement Indebtedness in an aggregate amount equal to the Credit Bid Amount (for the avoidance of doubt, any Encumbrance and security interest of Buyer on any asset of Seller that is not an asset being purchased by Buyer pursuant to this Tandy REPA shall not be released and will continue to secure the remaining outstanding amount of the Loan Agreement Indebtedness). At or prior to the REPA Closing, Buyer, in Buyer's sole discretion, either will (i) acquire by assignment from Current Lender the Credit Bid Amount of the Loan Agreement Indebtedness or (ii) have obtained Current Lender's agreement to discharge Seller and Healthcore from the Credit Bid Amount of the Prepetition Loan Indebtedness upon the occurrence of the REPA Closing in accordance with this Section 5.B.

6.      <u>Title Commitment and Survey</u>.

A.      Within fifteen (15) days of the Contract Date of this Tandy REPA, Buyer shall order title insurance commitments (the "<u>Title Commitments</u>") covering the Real Property issued by the Title Company, committing the Title Company to issue its current form of TLTA Form T-1 owner's title insurance policy to Buyer, with standard exceptions, other than those that can be removed by the Sale Order, and in the aggregate amount of the Purchase Price, together with copies of all documents evidencing the items referred to as exceptions in the Title Commitments. Buyer shall have fifteen (15) days after its receipt of the Title Commitments and exception documents within which to object to any matter disclosed in the Title Commitments. Buyer shall be deemed to have waived any title defects or objections of which Seller does not receive written notice within such 15-day period. Seller may, without obligation, remedy such objections or obtain a revised Title Commitment insuring over such objections within fifteen (15) days from its receipt of written notice of title objections (but in no event shall Seller's cure period extend the REPA Closing Date, defined below). If Seller notifies Buyer that it will not cure such title objections or

16

if Seller fails to send the notice within such 15-day period, then, on or before the third (3rd) day following such notification or the end of such 15-day period, as the case may be, Buyer shall elect, as its sole and exclusive remedy, to either: (i) waive in writing the title objections and proceed to REPA Closing, in which event the title objections shall be deemed Permitted Encumbrances, or (ii) terminate this Tandy REPA by providing written notice of such termination to Seller.

B.      At REPA Closing, title to the Real Property shall be insured by standard TLTA Form T-1 owner's policies of title insurance issued by the Title Company in the aggregate amount of the Purchase Price (the "Title Policies") The Title Policies shall insure title subject only to the Permitted Encumbrances. Buyer shall pay for the cost of the basic Title Policies. Buyer, in its discretion, may secure such additional coverages and endorsements to the standard coverage as Buyer may elect to obtain, but Buyer shall bear the cost of all such extended coverages and endorsements as Buyer may elect to obtain. Issuance of Title Policies conforming to the approved Title Commitments shall be a condition to Buyer's obligation to close this transaction, but the issuance of such extended coverage or endorsements shall not be a condition to Buyer's obligation to close this transaction. Buyer acknowledges that at REPA Closing title to the Real Property will be conveyed subject to the Permitted Encumbrances, and that neither these exceptions nor the standard printed exceptions in the Title Commitments or the Title Policies shall constitute title defects.

C.      Seller shall provide to Buyer a copy of the existing survey for the Real Property, if any, to the extent it is in Seller's possession or under its control (the "Existing Survey"). Buyer may update the Existing Survey at Buyer's sole cost and expense. If Buyer elects to update the Existing Survey, Buyer shall provide a copy to Seller.

D.      The obligation of Buyer to pay various costs set forth in this Section 6 shall survive the termination of this Tandy REPA.

7.      Payment of REPA Closing Costs. Buyer will pay for the standard owner's title policy. Buyer shall pay the state, county or city documentary/transfer tax, if any, and any other filing or recording fees, Title Company's escrow fee, the cost of any due diligence, all of its financing costs, and any other REPA Closing cost. Each of Buyer and Seller shall pay their own legal fees and expenses.

8.      Type of Deed. Seller agrees to convey fee simple title to the Real Property to Buyer by special warranty deed (the "Deeds") in recordable form subject to the Permitted Encumbrances and warranting title to the Property by, through, or under Seller, but not otherwise. The form of Deed is attached to this Tandy REPA as Exhibit D.

9.      Due Diligence Period and "As Is" Condition.

A.   Buyer, its agents and employees shall have up to sixty (60) days from the Contract Date (the "Due Diligence Period") to conduct such investigations with respect to the Real Property as Buyer shall desire in order to satisfy itself that it wishes to proceed with the purchase of the Real Property. If Buyer shall, in its sole discretion, decide that it does not wish to proceed, Buyer may, at its option by written notice given prior to the expiration of the Due Diligence Period, terminate this Tandy REPA by written notice to Seller. In order to facilitate Buyer's due diligence with respect to the Real Property, during the Due Diligence Period, Seller shall permit Buyer, its agents and employees reasonable access to the Real Property; provided, however, that Buyer must provide at least one (1) business days' notice of its desire to enter onto the Real Property.

B.   Buyer must repair any damages to the Property resulting from any inspection or testing conducted by it or at its direction. Buyer agrees to indemnify and defend Seller, Seller's partners, and each of their affiliated companies and their respective trustees, partners, members, shareholders, directors, officers, agents and employees (collectively, "Seller Indemnitees") and to hold the Seller Indemnitees harmless from and against any and all liens, claims, and liabilities arising out of or related to Buyer's or its contractors' or agents' inspections and/or tests with respect to the Property, including, without limitation, personal injuries or death, even if such liability, liens, or claims were caused by the concurrent negligence of any Seller Indemnitee.

C.   Before Buyer or any of its contractors or agents may enter onto the Property for its inspections or tests or otherwise, Buyer shall ensure that such parties carry commercial general liability insurance (on an occurrence basis) with a combined single limit of not less than One Million Dollars ($1,000,000) per occurrence during the period that these parties are on the Property, which policies must name Seller as an additional insured. Prior to such entry onto the Property, Buyer shall provide Seller with insurance certificates evidencing the required coverages.

D.   Buyer and Seller agree to maintain in confidence, the information contained in this Tandy REPA or pertaining to the sale contemplated hereby and the information and data furnished or made available by Seller to Buyer, its agents and representatives in connection with Buyer's investigation of the Property and the transactions contemplated by the Tandy REPA; provided, however, that each party, its agents and representatives may disclose such information and data (a) to such party's accountants, attorneys, prospective lenders, investment bankers, underwriters, ratings agencies, partners, consultants and other advisors in connection with the transactions contemplated by this Tandy REPA (collectively, the "Representatives") to the extent that such Representatives reasonably need to know such information and data in order to assist, and perform services on behalf of, Seller or Buyer; (b) to the extent required by any applicable statute, law,

18

regulation or governmental authority; and (c) in connection with any litigation that may arise between the parties in connection with the transactions contemplated by this Tandy REPA. The obligations of the Buyer and Seller under this Section 9.B shall survive the termination of this Tandy REPA.

E.      Seller makes no representations or warranties relating to the condition of the Acquired Assets other than those being made in this Tandy REPA, if any. Buyer acknowledges and agrees that it will be purchasing the Acquired Assets based solely upon its inspections and investigations of the Acquired Assets, and that Buyer will be purchasing the Acquired Assets "AS IS" and "WITH ALL FAULTS", based upon the condition of the Acquired Assets as of the REPA Closing Date. Except for the express representations, warranties and covenants of Seller in this Tandy REPA, Buyer expressly acknowledges that the Property is being sold and accepted AS-IS, WHERE-IS and Seller makes no representations or warranties with respect to the physical condition or any other aspect of the Property, including, without limitation, (i) the structural integrity of any improvements on the Property, (ii) the manner, construction, condition, and state of repair or lack of repair of any of such improvements, (iii) the conformity of the improvements to any plans or specifications for the Property, including but not limited to any plans and specifications that may have been or which may be provided to Buyer, (iv) the conformity of the Property to past, current or future applicable zoning or building code requirements or the compliance with any other laws, rules, ordinances, or regulations of any government or other body, (v) the financial earning capacity or history or expense history of the operation of the Property, (vi) the nature and extent of any right-of-way, lease, possession, lien, encumbrance, license, reservation, condition, or otherwise, (vii) the existence of soil instability, past soil repairs, soil additions or conditions of soil fill, susceptibility to landslides, sufficiency of undershoring, sufficiency of drainage, (viii) whether the Property is located wholly or partially in a flood plain or a flood hazard boundary or similar area, (ix) the existence or non-existence of asbestos, underground or above ground storage tanks, hazardous waste or other toxic or hazardous materials of any kind or any other environmental condition or whether the Property is in compliance with applicable laws, rules and regulations, (x) the Property's investment potential or resale at any future date, at a profit or otherwise, (xi) any tax consequences of ownership of the Property, or (xii) any other matter whatsoever affecting the stability, integrity, other condition or status of the land or any buildings or improvements situated on all or part of the Property (collectively, the "Property Conditions"), and BUYER HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY AND ALL ACTUAL OR POTENTIAL RIGHTS BUYER MIGHT HAVE REGARDING ANY FORM OF WARRANTY, EXPRESS OR IMPLIED OR ARISING BY OPERATION OF LAW, INCLUDING, BUT IN NO WAY LIMITED, TO ANY WARRANTY OF CONDITION, HABITABILITY, MERCHANTABILITY OR FITNESS FOR A

19

PARTICULAR PURPOSE relating to the Property, its improvements or the Property Conditions, such waiver being absolute, complete, total and unlimited in any way. In deciding to purchase the Property, Buyer is relying solely upon its own investigation of the Property's condition and not upon any representation or warranty from Seller or its agents. Notwithstanding anything to the contrary, all of the terms and provisions of this Section 9 of this Tandy REPA shall survive the REPA Closing.

10.     <u>Condemnation, Eminent Domain, Damage and Casualty</u>. Buyer shall have the right to terminate this Tandy REPA if (i) all or a material part of the Property is destroyed without fault of Buyer on or before the date Buyer takes possession of the Property, or (ii) all or a material part of the Property is taken by eminent domain prior to REPA Closing. Buyer shall give written notice of Buyer's election to terminate this Tandy REPA under this paragraph within five business days after Buyer first learns of any damage to or condemnation of the Property which entitles Buyer to terminate this Tandy REPA. If Buyer does not give such notice, then this Tandy REPA shall remain in full force and effect and there shall be no reduction in the Purchase Price, but Seller shall, at REPA Closing, assign to Buyer (a) any insurance proceeds payable to Seller with respect to such damage; or (b) the entire award payable with respect to such condemnation proceeding, whichever is applicable. For purposes of this paragraph, (a) a taking by eminent domain of a portion of a Property shall be deemed to affect a "material part" of the Property if the estimated value of the portion of the Property taken exceeds $1,000,000 and (b) the destruction of a "material part" of the Property shall be deemed to mean a casualty to the Property prior to the REPA Closing having an estimated cost of repair which equals or exceeds $1,000,000.

11.     <u>Interim Agreements</u>. Upon entry of the Sale Order under <u>Section 13</u>:

A.     The Trustee, for and on behalf of Romans, and Tandy New Operator shall enter into the Tandy Interim Management Agreement.

B.     The Trustee, for and on behalf of Healthcore, and Tandy New Operator shall enter into the Vincent Interim Management Agreement and Vincent Interim Sublease.

12.     <u>Operations Transfer Agreement</u>. Romans is the existing operator of the Facility and the operational responsibility for the Facility shall remain with Romans until the Operation Transfer Date. Romans shall sublease the Facility from Tandy New Operator from the REPA Closing Date until the Operation Transfer Date. Romans shall engage Tandy New Operator to render management, support, and administrative services for the operation of the Facility from the REPA Closing Date until the Operation Transfer Date. Operational responsibility for the Facility shall be transferred to Tandy New Operator on the Operation Transfer Date pursuant to the Tandy OTA.

13.     <u>Bankruptcy Court Matters</u>.

A.     Bankruptcy Actions.

(i)     <u>W</u>ithin two business days after the Contract Date or as promptly as reasonably practicable, the Trustee shall file the Sale and Bidding

20

Procedures Motion with the Bankruptcy Court. Buyer agrees and acknowledges that the Trustee, including through their representatives, may solicit inquiries, proposals or offers from third parties for an Alternative Transaction subject to and in accordance with the terms of the Bidding Procedures Order.

(ii) From the Contract Date until the earlier of (i) the termination of this Tandy REPA in accordance with Section 17 hereof, and (ii) the REPA Closing Date, the Trustee, on behalf of the Debtors, shall diligently pursue the entry of (A) the Bidding Procedures Order and (B) the Sale Order, in each case, by the Bankruptcy Court.

(iii) The Trustee, on behalf of Seller, and Buyer shall reasonably cooperate to assist in obtaining the Bankruptcy Court's entry of the Sale Order and any other Order reasonably necessary in connection with the transactions contemplated by this Tandy REPA and the other Stalking Horse Sale Agreements as promptly as reasonably practicable, including furnishing affidavits, non-confidential financial information, or other documents or information for filing with the Bankruptcy Court and making such advisors of the Trustee and Buyer and their respective Affiliates available to testify before the Bankruptcy Court for the purposes of, among other things, providing adequate assurances of performance by Buyer as required under Section 365 of the Bankruptcy Code, and demonstrating that Buyer is a "good faith" purchaser under Section 363(m) of the Bankruptcy Code.

(iv) Each of the Trustee and Buyer shall appear formally or informally in the Bankruptcy Court if reasonably requested by the other Party or required by the Bankruptcy Court in connection with the transactions contemplated by this Tandy REPA and the other Stalking Horse Sale Agreements and keep the other reasonably apprised of the status of material matters related to such agreements, including, upon reasonable request promptly furnishing the other with copies of notices or other communications received by the Trustee from the Bankruptcy Court or any third party and/or any Governmental Entity with respect to the transactions contemplated by any of the Stalking Horse Sale Agreements.

(v) If the Successful Bidder (as defined in the Bidding Procedures Order) fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, the next highest bidder (the "Backup Bidder") will be deemed to have the new prevailing bid, and the Trustee and the Debtors shall be required to consummate the transactions contemplated by this Tandy REPA and the other Stalking Horse Sale Agreements on the terms and conditions set forth in such

15079507 v4

agreements, as applicable; provided, however, that Buyer shall only be required to keep Bidder's bid to consummate the transactions contemplated by this Tandy REPA and the other Stalking Hose Sale Agreements on the terms and conditions set forth herein and therein (as the same may be improved upon in the Auction) open and irrevocable until the earlier of (i) the Outside Back-Up Date or (ii) the date of REPA Closing of an Alternative Transaction with the Successful Bidder.

(vi)     The Trustee and Buyer acknowledge that this Tandy REPA and the other Stalking Horse Sale Agreements (including the sale of the assets to be acquired thereunder) are subject to higher and better bids and Bankruptcy Court approval. The Trustee and Buyer acknowledge that the Trustee must take reasonable steps to demonstrate that he has sought to obtain the highest or otherwise best price for the Acquired Assets and other property subject to the Stalking Horse Sale Agreements, including giving notice thereof to the creditors of the Debtors and other interested parties, providing information about the Debtors, their property and their businesses to prospective bidders, entertaining higher and better offers from such prospective bidders, and, in the event that additional qualified prospective bidders desire to bid for the Acquired Assets and/or such other property, conducting an Auction.

(vii)    Notwithstanding any other provision of this Tandy REPA to the contrary, Buyer acknowledges that the Trustee is and may continue soliciting and/or responding to inquiries, proposals or offers for the Acquired Assets and other property of the Debtors and may furnish any information with respect to, or assist or participate in, or facilitate in any other manner, any effort or attempt by any Person to do or seek to do any of the foregoing in connection with any Alternative Transaction.

B.      Expense Reimbursement Amount. In consideration of Buyer and the other Pender Entities having expended considerable time and expense in connection with Stalking Horse Sale Agreements and the negotiation thereof, and the identification and quantification of assets to be acquired in the transactions contemplated by such Stalking Horse Agreements, the Pender Entities shall be entitled to allowance and payment of the Expense Reimbursement Amount subject to the terms and conditions of this Section 13.B. If this Tandy REPA is terminated in accordance with the terms set forth in Section 17 hereof (excluding any termination: (i) pursuant to Section 17.A(ix) because of the failure to satisfy Seller's conditions to REPA Closing set forth in Section 14.C(i) or Section 14.C(ii) of this Tandy REPA; or (ii) pursuant to Section 17.A(xii) when Buyer is the defaulting Party), then Seller shall pay to Buyer in cash not later than (i) in the case of a termination pursuant to Section 17.A(viii), the REPA Closing of an

Alternative Transaction and (ii) two (2) business days following receipt of documentation supporting the request for reimbursement of costs, fees and expenses, the Expense Reimbursement Amount, in each case by wire transfer of immediately available funds to an account specified by the applicable Pender Entity to Seller in writing. Seller's obligation to pay the Expense Reimbursement Amount pursuant to this Section 13.B shall survive termination of this Tandy REPA and shall constitute an administrative expense of Seller under Section 364(c)(1) of the Bankruptcy Code with priority over any and all administrative expenses of the kind specified in section 503(b) or 507(b) of the Bankruptcy Code, but subject to the Carve Out as defined in the Final Order (I) Authorizing Debtors (By And Through Michael A. McConnell as Chapter 11 Trustee) to Obtain Post-petition Financing (II) Authorizing Use of Cash Collateral, (III) Granting Adequate Protection, and (IV) Granting Related Relief, entered by the Bankruptcy Court on July 30, 2021 [Dkt. No. 503].

C.   Sale Order. The Sale Order shall, among other things, (i) approve, pursuant to Sections 105, 363, and 365 of the Bankruptcy Code, (a) the execution, delivery and performance by the Trustee and the Debtors of this Tandy REPA and the other Stalking Horse Sale Agreements, as applicable, (b) the sale of the Acquired Assets and the other assets of the Debtors subject to the Stalking Horse Sale Agreements to Buyer on the terms set forth herein and therein and free and clear of all Encumbrances (other than Encumbrances included in the Assumed Liabilities and Permitted Encumbrances), and (c) the performance by the Trustee and the Debtors of their respective obligations under the Stalking Horse Sale Agreements; (ii) authorize and empower Seller to assume and assign the Assigned Contracts in accordance with the Stalking Horse Sale Agreements, as applicable; (iii) find that Buyer is a "good faith" purchaser within the meaning of Section 363(m) of the Bankruptcy Code, find that the Buyer is not successors to any Debtor, and grant the Buyer the protections of section 363(m) of the Bankruptcy Code; (iv) find that Buyer shall have no Liability or responsibility for any Liability or other obligation of any Debtor arising under or related to the Acquired Assets or other property of the Debtors to be acquired pursuant to the Stalking Horse Sale Agreements, other than as expressly set forth in the applicable Stalking Horse Sale Agreement, including successor or vicarious Liabilities of any kind or character, including any theory of antitrust, environmental, successor, or transferee Liability, labor law, de facto merger, or substantial continuity; (v) find that Person(s) to which any Assigned Contracts are to be assigned pursuant to the applicable Stalking Horse Sale Agreements have provided adequate assurance (as that term is used in section 365 of the Bankruptcy Code) of future performance in connection with the assumption and assignment of the Assigned Contracts; and (vi) find that Buyer shall have no Liability for any Excluded Liability. Without limiting the obligations of the Trustee and the Debtors to take all such actions as are reasonably necessary to obtain Bankruptcy Court approval of the Sale Order, Buyer agrees that it will

promptly take reasonable actions to assist in obtaining Bankruptcy Court approval of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court for purposes, among others, of (x) demonstrating that Buyer is a "good faith" purchaser under section 363(m) of the Bankruptcy Code and (y) establishing adequate assurance of future performance within the meaning of Section 365 of the Bankruptcy Code.

D.     The Trustee acknowledges and agrees, and the Sale Order shall provide that, except as otherwise provided in Section 3 of this Tandy REPA and the corresponding provisions of the other Stalking Horse Sale Agreements, on the REPA Closing Date and concurrently with the REPA Closing, all then existing or thereafter arising obligations, Liabilities and Encumbrances of, against or created by the Trustee, the Debtors or the Debtors' bankruptcy estates, to the fullest extent permitted by Section 363 of the Bankruptcy Code, shall be fully released from and with respect to the Acquired Assets and the other property being sold pursuant to the other Stalking Horse Sale Agreements. On the REPA Closing Date, the Acquired Assets and such other property being sold pursuant to the other Stalking Horse Sale Agreements shall be transferred to Buyer free and clear of all obligations, Liabilities and Encumbrances, other than Permitted Encumbrances and the Assumed Liabilities to the fullest extent permitted by Section 363 of the Bankruptcy Code.

E.     The obligations of the Trustee and the Debtors under this Tandy REPA, the other Stalking Horse Sale Agreements, and in connection with the transactions contemplated hereby and thereby are subject to entry of and, to the extent entered, the terms of any Orders of the Bankruptcy Court (including entry of the Sale Order).

14.    <u>Conditions to REPA Closing</u>.

A.     For Both Buyer and Seller. The respective obligations of each Party to this Tandy REPA to consummate the transactions contemplated by this Tandy REPA are subject to the satisfaction (or to the extent permitted by law, written waiver by each of the Trustee and Buyer, in their respective sole discretion) on or prior to the REPA Closing Date, of each of the following conditions:

(i)     no court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Tandy REPA; and

(ii)    the Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order, the 9019 Order, and the Financing Orders,

24

and such orders shall not have been reversed, modified, amended or stayed.

B. **For Buyer.** The obligations of Buyer under this Tandy REPA are subject to the satisfaction on or prior to the REPA Closing Date of the following conditions, any one or more of which may be waived by Buyer in its sole discretion to the extent permitted by applicable law:

(i) <u>Final Sale Order</u>. The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

(ii) <u>Representations and Warranties</u>. The representations and warranties of Seller set forth in this Tandy REPA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the date of the REPA Closing as though made on and as of the date of the REPA Closing, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

(iii) <u>Performance</u>.

    (A) The Seller shall have performed or complied in all material respects with all covenants and agreements required by this Tandy REPA to be performed or complied with by Seller on or prior to the date of the REPA Closing.

    (B) The Debtor parties to the other Stalking Horse Sale Agreements shall have performed or complied in all material respects with all covenants and agreements required by such other Stalking Horse Sale Agreements to be performed or complied with by such Debtor(s) on or prior to the REPA Closing date provided for in such Stalking Horse Sale Agreements.

(iv) <u>Title Policies</u>. Receipt of the Title Policies.

(v) <u>No Termination of Licenses</u>. None of the health care licenses (the "<u>Licenses</u>") from the State of Texas necessary for Romans to operate the Facility with Tandy New Operator as manager pursuant to the Tandy Interim Management Agreement have been terminated.

(vi) <u>No Termination of Other Stalking Horse Sale Agreements</u>. Neither the Tandy OTA, the Tandy Interim Management Agreement, Tandy

Interim Sublease, nor the Vincent OTA shall have been terminated in accordance with its terms.

C.    <u>For Seller</u>. The obligations of Seller under this Tandy REPA are subject to the satisfaction on or prior to the REPA Closing Date of the following conditions, any one or more of which may be waived by Seller to the extent permitted by applicable law:

(i)    <u>Representations and Warranties</u>. The representations and warranties of Buyer set forth in this Tandy REPA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the date of the REPA Closing as though made on and as of the date of the REPA Closing, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

(ii)    <u>Performance</u>. Buyer shall have performed or complied in all material respects with all covenants and agreements required by this Tandy REPA to be performed or complied with by Buyer on or prior to the date of the REPA Closing.

15.    <u>REPA Closing</u>. The REPA Closing of this transaction (the "<u>REPA Closing</u>") shall occur at 10:00 a.m., Fort Worth, Texas time, on [•] (the "<u>REPA Closing Date</u>"), unless otherwise agreed in writing by the parties to this Tandy REPA. This transaction shall be closed through an escrow with the Title Company, in accordance with the general provisions of the usual and customary form of special warranty deed and money escrow for similar transactions in the State of Texas.

16.    <u>REPA Closing Documents</u>.

A.    On the REPA Closing Date, Seller and Buyer shall execute and deliver to one another a joint REPA Closing statement. In addition, Buyer shall deliver to Seller such other documents as may be reasonably required by the Title Insurer in order to consummate the transaction as set forth in this Tandy REPA.

B.    On the REPA Closing Date, Seller shall deliver to Buyer the following:

(i)    a copy of the docketed Sale Order;

(ii)    the Deeds, executed in accordance with Texas law, subject to the Permitted Encumbrances;

26

(iii)  a quitclaim bill of sale conveying the Personal Property (in the form of <u>Exhibit E</u> attached hereto);

(iv)  non-foreign affidavit (in the form of <u>Exhibit F</u> attached hereto); and

(v)  the Tandy Interim Sublease, duly executed by Romans.

(vi)  all documents and instruments reasonably required by the Title Insurer to issue the owner's title policy and consistent with the terms of this Tandy REPA.

17.  <u>Termination Events</u>.

A.  This Tandy REPA may be terminated by Buyer or Seller upon the following conditions:

(i)  By mutual consent of the Buyer and Seller;

(ii)  By the Trustee or Buyer if the conditions to REPA Closing set forth in Section 14. A have not been satisfied or waived by [December 31, 2021] (the "<u>Outside Date</u>");

(iii)  By Buyer if the conditions to REPA Closing set forth in Section 14.B have not been satisfied or waived by the Outside Date;

(iv)  By Trustee if the conditions to REPA Closing set forth in Section 14.C have not been satisfied or waived by the Outside Date;

(v)  By written notice from Buyer to the Trustee, if (a) the Trustee or any Debtor seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, either or both of the Bankruptcy Cases, or if a trustee (other than the Trustee) or examiner with expanded powers to operate or manage the financial affairs or reorganization of either or both of the Debtors is appointed in the Bankruptcy Cases or (b) an Order or dismissal, conversion or appointment is entered for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(vi)  By written notice from Buyer to Trustee, if the Trustee or Debtors announce any stand-alone plan of reorganization or liquidation (or support any such plan filed by any other party);

(vii)  By written notice from Buyer to the Trustee if, under Section 363(k) of the Bankruptcy Code, Buyer is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by this Tandy REPA in connection with the payment of the Purchase Price;

15079507 v4

(viii)   by written notice from either Buyer or the Trustee to the other Party, if an Order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or the Sale Order and (a) as to the Bidding Procedures Order such Order has not been reversed or vacated within fourteen (14) calendar days after its original entry or (b) as to the Sale Order such Order has not been reversed or vacated by the Outside Date;

(ix)    by written notice from Buyer or the Trustee to the other Party, if (a) (1) Buyer is not the Successful Bidder (as defined in the Bidding Procedures Order) and (2) the Bankruptcy Court approves an Alternative Transaction with the Successful Bidder; or (b) the Bankruptcy Court approves an Alternative Transaction other than in connection with the Auction; provided that if Buyer is the Backup Bidder at the Auction, the right of Buyer or the Trustee to terminate this Tandy REPA pursuant to this Section 17 shall not be available to Buyer or the Trustee until the Outside Back-Up Date;

(x)    By Seller if the conditions to REPA Closing set forth in Section 14.C have not been satisfied or waived by the Outside Date;

(xi)    By Buyer pursuant to Section 9.A;

(xii)   By Buyer pursuant to Sections 6.A and 9.E; and/or

(xiii)  By written notice from Buyer to Trustee if either the Tandy OTA or the Vincent OTA is terminated.

(xiv)   (By a non-defaulting party, in the event of a material breach by the other party which is not cured prior to the expiration of the cure period set forth in Section 17.B.

B.    Opportunity to Cure. Except as otherwise expressly provided in Section 17.A hereof, neither party to this Tandy REPA may claim termination or pursue any other remedy referred to in this Sections 17.A.xi - xiii on account of a breach of a condition, covenant or warranty by the other, without first giving such other party written notice of such breach and not less than ten (10) days within which to cure such breach. The REPA Closing Date shall be postponed if necessary to afford such opportunity to cure.

C.    Effect of Termination. In the event of termination of this Tandy REPA pursuant to Section 17.A, this Tandy REPA shall forthwith become void and there shall be no Liability on the part of any Party or any of its partners, officers, directors or shareholders; provided that this Section 17.C, Section 13.B and Sections 17 through 33 hereof shall survive any such termination; provided further that no termination will relieve any Party from any Liability from any Willful Breach of this Tandy REPA prior to the date of such termination (which, for the avoidance of doubt, will be deemed to

28

include any failure by Buyer to consummate the REPA Closing if and when it is obligated to do so hereunder).

18. <u>Recording</u>. Neither this Tandy REPA nor a memorandum thereof shall be recorded and the act of recording by Buyer shall be an act of default hereunder by Buyer.

19. <u>Assignment</u>.

    A.     This Tandy REPA shall be binding upon Buyer and, subject to the terms of the Bidding Procedures Order (with respect to the matters covered thereby) and the entry and terms of the Sale Order, Seller and the trustee, and shall inure to the benefit of and be so binding on the Parties and their respective successors and permitted assigns; provided that, subject to Section 19.B of this Tandy REPA, neither this Tandy REPA nor any of the rights or obligations hereunder may be assigned or delegated without the prior written consent of Buyer and the Trustee, and any attempted assignment or delegation without such prior written consent shall be null and void.

    B.     At any time prior to the REPA Closing, and notwithstanding anything contained herein to the contrary, Buyer shall be entitled to designate, by written notice to Seller, one or more Persons to (i) purchase the Acquired Assets and pay the corresponding Purchase Price amount and/or (ii) assume the Assumed Liabilities (any such Person that shall be designated in accordance with this clause, a "<u>Permitted Designee</u>"). In addition, and for the avoidance of doubt, a Permitted Designee to perform any other covenants or agreements of Buyer under this Tandy REPA. Notwithstanding the foregoing, Buyer's designation of any Permitted Designee pursuant to this Section 19.B shall not relieve Buyer of its obligations under this Tandy REPA in the event such obligations are not performed by any such Permitted Designee in accordance with their terms.

20. <u>Representations and Warranties of Seller</u>. Seller represents and warrants to Buyer that: (a) Seller has the full right, power and authority to execute and deliver this Tandy REPA and consummate the transactions contemplated herein; and (b) the execution, delivery and performance of this Tandy REPA by Seller will not result in any breach or violation or constitute a default under any agreement or other instrument to which Buyer is a party.

21. <u>Representations and Warranties of Buyer</u>. Buyer represents and warrants to Seller that: (a) Buyer has the full right, power and authority to execute and deliver this Tandy REPA and consummate the transactions contemplated herein; and (b) the execution, delivery and performance of this Tandy REPA by Buyer will not result in any breach or violation or constitute a default under any agreement or other instrument to which Buyer is a party.

22. <u>Limitation of Liability</u>. Neither Seller, nor any affiliate of Seller, the Trustee, nor any of their respective beneficiaries, shareholders, partners, officers, directors, agents or employees, heirs, successors or assigns shall have any personal liability of any kind or nature. Nor shall Buyer have the right to receive any judgment in or otherwise recover against the assets of the

29

aforesaid for or by reason of any matter or thing whatsoever under, in connection with, arising out of or in any way related to this Tandy REPA and the transactions contemplated herein. Buyer hereby waives for himself and anyone who may claim by, through or under Buyer any and all rights to sue or recover on account of any such alleged personal liability or to receive any judgment in or otherwise recover against the assets of Seller, the affiliates of Seller, the Trustee or their respective beneficiaries, affiliates, shareholders, partners, officers, agents or employees, heirs, successors or assigns. In no event shall Seller or Trustee be liable for consequential, incidental or punitive damages in respect of the transactions covered by this Tandy REPA or for damages in excess of the Purchase Price paid to Seller by Buyer.

23. <u>No Successor Liability</u>. The Parties intend that, to the fullest extent permitted by applicable law (including under Section 363 of the Bankruptcy Code), upon the REPA Closing, Buyer shall not be deemed to: (a) be the successor of Seller, (b) have, *de facto*, or otherwise, merged with or into Seller, (c) be a mere continuation or substantial continuation of Seller or the enterprise(s) of Seller or (d) be liable or have any Liability for any acts or omissions of Seller in the conduct of its business or arising under or related to the Acquired Assets other than as expressly set forth and agreed in this Tandy REPA. Without limiting the generality of the foregoing, and except as otherwise expressly provided in this Tandy REPA, the Parties intend that Buyer shall have no Liability for any Encumbrance (other than the Assumed Liabilities and Permitted Encumbrances on the Acquired Assets) against Seller or any of Seller's predecessors or Affiliates, and Buyer shall have no successor or vicarious liability of any kind or character whether known or unknown as of the REPA Closing Date or in connection with the transactions contemplated to occur on the REPA Closing, whether now existing or hereafter arising, or whether fixed or contingent, with respect to the business of Seller, the Acquired Assets or any Liability of Seller arising prior to, or relating to any period occurring prior to, the REPA Closing Date. The Parties agree that the Sale Order shall contain provisions substantially in the form set forth in this Section 23.

24. <u>Time of Essence</u>. Time is of the essence of this Tandy REPA.

25. <u>Notices</u>. Any notice or demand which either party hereto is required or may desire to give or deliver to or make upon the other party shall be in writing and may be personally delivered or given or made by overnight courier such as Federal Express, by telecopier transmission or made by United States registered or certified mail addressed as follows:

Seller: Romans House, LLC d/b/a/ Tandy Village Assisted Living
c/o Michael A. McConnell, Chapter 11 Trustee
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telecopier: (817) 878-9280
Telephone: (817) 878-3569

With a copy to Nancy Ribaudo, Esq.
(which shall not Kelly Hart & Hallman, LLP

| | |
|---|---|
| constitute notice): | 201 Main Street, Suite 2500<br>Fort Worth, TX 76102<br>Telecopier: (817) 878-9280<br>Telephone: (817-878-3574 |
| Buyer: | 2601 Tandy ABL Holdings I, LLC<br>11766 Wilshire Boulevard<br>Los Angeles, CA 90025<br>ATTN: _____<br>Telecopier: (___) _____<br>Telephone: (___) _____ |
| With a copy to its attorneys: | Benesch, Friedlander, Coplan, & Aronoff, LLP<br>1313 North Market Street, Suite 1201<br>Wilmington, DE 19801-1601<br>ATTN: Michael Barrie, Esq.<br>Telecopier: 877.357.4933<br>Telephone: 302.442.7068 |

subject to the right of either party to designate a different address for itself by notice similarly given. Any notice or demand so given shall be deemed to be delivered or made on the next business day if sent by overnight courier, or the same day as given if sent by telecopier transmission and received by 5:00 p.m. Fort Worth, Texas time or on the fourth (4th) business day after the same is deposited in the United States Mail as registered or certified matter, addressed as above provided, with postage thereon fully prepaid. Any such notice, demand or document not given, delivered or made by registered or certified mail, by overnight courier or by facsimile transmission as aforesaid shall be deemed to be given, delivered or made upon receipt of the same by the party to whom the same is to be given, delivered or made.

26.    Governing Law. EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

27.    Jurisdiction and Venue. Each of the Parties irrevocably agrees that any Action that may be based upon, arising out of, or related to this Tandy REPA or the negotiation, execution or performance of this Tandy REPA and the transactions contemplated hereby brought by any other Party or its successors or assigns will be brought and determined only in (a) the Bankruptcy Court and any federal court to which an appeal from the Bankruptcy Court may be validly taken or (b) if the Bankruptcy Court is unwilling or unable to hear such Action, in the state courts of the State of Texas, and any state court sitting in the State of Texas to which an appeal from a Texas state court may be taken ((a) and (b), the "Chosen Courts"), and each of the Parties hereby irrevocably submits

31

to the exclusive jurisdiction of the Chosen Courts for itself and with respect to its property, generally and unconditionally, with regard to any such Action arising out of or relating to this Tandy REPA and the transactions contemplated hereby. Each of the Parties agrees not to commence any Action relating thereto except in the Chosen Courts, other than Actions in any court of competent jurisdiction to enforce any Order, decree or award rendered by any Chosen Court, and no Party will file a motion to dismiss any Action filed in a Chosen Court on any jurisdictional or agree that venue would be proper in any of the Chosen Courts, and hereby irrevocably waive any objection that any such court is an improper or inconvenient forum for the resolution of such Action. Each of the Parties further irrevocably and unconditionally consents to service of process in the manner provided for notices in Section 25. Nothing in this Tandy REPA will affect the right of any Party to this agreement to serve process in any other manner permitted by law.

28. <u>Entire Agreement</u>. This Tandy REPA constitutes the entire agreement between the parties and supersedes all other negotiations, understandings and representations made by and between the parties and the agents, servants and employees.

29. <u>Counterparts</u>. This Tandy REPA may be executed in multiple counterparts, with facsimile transmission acceptable, each of which shall be deemed an original but all of which shall constitute one and the same instrument. Any counterpart, to the extent signed and delivered by means of a .PDF or other electronic transmission, will be treated in all manner and respects as an original contract and will be considered to have the same binding legal effects as if it were the original signed version thereof delivered in person. Minor variations in the form of the signature page to this Tandy REPA or any agreement or instrument contemplated hereby, including footers from earlier versions of this Tandy REPA or any such other document, will be disregarded in determining the effectiveness of such signature. At the request of any party or pursuant to any such contract, each other party hereto or thereto will re-execute original forms thereof and deliver them to all other parties. No party hereto or to any such contract will raise the use of a .PDF or other electronic transmission to deliver a signature or the fact that any signature or contract was transmitted or communicated through the use of .PDF or other electronic transmission as a defense to the formation of a contract and each such party forever waives any such defense.

30. <u>Captions; Construction</u>. Section titles or captions contained herein are inserted as a matter of convenience and for reference, and in no way define, limit, extend or describe the scope of this Tandy REPA or any provision hereof. Any reference in this Tandy REPA to "business days" means days in which national banks are open in the State of Texas.

31. <u>Release and Indemnification of Trustee</u>. FROM AND AFTER THE REPA CLOSING, BUYER ("<u>INDEMNIFYING PARTY</u>") SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS TRUSTEE AND HIS AFFILIATES, PARTNERS, CONSULTANTS, ADVISORS, AGENTS, AND REPRESENTATIVES (EACH AN "<u>INDEMNIFIED PARTY</u>") FROM AND AGAINST, AND HEREBY ASSUMES, ANY AND ALL LOSSES OR LIABILITIES RESULTING FROM, ARISING OUT OF, OR INCIDENTAL TO THE OPERATION OF THE FACILITY ON OR AFTER THE REPA CLOSING DATE UNLESS THE LOSS OR LIABILITY RESULTED FROM FRAUD OR INTENTINAL MISCONDUCT OF AN INDEMNIFIED PARTY.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EXCEPT FOR FRAUD BY OR INTENTIONAL MISCONDUCT OF TRUSTEE, NOTHING HEREIN SHALL OBLIGATE THE TRUSTEE IN HIS PERSONAL CAPACITY; HIS OBLIGATIONS HERETO ARE ONLY AS CHAPTER 11 TRUSTEE AND NOT IN HIS PERSONAL CAPACITY

32. <u>No Presumption</u>. No provision of this Tandy REPA will be interpreted in favor of, or against, either party hereto by reason of the extent to which any such party or its counsel participated in the drafting of this Tandy REPA or by reason of the extent to which any such provision is inconsistent with any prior draft of this Tandy REPA or any other document.

33. <u>Waiver Of Jury Trial</u>. EACH OF SELLER AND BUYER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES ANY AND ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, SUIT OR COUNTERCLAIM ARISING IN CONNECTION WITH, OUT OF OR OTHERWISE RELATING TO THIS AGREEMENT.

34. <u>Litigation</u>. In the event of litigation between the Parties with respect to the Property, this Tandy REPA, the performance of their respective obligations hereunder or the effect of a termination under this Tandy REPA, the losing Party shall pay all costs and expenses incurred by the prevailing Party in connection with such litigation, including, but not limited to, reasonable attorneys' fees of counsel selected by the prevailing Party. Notwithstanding any provision of this Tandy REPA to the contrary, the obligations of the parties under this Section shall survive termination of this Tandy REPA.

35. <u>No Solicitation</u>. This Tandy REPA and the transactions contemplated herein and therein are the product of negotiations among the Parties. Notwithstanding anything herein to the contrary, this Tandy REPA is not, and shall not be deemed to be, (a) a solicitation of votes for the acceptance of any plan of reorganization for the purposes of Sections 1125 and 1126 of the Bankruptcy Code or otherwise or (b) an offer for the issuance, purchase, sale, exchange, hypothecation, or other transfer of securities or a solicitation of an offer to purchase or otherwise acquire securities for purposes of the Securities Act of 1933, as amended, and the rules and regulations promulgated thereunder or the Exchange Act of 1934, as amended, and the rules and regulations promulgated thereunder.

36. For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Tandy REPA) are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

[SIGNATURE PAGE TO FOLLOW]

3418258.1

33

15079507 v4

SELLER:

**Romans House, LLC d/b/a Tandy Village Assisted Living**

By:     Michael A. McConnell, as the Chapter 11 Trustee

By:     _____

Name:  Michael A. McConnell

Title:   Chapter 11 Trustee

BUYER:

**2601 Tandy ABL I Holdings, LLC**

By:     _____

Name:  _____

Title:   _____

15079507 v4

EXHIBITS

A – Legal Description of the Property

B – Excluded Personal Property

C – Assumed Liabilities

D – Form of Deed

E – Bill of Sale

F – Non-Foreign Affidavit

G – Bidding Procedures Order

H - Sale Order

15079507 v4

EXHIBIT A

Legal Description of the Property

EXHIBIT B

Excluded Personal Property

Excluded Personal Property means:

1.      Any of Seller's Personal Property that is used principally in connection with, any facilities other than the Facility;

2.      Any personal property in which Seller has no interest, including any personal property belonging to a resident of the Facility; and

3.      Cash (other than petty cash, if any, located at the Facility), general intangibles, accounts, accounts receivable, deposits (including, without limitation, bank and demand deposit accounts), insurance policies, and contract rights of the Seller.

15079507 v4

EXHIBIT C

Assumed Liabilities

EXHIBIT D

<u>Form of Deed</u>

EXHIBIT E

Bill of Sale

40

EXHIBIT F

<u>Non-Foreign Affidavit</u>

Section 1445 of the Internal Revenue Code provides that a transferee of a United States real property interest must withhold tax if the transferor is a foreign person. To inform the Buyer that withholding of tax is not required upon the disposition of United States real property interests by **Romans House, LLC d/b/a Tandy Village Assisted Living**, a Texas limited liability company (the "<u>Company</u>"), the undersigned hereby certifies the following on behalf of the Company:

1.      The Company is not a foreign corporation, foreign partnership, foreign trust, or foreign estate (as those terms are defined in the Internal Revenue Code and Income Tax Regulations);

2.      The Company's United States employer identification number is _____;

3.      The Company's principal business office is located at _____.

The undersigned understands that this certification may be disclosed to the Internal Revenue Service by Buyer and that any false statement contained herein could be punished by fine, imprisonment, or both.

Under penalties of perjury, I declare that I have examined this certification and that it is true, correct, and complete, and I further declare that I have authority to sign this document on behalf of the Company.

By:     _____

Name:  _____

Its:    _____

COUNTY OF _____     )

                              ) SS

STATE OF TEXAS                )

Subscribed and sworn to before me this _____ day of _____, 2021.

41

15079507 v4

_____

Notary   Public,   _____   County,   Texas
My Commission Expires: _____

15079507 v4

EXHIBIT G

<u>Bidding Procedure Order</u>

15079507 v4

EXHIBIT H

<u>Sales Order</u>

EXHIBIT C

# OPERATIONS TRANSFER AGREEMENT

## (Tandy Village)

This OPERATIONS TRANSFER AGREEMENT ("Tandy OTA") is entered into as of _____, 2021 ("Contract Date"), by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Romans" or "Tandy Existing Operator"), and 2601 Tandy ABL I Operations, LLC, a Delaware limited liability company ("Tandy New Operator," and together with Tandy Existing Operator, the "Parties").

## RECITALS

A.      Tandy Existing Operator is a debtor under Title 11 of the United States Code, 11 U.S.C. § 101*et seq*. (the "Bankruptcy Code") having filed a voluntary petition for relief under Chapter 11 of the Bankruptcy Code on December 9, 2019 (the "Petition Date"), in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court").

B.      By Order entered on December 23, 2019 [Dkt. No. 28], the Bankruptcy Court directed that Tandy Existing Operator's bankruptcy case be jointly administered with the bankruptcy case of Tandy Existing Operator's affiliate, Healthcore System Management, LLC ("Healthcore," and with Tandy Existing Operator, the "Debtors"), under Case No. 19-45023-ELM (the "Bankruptcy Cases").

C.      On May 14, 2021, the Bankruptcy Court entered an Order [Dkt. No. 441] directing the United States Trustee for Region 6 (the "U.S. Trustee") to appoint a chapter 11 trustee for both Debtors. Also, on May 14, 2021, the U.S. Trustee filed a notice [Dkt. No. 442] of the appointment, subject to Bankruptcy Court approval, of Michael A. McConnell as the Trustee and an application [Dkt. No. 444] requesting the Court's approval of such appointment. By Order entered on May 17, 2021 [Dkt. No. 445], the Bankruptcy Court approved the Trustee's appointment.

D.      Tandy Existing Operator operates that certain assisted living facility identified on Schedule I (the "Facility"), which Facility is licensed by the applicable authorities of the State of Texas and is certified under the Medicaid Waiver Program for the number of beds set forth on Schedule I.

E.      The Facility and real property on which the Facility is located also are owned by Romans.

F.      Prior to the Petition Date, Pender West Credit 1 REIT, L.L.C. ("Original Lender") and the Debtors entered into and consummated a series of related transactions to, among other benefits provided to the Debtors, enable Romans to refinance and retire certain existing indebtedness (such transactions, the "March 2019 Refinancing"). The March 2019 Refinancing included the Original Lender's provision to Romans of a senior secured loan facility (the "Prepetition Loan Facility") in the original principal amount of $9,450,000.00, which loan was made to Romans, as Borrower, by Original Lender, as Lender, pursuant to the terms of that certain Loan Agreement, dated as of March __, 2019 (as modified, amended, or supplemented, the

"Prepetition Loan Agreement"). In connection with the Prepetition Loan Facility, Original Lender and Romans executed and delivered various other documents and agreements, including documents granting and perfecting the Prepetition Liens (as defined below) securing the payment and performance of Romans' obligations thereunder and agreements and documents relating to or evidencing any other indebtedness of Romans in connection with the Prepetition Loan Facility (collectively, as modified, amended, or supplemented, the "Prepetition Loan Documents")

G. On or about December 15, 2020, the Original Lender executed that certain *Transfer and Assignment of Note, Lien and Other Documents* (the "Transfer Agreement"), pursuant to which Original Lender transfer and assigned to Pender Capital Asset Based Lending Fund I, LP. ("Current Lender"), an affiliate of the Original Lender, *inter alia,* all of Original Lender's right, title and interest in and to the Promissory Note, the other obligations of the RH Debtor identified therein, and the Security Instruments (as defined therein and described on Schedule I thereto). The Transfer Agreement has been recorded by the Tarrant County, Texas Clerk in Official Public Records, as Document No. D221028892 in connection with the First Lien DOT and Document No. D221028892 in connection with the Second Lien DOT (together, the "Recorded Transfer Agreements"). In addition, to evidence the assignments, amendments to the previously filed and recorded UCC-1 financing statements were duly executed, filed, and recorded for the benefit of the Current Lender. In addition, on February 23, 2021, in accordance with Fed. R. Bankr. P. 3001(e)(2), Current Lender filed and served that certain *Notice of Transfer of Claim Other Than for Security* [Dkt. No. 279] (the "Transfer Notice," and collectively, with the Transfer Agreements and the Recorded Transfer Agreements, the "Transfer Documents") in the RH Debtor's bankruptcy case. The time for objections to the Transfer Notice has expired with no objections thereto having been filed.

H. Simultaneously herewith, the Trustee, for and on behalf of Romans, and 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company ("Buyer"), have entered into the Real Estate and Asset Purchase Agreement ("Tandy REPA"), pursuant to which Romans is selling the Facility and real property on which the Facility is located to Buyer, an affiliate of Tandy New Operator.

I. Upon entry of the Sale Order, the Trustee, for and on behalf of Romans, and Tandy New Operator will enter into the Tandy Interim Management Agreement for the orderly operation of the Facility by Romans between the Tandy Interim Contract Date and the Tandy Operation Transfer Date.

J. Simultaneously with the Closing of the transactions contemplated under the Tandy REPA, the Trustee, for and on behalf of Romans, and Tandy New Operator will enter into the Tandy Interim Sublease and the Tandy Interim Management Agreement for the orderly operation of the Facility by Romans between the REPA Closing Date and the Tandy Operation Transfer Date.

K. Also simultaneously herewith, Healthcore, and 4607 East California ABL I Operations, LLC, have entered into the Vincent OTA, providing for, among other things, the orderly transfer of operations of the Vincent Victoria Village assisted living facility and the sale of certain related assets.

15001267 v14

L.      Subject to the approval of the Bankruptcy Court and the other terms and conditions set forth herein, Tandy Existing Operator and Tandy New Operator desire to enter into this Tandy OTA to facilitate an orderly transition of the operations of the Facility from Tandy Existing Operator to Tandy New Operator or its designee on the Tandy Operation Transfer Date.

NOW, THEREFORE, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     <u>Certain Definitions</u>. Certain defined terms used in this Tandy OTA are set forth on <u>Schedule 1.1</u> hereof.

1.2     <u>Tandy REPA Defined Terms</u>.  Additional defined terms used in this Tandy OTA and not otherwise defined herein or in <u>Schedule 1.1</u> hereof have the meanings ascribed to such terms in the Tandy REPA.

## ARTICLE 2
## PRE-OPERATION TRANSFER; CONDITIONS TO OPERATION TRANSFER; DELIVERIES UPON TANDY OPERATION TRANSFER DATE

2.1     <u>Transferred Assets</u>. In return for Ten Dollars ($10) and the assumption of the Assumed Liabilities, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Effective Time, Tandy Existing Operator shall transfer to Tandy New Operator or its designee all of Tandy Existing Operator's right, title and interest in and to the following assets (the "<u>Assets</u>"), free and clear of all Encumbrances:

(a)     to the extent Tandy Existing Operator's interest is assignable and/or transferable pursuant to applicable law and to the extent Tandy New Operator in its sole discretion elects to assume the same, all consents, licenses, permits, approvals, certifications, and Medicaid provider number, issued by any Governmental Entity, including without limitation, any authorizations to participate in any state or federal reimbursement program such as Medicaid;

(b)     all telephone and facsimile numbers relating solely to the Facility (including, without limitation, all "800" numbers);

(c)     all consumable inventories of every kind and nature whatsoever (specifically including, but not limited to, all pharmacy supplies, nursing supplies, medical supplies, housekeeping supplies, laundry supplies, maintenance supplies, office supplies, dietary supplies, other supplies and food) located at and used in connection with the operation of the Facility, which inventory shall be in a quantity sufficient to meet the needs of the residents of the Facility for the proper operation thereof and in compliance with all Applicable Laws, in the ordinary course of business;

(d)     subject to Section 3.10(a), all Contracts to which Tandy Existing Operator is a party listed on <u>Schedule 3.10(a)</u>, and all purchase orders (the "<u>Assigned Contracts</u>"), and which schedule may be modified from time to time after the date hereof in

3

accordance with <u>Section 3.10(a)</u>, and, in each case, all rights under any such Assigned Contracts; and

(e) all furniture, fixtures and equipment, IT equipment, vehicles, and other items of personal property owned by Tandy Existing Operator and (x) located at the Facility or held or used by Tandy Existing Operator in operating the Facility and (y) not otherwise transferred pursuant to the Tandy REPA.

2.2 <u>Assumed Liabilities</u>. On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Effective Time, Tandy New Operator shall assume from Existing Seller (and from and after the Effective Time, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Tandy Existing Operator shall convey, transfer, and assign to Tandy New Operator or its designee only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Tandy Existing Operator), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the Effective Time (collectively, the "<u>Assumed Liabilities</u>"):

(a) Cure Costs relating to any Assigned Contracts;

(b) Tandy Existing Operator's Liabilities and obligations under the Assigned Contracts with respect to events or periods after the Effective Time;

(c) Transfer Taxes required for the consummation of the transactions contemplated by this Tandy OTA; and

(d) Other Liabilities, if any, set forth on <u>Schedule 2.2(d)</u> of this Tandy OTA, including fees payable to the U.S. Trustee and Trustee pursuant to <u>Section 3.5</u> of this Tandy OTA.

The assumption by Tandy New Operator of any Assumed Liability shall not, in any way, expand the rights of any third party relating thereto.

2.3 <u>Excluded Liabilities</u>. Except as expressly provided in this Tandy OTA as to the Assumed Liabilities or in the Sale Order, Tandy New Operator shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Tandy Existing Operator or relating to the Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Effective Time or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Effective Time, other than the Assumed Liabilities, and Tandy Existing Operator shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "<u>Excluded Liabilities</u>");

(a) all Liabilities arising out of, relating to or otherwise in respect of the Assets or the operation of the Facility or any other business of Tandy Existing Operator arising

4

on or prior to the Effective Time, including without limitation any accounts payable, or other Liability of Tandy Existing Operator incurred by Tandy Existing Operator prior to the Effective Time;

(b) all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Tandy Existing Operator or any of its Affiliates (including, for the avoidance of doubt, any Action related to malpractice, fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Tandy Existing Operator or any of its Affiliates, or any of their respective directors, officers, managers, or employees), or related to the Assets, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Effective Time (including any breach, default, failure to perform, torts related to performance, violations of law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Entity or other person or entity, and whether commenced, filed, initiated, or threatened prior to, on or following the Effective Time;

(c) all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-Tandy Operation Transfer Tax Period, and (ii) owed by Tandy Existing Operator (whether or not relating to a Pre-Tandy Operation Transfer Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which Tandy Existing Operator (or any Affiliate thereof) is obligated under or a party to;

(d) all Liabilities of Tandy Existing Operator or any of its Affiliates arising under or pursuant to Health Care Laws, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Tandy Operation Transfer, whether known or unknown as of the Tandy Operation Transfer.

(e) all Liabilities of Tandy Existing Operator arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Tandy Existing Operator, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Tandy Operation Transfer, whether known or unknown as of the Tandy Operation Transfer.

2.4 <u>Government Approvals</u>. Tandy New Operator will use its good faith efforts to promptly obtain all Health Care Licenses necessary to operate the Facility, including, without limitation, by filing such applications and making such notices as are necessary for Tandy New Operator to obtain the requisite Health Care Licenses to operate the Facility within

5

the time periods required by Applicable Laws. Tandy Existing Operator shall reasonably cooperate with Tandy New Operator with respect to Tandy New Operator's efforts to timely complete the filings contemplated under this <u>Section 2.4</u>, including, without limitation, by timely providing copies of all floor plans, certificates of occupancy, fire marshal reports, HVAC inspection reports, and emergency preparedness plans requested by Tandy New Operator.

2.5    <u>Conditions to Tandy Operation Transfer/Termination</u>.

    (a)    <u>For Both Parties</u>. The respective obligations of each Party to this Tandy OTA to consummate the transactions contemplated by this Tandy OTA are subject to the satisfaction (or to the extent permitted by law, written waiver by each of the Parties, in their respective sole discretion) on or prior to the Tandy Operation Transfer Date, of each of the following conditions:

        (i)    no court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Tandy OTA.

        (ii)    the Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order, the 9019 Order, and the Financing Orders, and such orders shall not have been reversed, modified, amended or stayed.

        (iii)    termination of the Tandy Interim Sublease and the Tandy Interim Management Agreement as of the Tandy Operation Transfer Date.

    (b)    <u>For Tandy New Operator</u>. The obligations of Tandy New Operator under this Tandy OTA are subject to the satisfaction on or prior to the Tandy Operation Transfer Date of the following conditions, any one or more of which may be waived by Tandy New Operator in its sole discretion to the extent permitted by Applicable Law:

        (i)    The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

        (ii)    Tandy Existing Operator shall have performed or complied, in all material respects, with all agreements, covenants and conditions required by this Tandy OTA to be performed or complied with by it on or prior to the Tandy Operation Transfer Date.

        (iii)    The transaction contemplated under the Tandy REPA have closed and the Debtor parties to the other Stalking Horse Sale Agreements shall have performed or complied in all material respects with all covenants and agreements required by such other Stalking Horse Sale Agreements to be performed or complied with by such Debtor(s) on or prior to the closing date provided for in such Stalking Horse Sale Agreements.

(iv)     The representations and warranties of Tandy Existing Operator set forth in this Tandy OTA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Tandy Operation Transfer Date as though made on and as of the Tandy Operation Transfer Date, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

(v)      Tandy New Operator shall have received verbal or written acknowledgement from the Texas Health and Human Services ("THHS") that it intends to approve the change of ownership applications and that all healthcare licenses necessary to operate the Facility ("Licenses") will be issued to Tandy New Operator as of the Tandy Operation Transfer Date.

(vi)     The applicable third-party to the Provider Agreements set forth on Schedule 2.5(b)(vi) shall have either consented to the assignment of the Provider Agreements to Tandy New Operator or agreed to enter into a new Provider Agreements with Tandy New Operator as of the Tandy Operation Transfer Date.

(vii)    Since the Contract Date, there shall have occurred, no event, circumstance or other change in Tandy Existing Operator or the Facility that has had a Material Adverse Effect that has not been corrected or resolved on or prior to Tandy Operation Transfer to Tandy New Operator's satisfaction as determined in its reasonable discretion.

(viii)   The average daily census shall not have decreased by 10% or more from the Baseline Facility Census.

(ix)     None of the other Stalking Horse Sale Agreements shall have been terminated in accordance with their terms.

(c)      For Tandy Existing Operator.  The obligations of Seller under this Tandy OTA are subject to the satisfaction on or prior to the Tandy Operation Transfer Date of the following conditions, any one or more of which may be waived by Tandy Existing Operator to the extent permitted by Applicable Law:

(i)      Tandy New Operator shall have performed or complied, in all material respects, with all agreements, covenants and conditions required by this Tandy OTA to be performed or complied with by it on or prior to the Tandy Operation Transfer Date.

(ii)     Tandy New Operator shall have performed or complied, in all material respects, with all agreements, covenants and conditions required by the Tandy Interim Management Agreement.

7

(iii) The representations and warranties of Tandy New Operator set forth in this Tandy OTA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Tandy Operation Transfer Date as though made on and as of the Tandy Operation Transfer Date, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

2.6     Tandy Existing Operator's Deliveries on the Tandy Operation Transfer Date. Tandy Existing Operator shall deliver the following to Tandy New Operator on the Tandy Operation Transfer Date:

(a)     A copy of the docketed Sale Order;

(b)     A Bill of Sale executed by Tandy Existing Operator, substantially in the form attached as Exhibit A (the "Tandy Bill of Sale");

(c)     An Assignment and Assumption Agreement executed by Tandy Existing Operator, substantially in the form attached hereto as Exhibit B (the "Tandy Assignment and Assumption Agreement");

(d)     An Assignment and Assumption Agreement of Resident Trust Funds executed by Tandy Existing Operator, substantially in the form attached hereto as Exhibit C (the "Tandy RTF Assignment and Assumption Agreement");

(e)     The Employee Schedule (as defined in Section 3.3(d));

(f)     The inventory and supplies included within the Assets, which Tandy Existing Operator shall deliver to Tandy New Operator or its designee by leaving the same at the Facility on the Tandy Operation Transfer Date;

(g)     A certificate executed by an authorized officer of Tandy Existing Operator that all representations and warranties of Tandy Existing Operator set forth in Article 5 of this Tandy OTA are true and correct in all material respects as of the Tandy Operation Transfer Date with the same force and effect as if made on the Tandy Operation Transfer Date, except that those representations and warranties that contain materiality qualifications and other qualifications based on the word "material" shall be required to be true and correct in all respects and not merely all material respects;

(h)     A closing statement executed by Tandy Existing Operator setting forth in reasonable detail the financial transactions contemplated by this Tandy OTA, including, without limitation, all prorations, as reasonably approved by Tandy Existing Operator and Tandy New Operator (the "Closing Statement"); and

8

(i)      Such other documents as are reasonably requested by Tandy New Operator to effectuate the transactions contemplated hereby.

2.7      <u>Tandy New Operator's Deliverables on the Tandy Operation Transfer Date</u>.  Tandy New Operator shall deliver to Tandy Existing Operator on the Tandy Operation Transfer Date:

(a)      The Tandy Bill of Sale executed by Tandy New Operator;

(b)      The Tandy Assignment and Assumption Agreement executed by Tandy New Operator;

(c)      The Tandy RTF Assignment and Assumption Agreement executed by Tandy New Operator;

(d)      A certificate executed by an authorized officer of Tandy New Operator that all representations and warranties of Tandy New Operator set forth in <u>Section 4</u> of this Tandy OTA are true and correct in all material respects as of the Tandy Operation Transfer Date with the same force and effect as if made on the Tandy Operation Transfer Date except that those representations and warranties that contain materiality qualifications and other qualifications based on the word "material" shall be required to be true and correct in all respects and not merely all material respects;

(e)      The Closing Statement executed by Tandy New Operator; and

(f)      Such other documents as are reasonably requested by Tandy Existing Operator to effectuate the transactions contemplated hereby.

## ARTICLE 3
## TRANSFER OF OPERATIONS AND ASSETS

3.1      <u>Cooperation; Covenants of the Parties</u>.

(a)      The parties hereto agree to cooperate with each other in good faith to effect an orderly transfer of the operations and transfer of the Assets of the Facility as of the Effective Time.

(b)      During the period between the Contract Date and the Tandy Operation Transfer Date (the "<u>Pre-Tandy Operation Transfer Period</u>"), Tandy Existing Operator and Tandy New Operator shall enter into the Tandy Interim Sublease and the Tandy Interim Management Agreement.  Subject to Tandy New Operator's rights and obligations under the Tandy Interim Management Agreement, Tandy Existing Operator shall: (i) operate the Facility in material compliance with Applicable Law and Tandy Existing Operator's past practices (both operational and financial); (ii) maintain the Assets in substantially the same condition as exists on the Contract Date (normal wear and tear excepted); (iii) perform all material obligations under the Assigned Contracts; (iv) maintain its normal inventory of supplies, which shall be in quantities consistent with Applicable Law and past practices for operation of the Facility; and (v) without limiting the foregoing, to the extent depleted or replaced in the ordinary

9

course, restock and replenish any portion of the inventory consumed or used during the Pre-Tandy Operation Transfer Period with inventory of comparable quality and consistent with past practice. Notwithstanding anything herein to the contrary, subject to Tandy New Operator's rights and obligations under the Tandy Interim Management Agreement, during any period of full or partial suspension of operations of a Facility related to the coronavirus (COVID-19) pandemic, Tandy Existing Operator may, in connection with the coronavirus (COVID-19) pandemic, take such actions (a "COVID Related Action") as are reasonably necessary (A) to protect the health and safety of the Facility's residents, employees and other individuals having business dealings with the Tandy Existing Operator, or (B) to respond to third-party supply or service disruptions caused by the coronavirus (COVID-19) pandemic; provided, that following any such suspension, to the extent that Tandy Existing Operator took any actions pursuant to the immediately preceding proviso that caused deviations from its business being conducted in the ordinary course of business consistent with past practice, to resume conducting its business in the ordinary course of business consistent with past practice in all material respects as soon as reasonably practicable as determined by Tandy Existing Operator in its reasonable discretion. Tandy Existing Operator shall provide to Tandy New Operator prompt written notice of the taking of any COVID Related Action.

(c) During the Pre-Tandy Operation Transfer Period, Tandy Existing Operator shall promptly notify Tandy New Operator in writing of any fact, circumstance, event, or action, the existence, occurrence, or taking of which: (1) has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (2) has resulted in, or could reasonably be expected to result in, the failure of any of the covenants set forth in Section 3.1(b).

(d) During the Pre-Tandy Operation Transfer Period, Tandy Existing Operator (i) shall not, without the prior written consent of Tandy New Operator, enter into any transaction or contractual obligation that would materially adversely impact Tandy Existing Operator's abilities to perform its obligations under this Tandy OTA; (ii) shall, upon request from Tandy New Operator, provide Tandy New Operator with a Resident Census Report detailing the performance of the Facility for the previous calendar month; and (iii) shall not transfer any Employees and shall not transfer any residents to any business or facility owned or controlled by an affiliate of Tandy Existing Operator, unless required to comply with Applicable Law or at the request of such transferred resident.

3.2     Resident Funds; Advance Payments.

(a) Prior to the Tandy Operation Transfer Date, Tandy Existing Operator shall prepare a true, correct and complete accounting, properly reconciled, of any Resident Trust Funds then held by Tandy Existing Operator for residents at the Facility. On the Tandy Operation Transfer Date, to the extent not previously transferred to Tandy New Operator pursuant to the Tandy Interim Management Agreement, Tandy Existing Operator shall transfer the Resident Trust Funds to a bank account

designated by Tandy New Operator, and Tandy New Operator shall expressly assume all of Tandy Existing Operator's financial and custodial obligations with respect thereto, it being the intent and purpose of this provision that, upon such transfer, Tandy Existing Operator will be relieved of all fiduciary and custodial obligation with respect to the Resident Trust Funds delivered to Tandy New Operator, and that Tandy New Operator will assume all such obligations and be directly accountable to the residents with respect thereto.

(b)     Tandy Existing Operator will indemnify, defend and hold Tandy New Operator harmless for, from and against all Losses: (i) in the event the amount of the Resident Trust Funds, if any, transferred to Tandy New Operator does not constitute the full amount of the Resident Trust Funds that were to be delivered to Tandy New Operator, (ii) resulting from inaccuracies in the accounting of Resident Trust Funds provided by Tandy Existing Operator and/or (iii) resulting from actions or omissions of Tandy Existing Operator with respect to the Resident Trust Funds prior to the Tandy Operation Transfer Date. Tandy New Operator agrees to indemnify and hold Tandy Existing Operator harmless from all Losses that may be asserted against Tandy Existing Operator in connection with Tandy New Operator's custody and treatment from and after the Tandy Operation Transfer Date of the Resident Trust Funds delivered by Tandy Existing Operator to Tandy New Operator.

3.3     Employees.

(a)     [Omitted]

(b)     As of 11:59:59 PM on the day before the Tandy Interim Contract Date, Tandy Existing Operator shall terminate all employees who are in its employ on that day (including any such employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave) (collectively, the "Employees"). Subject to Section 3.3(c), as of the Tandy Interim Contract Date, Tandy New Operator will offer employment, on an "at will" basis, to a sufficient number of the Employees so as to avoid any obligation of the Tandy Existing Operator to provide advance notice under the WARN Act, or under any comparable State law, at rates of pay and benefit packages comparable to their current compensation. Tandy Existing Operator and Tandy New Operator acknowledge and agree that one purpose of this Section 3.3(b) is to ensure that Tandy Existing Operator is not required to provide advance notice under the WARN Act and/or under any comparable State law.

(c)     Tandy New Operator or its designee shall hire as of the Tandy Interim Contract Date, on an "at will" basis, those Employees Tandy New Operator elects in its sole discretion and who elects to accept employment with Tandy New Operator or its designee (all of such employees who accept employment with Tandy New Operator or its designee being herein referred to as the "Hired Employees"). Tandy Existing Operator shall reasonably cooperate with Tandy New Operator or its designee and provide reasonable access to the Employees to allow Tandy New Operator or its designee to obtain all necessary information from the Employees needed by Tandy

11

New Operator or its designee to complete the onboarding process for the Hired Employees at a time mutually agreed to by Tandy Existing Operator and Tandy New Operator or its designee.

(d)     As soon as practicable following the most recent payroll date prior to the Tandy Interim Contract Date, Tandy Existing Operator shall provide a schedule (the "Employee Schedule") setting forth Tandy Existing Operator's estimate for each Employee as of the Tandy Interim Contract Date: (1) the name of such Employee, and (2) their positions, original hire dates, full/part time status, rates of pay and whether they are on medical disability or leave of absence to the extent such disclosures are permissible under applicable law.

(e)     Tandy Existing Operator shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits, to the extent such benefits exist, brought by or in respect of the Employees related to events occurring prior to the Tandy Interim Contract Date.  Tandy Existing Operator also shall remain solely responsible for all workers' compensation claims of any Employees which relate to events occurring prior to the Tandy Interim Contract Date.  Notwithstanding the foregoing, Tandy New Operator shall reimburse Tandy Existing Operator for any accrued PTO amounts owing to any Employee terminated pursuant to Section 3.3(b) to the extent (i) such amounts are required under the Texas Payday Law; and (ii) that following the Closing such Employee does not accept employment with Tandy New Operator with credit for such accrued PTO.  Tandy Existing Operator shall provide its calculation of the accrued PTO amounts owed to Employees under the Texas Payday Law 5 business days prior to the Tandy Interim Contract Date.

(f)     Upon reasonable advance written notice to Tandy New Operator and at reasonable times that will not, in any material respect, interfere with or disrupt the business of Tandy New Operator at the Facility, Tandy New Operator agrees to provide Tandy Existing Operator with reasonable access to the Facility's employees after the Tandy Interim Contract Date if necessary for Tandy Existing Operator's defense of any professional liability or general liability litigation.

(g)     Nothing in this Tandy OTA shall create any rights in favor of any person not a party hereto, including the Employees, or constitute an employment agreement or condition of employment for any employee of Tandy Existing Operator or the Tandy New Operator or any Affiliate thereof, nor shall this Tandy OTA be deemed the assignment to or assumption by Tandy New Operator of any collective bargaining agreement, employment agreement or terms or conditions of employment (except as set forth herein), and Tandy New Operator shall not assume any liabilities or obligations under any employee benefit plan or defined benefit plan of Tandy Existing Operator or its Affiliates.

(h)     Tandy Existing Operator acknowledges and agrees that Tandy New Operator is not assuming any of Tandy Existing Operator's obligations to its Employees and/or qualified beneficiaries under Section 601, et seq. of the Employee Retirement

12

Income Security Act of 1974, as amended, and the regulations thereunder, as in effect from time to time, and Section 4980B of the Code, in the event any such obligations of Tandy Existing Operator exist as of the Tandy Interim Contract Date.

3.4     <u>Accounts Receivable</u>.  Tandy Existing Operator shall transfer its right, title and interest in and to all unpaid accounts receivable with respect to the Facility that relate to all periods prior to the Effective Time, including, but not limited to, any accounts receivable arising from rate adjustments which relate to periods prior to the Effective Time, even if such adjustments occur after the Effective Time to Tandy New Operator.

3.5     <u>Payment of Operating Costs, Prorations, and Deposits</u>.

(a)     Tandy Existing Operator shall be responsible for, and shall pay on a timely basis, claims or charges which are owed to third parties arising from Tandy Existing Operator's operation or control of the Facility, including payroll, bed taxes, insurance premiums, utilities, operating charges, prepaid service contracts, amounts due to any third party vendors, including amounts due under any Contracts, and similar obligations for all periods prior to the Effective Time.

(b)     Tandy New Operator, shall be responsible for, and shall pay on a timely basis, any claims or charges which are owed to such third parties arising from the operation or control of the Facility from and after the Effective Time, including payroll, bed taxes, insurance premiums, utilities, operating charges, prepaid service contracts, amounts due to any third party vendors, including amounts due under any Assigned Contracts, and similar obligations for all periods on and after the Effective Time.

(c)     Revenues and expenses pertaining to utility charges for the billing period in which the Tandy Operation Transfer occurs (if known), prepaid expenses and like items of revenue or expense shall be prorated between Tandy Existing Operator and Tandy New Operator as of the Tandy Operation Transfer Date.  All such prorations shall be made on the basis of actual days elapsed in the relevant accounting or revenue period and shall be based on the most recent information available to Tandy Existing Operator.  In general, such prorations shall be made so as to reimburse Tandy Existing Operator for accrued prepaid expense items, and to charge Tandy Existing Operator for accrued revenue items, to the extent that the same are attributable to periods after the Effective Time.

(d)     Without modifying the obligations set forth in <u>Section 3.5(c)</u>, Tandy Existing Operator and Tandy New Operator shall cooperate to coordinate an orderly transfer of all utilities into the name of Tandy New Operator.

3.6     <u>Intentionally Deleted</u>

3.7     <u>Medicaid and other Third Party Payors</u>. As of the Effective Time, and to the extent permitted by Applicable Law, Tandy New Operator shall assume any and all of Tandy Existing Operator's rights and interests in and to: (i) all third party payor agreements (to the extent assignable and consent is obtained from such third party, where necessary); and (ii) Tandy Existing Operator's Medicaid provider reimbursement agreement (the "<u>Provider</u>

13

Agreements"). Notwithstanding the foregoing, or anything to the contrary contained in this Tandy OTA, Tandy New Operator shall not accept any rights nor assume any liabilities or obligations of Tandy Existing Operator under the Provider Agreements arising or relating to periods of time prior to the Effective Time. Tandy Existing Operator agrees to cooperate with Tandy New Operator in the assignment of Tandy Existing Operator's Provider Agreements to Tandy New Operator, including, without limitation, providing to Tandy New Operator or any Governmental Entity any information requested to effect the transfer of the Provider Agreements, to the extent permitted by Applicable Law.

3.8     Transfer of Records; Access To Records.  As of the Tandy Operation Transfer Date, Tandy Existing Operator shall transfer to Tandy New Operator or its designee, to the extent in the possession of Tandy Existing Operator or located at the Facility, all right, title and interest of Tandy Existing Operator in and to all books, data and records (including electronic versions thereof but excluding Tandy Existing Operator's proprietary software and excluding any financial, accounting and tax records of or relating to Tandy Existing Operator and any minute books, charter documents, record books and other similar books and records pertaining to the organization, existence or capitalization of Tandy Existing Operator), including the Employee records and resident records (except for such records and reports where transfer is prohibited by Applicable Law) (the "Facility Records"), provided, however, that Tandy Existing Operator shall be entitled to keep such copies of all Facility Records as it may deem necessary and as permitted by Applicable Law. Upon receipt of such Facility Records, Tandy New Operator will maintain the Facility Records in accordance with Applicable Law. At all times on and after the Tandy Operation Transfer Date, Tandy New Operator shall allow Tandy Existing Operator, at Tandy Existing Operator's sole cost and expense, to have reasonable access during regular business hours upon reasonable prior written notice and to make copies of, the Facility Records, to the extent reasonably necessary to enable Tandy Existing Operator to investigate and defend malpractice, employee or other claims, to file or defend tax returns, to verify accounts receivable collections due Tandy Existing Operator, and to perform similar matters.  Tandy Existing Operator makes no representations relating to the accuracy or the completeness of the Facility Records and any reliance upon the Facility Records shall be done at Tandy New Operator's sole risk and liability. To the extent that the Facility Records are maintained in an electronic format, the parties shall cooperate in good faith to coordinate the electronic transfer to Tandy New Operator or its designee all right, title and interest of Tandy Existing Operator in and to all such Facility Records, in a manner mutually acceptable to the parties, and Tandy New Operator shall be responsible for any third party costs related to the transfer of such Facility Records.

3.9     Inspections and Surveys. Tandy Existing Operator shall be responsible for the payment of all fines and penalties imposed by Governmental Bodies which fines and penalties arise in connection with any regulatory investigations, inspections or surveys occurring prior to the Effective Time, or which relate to events occurring prior to the Effective Time. Tandy New Operator shall be responsible for the payment of all fines and penalties imposed by Governmental Bodies which fines and penalties arise in connection with any regulatory inspections or surveys on or after the Effective Time and which are related to the operation of the Facility on or after the Effective Time.  Tandy Existing Operator shall provide to Tandy New Operator, promptly after receipt of the same, any survey reports, waivers of

14

deficiencies, plans of correction or any other investigation reports issued with respect to the Facility between the Contract Date and the Tandy Operation Transfer Date.

3.10 <u>Assigned Contracts</u>.

(a) <u>Assumption & Assignment / Rejection of Certain Contracts</u>. <u>Schedule 3.10(a)</u> sets forth a list of all executory Contracts to which, to the knowledge of the Trustee, Tandy Existing Operator is a party or to which any of its assets are bound and which are to be included in the Assigned Contracts. From time to time, and as reasonably requested by Tandy New Operator, Tandy Existing Operator shall update Schedule 3.10(a). Tandy Existing Operator shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts and take all other actions necessary or otherwise required to cause such Contracts to be assumed by Tandy Existing Operator and assigned to Tandy New Operator or its designee pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts as of the Tandy Operation Transfer (including (x) serving on all counterparties to all of their Contracts a notice specifically stating that Tandy Existing Operator is or may be seeking the assumption and assignment of such Contract(s) and of the deadline for objecting to the Cure Costs or any other aspect of the proposing assumption and assignment of their Contracts to Tandy New Operator or its designee and (y) taking, as promptly as practicable, all other actions reasonably requested by Tandy New Operator to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain an Order (which may be the Sale Order), including a finding that the proposed assumption and assignment of the Assigned Contracts to the Tandy New Operator satisfies all applicable requirements of section 365 of the Bankruptcy Code). The Sale Order shall provide that as of and conditioned on the occurrence of the Tandy Operation Transfer, Tandy Existing Operator shall assign or cause to be assigned to Tandy New Operator or its designee, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Tandy Existing Operator's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by the Trustee based on Tandy Existing Operator's books and records or as otherwise determined by the Bankruptcy Court. At the Tandy Operation Transfer and subject to <u>Section 3.10(b)</u>, Tandy Existing Operator shall, pursuant to the Sale Order, and the Tandy Assignment and Assumption Agreement, assume and assign to Tandy New Operator or its designee, all Assigned Contracts that may be assigned by Tandy Existing Operator to Tandy New Operator or its designee pursuant to sections 363 and 365 of the Bankruptcy Code. At the Tandy Operation Transfer, Tandy New Operator (i) shall pay all Cure Costs and (ii) shall, assume or cause to be assumed, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform (or cause to be fully satisfied, discharged and performed) all of the obligations (other than any Excluded Liabilities) that are Assumed Liabilities

15

under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code and the Tandy Assignment and Assumption Agreement, as applicable.

(b) <u>Excluding or Adding Assigned Contracts Prior to Tandy Operation Transfer</u>. Tandy New Operator shall have the right to notify Tandy Existing Operator in writing of any Assigned Contract that it does not wish to assume or a Contract to which Tandy Existing Operator is a party that Tandy New Operator wishes to add as an Assigned Contract up to one (1) Business Day prior to the Tandy Operation Transfer and (i) any such previously considered Assigned Contract that Tandy New Operator no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts, and (ii) any such Contract not originally appearing on the Schedules related to Assigned Contracts that Tandy New Operator wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, and assumed by Tandy Existing Operator to sell and assign to Tandy New Operator or its designee. Tandy New Operator may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract becoming an Assigned Contract, and Tandy Existing Operator shall use its reasonable best efforts to obtain such modifications or amendments; *provided, however*, that, for so long as Tandy Existing Operator use their reasonable best efforts to obtain such modifications or amendments, the failure to obtain any such modifications or amendments shall, in and of itself, not be a condition to Tandy New Operator's obligation to consummate the transactions contemplated by this Tandy OTA on the Tandy Operation Transfer Date. All reasonable and documented costs and expenses payable prior to Tandy Operation Transfer in connection with transferring any Assigned Contracts as contemplated by this Tandy OTA (other than the Cure Costs) shall be borne by Tandy Existing Operator.

(c) <u>Resident Agreements</u>. Notwithstanding anything to the contrary in this Section 3.10, as of the Tandy Operation Transfer Date, the Assigned Contracts to be assumed and assigned to Tandy New Operator or its designee as of the Tandy Operation Transfer Date shall include all care or residency agreements relating to the occupancy of the Facility by residents thereof (the "<u>Resident Agreements</u>") pursuant to the Tandy Assignment and Assumption Agreement. Tandy Existing Operator agrees to use best efforts to transfer the Resident Agreements to Tandy New Operator as of the Tandy Operation Transfer Date.

(d) Notwithstanding anything to the contrary in Sections 3.10(b) or (c) above, in the event that the notice from Tandy New Operator to Tandy Existing Operator concerning a Contract (including any Resident Agreement) to which Tandy Existing Operator is a party that Tandy New Operator wishes to add as an Assigned Contract is provided by Tandy New Operator on or after one (1) Business Day prior to the last date specified in the Bidding Procedures Order for the service of a Supplemental Assumption Notice (as defined in the Bidding Procedures Order), Tandy New Operator and Tandy Existing Operator shall cooperate in good faith and use their respective commercially reasonable efforts to obtain the Bankruptcy Court's approval pursuant to Section 365 of the Bankruptcy Code for Tandy Existing

16

Operator's assumption and assignment of such new Assigned Contract to Tandy New Operator or its designee, as applicable.

3.11    Remittances, Mail and Other Communications.    All remittances, mail and other communications relating to the operations of the Facility following the Tandy Operation Transfer Date received by Tandy Existing Operator or its Affiliates at any time after the Tandy Operation Transfer Date relating to periods of operations on and after the Tandy Operation Transfer Date shall be promptly turned over to Tandy New Operator or its designee. Likewise, all remittances, mail and other communications relating to the operations of the Facility prior to the Tandy Operation Transfer Date received by Tandy New Operator or its Affiliates at any time after the Tandy Operation Transfer Date relating to periods of operations prior to the Tandy Operation Transfer Date shall be promptly turned over to Tandy Existing Operator.

3.12    Software Systems.  On and after the Tandy Operation Transfer Date, Tandy New Operator shall not have the right to use any of Tandy Existing Operator's proprietary software systems.  Prior to the Tandy Operation Transfer Date, Tandy Existing Operator will reasonably cooperate with Tandy New Operator's efforts to put Tandy New Operator's software systems in place at the Facility in order to ensure orderly transition of the operations at the Facility.

3.13    Excluded Assets.  Notwithstanding anything to the contrary contained in this Section 3 or elsewhere in this Tandy OTA, the items listed on Exhibit D (collectively, the "Excluded Assets") are excluded from the Assets and shall remain the property of the Tandy Existing Operator after the Tandy Operation Transfer.

3.14    Release and Indemnification of Trustee. FROM AND AFTER THE OPERATION TRANSFER, TANDY NEW OPERATOR ("INDEMNIFYING PARTY") SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS TRUSTEE AND HIS AFFILIATES, PARTNERS, CONSULTANTS, ADVISORS, AGENTS, AND REPRESENTATIVES (COLLECTIVELY, "INDEMNIFIED PARTY") FROM AND AGAINST, AND HEREBY ASSUMES, ANY AND ALL LOSSES OR LIABILITIES RESULTING FROM, ARISING OUT OF, OR INCIDENTAL TO THE OPERATION OF THE FACILITY ON OR AFTER THE OPERATION TRANSFER DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EXCEPT FOR FRAUD BY OR INTENTIONAL MISCODUCT OF THE TRUSTEE, NOTHING HEREIN SHALL OBLIGATE THE TRUSTEE IN HIS PERSONAL CAPACITY; HIS OBLIGATIONS HERETO ARE ONLY AS CHAPTER 11 TRUSTEE AND NOT IN HIS PERSONAL CAPACITY

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF TANDY NEW OPERATOR

Tandy New Operator hereby makes the representations and warranties indicated below to Tandy Existing Operator, in each case as of the Contract Date, unless another date is specifically indicated below:

17

4.1     Authority, Validity and Binding Effect. Tandy New Operator has all necessary power and authority to operate and lease the Facility and to carry on its business as it is now being conducted. Tandy New Operator is duly organized and in good standing under the laws of the State of Delaware. Tandy New Operator has all necessary limited liability company power and authority, as the case may be, to enter into this Tandy OTA and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Tandy OTA on each of their behalf to do so. This Tandy OTA has been duly and validly executed and delivered by Tandy New Operator and is enforceable against Tandy New Operator in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

4.2     No Defaults. The execution and delivery of this Tandy OTA and any documents contemplated hereby by Tandy New Operator, and the performance of its obligations hereunder and thereunder, do not and will not:

(a)     conflict with or result in any material breach of the provisions of, or constitute a default under articles of organization or the operating agreement of Tandy New Operator;

(b)     violate any material restriction to which Tandy New Operator is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization or permit or other material agreement or instrument to which Tandy New Operator is a party, which will not be satisfied or terminated prior to the Tandy Operation Transfer Date as a result of the transactions contemplated by this Tandy OTA or result in the termination of any such instrument or termination of any provisions in such instruments that will result in the impairment of any of Tandy New Operator's rights under such instruments; or

(c)     constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or governmental authority, or of any judgment, decree, writ, injunction or order of any court to which Tandy New Operator is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which Tandy New Operator, or any of its Affiliates is a party.

4.3     No Litigation. There are no Actions pending or in effect, or to the knowledge of Tandy New Operator, threatened against, Tandy New Operator relating to the transactions contemplated by this Tandy OTA.

4.4     Approvals. Tandy New Operator is familiar with the requirements to become a licensed operator of an assisted living facility in the State of Texas. To the knowledge of Tandy New Operator, except as set forth on the Plan of Correction and other matters disclosed by Tandy Existing Operator on Schedule 5.9, no fact, issue, concern or other matter, either past or present, exists that would materially adversely affect Tandy New Operator's ability

18

to obtain an assisted living facility license from the THHS to operate the Facility or any other approvals required to consummate the transactions contemplated hereunder. Neither Tandy New Operator nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from any healthcare programs, or (iii) been the subject of any criminal investigation, or any enforcement action regarding, its or their ownership or operation of any health care facility or concerning or relating to the delivery of, or reimbursement for, health care services.

4.5     Broker.  Tandy New Operator has not engaged, nor is Tandy New Operator liable to pay any fees, costs or commissions to, any broker, finder, agent or financial advisor in connection with the transactions contemplated hereby.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF TANDY EXISTING OPERATOR

Tandy Existing Operator hereby represents and warrants as follows to Tandy New Operator, in each case as of the Contract Date, unless another date is specifically indicated below:

5.1     Authority, Validity and Binding Effect.  Tandy Existing Operator has all necessary power and authority to carry on its business as it is now being conducted.  Tandy Existing Operator is duly organized and in good standing under the laws of the State of Texas. Subject to requisite Bankruptcy Court approvals, Tandy Existing Operator has all necessary power and authority to enter into this Tandy OTA and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Tandy OTA to do so.  This Tandy OTA has been duly and validly executed and delivered by Tandy Existing Operator and, subject to requisite Bankruptcy Court approvals, is enforceable against Tandy Existing Operator in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

5.2     No Defaults.  The execution and delivery of this Tandy OTA and any documents contemplated hereby by Tandy Existing Operator, and the performance of their obligations hereunder, does not and will not:

(a)     conflict with or result in any material breach of the provisions of, or constitute a default under the articles of organization or operating agreement of Tandy Existing Operator;

(b)     violate any material restriction to which Tandy Existing Operator is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization or permit or other material agreement or instrument to which Tandy Existing Operator is a party, which will not be satisfied or terminated with respect to the Facility prior to the Tandy Operation Transfer Date as a result of the transactions contemplated by this Tandy OTA or result in the termination of any such instrument or termination of any provisions in such instruments that will result

19

in the impairment of any of Tandy Existing Operator's rights under such instruments; or

(c) constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or governmental authority, or any judgment, decree, writ, injunction or order of any court to which Tandy Existing Operator is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which Tandy Existing Operator is a party.

5.3     Environmental. Except for medical waste generated and disposed of in the ordinary course of business and in compliance with Applicable Laws, Tandy Existing Operator has not generated, stored or disposed of any Hazardous Materials on the real property on which the Facility is located (the "Property"), and there is not currently any Hazardous Materials on the Property. To Tandy Existing Operator's Knowledge, there are no environmental permits, licenses or approvals required by any Applicable Law pertaining to the Facility.

5.4     Litigation. Except as set forth on Schedule 5.4, there are no Actions pending or, to Tandy Existing Operator's Knowledge, threatened against or affecting Tandy Existing Operator (as it relates to the ownership, leasing or operation of the Facility). Tandy Existing Operator is neither subject to, nor in default under, any Governmental Order applicable to it, or to the Facility.

5.5     Labor and Employment Matters. Except as set forth on Schedule 5.5, Tandy Existing Operator is not a party to any collective bargaining agreement, employment agreement or other labor contract applicable to any of the Employees, and there are no pending or, to Tandy Existing Operator's Knowledge, threatened labor disputes at the Facility including, but not limited to, any strike, slowdown, picketing, work stoppage, organizational activities or employee grievance process affecting the Facility. Tandy Existing Operator has complied in all material respects with all Applicable Laws governing wage, hour, payroll and all other employment and labor matters.

5.6     ERISA and Benefit Plans.

(a) To the best of Tandy Existing Operator's Knowledge, Tandy Existing Operator is and never has been a party to, participates in, has participated in or has any liability or contingent liability with respect to any of the following as they relate to the Employees: (i) any "employee welfare benefit plan" or "employee pension benefit plan" or "multiemployer plan" as those terms are respectively defined in sections 3(1), 3(2) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("ERISA"); (ii) any retirement or deferred compensation plan, incentive compensation plan, stock plan, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, insurance or hospitalization program or any other fringe benefit arrangements for any current or former employee, director, consultant or agent, whether pursuant to contract, arrangement, custom or informal understanding, written or unwritten, which does not constitute an "employee benefit plan" (as defined in section 3(3) of ERISA); or (iii) any fringe benefit plans, as that term is

20

defined in Section 6039D(d) of the Code (collectively, the "Employee Plans"), and under no circumstances will Tandy New Operator have any liability with respect to any such Employee Plan of Tandy Existing Operator in the event it exists.

(b)     Omitted.

5.7     Taxes.  Except as set forth on Schedule 5.7, all Tax Returns required to be filed by Tandy Existing Operator on or before the Contract Date have been timely filed with the appropriate Governmental Entities in all jurisdictions in which such Tax Returns are required to be filed, and all Taxes shown as due in connection therewith have been paid. Except as set forth on Schedule 5.7, all Taxes which have become due or payable or are required to be collected by Tandy Existing Operator or are otherwise attributable to any periods ending on or before the Tandy Operation Transfer Date and all interest and penalties thereon, have been paid or will be paid in full on or prior to the Tandy Operation Transfer Date, other than such Taxes that are being contested by Tandy Existing Operator in good faith. Except as set forth on Schedule 5.7, all deposits required by law to be made by Tandy Existing Operator with respect to employees' withholding Taxes have been duly made, and, as of the Tandy Operation Transfer Date, all such deposits due will have been made.  Except as set forth on Schedule 5.7, all Taxes that Tandy Existing Operator are or were required by Applicable Law to withhold, deduct or collect have been duly withheld, deducted and collected and, to the extent required, have been paid to the proper Governmental Entity or other Person.  No examination of any Tax Return of Tandy Existing Operator is currently in progress. There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any such Tax Return. Except as set forth on Schedule 5.7, there are no encumbrances for Taxes upon the Assets other than statutory liens for Taxes not yet due or payable.

5.8     Financial Materials.   All materials and/or documents relating to the financial condition and/or census of the Facility, provided to Tandy New Operator, are true and complete in all material respects, and are not misleading in any material respect.

5.9     Health Care Representations

(a)     The License to operate the Facility is in renewal, is subject to a pending Plan of Correction and ongoing review by state and other regulatory agencies.  Subject to the foregoing:  (i) except as set forth on Schedule 5.9(a) Tandy Existing Operator owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all material licenses, permits, certificates, accreditations, and other approvals required by a Governmental Entity for the operation of the Facility and will operate or cause the Facility to be operated in such a manner that such licenses shall remain in full force and effect; (ii) all material licenses applicable to the business conducted at the Facility are set forth on Schedule 5.9(a); (iii) except as set forth on Schedule 5.9(a), no proceeding is pending or, to Tandy Existing Operator's Knowledge, threatened, seeking the revocation or limitation of any such license;.(iv) except as set forth on Schedule 5.9(a), Tandy Existing Operator has not received any written notice from any Governmental Entity or other applicable authority of (a) any violation, non-renewal, suspension or revocation of any such licenses that has not

21

been dismissed or cured, or (b) any failure by Tandy Existing Operator to obtain any material licenses required by Applicable Law for the ownership, maintenance, use, occupancy or operation of the Facility as currently owned or operated; and (v) except as set forth on Schedule 5.9(a), there has been no event, change, development, or occurrence that could reasonably be expected to lead to either of (a) or (b), above.

(b)     The Facility is and shall be, as of 11:59:59 p.m. EST on the day prior to the Tandy Operation Transfer Date, licensed by the applicable Governmental Entity as an assisted living facility, with the same number and type of licensed beds as are set forth on Schedule I.

(c)     Except as disclosed on Schedule 5.9(c) and the Plan of Correction, subject to the ongoing review and inspections by the State and other Governmental Entities while the Licensee is in the renewal phase, to the Knowledge of Tandy Existing Operator, (i) Tandy Existing Operator has operated the Facility in material compliance with all Healthcare Laws; (ii) there are no outstanding inspections, surveys, or plans of correction as of the Contract Date, except for Plan of Correction, and ongoing review and inspection by the state and other Governmental Entities; (iii) there are no implemented bans, remedies, sanctions, prohibitions on payment, or other limitations in effect with respect to the Facility; and (iv) no action has been taken or recommended, nor, to Tandy Existing Operator's Knowledge, is there any basis for any action, by any Governmental Entity, either to revoke, withdraw or suspend its license to operate the Facility or to terminate or decertify any participation of the Facility in the Medicaid waiver programs; other than the current ongoing review in connection with license renewal.

(d)     To the Knowledge of Tandy Existing Operator, neither Tandy Existing Operator nor any current member, officer, director or employee of Tandy Existing Operator has been (i) sanctioned pursuant to the Anti-Kickback Statute (42 U.S.C. §§1320a-7a or 1320a-8), the False Claims Act (31 U.S.C. §3729 et seq.), the Stark Law (42 U.S.C. §1395nn), or the regulations promulgated pursuant to such statutes, or any related or similar federal, state or local statutes or regulations governing referrals, fraud, waste, and abuse in the healthcare industry ("Health Care Fraud and Abuse Laws"); or (ii) convicted of a criminal offense under the Health Care Fraud and Abuse Laws. There are no pending or threatened Healthcare Fraud and Abuse Law investigations, proceedings, or actions (including any civil investigative demand, subpoena, or self-disclosure) involving Tandy Existing Operator, any current member, officer, director or employee of Tandy Existing Operator, or the Facility. Other than as set forth on Schedule 5.9(d), to the Knowledge of Tandy Existing Operator, Tandy Existing Operator has not received any written notice (i) of the commencement of any proceeding under the Health Care Fraud and Abuse Laws or (ii) that the Facility, Tandy Existing Operator and/or any officer, director or employee of Tandy Existing Operator is under investigation or involved in proceedings regarding the Health Care Fraud and Abuse Laws, including as a result of a self-disclosure. Tandy Existing Operator and its agents and representatives, and all agreements, arrangements, and operations of the Facility, have at all times been in material compliance with all of the Health Care Fraud and Abuse Laws.

(e)     Except as set forth on <u>Schedule 5.9(e)</u>, to the Knowledge of Tandy Existing Operator, neither Tandy Existing Operator nor any current director, officer, or managing employee of Tandy Existing Operator, is or has been party to a corporate integrity agreement, corporate compliance agreement, or other settlement agreement with the OIG, CMS, the United States Department of Justice, the THHS, the Texas Department of Medicaid, or any state Attorney General, as a result of an alleged violation of any Applicable Law. Neither Tandy Existing Operator nor any current director, officer, contractor, vendor, or employee of Tandy Existing Operator is listed on the OIG List of Excluded Individuals and entities, Texas Medicaid Provider Exclusion and Suspension List, or has been suspended, excluded, or otherwise limited from participating in the Medicaid waiver program, or any other government reimbursement program.

(f)     Tandy Existing Operator is certified for participation in the Medicaid and Medicaid waiver programs. Except as disclosed on <u>Schedule 5.9(f)</u>, to the Knowledge of Tandy Existing Operator, the Facility is in material compliance with the conditions of participation and conditions for coverage of the government reimbursement programs and with the terms, conditions, and provisions of the Provider Agreements. The Provider Agreements are each in full force and effect, and Tandy Existing Operator has no Knowledge of any fact or circumstance that would cause any such Provider Agreement not to remain in force or be assigned to Tandy New Operator or its designee on and after Tandy Operation Transfer. Attached hereto on <u>Schedule 5.9(f)</u> is a true, correct, and complete list of all Medicaid provider numbers (the "<u>Provider Numbers</u>") in the name of Tandy Existing Operator, the Facility, or as otherwise specified which are currently used in connection with the operation of the Facility. The Provider Numbers are active with CMS, the applicable Governmental Entity of the State, and any other applicable Governmental Entity. There is no Action pending or, to Tandy Existing Operator's Knowledge, threatened, involving any of the Provider Agreements or any other third-party payor programs, with respect to the Facility, and Tandy Existing Operator has no reason to believe that any such proceedings, audits, investigations, or surveys are pending, threatened, or imminent.

(g)     All billing practices of Tandy Existing Operator with respect to all third-party payors, including Medicaid and commercial insurance companies, have been in material compliance with all Applicable Laws and policies of such third-party payors, commercial insurance companies and Medicaid waiver programs.

(h)     <u>Schedule I</u> sets forth the number of licensed and certified beds at the Facility.

(i)     Except as disclosed on <u>Schedule 5.9(i)</u>, to the Knowledge of Tandy Existing Operator, Tandy Existing Operator and the policies, procedures, and systems of the Facility are in material compliance with the Health Insurance Portability and Accountability Act of 1996 and the rules and regulations promulgated thereunder ("<u>HIPAA</u>") and related or similar federal, state or local statutes or regulations governing medical records and the privacy of resident information. Except as disclosed on <u>Schedule 5.9(i)</u>, to the Knowledge of Tandy Existing Operator, all protected health information (as defined under HIPAA) maintained by the Facility

23

is maintained in accordance with HIPAA's administrative, physical, and technical safeguard requirements. Except as disclosed on Schedule 5.9(i), to the Knowledge of Tandy Existing Operator, to the extent required under HIPAA, the Facility has in effect with each individual or entity acting as a business associate (as defined in HIPAA) of such Facility an agreement that satisfies all of the business associate requirements of HIPAA. Except as disclosed on Schedule 5.9(i), to the Knowledge of Tandy Existing Operator, Tandy Existing Operator has not received any complaint or notice of investigation (in writing or otherwise) from the Department of Health and Human Services Office for Civil Rights, or from any other person, entity or government agency regarding Tandy Existing Operator, the Facility, or any of their business associates' uses or disclosures of, or security practices or security incidents regarding, protected health information or HIPAA compliance. Except as disclosed on Schedule 5.9(i), to the Knowledge of Tandy Existing Operator, with regard to protected health information of the Facility's residents, Tandy Existing Operator and the Facility are, and at all times have been, in material compliance with all applicable Legal Requirements related to reporting to individuals, governmental or regulatory authorities, the media, or credit reporting agencies, as applicable, breaches involving protected health information under HIPAA or otherwise.

5.10    Title to Property; Sufficiency of Assets.

(a)    Subject to requisite Bankruptcy Court approvals, and assumption by the Tandy Existing Operator of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, (i) Tandy Existing Operator owns good and valid title to, or holds a valid leasehold interest in, all of the Assets, whether tangible or intangible, free and clear of all Encumbrances, and (ii) at the Tandy Operation Transfer, Tandy Existing Operator will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Assets free and clear of all Encumbrances.

(b)    Other than the Excluded Assets and any Permits, the Assets constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the business of the Facility and its Subsidiaries as conducted in the ordinary course as of the Contract Date.

5.11    Absence of Changes.  Except as disclosed on Schedule 5.11, to the Knowledge of Tandy Existing Operator, since December 31, 2020, and except with respect to any changes that are the result of the COVID-19 pandemic: (a) the business at the Facility has been conducted in all material respects in the ordinary course consistent with past practice; (b) nothing has occurred which would constitute a Material Adverse Effect; and (c) no transaction or contractual obligation that would materially adversely impact Tandy Existing Operator's abilities to perform its obligations under this Tandy OTA has been entered into.

5.12    Contracts.

15001267 v14

(a)     True, correct, and complete copies of all of the Contracts have been, or will be, made available to Tandy New Operator. A list of all Contracts is attached hereto as Schedule 5.12(a). With respect to the Contracts, (i) each of the Contracts is valid, binding and enforceable in accordance with its terms except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general, (ii) there is not such material default or material event of default, or any event which, with or without notice or lapse of time or both, would constitute a material default under any Contract by Tandy Existing Operator. With respect to each Contract that is a lease of equipment or other personal property, (i) such lease creates a valid leasehold interest in all property purported to be leased thereunder, (ii) all rent and other required payments have been timely paid by Tandy Existing Operator, (iii) Tandy Existing Operator is in lawful possession of all of such property, and (iv) such lease is specifically identified as a lease on Schedule 5.12(a).

(b)     the execution and delivery of this Tandy OTA by Tandy Existing Operator and the consummation of the transactions contemplated hereby by Tandy Existing Operator do not require any consent under, constitute (with or without notice or lapse of time or both) a default under, result in any breach of, or give any Person any rights of termination, acceleration or cancellation of, any Contract.

5.13   Patriot Act Representations. Tandy Existing Operator is not, and is not acting, directly or indirectly, for or on behalf of any Person named as a "specially designated national and blocked person" (as defined in Presidential Executive Order 13224) on the most current list published by the U.S. Treasury Department of Foreign Assets Control, and Tandy Existing Operator is not engaged in this transaction, directly or indirectly, on behalf of, and are not facilitating this transaction, directly or indirectly, on behalf of, any such Person. Neither Tandy Existing Operator nor its constituents or affiliates are in violation of any laws relating to terrorism or money laundering, including the aforesaid Executive Order and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended.

5.14   Broker. Neither the Trustee nor Tandy Existing Operator has engaged, or is liable to pay any fees, costs or commissions to, any broker, finder, agent or financial advisor in connection with the transactions contemplated hereby.

## ARTICLE 6
## TERMINATION; REMEDIES

6.1   Termination. This Tandy OTA may be terminated and the transactions contemplated hereby abandoned at any time prior to the Tandy Operation Transfer upon the following conditions:

(a)     by mutual written consent of Tandy Existing Operator and Tandy New Operator;

(b)     by Tandy Existing Operator upon written notice to Tandy New Operator, if there shall have been any material breach by Tandy New Operator of any of its

25

representations, warranties, covenants and agreements set forth herein: (i) which breach shall have rendered impossible the fulfillment of the conditions set forth in Section 2.5(c); or (ii) which breach is not cured within thirty (30) days of receipt of written notice of such breach;

(c)     by Tandy New Operator upon written notice to Tandy Existing Operator, if there shall have been any material breach by Tandy Existing Operator of any of its representations, warranties, covenants and agreements set forth herein: (i) which breach shall have rendered impossible the fulfillment of the conditions set forth in Section 2.5(b); or (ii) which breach is not cured within thirty (30) days of receipt of written notice of such breach;

(d)     By written notice from Tandy New Operator to the Trustee, if (a) the Trustee or any Debtor seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, either or both of the Bankruptcy Cases, or if a trustee (other than the Trustee) or examiner with expanded power to operate or manage the financial affairs or reorganization of either or both of the Debtors is appointed in the Bankruptcy Cases or (b) an Order or dismissal, conversion or appointment is entered for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(e)     By written notice from Tandy New Operator to the Trustee, if the Trustee or Debtors announce any stand-alone plan of reorganization or liquidation (or support any such plan field by any other party);

(f)     By written notice from Tandy New Operator to the Trustee if, under Section 363(k) of the Bankruptcy Code, Buyer is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by this Tandy OTA in connection with the payment of the Purchase Price;

(g)     By written notice from either Tandy New Operator or the Trustee to the other Party, if an Order of the Bankruptcy Court is entered denying approval of the Bidding Procedures Order or the Sale Order and (a) as to the Bidding Procedures Order such Order has not been reversed or vacated within fourteen (14) calendar days after its original entry or (b) as to the Sale Order such Order has not been reversed or vacated by the Outside Date;

(h)     By written notice from Tandy New Operator or the Trustee to the other Party, if (a)(1) Buyer is not the Successful Bidder (as defined in the Bidding Procedures Order) and (2) the Bankruptcy Court approves an Alternative Transaction with the Successful Bidder; or (b) the Bankruptcy Court approves an Alternative Transaction other than in connection with the Auction; *provided* that if Buyer is the Backup Bidder at the Auction, the right of Tandy New Operator or the Trustee to terminate this Tandy OTA pursuant to this Section 6.1 shall not be available to Tandy New Operator or the Trustee until the Outside Back-Up Date;

26

(i) By written notice from Trustee to Tandy New Operator if Manager fails to pay Trustee the Trustee Funding under the Tandy Interim Management Agreement, if Manager fails to pay Trustee the Trustee Funding due within ten (10) business days of such written notice;

(j) By written notice from Tandy New Operator to the Trustee if the Tandy REPA is terminated; or

(k) By written notice from Tandy New Operator to the Trustee if the Tandy Interim Management Agreement or the Tandy Interim Sublease is terminated.

6.2    Procedure and Effect of Termination.

(a) In the event of termination of this Tandy OTA pursuant to Section 6.1(a), (b) or (c) above, the terminating Party shall give written notice thereof to the other Parties and this Tandy OTA shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties.

(b) If this Tandy OTA is terminated as provided herein, no Party shall have any Liability or further obligation hereunder to any other Party to this Tandy OTA except that: (i) nothing herein shall relieve any Party hereto from Liability for any breach of any provision hereof; and (ii) nothing herein shall relieve the Debtors of any Liability under the Tandy REPA for the Expense Reimbursement Amount.

## ARTICLE 7
## MISCELLANEOUS

7.1    Further Assurances.  Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments reasonably necessary to effectuate this Tandy OTA and the transactions referred to herein, contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

7.2    Notices.  All notices, requests, consents, approvals, waivers, demands and other communications required or permitted to be given or made under this Tandy OTA shall be in writing and shall be (a)(i) hand delivered, or (ii) sent by a nationally recognized overnight delivery service, *and* (b) sent by email, in each case, addressed as follows, or to such other address, Person as any party may designate by notice to the others in accordance herewith:

If to Tandy Existing Operator, to:

Romans House, LLC d/b/a Tandy Village Assisted Living
c/o Michael McConnell
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

with a copy (which shall not constitute notice) to:

27

Nancy Ribaudo Esq.
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

If to Tandy New Operator:
2601 Tandy ABL I Operations, LLC
11766 Wilshire Boulevard, Suite 1460
Los Angeles, CA 90025

with copies to (which shall not constitute notice):

Benesch, Friedlander, Coplan & Aronoff LLP
Attn: Michael Barrie, Esq.
1313 North Market Street, Suite 1201
Wilmington, DE 19801-1601

or to such other person or address as any party hereto shall furnish to the other parties hereto in writing pursuant to this Section 7.2.

7.3     <u>Payment of Expenses</u>.  In the event of any dispute or controversy arising out of this Tandy OTA, including in connection with the interpretation of any term or condition of this Tandy OTA, the prevailing party shall recover from the non-prevailing party all reasonable costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party.

7.4     <u>Entire Agreement; Amendment; Waiver</u>.    This Tandy OTA constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Tandy OTA may not be modified or amended except in writing signed by the parties hereto.  Any waiver by any party of any violation of, breach of or default under any provision of this Tandy OTA or any exhibit, schedule or other document referred to in this Tandy OTA by any other party shall not be effective unless in writing signed by the party granting the waiver. Further, no such waiver shall be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Tandy OTA, or any exhibit or schedule or other document referred to in this Tandy OTA.

7.5     <u>Assignment</u>.  Neither this Tandy OTA nor the rights, duties or obligations arising hereunder shall be assignable or delegable (including by transfer of equity) by either party hereto without the express prior written consent of the other party hereto.

7.6     <u>Joint Venture</u>.  Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.

7.7     <u>Representation By Counsel</u>.    The parties hereto acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the

28

negotiations which preceded the execution of this Tandy OTA, and that each party has executed this Tandy OTA with the consent and on the advice of such independent legal counsel. This Tandy OTA is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Tandy OTA to be construed against the draftsperson of this Tandy OTA shall be inapplicable to the interpretation of this Tandy OTA.

7.8     <u>Captions</u>. The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

7.9     <u>Counterparts</u>. This Tandy OTA may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. Facsimile or email transmission of any signed, original counterpart transmission shall be deemed the same as the delivery of an original. The parties agree and acknowledge that this Tandy OTA may be kept in electronic form and that an electronic version of this Tandy OTA will be just as valid and enforceable as the original.

7.10    <u>Governing Law</u>. EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

7.11    <u>Venue; Choice of Law</u>. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF TARRANT, STATE OF TEXAS. TANDY EXISTING OPERATOR AND TANDY NEW OPERATOR WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT UNDER THIS AGREEMENT.

7.12    <u>Calculation of Time Periods</u>. Any reference in this Tandy OTA to a "business day" shall mean every day other than Saturdays, Sundays, all days observed by the federal or Texas government as legal holidays and all days on which commercial banks in Texas are required by law to be closed. Unless otherwise specified, in computing any period of time described herein, the day of the act or event on which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included. Any reference in this Tandy OTA to a "day" or a number of "days" (other than references to a "business day" or "business days") shall mean a calendar day or calendar days, provided that if the calendar day or last calendar day to perform any act or give any notice or approval shall fall on a calendar day that is not a business day, such act or notice may be timely performed or given on the next succeeding business day.

15001267 v14

7.13 <u>Third Party Beneficiary</u>.  Nothing in this Tandy OTA express or implied is intended to and shall not be construed to confer upon or create in any person (other than the parties hereto) any rights or remedies under or by reason of this Tandy OTA, including without limitation, any right to enforce this Tandy OTA.

7.14 <u>References to Trustee</u>. For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Tandy OTA) are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

*[Signature Page Follows]*

3417485.1

15001267 v14

**IN WITNESS WHEREOF**, the parties hereto have executed this Tandy OTA as of the Contract Date.

**TANDY EXISTING OPERATOR:**

**Romans House, LLC d/b/a Tandy Village Assisted Living**

By: Michael A. McConnel, as the Chapter 11 Trustee

By: _____

Name: Michael A. McConnell

Title: Chapter 11 Trustee

**TANDY NEW OPERATOR:**

**2601 Tandy ABL I Operations, LLC**

By: _____

Name:

Title:

31

15001267 v14

## LIST OF SCHEDULES

| | |
|---|---|
| Schedule I | Facility; Licensed and Certified Beds |
| Schedule 1.1 | Definitions |
| Schedule 2.2(d) | Other Assumed Liabilities |
| Schedule 2.5(b)(vi) | Provider Agreements |
| Schedule 3.3(d) | Employee Schedule |
| Schedule 3.10(a) | Assigned Contracts |
| Schedule 5.4 | Litigation |
| Schedule 5.5 | Labor and Employment Matters |
| Schedule 5.7 | Taxes |
| Schedule 5.9 | Health Care Representations |
| Schedule 5.11 | Absence of Changes |
| Schedule 5.12(a)(i) | List of Contracts and Leases |

**SCHEDULE I**

**FACILITY; Licensed and Certified Beds**

| Facility | Licensed & Certified Beds |
|---|---|
|  |  |

# SCHEDULE 1.1

# DEFINITIONS

"Action" shall mean any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which Liability, if any, or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

"Affiliate" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"Applicable Laws" shall mean any statute, law, ordinance, regulation, rule, code, Governmental Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Entity, including, without limitation, Health Care Laws.

"Assets" shall have the meaning set forth in Section 2.1 of this Tandy OTA.

"Assigned Contracts" as identified on Schedule 3.10(a).

"Assumed Liabilities" shall have the meaning set forth in Section 2.2 of this Tandy OTA.

"Bankruptcy Cases" shall mean Case No. 1-445023-EML.

"Bankruptcy Code" shall mean Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

"Bankruptcy Court" shall mean the United Stated Bankruptcy Court for the Northern District of Texas, Forth Worth Division.

"Baseline Facility Census" shall mean the average census for the three-month period ending _____ 31, 2021.

"Buyer" shall mean 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company.

"Closing Statement" shall have the meaning set forth in Section 2.6(h) of this Tandy OTA.

"Code" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Contract Date" shall mean _____, 2021.

"COVID Related Action" shall have the meaning set forth in Section 3.1(b) of this Tandy OTA.

"Current Lender" has the meaning ascribed to such term in the recitals of this Tandy OTA.

"Debtors" shall mean Healthcore System Management, LLC and Romans House, LLC d/b/a Tandy Village Assisted Living.

"Effective Time" shall mean 12:00:01 AM on the Tandy Operation Transfer Date.

"Employees" shall mean all individuals employed by Tandy Existing Operator to work at the Facility.

"Employee Plans" shall have the meaning set forth in Section 5.6(a) of this Tandy OTA.

"Employee Schedule" shall mean employees employed at the time of Tandy Operation Transfer and identified on Schedule 3.3(d).

"Encumbrance" shall mean any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrance of any kind.

"Environmental Law(s)" shall mean all applicable Laws concerning pollution or protection of the environment or concerning public or worker health or safety (with respect to exposure to Hazardous Substances), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, control, or cleanup of any Hazardous Substances.

"Excluded Assets" shall mean those assets identified on Exhibit D to this Tandy OTA.

"Excluded Liabilities" shall have the meaning set forth in Section 2.3 of this Tandy OTA.

"ERISA" shall have the meaning set forth in Section 5.6(a) of this Tandy OTA.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with any of Tandy Existing Operator is or ever was treated as a single employer under Section 414(b), (c), (m), (o) or (t) of the Code.

"Facility" shall have the meaning identified on Schedule 1 to this Tandy OTA.

"<u>Facility Records</u>" shall have the meaning set forth in Section 3.8 of this Tandy OTA.

"<u>Governmental Entity</u>" shall mean any (a) federal, state, county or municipal government, or city, town, borough, village, district or other jurisdiction; (b) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); and (c) any body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

"<u>Governmental Liabilities</u>" shall mean all Liabilities to any Governmental Entity related to the ownership, operation or management of the Facilities or Assets prior to the Tandy Operation Transfer including, without limitation, Medicaid Liabilities, billing overpayments and provider taxes.

"<u>Governmental Order</u>" shall mean any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Entity.

"<u>Hazardous Materials</u>" shall have the meaning ascribed in any Environmental Law to any hazardous, toxic or dangerous waste, substance, pollutant or material, whether liquid, solid or gaseous, and in any event shall include all substances identified or characterized as "hazardous substances," "hazardous wastes," "pollutants," or "contaminants" in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601 *et seq.* and the regulations promulgated thereunder (as amended from time to time); the Clean Air Act, 42 U.S.C. 7401, *et seq.* and the regulations promulgated thereunder (as amended from time to time); the Resource, Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.* and the regulations promulgated thereunder (as amended from time to time); or the Oil Pollution Act of 1990, 33 U.S.C. 2701 *et seq.* and the regulations promulgated thereunder (as amended from time to time); any other material, waste, pollutant, contaminant or substance designated as hazardous, toxic or dangerous by Congress or by the United States Environmental Protection Agency (EPA) or by any federal, state, or local statute, law, code, ordinance, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic, or dangerous material, waste, pollutant, contaminant or substance, as such statutes, laws, ordinances, codes, rules, regulations or decrees are now or at any time hereafter in effect; and oil, oil waste, and used oil as those terms are defined in the Clean Water Act, 33 U.S.C. 1251 *et seq.* and the regulations promulgated thereunder (as amended from time to time). Notwithstanding anything to the contrary contained herein, the term "Hazardous Materials" shall not include medical waste generated at the Facility in the ordinary course of business and disposed of in accordance with Applicable Laws.

"<u>Health Care Authorities</u>" shall mean any Governmental Entity or quasi-Governmental Entity or any agency, intermediary, board, authority or entity concerned with or relevant to the ownership, operation, use or occupancy of the Facility as an assisted living facility.

"<u>Health Care Fraud and Abuse Laws</u>" shall have the meaning set forth in Section 3.8 of this Tandy OTA.

"<u>Health Care Licenses</u>" shall mean all material certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and

approvals, including certificates of operation, completion and occupancy, and state nursing facility or residential care facility license or other licenses required by Health Care Authorities for the legal use, occupancy and operation of the Facilities.

"Health Care Laws" means: (a) all Applicable Laws related to billing or submission of claims, reimbursement or fraud and abuse including, without limitation, (i) the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), (ii) the federal Physician Self-Referral Prohibition (commonly referred to as the "Stark Law")(42 U.S.C. § 1395nn), (iii) the federal False Claims Act (31 U.S.C. §§ 3729 et seq.), (iv) the federal Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), (v) the federal Exclusion Laws (42 U.S.C.§ 1320a-7), (vi) the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), (vii) 42 U.S.C. § 1320a-7k(d), (viii) the regulations promulgated pursuant to each of the foregoing statutes, and (ix) applicable state Laws similar to any of the foregoing; (b) all Applicable Laws related to medical records and patient privacy and security, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (42 U.S.C. §§ 1320d-1320d-9), and its implementing regulations, including the Standards for Electronic Transaction and Code Set (45 C.F.R. Parts 160 and 162), the Standards for Privacy of Individually Identifiable Health Information (45 C.F.R. Parts 160 and 164), the Security Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and 164), and Breach Notification for Unsecured Protected Health Information Rules (45 C.F.R. Parts 164.402 through 164.408), and any similar state laws; (c) the Patient Protection and Affordable Care Act (Pub. L. 111−148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111−152), and the regulations promulgated pursuant to each of the foregoing; (d) Medicaid (Title XIX of the Social Security Act), as amended and the regulations promulgated thereunder, including, without limitation, all conditions of participation; (e) all Applicable Laws related to the obtaining or maintenance of any License required for the operation of the Facility; and (f) Applicable Laws regulating the ownership and operation of an assisted living facility or assets used in connection therewith.

"Healthcore" shall mean Healthcore System Management, LLC.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996.

"Hired Employees" shall mean all individuals hired and employed by Tandy New Operator to work at the Facility.

"Indemnified Party" shall have the meaning set forth in Section 3.14 of this Tandy OTA.

"Indemnifying Party" shall have the meaning set forth in Section 3.14 of this Tandy OTA.

"Liability" or "Liabilities" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Licenses" shall have the meaning set forth in Section 2.5(b)(v) of this Tandy OTA.

"Licensure Date" shall mean the date all Licenses are issued to Buyer or Buyer's designee to own and operate the Facility as an assisted living facility, and the Facility is no longer operated under the Seller's or Trustee's Licenses.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however*, that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Entity or other third party.

"March 2019 Refinancing" shall have the meaning as set forth in the Recitals of this Tandy OTA.

"Material Adverse Effect" means the following: (i) the loss or material limitation of any Health Care License, (ii) the designation of the Facility as a Special Focus Nursing Home Facility as defined by the CMS Special Focus Nursing Home Facility Program, (iii) the decertification of the Tandy Existing Operator or the Facility from or under Medicaid or any other governmental health care program, (iv) the issuance of a level "G" or higher survey deficiency that is not deemed to be in substantial compliance by the Tandy Operation Transfer Date; or (v) if two weeks prior to the Tandy Operation Transfer Date ten percent (10%) or more of the residents at the Facility test positive for COVID-19, then the Tandy Operation Transfer shall be suspended until a date mutually agreeable to the Tandy Existing Operator and the Tandy New Operator but in no event more than thirty (30) days after the original Tandy Operation Transfer Date. For the avoidance of doubt, the following shall not constitute a "Material Adverse Effect": (v) any change in any Applicable Law or the interpretation thereof, (vi) any change in GAAP or the interpretation thereof, (vii) any events, changes, developments or occurrences generally affecting the industries in which Tandy Existing Operator operates, (viii) general economic, political or market conditions, (ix) any disasters, calamities, emergencies, acts of war, sabotage or terrorism, or comparable events, or pandemics (including SARS-CoV-2 novel coronavirus, except as otherwise specifically provided otherwise in section (v) above), or an escalation or worsening of any of the foregoing, or (x) any breach by Tandy New Operator of this Tandy OTA.

"Original Lender" shall mean Pender West Credit 1 REIT, L.L.C.

"Parties" shall mean 2601 Tandy ABL I Operations, LLC and Romans House, LLC d/b/a Tandy Village Assisted Living.

"Person" shall mean an individual, partnership, corporation, business trust, limited liability company, limited partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Entity.

"Petition Date" shall mean December 9, 2019.

"Plan of Correction" shall mean that certain plan of correction submitted by Tandy Existing Operator to THHS on [August 24, 2021].

"Pre-Tandy Operation Transfer Period" shall have the meaning as set forth in Section 3.1(b) of this Tandy OTA.

"Prepetition Loan Agreement" shall have the meaning ascribed to such term in the Recitals of this Tandy OTA.

"Prepetition Loan Documents" shall have meaning ascribed to such term in the Recitals of this Tandy OTA.

"Prepetition Loan Facility" shall have the meaning ascribed to such term in the Recitals of this Tandy OTA.

"Pre-Tandy Operation Transfer Tax Period" means any Tax period ending on or before the Effective Time and with respect to any taxable period that includes but does not end on the Effective Time, the portion thereof ending on the Effective Time.

"Property" shall mean the real property on which the Facility is located as identified on Schedule 1 to this Tandy OTA.

"Provider Agreements" shall have the meaning set forth in Section 3.7 of this Tandy OTA.

"Provider Numbers" shall have the meaning set forth in Section 5.9(f) of this Tandy OTA.

"Recorded Transfer Agreements" has the meaning ascribed to such term in the Recitals of this Tandy OTA.

"Release" means actual or threatened spilling, leaking, pumping, pouring, releasing, emitting, emptying, discharging, injecting, escaping, dumping, disposing, depositing, dispersing, leaching or migrating of any Hazardous Substance into or through the indoor or outdoor environment.

"REPA Closing Date" means the date of the closing of the transaction contemplated under the Tandy REPA.

"Resident Agreements" shall have the meaning set forth in Section 3.10(c) of this Tandy OTA.

"Resident Census Report" shall mean a true, correct and complete schedule (provided in accordance with all applicable Health Care Requirements related to privacy) which accurately and completely sets forth the occupancy status of the Facility, the average daily rate and other charges payable with respect thereto, the class of payment or reimbursement (i.e., private, third-party payor, Medicaid Waiver), the average monthly census of the Facility and its occupancy rate.

"Resident Trust Funds" shall mean the funds held in trust by Tandy Existing Operator for residents at the Facility, including any deposits or prepayments paid by or for any resident of the Facility.

"Romans" shall mean Romans House, LLC d/b/a Tandy Village Assisted Living.

"Recorded Transfer Agreements" shall have the meaning set forth in the Recitals of this Tandy OTA.

"THHS" shall mean Texas Health and Human Services.

"Tandy Assignment and Assumption Agreement" identified in Section 2.6(c) of this Tandy OTA.

"Tandy Bill of Sale" identified in Section 2.6(b) as Exhibit A to this Tandy OTA.

"Tandy Existing Operator" shall mean Romans House, LLC d/b/a Tandy Village Assisted Living.

"Tandy Existing Operator's Knowledge" or any other reference to the "Knowledge" of Tandy Existing Operator shall mean the actual knowledge of (a) the Trustee, or (b) Jason Quick or Denise Deapen of WesternCare Management, LLC.

"Tandy Interim Contract Date" means the date on which the Trustee for and on behalf of Romans, as Tandy Existing Operator, and Tandy New Operator, as interim manager enter into the Tandy Interim Management Agreement.

"Tandy Interim Management Agreement" means that certain *Interim Management Agreement* dated _____, 2021 by and between the Trustee for and on behalf of Romans, as Tandy Existing Operator, and Tandy New Operator, as interim manager.

"Tandy Interim Sublease" means that certain *Interim Sublease* dated _____, 2021 by and between the Trustee for and on behalf of Romans, as sublessee, and Tandy New Operator, as sublessor.

"Tandy New Operator" shall mean 2601 Tandy ABL I Operations, LLC, a Delaware limited liability company.

"Tandy Operation Transfer" means the closing of the transaction contemplated by this Tandy OTA.

"Tandy Operation Transfer Date" means the date of the Tandy Operation Transfer, which shall within 10 business days of the satisfaction or waiver of the conditions set forth in Section 2.5 of this Tandy OTA.

"Tandy OTA" shall mean this Operations Transfer Agreement.

"Tandy REPA" shall mean that certain *Real Estate and Asset Purchase Agreement* dated _____, 2021.

"Tandy RTF Assignment and Assumption Agreement" identified in Section 2.6(d) of this Tandy OTA.

"Tax" or "Taxes" means any and all (a) domestic or foreign, federal, state or local taxes, charges, fees, levies, imposts, escheat for unclaimed property, duties and governmental fees or other like assessments or charges of any kind whatsoever, including income taxes (whether imposed on or measured by net income, gross income, income as specially defined, earnings, profits, or selected items of income, earnings, or profits), capital taxes, gross receipts taxes, environmental taxes, sales taxes, use taxes, value added taxes, goods and services taxes, accumulated earnings taxes, fuel taxes, transfer taxes, franchise taxes, license taxes, withholding taxes or other withholding obligations, payroll taxes, employment taxes, excise taxes, severance taxes, social security premiums, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, ad valorem taxes, property taxes, windfall profits taxes, alternative or add-on minimum taxes, franchise permit fee or "bed taxes," and customs duties, (b) interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with (i) any item described in clause (a) or (ii) the failure to comply with any requirement imposed with respect to any Tax Returns and (c) liabilities in respect of any items described in clause (a) or clause (b) payable by reason of contract, assumption, transferee liability, operation of law or otherwise.

"Tax Return" means any report, return, statement or other written information, including any schedules or attachments thereto and any amendment thereof, supplied or required to be supplied to a taxing authority in connection with Taxes.

"Texas Payday Law" means Chapter 61 of the Texas Labor Code.

"Transfer Agreement" shall mean that certain Transfer and Assignment of Note, Lien and Other Documents executed by the Original Lender dated December 15, 2020.

"Transfer Documents" shall have the meaning set forth in the Recitals of this Tandy OTA.

"Transfer Notice" shall have the meaning set forth in the Recitals of this Tandy OTA.

"Trustee" shall mean Michael A. McConnell, Chapter 11 Trustee.

"U.S. Trustee" has the meaning ascribed to such term in the Recitals of this Tandy OTA.

"Vincent OTA" means that certain *Operations Transfer Agreement (Vincent Victoria Village)*, dated _____, 2021, by and between the Trustee for and on behalf of Healthcore, as the Tandy Existing Operator, and 4607 East California ABL I Operations, LLC, as the Tandy New Operator.

**SCHEDULE 2.2(d)**

**OTHER ASSUMED LIABILITIES**

1.      [None]

**SCHEDULE 3.3(d)**

**EMPLOYEE SCHEDULE**

| Employee Name | Position | Hire Date | Full/Part Time | Pay | Status<br><br>**Medical disability/leave of absence** |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |
|  |  |  |  |  |  |

## SCHEDULE 5.4

## LITIGATION

**[complete from SOFAs]**

**SCHEDULE 5.5**

**LABOR AND EMPLOYMENT MATTERS**

**SCHEDULE 5.7**

**TAXES**

**[to be completed]**

**Schedules 5.9(a-i)**

**HEALTHCARE REPRESENTATIONS**

**Schedule 5.9(a)**

The license to operate the Facility issued by the state is in the renewal phase and subject to a Plan of Correction and ongoing review by Texas Health and Human Services and other Governmental Entities for determination and evaluation of repairs, maintenance and other requirements for licensure renewal and city and fire code compliance.

**5.9(c) List Deficiencies-**

The Plan of Correction addresses certain deficiencies identified by HHS. Review and identification of deficiencies is ongoing by the HHS and other city, state and other Government Entities.

## SCHEDULE 5.11

## KNOWLEDGE OF CHANGES

1.  Replacement of existing management with WesternCare in July 2021.

**SCHEDULE 5.12(A)(i)**

**CONTRACTS**

**EXHIBIT A**

**BILL OF SALE**

This Bill of Sale is made in connection with the Operations Transfer Agreement dated __, 2021 (the "Tandy OTA"), entered into by and between Michael A. McConnell, as the Chapter 11 Truste (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Tandy Existing Operator") and 2601 Tandy ABL I Operations, LLC ("Tandy New Operator").

In consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Tandy Existing Operator does hereby convey and transfer to Tandy New Operator the Assets (as defined in the Tandy OTA). This Bill of Sale is made subject to all of the terms, conditions, representations and warranties set forth in the Tandy OTA.

Tandy Existing Operator covenants to execute and deliver to Tandy New Operator (or to its successors and assigns) such other and further reasonable instruments of transfer, assignment and conveyance as may be necessary to more fully transfer, assign and convey to and vest in Tandy New Operator the Assets hereby transferred, assigned and conveyed.

**[SIGNATURES APPEAR ON FOLLOWING PAGE]**

This Bill of Sale is effective as of _____, 2021.

**TANDY EXISTING OPERATOR:**

**Romans House, LLC d/b/a Tandy Village Assisted Living**

By: Michael A. McConnel, as the Chapter 11 Trustee

By: _____

Name: Michael A. McConnell

Title: Chapter 11 Trustee

**TANDY NEW OPERATOR:**

**2601 Tandy ABL I Operations, LLC**

By: _____

Name:

Title:

[SIGNATURE PAGE TO OTA BILL OF SALE]

**EXHIBIT B**

**ASSIGNMENT AND ASSUMPTION AGREEMENT**

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** ("Tandy Assignment and Assumption Agreement") is made as of the _____ day of _____, 202_ (the "Tandy Operation Transfer Date"), by Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Assignor"), and 2601 Tandy ABL I Operations, LLC ("Assignee").

**RECITALS**

A.      By Operations Transfer Agreement dated as of _____, 2021 (as amended, the "Tandy OTA"), by and between Assignor and Assignee, Assignor agreed to assign to Assignee, and Assignee agreed to accept and assume from Assignor, the Assigned Contracts. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Tandy OTA.

B.      Assignor and Assignee have agreed that the Assigned Contracts are those contracts identified on **Exhibit A** hereto.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.      **Assignment.**  Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in and to and obligations under the Assigned Contracts arising from and after the Tandy Operation Transfer Date.

2.      **Assumption**.  Assignee hereby accepts the assignment of the Assigned Contracts and agrees to assume the rights and obligations of Assignor arising under the Assigned Contracts from and after the Tandy Operation Transfer Date.

3.      **No Representations or Warranties**. Except as may be expressly set forth in the Tandy OTA (and as limited thereby), Assignor makes no representations or warranties of any kind with respect to the Assigned Contracts assigned herein.

4.      **Relationship to Tandy OTA**.  Assignor and Assignee acknowledge and agree that the assignment and assumption provided for in this Tandy Assignment and Assumption Agreement shall in all respects be subject to the terms of the Tandy OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Tandy Assignment and Assumption Agreement shall contradict the Tandy OTA, the Tandy OTA shall control.

5.      **Miscellaneous**.  This Tandy Assignment and Assumption Agreement and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions set forth in the Tandy OTA, shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Texas and may not be modified or amended in any manner other than by a

written agreement signed by the party to be charged therewith. This Tandy Assignment and Assumption Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. This Tandy Assignment and Assumption Agreement may be executed by any party by the delivery of such party by facsimile, by portable document format via electronic mail, or by other electronic means, a copy of the signature page of this Tandy Assignment and Assumption Agreement duly executed by such party. Any copy of this Tandy Assignment and Assumption Agreement so delivered by facsimile, by portable document format, or by other electronic means, shall be deemed to be an originally executed copy of this Assignment.

**IN WITNESS WHEREOF**, the parties hereto have executed this Tandy Assignment and Assumption Agreement as of the Tandy Operation Transfer Date.

**ASSIGNOR:**    **Romans House, LLC d/b/a Tandy Village Assisted Living**

By:    Michael A. McConnel, as the Chapter 11 Trustee

By:_____
Name: Michael A. McConnell
Title: Chapter 11 Trustee

**ASSIGNEE:**    **2601 Tandy ABL I Operations, LLC**

By:_____
Print Name:_____
Title:_____

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF RESIDENT TRUST FUNDS AND DEPOSITS

This Assignment and Assumption Agreement (the "Tandy RTF Assignment and Assumption Agreement") is made as of the ____ day of _____, 202_ (the "Tandy Operation Transfer Date"), by Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Assignor"), and 2601 Tandy ABL I Operations, LLC ("Assignee").

## RECITALS

A.      Assignor and Assignee are parties to an Operations Transfer Agreement (the "Tandy OTA") dated as of _____, 2021.

B.      It is a condition to the Tandy Operation Transfer under the Tandy OTA that Assignor assign all of its right, title and interest in, to, and under the Resident Trust Funds to Assignee, and that Assignee assume Assignor's obligations with respect to such Resident Trust Funds arising from and after the Tandy Operation Transfer Date.

Now, therefore, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto, intending to be bound, hereby agree to incorporate the foregoing recitals into this Tandy RTF Assignment and Assumption Agreement and further agree as follows:

1.      Assignor hereby assigns, transfers and conveys all of its right, title and interest in, to, and under the Resident Trust Funds to Assignee.

2.      Assignee hereby accepts and assumes all liabilities arising from and after the Tandy Operation Transfer Date with respect to the Resident Trust Funds.

3.      Except as may be expressly set forth in the Tandy OTA (and as limited thereby), Assignor makes no representations or warranties of any kind with respect to the Resident Trust Funds assigned herein.

4.      Assignor and Assignee acknowledge and agree that the assignment and assumption provided for in this Agreement shall in all respects be subject to the terms of the Tandy OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Tandy RTF Assignment and Assumption Agreement shall contradict the Tandy OTA, the Tandy OTA shall control.

5.      This Tandy RTF Assignment and Assumption Agreement and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the Tandy OTA, shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Texas and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith. This Tandy RTF Assignment and

Assumption Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. This Tandy RTF Assignment and Assumption Agreement may be executed by any party by the delivery of such party by facsimile, by portable document format via electronic mail, or by other electronic means, a copy of the signature page of this Tandy RTF Assignment and Assumption Agreement duly executed by such party. Any copy of this Tandy RTF Assignment and Assumption Agreement so delivered by facsimile, by portable document format, or by other electronic means, shall be deemed to be an originally executed copy of this Tandy RTF Assignment and Assumption Agreement.

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed and delivered this Tandy RTF Assignment and Assumption Agreement as of the Tandy Operation Transfer Date.

**ASSIGNOR:**                    **Romans House, LLC d/b/a Tandy Village Assisted Living**

By:      Michael A. McConnel, as the Chapter 11 Trustee

By:_____
Name: Michael A. McConnell
Title: Chapter 11 Trustee

**ASSIGNEE:**                    **2601 Tandy ABL I Operations, LLC**

By:_____
Print Name:_____
Title:_____

55

## EXHIBIT D

## EXCLUDED ASSETS

(a) All cash and cash equivalents, bank accounts, securities and accounts receivable/healthcare receivables of Tandy Existing Operator, including accounts receivable relating to residents' fees and rents and/or services provided prior to the Tandy Operation Transfer Date, whether from any Governmental Entity, resident or any other Person;

(b) All refunds or reimbursements of whatever nature or description which relate to or are attributable to the period prior to the Tandy Operation Transfer Date;

(c) All claims, disputes and litigation, and all amounts of any nature or description relating thereto, to the extent such dispute, claim or litigation is related to the period prior to the Tandy Operation Transfer Date;

(d) All notes, bonds, debt instruments, financing agreements or other Contracts for borrowed money issued by Tandy Existing Operator or to which Tandy Existing Operator is a party;

(e) All contracts other than the Assigned Contracts;

(f) All leased equipment to the extent the underlying lease is not an Assigned Contract;

(g) Tandy Existing Operator's National Provider Identifier ("NPI") numbers;

(h) Tandy Existing Operator's rights to indemnification from third parties with respect to any liability that is not an Assigned Contract;

(i) All of the insurance policies maintained by Tandy Existing Operator, and all claims, benefits, proceeds, or premium refunds paid or payable thereunder or with respect thereto;

(j) All past, present or future claims and rights or actions by Tandy Existing Operator against third parties to the extent relating to any Excluded Asset or the operation of the Facility prior to the Tandy Operation Transfer Date;

(k) Tandy Existing Operator's organizational documents, minute books and other books and records relating solely to the existence of Tandy Existing Operator as a legal entity; and

(l) All post office box addresses associated solely with the Facility.

**EXHIBIT D**

# OPERATIONS TRANSFER AGREEMENT

## (Vincent Victoria Village)

This OPERATIONS TRANSFER AGREEMENT ("Vincent OTA") is entered into as of _____, 2021 ("Contract Date"), by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village assisted living facility ("Healthcore" or "Vincent Existing Operator"), and 4607 East California ABL I Operations, LLC, a Delaware limited liability company ("Vincent New Operator," and together with Vincent Existing Operator, the "Parties").

## RECITALS

A.      Prior to on or about May 7, 2019, Healthcore was the fee owner of the land and improvements thereon commonly known as 4607 E. California Parkway, Fort Worth, Texas, and consisting of an assisted living facility operating under the name "Vincent Victoria Village Assisted Living" (the "Facility")

B.      On or about May 7, 2019, Pender West Credit 1, REIT, L.L.C. ("PWC 1"), an affiliate of Vincent New Operator, acquired via a non-judicial foreclosure sale all of the real property and improvements comprising the Facility, as well as all associated personal property. Soon after the completion of the foreclosure sale, Healthcore, as tenant, and PWC 1, as lessor, entered into a short-term lease (the "Prepetition Lease") for the real property and improvements comprising the Facility, which lease by its terms expired prior to the Petition Date (as defined herein).

C.      On December 9, 2019 (the "Petition Date"), Healthcore, and a related entity, Romans House, LLC ("Romans" and together with Healthcore, the "Debtors"), commenced voluntary cases (the "Bankruptcy Cases") by filing petitions for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. § 101 *et seq.* (the "Bankruptcy Code") in the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "Bankruptcy Court").

D.      Notwithstanding the expiration of the Prepetition Lease, Healthcore still occupied, and purported to operate, the Facility as of the Petition Date.

E.      By Order entered on December 23, 2019 [Dkt. No. 28], the Bankruptcy Court directed that Healthcore's Bankruptcy Case be jointly administered with Romans' Bankruptcy Case under Case No. 19-45023-ELM.

F.      Vincent Existing Operator operates that certain assisted living facility identified on Schedule I (the "Facility"), which Facility is licensed by the applicable authorities of the State of Texas and is certified under the Medicaid Waiver Program for the number of beds set forth on Schedule I.

G.      On May 14, 2021, the Bankruptcy Court entered an Order [Dkt. No. 441] directing the United States Trustee for Region 6 (the "U.S. Trustee") to appoint a chapter 11 trustee for both Debtors. Also, on May 14, 2021, the U.S. Trustee filed a notice [Dkt. No. 442] of the appointment,

subject to Bankruptcy Court approval, of Michael A. McConnell as the Trustee and an application [Dkt. No. 444] requesting the Court's approval of such appointment. By Order entered on May 17, 2021 [Dkt. No. 445], the Bankruptcy Court approved the Trustee's appointment.

H.       Prior to the Petition Date, PWC 1, as lender, and the Debtors entered into and consummated a series of related transactions to, among other benefits provided to the Debtors, enable Romans to refinance and retire certain existing indebtedness (such transactions, the "March 2019 Refinancing"). The March 2019 Refinancing included PWC 1's provision to Romans of a senior secured loan facility (the "Prepetition Loan Facility") in the original principal amount of $9,450,000.00, pursuant to the terms of that certain Loan Agreement, dated as of March __, 2019 (as modified, amended, or supplemented, the "Prepetition Loan Agreement"). In connection with the Prepetition Loan Facility, PWC 1, Romans, and Healthcore executed and delivered various other documents and agreements, including documents granting and perfecting security interests, mortgages and liens securing the payment and performance of obligations in connection with the March 2019 Refinancing and agreements and documents relating to or evidencing any other indebtedness of the Debtors in connection with the Prepetition Loan Facility (collectively, as modified, amended, or supplemented, the "Prepetition Loan Documents").

I.       Following the Petition Date, PWC 1 and an affiliate, Pender Aggregator East 1, L.L.C., n/k/a Pender ABL I Holdings UBI, LLC ("Pender-UBI") entered into and recorded with the Clerk of Tarrant County, Texas, that certain *General Warranty Deed,* dated December 15, 2020, pursuant to which PWC 1 conveyed fee simple title to the real property and improvements comprising the Facility to Pender-UBI. PWC 1 and Pender-UBI also entered into that certain *Assignment and Assumption of Leases and Contracts,* dated December 15, 2020, pursuant to which PWC 1 assigned to Pender-UBI all rights, claims and interests in the Prepetition Lease and other leases and contracts relating to the Facility. In addition, on February 23, 2021, in accordance with Fed. R. Bankr. P. 3001(e)(2), Current Lender filed and served that certain *Notice of Transfer of Claim Other Than for Security* [Healthcore Bankruptcy Case, Dkt. No. 33] in Healthcore's Bankruptcy Case.

J.       On or about [_____ __, 2021], Pender-UBI and an affiliate, 4607 East California ABL I Holdings, LLC ("4607 EC Holding"), entered into and recorded with the Clerk of Tarrant County, Texas, that certain *General Warranty Deed,* dated [_____ __, 2021], pursuant to which Pender-UBI conveyed fee simple title to the real property and improvements comprising the Facility to 4607 EC Holding. Pender-UBI and 4607 EC Holding also entered into that certain *Assignment and Assumption of Leases and Contracts,* dated [_____ __, 2021], pursuant to which Pender-UBI assigned to 4607 EC Holding all rights, claims and interests in the Prepetition Lease and other leases and contracts relating to the Facility.

K.       Also simultaneously herewith, the Trustee, for and on behalf of Romans, and 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company ("Buyer"), have entered into the Real Estate and Asset Purchase Agreement ("Tandy REPA").

L.       Upon entry of the Sale Order, the Trustee, for and on behalf of Healthcore, and Vincent New Operator will enter into the Vincent Interim Sublease and the Vincent Interim Management Agreement for the orderly operation of the Facility by Healthcore between the Vincent Interim Contract Date and the Vincent Operation Transfer Date.

M.      Also simultaneously herewith, Romans, and 2601 Tandy ABL I Operations, LLC, have entered into the Tandy OTA, providing for, among other things, the orderly transfer of operations of the Tandy Village assisted living facility and the sale of certain related assets.

N.      Subject to the approval of the Bankruptcy Court and the other terms and conditions set forth herein, Vincent Existing Operator and Vincent New Operator desire to enter into this Vincent OTA to facilitate an orderly transition of the operations of the Facility from Vincent Existing Operator to Vincent New Operator or its designee on the Vincent Operation Transfer Date.

NOW, THEREFORE, the Parties agree as follows:

## ARTICLE 1
## DEFINITIONS

1.1     <u>Certain Definitions</u>. Certain defined terms used in this Vincent OTA are set forth on <u>Schedule 1.1</u> hereof.

1.2     <u>Tandy REPA Defined Terms</u>.  Additional defined terms used in this Vincent OTA and not otherwise defined herein or in <u>Schedule 1.1</u> hereof have the meanings ascribed to such terms in the Tandy REPA.

## ARTICLE 2
## PRE-OPERATION TRANSFER; CONDITIONS TO OPERATION TRANSFER; DELIVERIES UPON VINCENT OPERATION TRANSFER DATE

2.1     <u>Transferred Assets</u>. In return for Ten Dollars ($10) and the assumption of the Assumed Liabilities, on the terms and subject to the conditions set forth herein and in the Sale Order, at the Effective Time, Vincent Existing Operator shall transfer to Vincent New Operator or its designee all of Vincent Existing Operator's right, title and interest in and to the following assets (the "<u>Assets</u>"), free and clear of all Encumbrances:

(a)     to the extent Vincent Existing Operator's interest is assignable and/or transferable pursuant to applicable law and to the extent Vincent New Operator in its sole discretion elects to assume the same, all consents, licenses, permits, approvals, certifications, and Medicaid provider number, issued by any Governmental Entity, including without limitation, any authorizations to participate in any state or federal reimbursement program such as Medicaid;

(b)     all telephone and facsimile numbers relating solely to the Facility (including, without limitation, all "800" numbers);

(c)     all consumable inventories of every kind and nature whatsoever (specifically including, but not limited to, all pharmacy supplies, nursing supplies, medical supplies, housekeeping supplies, laundry supplies, maintenance supplies, office supplies, dietary supplies, other supplies and food) located at and used in connection with the operation of the Facility, which inventory shall be in a quantity sufficient to meet the needs of the residents of the Facility for the proper operation

thereof and in compliance with all Applicable Laws, in the ordinary course of business;

(d)    subject to Section 3.10(a), all Contracts to which Vincent Existing Operator is a party listed on Schedule 3.10(a), and all purchase orders (the "Assigned Contracts"), and which schedule may be modified from time to time after the date hereof in accordance with Section 3.10(a), and, in each case, all rights under any such Assigned Contracts; and

(e)    all furniture, fixtures and equipment, IT equipment, vehicles, and other items of personal property owned by Vincent Existing Operator and located at the Facility or held or used by Vincent Existing Operator in operating the Facility.

2.2    Assumed Liabilities.  On the terms and subject to the conditions set forth herein and in the Sale Order, effective as of the Effective Time, Vincent New Operator shall assume from Existing Seller (and from and after the Effective Time, pay, perform, discharge, or otherwise satisfy in accordance with their respective terms), and Vincent Existing Operator shall convey, transfer, and assign to Vincent New Operator or its designee only the following Liabilities (and no other Liabilities, which other Liabilities shall be retained by Vincent Existing Operator), without duplication and only to the extent not paid, performed, discharged or otherwise satisfied prior to the Effective Time (collectively, the "Assumed Liabilities"):

(a)    Cure Costs relating to any Assigned Contracts;

(b)    Vincent Existing Operator's Liabilities and obligations under the Assigned Contracts with respect to events or periods after the Effective Time;

(c)    Transfer Taxes required for the consummation of the transaction contemplated by this Vincent OTA; and

(d)    Other Liabilities, if any, set forth on Schedule 2.2(d) of this Vincent OTA, including fees payable to the U.S. Trustee and Trustee pursuant to Section 3.5 of this Vincent OTA.

The assumption by Vincent New Operator of any Assumed Liability shall not, in any way, expand the rights of any third party relating thereto.

2.3    Excluded Liabilities.  Except as expressly provided in this Vincent OTA as to the Assumed Liabilities or in the Sale Order, Vincent New Operator shall not assume and shall not be deemed to have assumed, nor shall be obligated to pay, perform or otherwise discharge or in any other manner be liable or responsible for any Liabilities of, or Action against, Vincent Existing Operator or relating to the Assets, of any kind or nature whatsoever, whether absolute, accrued, contingent or otherwise, liquidated or unliquidated, due or to become due, known or unknown, currently existing or hereafter arising, matured or unmatured, direct or indirect, and however arising, whether existing prior to or on the Effective Time or arising thereafter as a result of any act, omission, or circumstances taking place prior to the Effective Time, other than the Assumed Liabilities, and Vincent Existing

4

Operator shall be solely and exclusively liable for any and all such Liabilities, including those Liabilities set forth below (collectively, the "Excluded Liabilities");

(a)    all Liabilities arising out of, relating to or otherwise in respect of the Assets or the operation of the Facility or any other business of Vincent Existing Operator arising on or prior to the Effective Time, including without limitation any accounts payable, or other Liability of Vincent Existing Operator incurred by Vincent Existing Operator prior to the Effective Time;

(b)    all Liabilities arising from or related to any Action (whether civil, criminal, administrative, investigative, or informal) against the Vincent Existing Operator or any of its Affiliates (including, for the avoidance of doubt, any Action related to malpractice, fraud, breach of fiduciary duty, misfeasance or under any other theory relating to conduct, performance or non-performance of the Vincent Existing Operator or any of its Affiliates, or any of their respective directors, officers, managers, or employees), or related to the Assets, pending or threatened or having any other status or with respect to facts, actions, omissions, circumstances or conditions existing, occurring or accruing prior to the Effective Time (including any breach, default, failure to perform, torts related to performance, violations of law, infringements or indemnities, guaranties and overcharges, underpayments or penalties, whether in respect of any contract, agreement, arrangement, promise or understanding of any kind), including any successor liability claims or that may be owed to or assessed by, any Governmental Entity or other person or entity, and whether commenced, filed, initiated, or threatened prior to, on or following the Effective Time;

(c)    all Liabilities for any Taxes (including Taxes payable by reason of contract, assumption, transferee or successor Liability, operation of Law, pursuant to Treasury Regulations Section 1.1502-6 (or any similar provision of any state or local law) or otherwise: (i) arising or relating to any Pre-Vincent Operation Transfer Tax Period, and (ii) owed by Vincent Existing Operator (whether or not relating to a Pre-Vincent Operation Transfer Tax Period), including pursuant to any Tax sharing, Tax indemnity or similar agreement or arrangement to which Vincent Existing Operator (or any Affiliate thereof) is obligated under or a party to;

(d)    all Liabilities of Vincent Existing Operator or any of its Affiliates arising under or pursuant to Health Care Laws, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Vincent Operation Transfer, whether known or unknown as of the Vincent Operation Transfer.

(e)    all Liabilities of Vincent Existing Operator arising under or pursuant to Environmental Laws, including with respect to any real property owned, operated, leased or otherwise used by Vincent Existing Operator, including any Liabilities for noncompliance with Environmental Laws or the Release of Hazardous Substances, to the extent arising as a result of any act, omission, or circumstances taking place on or prior to the Vincent Operation Transfer, whether known or unknown as of the Vincent Operation Transfer.

2.4 <u>Government Approvals</u>. Vincent New Operator will use its good faith efforts to promptly obtain all Health Care Licenses necessary to operate the Facility, including, without limitation, by filing such applications and making such notices as are necessary for Vincent New Operator to obtain the requisite Health Care Licenses to operate the Facility within the time periods required by Applicable Laws.  Vincent Existing Operator shall reasonably cooperate with Vincent New Operator with respect to Vincent New Operator's efforts to timely complete the filings contemplated under this <u>Section 2.4</u>, including, without limitation, by timely providing copies of all floor plans, certificates of occupancy, fire marshal reports, HVAC inspection reports, and emergency preparedness plans requested by Vincent New Operator.

2.5 <u>Conditions to Vincent Operation Transfer/Termination</u>.

 (a) <u>For Both Parties</u>. The respective obligations of each Party to this Vincent OTA to consummate the transactions contemplated by this Vincent OTA are subject to the satisfaction (or to the extent permitted by law, written waiver by each of the Parties, in their respective sole discretion) on or prior to the Vincent Operation Transfer Date, of each of the following conditions:

  (i) no court or other Governmental Entity has issued, enacted, entered, promulgated or enforced any law or Order (that has not been vacated, withdrawn or overturned) restraining, enjoining or otherwise prohibiting the transactions contemplated by this Vincent OTA.

  (ii) the Bankruptcy Court shall have entered the Bidding Procedures Order, the Sale Order, the 9019 Order, and the Financing Orders, and such orders shall not have been reversed, modified, amended or stayed.

  (iii) termination of the Vincent Interim Sublease and the Vincent Interim Management Agreement as of the Vincent Operation Transfer Date.

 (b) <u>For Vincent New Operator</u>. The obligations of Vincent New Operator under this Vincent OTA are subject to the satisfaction on or prior to the Vincent Operation Transfer Date of the following conditions, any one or more of which may be waived by Vincent New Operator in its sole discretion to the extent permitted by Applicable Law:

  (i) The Bankruptcy Court shall have entered the Sale Order and such Sale Order shall have become a Final Order.

  (ii) Vincent Existing Operator shall have performed or complied, in all material respects, with all agreements, covenants and conditions required by this Vincent OTA to be performed or complied with by it on or prior to the Vincent Operation Transfer Date.

  (iii) The transaction contemplated under the Tandy REPA have closed and the Debtor parties to the other Stalking Horse Sale Agreements shall have performed or complied in all material respects with all covenants and

agreements required by such other Stalking Horse Sale Agreements to be performed or complied with by such Debtor(s) on or prior to the closing date provided for in such Stalking Horse Sale Agreements.

(iv)    The representations and warranties of Vincent Existing Operator set forth in this Vincent OTA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Vincent Operation Transfer Date as though made on and as of the Vincent Operation Transfer Date, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

(v)    Vincent New Operator shall have received verbal or written acknowledgement from the Texas Health and Human Services ("THHS") that it intends to approve the change of ownership applications and that all healthcare licenses necessary to operate the Facility ("Licenses") will be issued to Vincent New Operator as of the Vincent Operation Transfer Date.

(vi)    The applicable third-party to the Provider Agreements set forth on Schedule 2.5(b)(vi) shall have either consented to the assignment of the Provider Agreements to Vincent New Operator or agreed to enter into a new Provider Agreements with Vincent New Operator as of the Vincent Operation Transfer Date.

(vii)    Since the Contract Date, there shall have occurred, no event, circumstance or other change in Vincent Existing Operator or the Facility that has had a Material Adverse Effect that has not been corrected or resolved on or prior to Vincent Operation Transfer to Vincent New Operator's satisfaction as determined in its reasonable discretion.

(viii)    The average daily census shall not have decreased by 10% or more from the Baseline Facility Census.

(ix)    None of the other Stalking Horse Sale Agreements shall have been terminated in accordance with their terms.

(c)    For Vincent Existing Operator.  The obligations of Seller under this Vincent OTA are subject to the satisfaction on or prior to the Vincent Operation Transfer Date of the following conditions, any one or more of which may be waived by Vincent Existing Operator to the extent permitted by Applicable Law:

(i)    Vincent New Operator shall have performed or complied, in all material respects, with all agreements, covenants and conditions required by this Vincent OTA to be performed or complied with by it on or prior to the Vincent Operation Transfer Date.

(ii)     Vincent New Operator shall have performed or complied, in all material respects, withal agreements, covenants, and conditions required by the Vincent Interim Management Agreement.

(iii)    The representations and warranties of Vincent New Operator set forth in this Vincent OTA shall be true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) on and as of the Vincent Operation Transfer Date as though made on and as of the Vincent Operation Transfer Date, except to the extent any such representation or warranty expressly is made as of an earlier date or with respect to a particular period, in which case such representation or warranty shall have been true and correct in all material respects (or, with respect to any representation qualified as to materiality, true and correct) as of such date or with respect to such period.

2.6     <u>Vincent Existing Operator's Deliveries on the Vincent Operation Transfer Date</u>.  Vincent Existing Operator shall deliver the following to Vincent New Operator on the Vincent Operation Transfer Date:

(a)     A copy of the docketed Sale Order;

(b)     A Bill of Sale executed by Vincent Existing Operator, substantially in the form attached as <u>Exhibit A</u> (the "<u>Vincent Bill of Sale</u>");

(c)     An Assignment and Assumption Agreement executed by Vincent Existing Operator, substantially in the form attached hereto as <u>Exhibit B</u> (the "<u>Vincent Assignment and Assumption Agreement</u>");

(d)     An Assignment and Assumption Agreement of Resident Trust Funds executed by Vincent Existing Operator, substantially in the form attached hereto as <u>Exhibit C</u> (the "<u>Vincent RTF Assignment and Assumption Agreement</u>");

(e)     The Employee Schedule (as defined in <u>Section 3.3(d))</u>;

(f)     The inventory and supplies included within the Assets, which Vincent Existing Operator shall deliver to Vincent New Operator or its designee by leaving the same at the Facility on the Vincent Operation Transfer Date;

(g)     A certificate executed by an authorized officer of Vincent Existing Operator that all representations and warranties of Vincent Existing Operator set forth in <u>Article 5</u> of this Vincent OTA are true and correct in all material respects as of the Vincent Operation Transfer Date with the same force and effect as if made on the Vincent Operation Transfer Date, except that those representations and warranties that contain materiality qualifications and other qualifications based on the word "material" shall be required to be true and correct in all respects and not merely all material respects;

(h) A closing statement executed by Vincent Existing Operator setting forth in reasonable detail the financial transactions contemplated by this Vincent OTA, including, without limitation, all prorations, as reasonably approved by Vincent Existing Operator and Vincent New Operator (the "Closing Statement"); and

(i) Such other documents as are reasonably requested by Vincent New Operator to effectuate the transactions contemplated hereby.

2.7 Vincent New Operator's Deliverables on the Vincent Operation Transfer Date. Vincent New Operator shall deliver to Vincent Existing Operator on the Vincent Operation Transfer Date:

(a) The Vincent Bill of Sale executed by Vincent New Operator;

(b) The Vincent Assignment and Assumption Agreement executed by Vincent New Operator;

(c) The Vincent RTF Assignment and Assumption Agreement executed by Vincent New Operator;

(d) A certificate executed by an authorized officer of Vincent New Operator that all representations and warranties of Vincent New Operator set forth in Section 4 of this Vincent OTA are true and correct in all material respects as of the Vincent Operation Transfer Date with the same force and effect as if made on the Vincent Operation Transfer Date except that those representations and warranties that contain materiality qualifications and other qualifications based on the word "material" shall be required to be true and correct in all respects and not merely all material respects;

(e) The Closing Statement executed by Vincent New Operator; and

(f) Such other documents as are reasonably requested by Vincent Existing Operator to effectuate the transactions contemplated hereby.

## ARTICLE 3
## TRANSFER OF OPERATIONS AND ASSETS

3.1 Cooperation; Covenants of the Parties.

(a) The parties hereto agree to cooperate with each other in good faith to effect an orderly transfer of the operations and transfer of the Assets of the Facility as of the Effective Time.

(b) During the period between the Contract Date and the Vincent Operation Transfer Date (the "Pre-Vincent Operation Transfer Period"), Vincent Existing Operator and Vincent New Operator shall enter into the Vincent Interim Sublease and the Vincent Interim Management Agreement. Subject to Vincent New Operator's rights and obligations under the Vincent Interim Management Agreement, Vincent

Existing Operator shall: (i) operate the Facility in material compliance with Applicable Law and Vincent Existing Operator's past practices (both operational and financial); (ii) maintain the Assets in substantially the same condition as exists on the Contract Date (normal wear and tear excepted); (iii) perform all material obligations under the Assigned Contracts; (iv) maintain its normal inventory of supplies, which shall be in quantities consistent with Applicable Law and past practices for operation of the Facility; and (v) without limiting the foregoing, to the extent depleted or replaced in the ordinary course, restock and replenish any portion of the inventory consumed or used during the Pre-Vincent Operation Transfer Period with inventory of comparable quality and consistent with past practice. Notwithstanding anything herein to the contrary, subject to Vincent New Operator's rights and obligations under the Vincent Interim Management Agreement, during any period of full or partial suspension of operations of a Facility related to the coronavirus (COVID-19) pandemic, Vincent Existing Operator may, in connection with the coronavirus (COVID-19) pandemic, take such actions (a "COVID Related Action") as are reasonably necessary (A) to protect the health and safety of the Facility's residents, employees and other individuals having business dealings with the Vincent Existing Operator, or (B) to respond to third-party supply or service disruptions caused by the coronavirus (COVID-19) pandemic; provided, that following any such suspension, to the extent that Vincent Existing Operator took any actions pursuant to the immediately preceding proviso that caused deviations from its business being conducted in the ordinary course of business consistent with past practice, to resume conducting its business in the ordinary course of business consistent with past practice in all material respects as soon as reasonably practicable as determined by Vincent Existing Operator in its reasonable discretion. Vincent Existing Operator shall provide to Vincent New Operator prompt written notice of the taking of any COVID Related Action.

(c)    During the Pre-Vincent Operation Transfer Period, Vincent Existing Operator shall promptly notify Vincent New Operator in writing of any fact, circumstance, event, or action, the existence, occurrence, or taking of which: (1) has had or could reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect, or (2) has resulted in, or could reasonably be expected to result in, the failure of any of the covenants set forth in Section 3.1(b).

(d)    During the Pre-Vincent Operation Transfer Period, Vincent Existing Operator (i) shall not, without the prior written consent of Vincent New Operator, enter into any transaction or contractual obligation that would materially adversely impact Vincent Existing Operator's abilities to perform its obligations under this Vincent OTA; (ii) shall, upon request from Vincent New Operator, provide Vincent New Operator with a Resident Census Report detailing the performance of the Facility for the previous calendar month; and (iii) shall not transfer any Employees and shall not transfer any residents to any business or facility owned or controlled by an affiliate of Vincent Existing Operator, unless required to comply with Applicable Law or at the request of such transferred resident.

3.2    <u>Resident Funds; Advance Payments</u>.

(a)    Prior to the Vincent Operation Transfer Date, Vincent Existing Operator shall prepare a true, correct and complete accounting, properly reconciled, of any Resident Trust Funds then held by Vincent Existing Operator for residents at the Facility. On the Vincent Operation Transfer Date, to the extent not previously transferred to Vincent New Operator pursuant to the Vincent Interim Management Agreement, Vincent Existing Operator shall transfer the Resident Trust Funds to a bank account designated by Vincent New Operator, and Vincent New Operator shall expressly assume all of Vincent Existing Operator's financial and custodial obligations with respect thereto, it being the intent and purpose of this provision that, upon such transfer, Vincent Existing Operator will be relieved of all fiduciary and custodial obligation with respect to the Resident Trust Funds delivered to Vincent New Operator, and that Vincent New Operator will assume all such obligations and be directly accountable to the residents with respect thereto.

(b)    Vincent Existing Operator will indemnify, defend and hold Vincent New Operator harmless for, from and against all Losses: (i) in the event the amount of the Resident Trust Funds, if any, transferred to Vincent New Operator does not constitute the full amount of the Resident Trust Funds that were to be delivered to Vincent New Operator, (ii) resulting from inaccuracies in the accounting of Resident Trust Funds provided by Vincent Existing Operator and/or (iii) resulting from actions or omissions of Vincent Existing Operator with respect to the Resident Trust Funds prior to the Vincent Operation Transfer Date. Vincent New Operator agrees to indemnify and hold Vincent Existing Operator harmless from all Losses that may be asserted against Vincent Existing Operator in connection with Vincent New Operator's custody and treatment from and after the Vincent Operation Transfer Date of the Resident Trust Funds delivered by Vincent Existing Operator to Vincent New Operator.

3.3    <u>Employees</u>.

(a)    [Omitted]

(b)    As of 11:59:59 PM on the day before the Vincent Interim Contract Date, Vincent Existing Operator shall terminate all employees who are in its employ on that day (including any such employees who are on medical disability or leaves of absence and who worked at the Facility immediately prior to such disability or leave) (collectively, the "<u>Employees</u>"). Subject to Section 3.3(c), as of the Vincent Interim Contract Date, Vincent New Operator will offer employment, on an "at will" basis, to a sufficient number of the Employees so as to avoid any obligation of the Vincent Existing Operator to provide advance notice under the WARN Act, or under any comparable State law, at rates of pay and benefit packages comparable to their current compensation. Vincent Existing Operator and Vincent New Operator acknowledge and agree that one purpose of this <u>Section 3.3(b)</u> is to ensure that Vincent Existing Operator is not required to provide advance notice under the WARN Act and/or under any comparable State law.

(c)     Vincent New Operator or its designee shall hire as of the Vincent Interim Contract Date, on an "at will" basis, those Employees Vincent New Operator elects in its sole discretion and who elects to accept employment with Vincent New Operator or its designee (all of such employees who accept employment with Vincent New Operator or its designee being herein referred to as the "Hired Employees"). Vincent Existing Operator shall reasonably cooperate with Vincent New Operator or its designee and provide reasonable access to the Employees to allow Vincent New Operator or its designee to obtain all necessary information from the Employees needed by Vincent New Operator or its designee to complete the onboarding process for the Hired Employees at a time mutually agreed to by Vincent Existing Operator and Vincent New Operator or its designee.

(d)     As soon as practicable following the most recent payroll date prior to the Vincent Interim Contract Date, Vincent Existing Operator shall provide a schedule (the "Employee Schedule") setting forth Vincent Existing Operator's estimate for each Employee as of the Vincent Interim Contract Date: (1) the name of such Employee, and (2) their positions, original hire dates, full/part time status, rates of pay and whether they are on medical disability or leave of absence to the extent such disclosures are permissible under applicable law.

(e)     Vincent Existing Operator shall remain solely responsible for the satisfaction of all claims for medical, dental, life insurance, health accident or disability benefits, to the extent such benefits exist, brought by or in respect of the Employees related to events occurring prior to the Vincent Interim Contract Date. Vincent Existing Operator also shall remain solely responsible for all workers' compensation claims of any Employees which relate to events occurring prior to the Vincent Interim Contract Date. Notwithstanding the foregoing, Vincent New Operator shall reimburse Vincent Existing Operator for any accrued PTO amounts owing to any Employee terminated pursuant to Section 3.3(b) to the extent (i) such amounts are required under the Texas Payday Law; and (ii) that following the Vincent Interim Contract Date such Employee does not accept employment with Vincent New Operator with credit for such accrued PTO. Vincent Existing Operator shall provide its calculation of the accrued PTO amounts owed to Employees under the Texas Payday Law 5 business days prior to the Vincent Interim Contract Date.

(f)     Upon reasonable advance written notice to Vincent New Operator and at reasonable times that will not, in any material respect, interfere with or disrupt the business of Vincent New Operator at the Facility, Vincent New Operator agrees to provide Vincent Existing Operator with reasonable access to the Facility's employees after the Vincent Interim Contract Date if necessary for Vincent Existing Operator's defense of any professional liability or general liability litigation.

(g)     Nothing in this Vincent OTA shall create any rights in favor of any person not a party hereto, including the Employees, or constitute an employment agreement or condition of employment for any employee of Vincent Existing Operator or the Vincent New Operator or any Affiliate thereof, nor shall this Vincent OTA be deemed the assignment to or assumption by Vincent New Operator of any

collective bargaining agreement, employment agreement or terms or conditions of employment (except as set forth herein), and Vincent New Operator shall not assume any liabilities or obligations under any employee benefit plan or defined benefit plan of Vincent Existing Operator or its Affiliates.

(h)     Vincent Existing Operator acknowledges and agrees that Vincent New Operator is not assuming any of Vincent Existing Operator's obligations to its Employees and/or qualified beneficiaries under Section 601, et seq. of the Employee Retirement Income Security Act of 1974, as amended, and the regulations thereunder, as in effect from time to time, and Section 4980B of the Code, in the event any such obligations of Vincent Existing Operator exist as of the Vincent Interim Contract Date.

3.4     <u>Accounts Receivable</u>.  Vincent Existing Operator shall transfer its right, title and interest in and to all unpaid accounts receivable with respect to the Facility that relate to all periods prior to the Effective Time, including, but not limited to, any accounts receivable arising from rate adjustments which relate to periods prior to the Effective Time, even if such adjustments occur after the Effective Time to Vincent New Operator.

3.5     <u>Payment of Operating Costs, Prorations, and Deposits</u>.

(a)     Vincent Existing Operator shall be responsible for, and shall pay on a timely basis, claims or charges which are owed to third parties arising from Vincent Existing Operator's operation or control of the Facility, including payroll, bed taxes, insurance premiums, utilities, operating charges, prepaid service contracts, amounts due to any third party vendors, including amounts due under any Contracts, and similar obligations for all periods prior to the Effective Time.

(b)     Vincent New Operator, shall be responsible for, and shall pay on a timely basis, any claims or charges which are owed to such third parties arising from the operation or control of the Facility from and after the Effective Time, including payroll, bed taxes, insurance premiums, utilities, operating charges, prepaid service contracts, amounts due to any third party vendors, including amounts due under any Assigned Contracts, and similar obligations for all periods on and after the Effective Time.

(c)     Revenues and expenses pertaining to utility charges for the billing period in which the Vincent Operation Transfer occurs (if known), prepaid expenses and like items of revenue or expense shall be prorated between Vincent Existing Operator and Vincent New Operator as of the Vincent Operation Transfer Date.  All such prorations shall be made on the basis of actual days elapsed in the relevant accounting or revenue period and shall be based on the most recent information available to Vincent Existing Operator.  In general, such prorations shall be made so as to reimburse Vincent Existing Operator for accrued prepaid expense items, and to charge Vincent Existing Operator for accrued revenue items, to the extent that the same are attributable to periods after the Effective Time.

13

(d) Without modifying the obligations set forth in <u>Section 3.5(c)</u>, Vincent Existing Operator and Vincent New Operator shall cooperate to coordinate an orderly transfer of all utilities into the name of Vincent New Operator.

3.6 <u>Intentionally Deleted</u>

3.7 <u>Medicaid and other Third Party Payors</u>. As of the Effective Time, and to the extent permitted by Applicable Law, Vincent New Operator shall assume any and all of Vincent Existing Operator's rights and interests in and to: (i) all third party payor agreements (to the extent assignable and consent is obtained from such third party, where necessary); and (ii) Vincent Existing Operator's Medicaid provider reimbursement agreement (the "<u>Provider Agreements</u>"). Notwithstanding the foregoing, or anything to the contrary contained in this Vincent OTA, Vincent New Operator shall not accept any rights nor assume any liabilities or obligations of Vincent Existing Operator under the Provider Agreements arising or relating to periods of time prior to the Effective Time. Vincent Existing Operator agrees to cooperate with Vincent New Operator in the assignment of Vincent Existing Operator's Provider Agreements to Vincent New Operator, including, without limitation, providing to Vincent New Operator or any Governmental Entity any information requested to effect the transfer of the Provider Agreements, to the extent permitted by Applicable Law.

3.8 <u>Transfer of Records; Access To Records</u>. As of the Vincent Operation Transfer Date, Vincent Existing Operator shall transfer to Vincent New Operator or its designee, to the extent in the possession of Vincent Existing Operator or located at the Facility, all right, title and interest of Vincent Existing Operator in and to all books, data and records (including electronic versions thereof but excluding Vincent Existing Operator's proprietary software and excluding any financial, accounting and tax records of or relating to Vincent Existing Operator and any minute books, charter documents, record books and other similar books and records pertaining to the organization, existence or capitalization of Vincent Existing Operator), including the Employee records and resident records (except for such records and reports where transfer is prohibited by Applicable Law) (the "<u>Facility Records</u>"), provided, however, that Vincent Existing Operator shall be entitled to keep such copies of all Facility Records as it may deem necessary and as permitted by Applicable Law. Upon receipt of such Facility Records, Vincent New Operator will maintain the Facility Records in accordance with Applicable Law. At all times on and after the Vincent Operation Transfer Date, Vincent New Operator shall allow Vincent Existing Operator, at Vincent Existing Operator's sole cost and expense, to have reasonable access during regular business hours upon reasonable prior written notice and to make copies of, the Facility Records, to the extent reasonably necessary to enable Vincent Existing Operator to investigate and defend malpractice, employee or other claims, to file or defend tax returns, to verify accounts receivable collections due Vincent Existing Operator, and to perform similar matters. Vincent Existing Operator makes no representations relating to the accuracy or the completeness of the Facility Records and any reliance upon the Facility Records shall be done at Vincent New Operator's sole risk and liability. To the extent that the Facility Records are maintained in an electronic format, the parties shall cooperate in good faith to coordinate the electronic transfer to Vincent New Operator or its designee all right, title and interest of Vincent Existing Operator in and to all such Facility Records, in

a manner mutually acceptable to the parties, and Vincent New Operator shall be responsible for any third party costs related to the transfer of such Facility Records.

3.9    <u>Inspections and Surveys</u>. Vincent Existing Operator shall be responsible for the payment of all fines and penalties imposed by Governmental Bodies which fines and penalties arise in connection with any regulatory investigations, inspections or surveys occurring prior to the Effective Time, or which relate to events occurring prior to the Effective Time. Vincent New Operator shall be responsible for the payment of all fines and penalties imposed by Governmental Bodies which fines and penalties arise in connection with any regulatory inspections or surveys on or after the Effective Time and which are related to the operation of the Facility on or after the Effective Time.  Vincent Existing Operator shall provide to Vincent New Operator, promptly after receipt of the same, any survey reports, waivers of deficiencies, plans of correction or any other investigation reports issued with respect to the Facility between the Contract Date and the Vincent Operation Transfer Date.

3.10   <u>Assigned Contracts</u>.

(a)    <u>Assumption & Assignment / Rejection of Certain Contracts</u>. Schedule 3.10(a) sets forth a list of all executory Contracts to which, to the knowledge of the Trustee, Vincent Existing Operator is a party or to which any of its assets are bound and which are to be included in the Assigned Contracts. From time to time, and as reasonably requested by Vincent New Operator, Vincent Existing Operator shall update Schedule 3.10(a). Vincent Existing Operator shall provide timely and proper written notice of the motion seeking entry of the Sale Order to all parties to any executory Contracts or unexpired leases that are Assigned Contracts and take all other actions necessary or otherwise required to cause such Contracts to be assumed by Vincent Existing Operator and assigned to Vincent New Operator or its designee pursuant to Section 365 of the Bankruptcy Code to the extent that such Contracts are Assigned Contracts as of the Vincent Operation Transfer (including (x) serving on all counterparties to all of their Contracts a notice specifically stating that Vincent Existing Operator is or may be seeking the assumption and assignment of such Contract(s) and of the deadline for objecting to the Cure Costs or any other aspect of the proposing assumption and assignment of their Contracts to Vincent New Operator or its designee and (y) taking, as promptly as practicable, all other actions reasonably requested by Vincent New Operator to facilitate any negotiations with the counterparties to such Assigned Contracts and to obtain an Order (which may be the Sale Order), including a finding that the proposed assumption and assignment of the Assigned Contracts to the Vincent New Operator satisfies all applicable requirements of section 365 of the Bankruptcy Code). The Sale Order shall provide that as of and conditioned on the occurrence of the Vincent Operation Transfer, Vincent Existing Operator shall assign or cause to be assigned to Vincent New Operator or its designee, as applicable, the Assigned Contracts, each of which shall be identified by the name or appropriate description and date of the Assigned Contract (if available), the other party to the Assigned Contract and the address of such party for notice purposes, a notice filed in connection with the motion for approval of the Sale Order or a separate motion for authority to assume and assign such Assigned Contracts. Such exhibit shall also set forth Vincent

Existing Operator's good faith estimate of the amounts necessary to cure any defaults under each of the Assigned Contracts as determined by the Trustee based on Vincent Existing Operator's books and records or as otherwise determined by the Bankruptcy Court. At the Vincent Operation Transfer and subject to Section 3.10(b), Vincent Existing Operator shall, pursuant to the Sale Order, and the Vincent Assignment and Assumption Agreement, assume and assign to Vincent New Operator or its designee, all Assigned Contracts that may be assigned by Vincent Existing Operator to Vincent New Operator or its designee pursuant to sections 363 and 365 of the Bankruptcy Code. At the Vincent Operation Transfer, Vincent New Operator (i) shall pay all Cure Costs and (ii) shall, assume or cause to be assumed, and thereafter in due course and in accordance with its respective terms pay, fully satisfy, discharge and perform (or cause to be fully satisfied, discharged and performed) all of the obligations (other than any Excluded Liabilities) that are Assumed Liabilities under each Assigned Contract pursuant to Section 365 of the Bankruptcy Code and the Vincent Assignment and Assumption Agreement, as applicable.

(b)     Excluding or Adding Assigned Contracts Prior to Vincent Operation Transfer. Vincent New Operator shall have the right to notify Vincent Existing Operator in writing of any Assigned Contract that it does not wish to assume or a Contract to which Vincent Existing Operator is a party that Vincent New Operator wishes to add as an Assigned Contract up to one (1) Business Day prior to the Vincent Operation Transfer and (i) any such previously considered Assigned Contract that Vincent New Operator no longer wishes to assume shall be automatically deemed removed from the Schedules related to Assigned Contracts, and (ii) any such Contract not originally appearing on the Schedules related to Assigned Contracts that Vincent New Operator wishes to assume as an Assigned Contract shall be automatically deemed added to the Schedules related to Assigned Contracts, and assumed by Vincent Existing Operator to sell and assign to Vincent New Operator or its designee. Vincent New Operator may request, in its reasonable business judgment, certain modifications and amendments to any Contract as a condition to such Contract becoming an Assigned Contract, and Vincent Existing Operator shall use its reasonable best efforts to obtain such modifications or amendments; *provided, however*, that, for so long as Vincent Existing Operator use their reasonable best efforts to obtain such modifications or amendments, the failure to obtain any such modifications or amendments shall, in and of itself, not be a condition to Vincent New Operator's obligation to consummate the transactions contemplated by this Vincent OTA on the Vincent Operation Transfer Date. All reasonable and documented costs and expenses payable prior to Vincent Operation Transfer in connection with transferring any Assigned Contracts as contemplated by this Vincent OTA (other than the Cure Costs) shall be borne by Vincent Existing Operator.

(c)     Resident Agreements.  Notwithstanding anything to the contrary in this Section 3.10, as of the Vincent Operation Transfer Date, the Assigned Contracts to be assumed and assigned to Vincent New Operator or its designee as of the Vincent Operation Transfer Date shall include all care or residency agreements relating to

16

the occupancy of the Facility by residents thereof (the "Resident Agreements") pursuant to the Vincent Assignment and Assumption Agreement. Vincent Existing Operator agrees to use best efforts to transfer the Resident Agreements to Vincent New Operator as of the Vincent Operation Transfer Date.

(d)     Notwithstanding anything to the contrary in Sections 3.10(b) or (c) above, in the event that the notice from Vincent New Operator to Vincent Existing Operator concerning a Contract (including any Resident Agreement) to which Vincent Existing Operator is a party that Vincent New Operator wishes to add as an Assigned Contract is provided by Vincent New Operator on or after one (1) Business Day prior to the last date specified in the Bidding Procedures Order for the service of a Supplemental Assumption Notice (as defined in the Bidding Procedures Order), Vincent New Operator and Vincent Existing Operator shall cooperate in good faith and use their respective commercially reasonable efforts to obtain the Bankruptcy Court's approval pursuant to Section 365 of the Bankruptcy Code for Vincent Existing Operator's assumption and assignment of such new Assigned Contract to Vincent New Operator or its designee, as applicable.

3.11    Remittances, Mail and Other Communications.    All remittances, mail and other communications relating to the operations of the Facility following the Vincent Operation Transfer Date received by Vincent Existing Operator or its Affiliates at any time after the Vincent Operation Transfer Date relating to periods of operations on and after the Vincent Operation Transfer Date shall be promptly turned over to Vincent New Operator or its designee. Likewise, all remittances, mail and other communications relating to the operations of the Facility prior to the Vincent Operation Transfer Date received by Vincent New Operator or its Affiliates at any time after the Vincent Operation Transfer Date relating to periods of operations prior to the Vincent Operation Transfer Date shall be promptly turned over to Vincent Existing Operator.

3.12    Software Systems.    On and after the Vincent Operation Transfer Date, Vincent New Operator shall not have the right to use any of Vincent Existing Operator's proprietary software systems. Prior to the Vincent Operation Transfer Date, Vincent Existing Operator will reasonably cooperate with Vincent New Operator's efforts to put Vincent New Operator's software systems in place at the Facility in order to ensure orderly transition of the operations at the Facility.

3.13    Excluded Assets.    Notwithstanding anything to the contrary contained in this Section 3 or elsewhere in this Vincent OTA, the items listed on Exhibit D (collectively, the "Excluded Assets") are excluded from the Assets and shall remain the property of the Vincent Existing Operator after the Vincent Operation Transfer.

3.14    Release and Indemnification of Trustee. FROM AND AFTER THE OPERATION TRANSFER, VINCENT NEW OPERATOR ("INDEMNIFYING PARTY") SHALL INDEMNIFY, DEFEND, AND HOLD HARMLESS TRUSTEE AND HIS AFFILIATES, PARTNERS, CONSULTANTS, ADVISORS, AGENTS, AND REPRESENTATIVES (COLLECTIVELY, "INDEMNIFIED PARTY") FROM AND AGAINST, AND HEREBY ASSUMES, ANY AND ALL LOSSES OR LIABILITIES RESULTING

FROM, ARISING OUT OF, OR INCIDENTAL TO THE OPERATION OF THE FACILITY ON OR AFTER THE OPERATION TRANSFER DATE.

NOTWITHSTANDING ANYTHING TO THE CONTRARY HEREIN, EXCEPT FOR FRAUD BY OR INTENTIONAL MISCODUCT OF THE TRUSTEE, NOTHING HEREIN SHALL OBLIGATE THE TRUSTEE IN HIS PERSONAL CAPACITY; HIS OBLIGATIONS HERETO ARE ONLY AS CHAPTER 11 TRUSTEE AND NOT IN HIS PERSONAL CAPACITY

## ARTICLE 4
## REPRESENTATIONS AND WARRANTIES OF VINCENT NEW OPERATOR

Vincent New Operator hereby makes the representations and warranties indicated below to Vincent Existing Operator, in each case as of the Contract Date, unless another date is specifically indicated below:

4.1     <u>Authority, Validity and Binding Effect</u>.  Vincent New Operator has all necessary power and authority to operate and lease the Facility and to carry on its business as it is now being conducted.  Vincent New Operator is duly organized and in good standing under the laws of the State of Delaware. Vincent New Operator has all necessary limited liability company power and authority, as the case may be, to enter into this Vincent OTA and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Vincent OTA on each of their behalf to do so.  This Vincent OTA has been duly and validly executed and delivered by Vincent New Operator and is enforceable against Vincent New Operator in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

4.2     <u>No Defaults</u>.  The execution and delivery of this Vincent OTA and any documents contemplated hereby by Vincent New Operator, and the performance of its obligations hereunder and thereunder, do not and will not:

(a)     conflict with or result in any material breach of the provisions of, or constitute a default under articles of organization or the operating agreement of Vincent New Operator;

(b)     violate any material restriction to which Vincent New Operator is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization or permit or other material agreement or instrument to which Vincent New Operator is a party, which will not be satisfied or terminated prior to the Vincent Operation Transfer Date as a result of the transactions contemplated by this Vincent OTA or result in the termination of any such instrument or termination of any provisions in such instruments that will result in the impairment of any of Vincent New Operator's rights under such instruments; or

(c)      constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or governmental authority, or of any judgment, decree, writ, injunction or order of any court to which Vincent New Operator is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which Vincent New Operator, or any of its Affiliates is a party.

4.3    <u>No Litigation</u>. There are no Actions pending or in effect, or to the knowledge of Vincent New Operator, threatened against, Vincent New Operator relating to the transactions contemplated by this Vincent OTA.

4.4    <u>Approvals</u>. Vincent New Operator is familiar with the requirements to become a licensed operator of an assisted living facility in the State of Texas. To the knowledge of Vincent New Operator, except for matters disclosed by Vincent Existing Operator on Schedule 5.9, no fact, issue, concern or other matter, either past or present, exists that would materially adversely affect Vincent New Operator's ability to obtain an assisted living facility license from the THHS to operate the Facility or any other approvals required to consummate the transactions contemplated hereunder. Neither Vincent New Operator nor any of its members, directors, officers or employees has (i) been indicted or convicted of a felony, (ii) been suspended or excluded from any healthcare programs, or (iii) been the subject of any criminal investigation, or any enforcement action regarding, its or their ownership or operation of any health care facility or concerning or relating to the delivery of, or reimbursement for, health care services.

4.5    <u>Broker</u>. Vincent New Operator has not engaged, nor is Vincent New Operator liable to pay any fees, costs or commissions to, any broker, finder, agent or financial advisor in connection with the transactions contemplated hereby.

## ARTICLE 5
## REPRESENTATIONS AND WARRANTIES OF VINCENT EXISTING OPERATOR

Vincent Existing Operator hereby represents and warrants as follows to Vincent New Operator, in each case as of the Contract Date, unless another date is specifically indicated below:

5.1    <u>Authority, Validity and Binding Effect</u>. Vincent Existing Operator has all necessary power and authority to carry on its business as it is now being conducted. Vincent Existing Operator is duly organized and in good standing under the laws of the State of Texas. Subject to requisite Bankruptcy Court approvals, Vincent Existing Operator has all necessary power and authority to enter into this Vincent OTA and to execute all documents and instruments referred to herein or contemplated hereby and all necessary action has been taken to authorize the individuals executing this Vincent OTA to do so. This Vincent OTA has been duly and validly executed and delivered by Vincent Existing Operator and, subject to requisite Bankruptcy Court approvals, is enforceable against Vincent Existing Operator in accordance with its terms, except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general.

19

5.2 <u>No Defaults</u>. The execution and delivery of this Vincent OTA and any documents contemplated hereby by Vincent Existing Operator, and the performance of their obligations hereunder, does not and will not:

(a) conflict with or result in any material breach of the provisions of, or constitute a default under the articles of organization or operating agreement of Vincent Existing Operator;

(b) violate any material restriction to which Vincent Existing Operator is subject or, without the giving of notice, passage of time, or both, violate (or give rise to any right of termination, cancellation or acceleration under) any material license, authorization or permit or other material agreement or instrument to which Vincent Existing Operator is a party, which will not be satisfied or terminated with respect to the Facility prior to the Vincent Operation Transfer Date as a result of the transactions contemplated by this Vincent OTA or result in the termination of any such instrument or termination of any provisions in such instruments that will result in the impairment of any of Vincent Existing Operator's rights under such instruments; or

(c) constitute a violation of any applicable material resolution, rule, regulation, law, statute or ordinance of any administrative agency or governmental authority, or any judgment, decree, writ, injunction or order of any court to which Vincent Existing Operator is subject or by which its assets are bound, or any credit agreement or other financing arrangement to which Vincent Existing Operator is a party.

5.3 <u>Environmental</u>. Except for medical waste generated and disposed of in the ordinary course of business and in compliance with Applicable Laws, Vincent Existing Operator has not generated, stored or disposed of any Hazardous Materials on the real property on which the Facility is located (the "<u>Property</u>"), and there is not currently any Hazardous Materials on the Property. To Vincent Existing Operator's Knowledge, there are no environmental permits, licenses or approvals required by any Applicable Law pertaining to the Facility.

5.4 <u>Litigation</u>. Except as set forth on <u>Schedule 5.4</u>, there are no Actions pending or, to Vincent Existing Operator's Knowledge, threatened against or affecting Vincent Existing Operator (as it relates to the ownership, leasing or operation of the Facility). Vincent Existing Operator is neither subject to, nor in default under, any Governmental Order applicable to it, or to the Facility.

5.5 <u>Labor and Employment Matters</u>. Except as set forth on <u>Schedule 5.5</u>, Vincent Existing Operator is not a party to any collective bargaining agreement, employment agreement or other labor contract applicable to any of the Employees, and there are no pending or, to Vincent Existing Operator's Knowledge, threatened labor disputes at the Facility including, but not limited to, any strike, slowdown, picketing, work stoppage, organizational activities or employee grievance process affecting the Facility. Vincent Existing Operator has complied in all material respects with all Applicable Laws governing wage, hour, payroll and all other employment and labor matters.

5.6   <u>ERISA and Benefit Plans</u>.

    (a)    To the best of Vincent Existing Operator's Knowledge, Vincent Existing Operator is and never has been a party to, participates in, has participated in or has any liability or contingent liability with respect to any of the following as they relate to the Employees: (i) any "employee welfare benefit plan" or "employee pension benefit plan" or "multiemployer plan" as those terms are respectively defined in sections 3(1), 3(2) and 3(37) of the Employee Retirement Income Security Act of 1974, as amended, and the rules and regulations promulgated thereunder ("<u>ERISA</u>"); (ii) any retirement or deferred compensation plan, incentive compensation plan, stock plan, unemployment compensation plan, vacation pay, severance pay, bonus or benefit arrangement, insurance or hospitalization program or any other fringe benefit arrangements for any current or former employee, director, consultant or agent, whether pursuant to contract, arrangement, custom or informal understanding, written or unwritten, which does not constitute an "employee benefit plan" (as defined in section 3(3) of ERISA); or (iii) any fringe benefit plans, as that term is defined in Section 6039D(d) of the Code (collectively, the "<u>Employee Plans</u>"), and under no circumstances will Vincent New Operator have any liability with respect to any such Employee Plan of Vincent Existing Operator in the event it exists.

    (b)    Omitted.

5.7   <u>Taxes</u>.  Except as set forth on <u>Schedule 5.7</u>, all Tax Returns required to be filed by Vincent Existing Operator on or before the Contract Date have been timely filed with the appropriate Governmental Entities in all jurisdictions in which such Tax Returns are required to be filed, and all Taxes shown as due in connection therewith have been paid. Except as set forth on <u>Schedule 5.</u>7, all Taxes which have become due or payable or are required to be collected by Vincent Existing Operator or are otherwise attributable to any periods ending on or before the Vincent Operation Transfer Date and all interest and penalties thereon, have been paid or will be paid in full on or prior to the Vincent Operation Transfer Date, other than such Taxes that are being contested by Vincent Existing Operator in good faith. Except as set forth on <u>Schedule 5.</u>7, all deposits required by law to be made by Vincent Existing Operator with respect to employees' withholding Taxes have been duly made, and, as of the Vincent Operation Transfer Date, all such deposits due will have been made.  Except as set forth on <u>Schedule 5.</u>7, all Taxes that Vincent Existing Operator are or were required by Applicable Law to withhold, deduct or collect have been duly withheld, deducted and collected and, to the extent required, have been paid to the proper Governmental Entity or other Person.  No examination of any Tax Return of Vincent Existing Operator is currently in progress. There are no outstanding agreements or waivers extending the statutory period of limitations applicable to any such Tax Return. Except as set forth on <u>Schedule 5.</u>7, there are no encumbrances for Taxes upon the Assets other than statutory liens for Taxes not yet due or payable.

5.8   <u>Financial Materials</u>.   All materials and/or documents relating to the financial condition and/or census of the Facility, provided to Vincent New Operator, are true and complete in all material respects, and are not misleading in any material respect.

5.9    Health Care Representations

(a)    (i) except as set forth on Schedule 5.9(a) Vincent Existing Operator owns and/or possesses, and holds free from restrictions or conflicts with the rights of others, all material licenses, permits, certificates, accreditations, and other approvals required by a Governmental Entity for the operation of the Facility and will operate or cause the Facility to be operated in such a manner that such licenses shall remain in full force and effect; (ii) all material licenses applicable to the business conducted at the Facility are set forth on Schedule 5.9(a); (iii) except as set forth on Schedule 5.9(a), no proceeding is pending or, to Vincent Existing Operator's Knowledge, threatened, seeking the revocation or limitation of any such license;.(iv) except as set forth on Schedule 5.9(a), Vincent Existing Operator has not received any written notice from any Governmental Entity or other applicable authority of (a) any violation, non-renewal, suspension or revocation of any such licenses that has not been dismissed or cured, or (b) any failure by Vincent Existing Operator to obtain any material licenses required by Applicable Law for the ownership, maintenance, use, occupancy or operation of the Facility as currently owned or operated; and (v) except as set forth on Schedule 5.9(a), there has been no event, change, development, or occurrence that could reasonably be expected to lead to either of (a) or (b), above.

(b)    The Facility is and shall be, as of 11:59:59 p.m. EST on the day prior to the Vincent Operation Transfer Date, licensed by the applicable Governmental Entity as an assisted living facility, with the same number and type of licensed beds as are set forth on Schedule I.

(c)    Except as disclosed on Schedule 5.9(c), to the Knowledge of Vincent Existing Operator, (i) Vincent Existing Operator has operated the Facility in material compliance with all Healthcare Laws; (ii) there are no outstanding inspections, surveys, or plans of correction as of the Contract Date; (iii) there are no implemented bans, remedies, sanctions, prohibitions on payment, or other limitations in effect with respect to the Facility; and (iv) no action has been taken or recommended, nor, to Vincent Existing Operator's Knowledge, is there any basis for any action, by any Governmental Entity, either to revoke, withdraw or suspend its license to operate the Facility or to terminate or decertify any participation of the Facility in the Medicaid waiver programs; other than the current ongoing review in connection with license renewal.

(d)    To the Knowledge of Vincent Existing Operator, neither Vincent Existing Operator nor any current member, officer, director or employee of Vincent Existing Operator has been (i) sanctioned pursuant to the Anti-Kickback Statute (42 U.S.C. §§1320a-7a or 1320a-8), the False Claims Act (31 U.S.C. §3729 et seq.), the Stark Law (42 U.S.C. §1395nn), or the regulations promulgated pursuant to such statutes, or any related or similar federal, state or local statutes or regulations governing referrals, fraud, waste, and abuse in the healthcare industry ("Health Care Fraud and Abuse Laws"); or (ii) convicted of a criminal offense under the Health Care Fraud and Abuse Laws. There are no pending or threatened Healthcare Fraud and Abuse Law

investigations, proceedings, or actions (including any civil investigative demand, subpoena, or self-disclosure) involving Vincent Existing Operator, any current member, officer, director or employee of Vincent Existing Operator, or the Facility. Other than as set forth on Schedule 5.9(e), to the Knowledge of Vincent Existing Operator, Vincent Existing Operator has not received any written notice (i) of the commencement of any proceeding under the Health Care Fraud and Abuse Laws or (ii) that the Facility, Vincent Existing Operator and/or any officer, director or employee of Vincent Existing Operator is under investigation or involved in proceedings regarding the Health Care Fraud and Abuse Laws, including as a result of a self-disclosure. Vincent Existing Operator and its agents and representatives, and all agreements, arrangements, and operations of the Facility, have at all times been in material compliance with all of the Health Care Fraud and Abuse Laws.

(e)     Except as set forth on Schedule 5.9(e), to the Knowledge of Vincent Existing Operator, neither Vincent Existing Operator nor any current director, officer, or managing employee of Vincent Existing Operator, is or has been party to a corporate integrity agreement, corporate compliance agreement, or other settlement agreement with the OIG, CMS, the United States Department of Justice, the THHS, the Texas Department of Medicaid, or any state Attorney General, as a result of an alleged violation of any Applicable Law. Neither Vincent Existing Operator nor any current director, officer, contractor, vendor, or employee of Vincent Existing Operator is listed on the OIG List of Excluded Individuals and entities, Texas Medicaid Provider Exclusion and Suspension List, or has been suspended, excluded, or otherwise limited from participating in the Medicaid waiver program, or any other government reimbursement program.

(f)     Vincent Existing Operator is certified for participation in the Medicaid and Medicaid waiver programs. Except as disclosed on Schedule 5.9(f), to the Knowledge of Vincent Existing Operator, the Facility is in material compliance with the conditions of participation and conditions for coverage of the government reimbursement programs and with the terms, conditions, and provisions of the Provider Agreements. The Provider Agreements are each in full force and effect, and Vincent Existing Operator has no Knowledge of any fact or circumstance that would cause any such Provider Agreement not to remain in force or be assigned to Vincent New Operator or its designee on and after Vincent Operation Transfer. Attached hereto on Schedule 5.9(f) is a true, correct, and complete list of all Medicaid provider numbers (the "Provider Numbers") in the name of Vincent Existing Operator, the Facility, or as otherwise specified which are currently used in connection with the operation of the Facility. The Provider Numbers are active with CMS, the applicable Governmental Entity of the State, and any other applicable Governmental Entity. There is no Action pending or, to Vincent Existing Operator's Knowledge, threatened, involving any of the Provider Agreements or any other third-party payor programs, with respect to the Facility, and Vincent Existing Operator has no reason to believe that any such proceedings, audits, investigations, or surveys are pending, threatened, or imminent.

(g)     All billing practices of Vincent Existing Operator with respect to all third-party payors, including Medicaid and commercial insurance companies, have been in material compliance with all Applicable Laws and policies of such third-party payors, commercial insurance companies and Medicaid waiver programs.

(h)     Schedule I sets forth the number of licensed and certified beds at the Facility.

(i)     Except as disclosed on Schedule 5.9(i), to the Knowledge of Vincent Existing Operator, Vincent Existing Operator and the policies, procedures, and systems of the Facility are in material compliance with the Health Insurance Portability and Accountability Act of 1996 and the rules and regulations promulgated thereunder ("HIPAA") and related or similar federal, state or local statutes or regulations governing medical records and the privacy of resident information. Except as disclosed on Schedule 5.9(i), to the Knowledge of Vincent Existing Operator, all protected health information (as defined under HIPAA) maintained by the Facility is maintained in accordance with HIPAA's administrative, physical, and technical safeguard requirements. Except as disclosed on Schedule 5.9(i), to the Knowledge of Vincent Existing Operator, to the extent required under HIPAA, the Facility has in effect with each individual or entity acting as a business associate (as defined in HIPAA) of such Facility an agreement that satisfies all of the business associate requirements of HIPAA. Except as disclosed on Schedule 5.9(i), to the Knowledge of Vincent Existing Operator, Vincent Existing Operator has not received any complaint or notice of investigation (in writing or otherwise) from the Department of Health and Human Services Office for Civil Rights, or from any other person, entity or government agency regarding Vincent Existing Operator, the Facility, or any of their business associates' uses or disclosures of, or security practices or security incidents regarding, protected health information or HIPAA compliance. Except as disclosed on Schedule 5.9(i), to the Knowledge of Vincent Existing Operator, with regard to protected health information of the Facility's residents, Vincent Existing Operator and the Facility are, and at all times have been, in material compliance with all applicable Legal Requirements related to reporting to individuals, governmental or regulatory authorities, the media, or credit reporting agencies, as applicable, breaches involving protected health information under HIPAA or otherwise.

5.10    Title to Property; Sufficiency of Assets.

(a)     Subject to requisite Bankruptcy Court approvals, and assumption by the Vincent Existing Operator of the applicable Contract in accordance with applicable Law (including satisfaction of any applicable Cure Costs) and except as a result of the commencement of the Bankruptcy Case, (i) Vincent Existing Operator owns good and valid title to, or holds a valid leasehold interest in, all of the Assets, whether tangible or intangible, free and clear of all Encumbrances, and (ii) at the Vincent Operation Transfer, Vincent Existing Operator will transfer, convey and assign good and valid title to, or a valid leasehold interest in, all of the Assets free and clear of all Encumbrances.

(b)      Other than the Excluded Assets and any Permits, the Assets constitute all of the material assets, properties and rights held for use or necessary to operate and conduct the business of the Facility and its Subsidiaries as conducted in the ordinary course as of the Contract Date.

5.11    Absence of Changes. Except as disclosed on Schedule 5.11, to the Knowledge of Vincent Existing Operator, since December 31, 2020, and except with respect to any changes that are the result of the COVID-19 pandemic: (a) the business at the Facility has been conducted in all material respects in the ordinary course consistent with past practice; (b) nothing has occurred which would constitute a Material Adverse Effect; and (c) no transaction or contractual obligation that would materially adversely impact Vincent Existing Operator's abilities to perform its obligations under this Vincent OTA has been entered into.

5.12    Contracts.

(a)      True, correct, and complete copies of all of the Contracts have been, or will be, made available to Vincent New Operator. A list of all Contracts is attached hereto as Schedule 5.12(a). With respect to the Contracts, (i) each of the Contracts is valid, binding and enforceable in accordance with its terms except as limited by bankruptcy, insolvency, fraudulent conveyance, moratorium, liquidation, reorganization or other similar laws affecting the enforcement of creditors' rights in general, (ii) there is not such material default or material event of default, or any event which, with or without notice or lapse of time or both, would constitute a material default under any Contract by Vincent Existing Operator. With respect to each Contract that is a lease of equipment or other personal property, (i) such lease creates a valid leasehold interest in all property purported to be leased thereunder, (ii) all rent and other required payments have been timely paid by Vincent Existing Operator, (iii) Vincent Existing Operator is in lawful possession of all of such property, and (iv) such lease is specifically identified as a lease on Schedule 5.12(a).

(b)      the execution and delivery of this Vincent OTA by Vincent Existing Operator and the consummation of the transactions contemplated hereby by Vincent Existing Operator do not require any consent under, constitute (with or without notice or lapse of time or both) a default under, result in any breach of, or give any Person any rights of termination, acceleration or cancellation of, any Contract.

5.13    Patriot Act Representations. Vincent Existing Operator is not, and is not acting, directly or indirectly, for or on behalf of any Person named as a "specially designated national and blocked person" (as defined in Presidential Executive Order 13224) on the most current list published by the U.S. Treasury Department of Foreign Assets Control, and Vincent Existing Operator is not engaged in this transaction, directly or indirectly, on behalf of, and are not facilitating this transaction, directly or indirectly, on behalf of, any such Person. Neither Vincent Existing Operator nor its constituents or affiliates are in violation of any laws relating to terrorism or money laundering, including the aforesaid Executive Order and the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56), as amended.

5.14 <u>Broker</u>. Neither the Trustee nor Vincent Existing Operator has engaged, or is liable to pay any fees, costs or commissions to, any broker, finder, agent or financial advisor in connection with the transactions contemplated hereby.

# ARTICLE 6
# TERMINATION; REMEDIES

6.1 <u>Termination</u>. This Vincent OTA may be terminated and the transactions contemplated hereby abandoned at any time prior to the Vincent Operation Transfer upon the following conditions:

(a) by mutual written consent of Vincent Existing Operator and Vincent New Operator;

(b) by Vincent Existing Operator upon written notice to Vincent New Operator, if there shall have been any material breach by Vincent New Operator of any of its representations, warranties, covenants and agreements set forth herein: (i) which breach shall have rendered impossible the fulfillment of the conditions set forth in <u>Section 2.5(c)</u>; or (ii) which breach is not cured within thirty (30) days of receipt of written notice of such breach;

(c) by Vincent New Operator upon written notice to Vincent Existing Operator, if there shall have been any material breach by Vincent Existing Operator of any of its representations, warranties, covenants and agreements set forth herein: (i) which breach shall have rendered impossible the fulfillment of the conditions set forth in <u>Section 2.5(b)</u>; or (ii) which breach is not cured within thirty (30) days of receipt of written notice of such breach;

(d) By written notice from Vincent New Operator to the Trustee, if (a) the Trustee or any Debtor seeks to have the Bankruptcy Court enter an Order dismissing, or converting into cases under chapter 7 of the Bankruptcy Code, either or both of the Bankruptcy Cases, or if a trustee (other than the Trustee) or examiner with expanded power to operate or manage the financial affairs or reorganization of either or both of the Debtors is appointed in the Bankruptcy Cases or (b) an Order or dismissal, conversion or appointment is entered for any reason and not reversed or vacated within fourteen (14) days after entry thereof;

(e) By written notice from Vincent New Operator to the Trustee, if the Trustee or Debtors announce any stand-alone plan of reorganization or liquidation (or support any such plan field by any other party);

(f) By written notice from Vincent New Operator to the Trustee if, under Section 363(k) of the Bankruptcy Code, Buyer is disallowed from providing a credit bid (or otherwise bidding on such other terms as may be agreed by Buyer, in its sole discretion) as contemplated by this Vincent OTA in connection with the payment of the Purchase Price;

(g) By written notice from either Vincent New Operator or the Trustee to the other Party, if an Order of the Bankruptcy Court is entered denying approval of the

Bidding Procedures Order or the Sale Order and (a) as to the Bidding Procedures Order such Order has not been reversed or vacated within fourteen (14) calendar days after its original entry or (b) as to the Sale Order such Order has not been reversed or vacated by the Outside Date;

(h)  By written notice from Vincent New Operator or the Trustee to the other Party, if (a)(1) Buyer is not the Successful Bidder (as defined in the Bidding Procedures Order) and (2) the Bankruptcy Court approves an Alternative Transaction with the Successful Bidder; or (b) the Bankruptcy Court approves an Alternative Transaction other than in connection with the Auction; *provided* that if Buyer is the Backup Bidder at the Auction, the right of Vincent New Operator or the Trustee to terminate this Vincent OTA pursuant to this Section 6.1 shall not be available to Vincent New Operator or the Trustee until the Outside Back-Up Date;

(i)  By written notice from Trustee to Vincent New Operator if Manager fails to pay Trustee the Trustee Funding under the Tandy Interim Management Agreement, if Manager fails to pay Trustee the Trustee Funding due within ten (10) business days of such written notice;

(j)  By written notice from Vincent New Operator to the Trustee if the Tandy REPA is terminated; or

(k)  By written notice from Vincent New Operator to the Trustee if the Vincent Interim Management Agreement or the Vincent Interim Sublease is terminated.

6.2  Procedure and Effect of Termination.

(a)  In the event of termination of this Vincent OTA pursuant to Section 6.1(a), (b) or (c) above, the terminating Party shall give written notice thereof to the other Parties and this Vincent OTA shall terminate, and the transactions contemplated hereby shall be abandoned, without further action by any of the Parties.

(b)  If this Vincent OTA is terminated as provided herein, no Party shall have any Liability or further obligation hereunder to any other Party to this Vincent OTA except that: (i) nothing herein shall relieve any Party hereto from Liability for any breach of any provision hereof; and (ii) nothing herein shall relieve the Debtors of any Liability under the Tandy REPA for the Expense Reimbursement Amount.

## ARTICLE 7
## MISCELLANEOUS

7.1  Further Assurances.  Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments reasonably necessary to effectuate this Vincent OTA and the transactions referred to herein, contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

7.2  Notices.  All notices, requests, consents, approvals, waivers, demands and other communications required or permitted to be given or made under this Vincent OTA shall

be in writing and shall be (a)(i) hand delivered, or (ii) sent by a nationally recognized overnight delivery service, *and* (b) sent by email, in each case, addressed as follows, or to such other address, Person as any party may designate by notice to the others in accordance herewith:

If to Vincent Existing Operator, to:

Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living
c/o Michael McConnell
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

with a copy (which shall not constitute notice) to:

Nancy Ribaudo Esq.
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102

If to Vincent New Operator:
4607 East California ABL I Operations, LLC
11766 Wilshire Boulevard, Suite 1460
Los Angeles, CA 90025

with copies to (which shall not constitute notice):

Benesch, Friedlander, Coplan & Aronoff LLP
Attn: Michael Barrie, Esq.
1313 North Market Street, Suite 1201
Wilmington, DE 19801-1601

or to such other person or address as any party hereto shall furnish to the other parties hereto in writing pursuant to this Section 7.2.

7.3    <u>Payment of Expenses</u>.  In the event of any dispute or controversy arising out of this Vincent OTA, including in connection with the interpretation of any term or condition of this Vincent OTA, the prevailing party shall recover from the non-prevailing party all reasonable costs and expenses, including reasonable attorneys' fees, incurred by the prevailing party.

7.4    <u>Entire Agreement; Amendment; Waiver</u>.  This Vincent OTA constitutes the entire understanding between the parties with respect to the subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements.  This Vincent OTA may

not be modified or amended except in writing signed by the parties hereto. Any waiver by any party of any violation of, breach of or default under any provision of this Vincent OTA or any exhibit, schedule or other document referred to in this Vincent OTA by any other party shall not be effective unless in writing signed by the party granting the waiver. Further, no such waiver shall be construed as or constitute a waiver of any subsequent violation, breach of, or default under that provision or any other provision of this Vincent OTA, or any exhibit or schedule or other document referred to in this Vincent OTA.

7.5     <u>Assignment</u>.   Neither this Vincent OTA nor the rights, duties or obligations arising hereunder shall be assignable or delegable (including by transfer of equity) by either party hereto without the express prior written consent of the other party hereto.

7.6     <u>Joint Venture</u>.  Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.

7.7     <u>Representation By Counsel</u>.   The parties hereto acknowledge that they have been represented by independent legal counsel of their choosing throughout all of the negotiations which preceded the execution of this Vincent OTA, and that each party has executed this Vincent OTA with the consent and on the advice of such independent legal counsel. This Vincent OTA is a negotiated document. As a result, any rule of construction providing for any ambiguity in the terms of this Vincent OTA to be construed against the draftsperson of this Vincent OTA shall be inapplicable to the interpretation of this Vincent OTA.

7.8     <u>Captions</u>.  The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

7.9     <u>Counterparts</u>.  This Vincent OTA may be executed in several counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.   Facsimile or email transmission of any signed, original counterpart transmission shall be deemed the same as the delivery of an original. The parties agree and acknowledge that this Vincent OTA may be kept in electronic form and that an electronic version of this Vincent OTA will be just as valid and enforceable as the original.

7.10    <u>Governing Law</u>.   EXCEPT IN SUCH MATTERS AS ARE GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE EXHIBITS AND SCHEDULES ANNEXED HERETO, SHALL BE GOVERNED BY, INTERPRETED UNDER, AND CONSTRUED AND ENFORCED IN ACCORDANCE WITH, THE INTERNAL LAWS OF THE STATE OF TEXAS WITHOUT REGARD TO PRINCIPLES OF CONFLICTS OF LAW.

7.11    <u>Venue; Choice of Law</u>. THE PARTIES AGREE THAT ALL ACTIONS OR PROCEEDINGS ARISING IN CONNECTION WITH THIS AGREEMENT SHALL BE TRIED AND LITIGATED ONLY IN THE STATE AND FEDERAL COURTS LOCATED IN THE COUNTY OF TARRANT, STATE OF TEXAS. VINCENT EXISTING OPERATOR AND VINCENT NEW OPERATOR WAIVE, TO THE EXTENT PERMITTED UNDER APPLICABLE LAW, ANY RIGHT EACH MAY

HAVE TO ASSERT THE DOCTRINE OF FORUM NON CONVENIENS OR TO OBJECT TO VENUE TO THE EXTENT ANY PROCEEDING IS BROUGHT UNDER THIS AGREEMENT.

7.12   <u>Calculation of Time Periods</u>.  Any reference in this Vincent OTA to a "business day" shall mean every day other than Saturdays, Sundays, all days observed by the federal or Texas government as legal holidays and all days on which commercial banks in Texas are required by law to be closed. Unless otherwise specified, in computing any period of time described herein, the day of the act or event on which the designated period of time begins to run shall not be included and the last day of the period so computed shall be included. Any reference in this Vincent OTA to a "day" or a number of "days" (other than references to a "business day" or "business days") shall mean a calendar day or calendar days, provided that if the calendar day or last calendar day to perform any act or give any notice or approval shall fall on a calendar day that is not a business day, such act or notice may be timely performed or given on the next succeeding business day.

7.13   <u>Third Party Beneficiary</u>.  Nothing in this Vincent OTA express or implied is intended to and shall not be construed to confer upon or create in any person (other than the parties hereto) any rights or remedies under or by reason of this Vincent OTA, including without limitation, any right to enforce this Vincent OTA.

7.14   <u>References to Trustee</u>. For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Vincent OTA) are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

*[Signature Page Follows]*

3417456.1

30

**IN WITNESS WHEREOF**, the parties hereto have executed this Vincent OTA as of the Contract Date.

<div style="margin-left: 40%;">

**VINCENT EXISTING OPERATOR:**

**Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By: Michael A. McConnel, as the Chapter 11 Trustee

By: _____

Name: Michael A. McConnell

 Title: Chapter 11 Trustee

**VINCENT NEW OPERATOR:**

**4607 East California ABL I Operations, LLC**

By: _____

Name:

 Title:

</div>

## LIST OF SCHEDULES

Schedule I                Facility; Licensed and Certified Beds

Schedule 1.1              Definitions

Schedule 2.2(d)           Other Assumed Liabilities

Schedule 2.5(b)(vi)       Provider Agreements

Schedule 3.3(d)           Employee Schedule

Schedule 3.10(a)          Assigned Contracts

Schedule 5.4              Litigation

Schedule 5.5              Labor and Employment Matters

Schedule 5.7              Taxes

Schedule 5.9              Health Care Representations

Schedule 5.11             Absence of Changes

Schedule 5.12(a)(i)       List of Contracts and Leases

## SCHEDULE I

**FACILITY; Licensed and Certified Beds**

| Facility | Licensed & Certified Beds |
|---|---|
|  |  |

## SCHEDULE 1.1

## DEFINITIONS

"<u>Action</u>" shall mean any action, claim (including a counterclaim, cross-claim, or defense), complaint, grievance, summons, suit, litigation, arbitration, mediation, audit, proceeding (including any civil, criminal, administrative, investigative or appellate proceeding), prosecution, contest, hearing, inquiry, inquest, audit, examination or investigation, of any kind whatsoever, regardless of the legal theory under which Liability, if any, or obligation may be sought to be imposed, whether sounding in contract or tort, or whether at law or in equity, or otherwise under any legal or equitable theory, commenced, brought, conducted or heard by or before, or otherwise involving, any Governmental Body.

"<u>Affiliate</u>" shall mean, with respect to any Person, any other Person that, directly or indirectly through one or more intermediaries, controls, or is controlled by, or is under common control with, such Person, and the term "control" (including the terms "controlled by" and "under common control with") means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through ownership of voting securities, by contract or otherwise.

"<u>Applicable Laws</u>" shall mean any statute, law, ordinance, regulation, rule, code, Governmental Order, constitution, treaty, common law, judgment, decree, other requirement or rule of law of any Governmental Entity, including, without limitation, Health Care Laws.

"<u>Assets</u>" shall have the meaning set forth in Section 2.1 of this Vincent OTA.

"<u>Assigned Contracts</u>" as identified on <u>Schedule3.10(a)</u>.

"<u>Assumed Liabilities</u>" shall have the meaning set forth in Section 2.2 of this Vincent OTA.

"<u>Bankruptcy Cases</u>" shall mean Case No. 1-445023-EML.

"<u>Bankruptcy Code</u>" shall mean Title 11 of the United States Code, 11 U.S.C. § 101 *et seq.*

"<u>Bankruptcy Court</u>" shall mean the United Stated Bankruptcy Court for the Northern District of Texas, Forth Worth Division.

"<u>Baseline Facility Census</u>" shall mean the average census for the three-month period ending _____ 31, 2021.

"<u>Buyer</u>" shall mean 2601 Tandy ABL I Holdings, LLC, a Delaware limited liability company.

"<u>Closing Statement</u>" shall have the meaning set forth in Section 2.6(h) of this Vincent OTA.

"<u>Code</u>" means the Internal Revenue Code of 1986, as amended.

"Contract" means any written or oral contract, purchase order, service order, sales order, indenture, note, bond, lease, sublease, mortgage, agreement, guarantee, license or other agreement, arrangement, instrument or commitment, in each case that is binding upon a Person.

"Contract Date" shall mean _____, 2021.

"COVID Related Action" shall have the meaning set forth in Section 3.1(b) of this Vincent OTA.

"Current Lender" has the meaning ascribed to such term in the recitals of this Vincent OTA.

"Debtors" shall mean Healthcore System Management, LLC and Romans House, LLC d/b/a Vincent Victoria Village Assisted Living.

"Effective Time" shall mean 12:00:01 AM on the Vincent Operation Transfer Date.

"Employees" shall mean all individuals employed by Vincent Existing Operator to work at the Facility.

"Employee Plans" shall have the meaning set forth in Section 5.6(a) of this Vincent Operating Agreement.

"Employee Schedule" shall mean employees employed at the time of Vincent Operation Transfer and identified on Schedule 3.3(d).

"Encumbrance" shall mean any lien (as defined in Section 101(37) of the Bankruptcy Code), encumbrance, Claim, license, charge, mortgage, deed of trust, option, pledge, security interest, restriction or similar interests, title defects, hypothecations, easements, rights of way, encroachments, Orders, conditional sale or other title retention agreements and other similar impositions, imperfections or defects of title or restrictions on transfer or use or other encumbrance of any kind.

"Environmental Law(s)" shall mean all applicable Laws concerning pollution or protection of the environment or concerning public or worker health or safety (with respect to exposure to Hazardous Substances), including all those relating to the presence, use, production, generation, handling, transportation, treatment, storage, disposal, distribution, labeling, testing, processing, discharge, Release, control, or cleanup of any Hazardous Substances.

"Excluded Assets" shall mean those assets identified on Exhibit D to this Vincent OTA.

"Excluded Liabilities" shall have the meaning set forth in Section 2.3 of this Vincent OTA.

"ERISA" shall have the meaning set forth in Section 5.6(a) of this Vincent OTA.

"ERISA Affiliate" means each trade or business (whether or not incorporated) which together with any of Vincent Existing Operator is or ever was treated as a single employer under Section 414(b), (c), (m), (o) or (t) of the Code.

"Facility" shall have the meaning identified on Schedule 1 to this Vincent OTA.

"Facility Records" shall have the meaning set forth in Section 3.8 of this Vincent OTA.

"Governmental Entity" shall mean any (a) federal, state, county or municipal government, or city, town, borough, village, district or other jurisdiction; (b) governmental or quasi-governmental body of any nature (including any agency, branch, department, board, commission, court, tribunal or other entity exercising governmental or quasi-governmental powers); and (c) any body exercising, or entitled or purporting to exercise, any administrative, executive, judicial, legislative, police, regulatory or taxing authority or power.

"Governmental Liabilities" shall mean all Liabilities to any Governmental Entity related to the ownership, operation or management of the Facilities or Assets prior to the Vincent Operation Transfer including, without limitation, Medicaid Liabilities, billing overpayments and provider taxes.

"Governmental Order" shall mean any order, injunction, judgment, decree, ruling, assessment or arbitration award of any Governmental Entity.

"Hazardous Materials" shall have the meaning ascribed in any Environmental Law to any hazardous, toxic or dangerous waste, substance, pollutant or material, whether liquid, solid or gaseous, and in any event shall include all substances identified or characterized as "hazardous substances," "hazardous wastes," "pollutants," or "contaminants" in the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601 *et seq.* and the regulations promulgated thereunder (as amended from time to time); the Clean Air Act, 42 U.S.C. 7401, *et seq.* and the regulations promulgated thereunder (as amended from time to time); the Resource, Conservation and Recovery Act, 42 U.S.C. 6901 *et seq.* and the regulations promulgated thereunder (as amended from time to time); or the Oil Pollution Act of 1990, 33 U.S.C. 2701 *et seq.* and the regulations promulgated thereunder (as amended from time to time); any other material, waste, pollutant, contaminant or substance designated as hazardous, toxic or dangerous by Congress or by the United States Environmental Protection Agency (EPA) or by any federal, state, or local statute, law, code, ordinance, rule, regulation, order or decree regulating, relating to, or imposing liability or standards of conduct concerning any hazardous, toxic, or dangerous material, waste, pollutant, contaminant or substance, as such statutes, laws, ordinances, codes, rules, regulations or decrees are now or at any time hereafter in effect; and oil, oil waste, and used oil as those terms are defined in the Clean Water Act, 33 U.S.C. 1251 *et seq.* and the regulations promulgated thereunder (as amended from time to time). Notwithstanding anything to the contrary contained herein, the term "Hazardous Materials" shall not include medical waste generated at the Facility in the ordinary course of business and disposed of in accordance with Applicable Laws.

"Health Care Authorities" shall mean any Governmental Entity or quasi-Governmental Entity or any agency, intermediary, board, authority or entity concerned with or relevant to the ownership, operation, use or occupancy of the Facility as an assisted living facility.

"Health Care Fraud and Abuse Laws" shall have the meaning set forth in Section 3.8 of this Vincent OTA.

"Health Care Licenses" shall mean all material certificates of need, if applicable, certifications, governmental licenses, permits, regulatory agreements or other agreements and approvals, including certificates of operation, completion and occupancy, and state nursing facility or residential care facility license or other licenses required by Health Care Authorities for the legal use, occupancy and operation of the Facilities.

"Health Care Laws" means: (a) all Applicable Laws related to billing or submission of claims, reimbursement or fraud and abuse including, without limitation, (i) the federal Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)), (ii) the federal Physician Self-Referral Prohibition (commonly referred to as the "Stark Law")(42 U.S.C. § 1395nn), (iii) the federal False Claims Act (31 U.S.C. §§ 3729 et seq.), (iv) the federal Civil Monetary Penalties Law (42 U.S.C. §§ 1320a-7a and 1320a-7b), (v) the federal Exclusion Laws (42 U.S.C.§ 1320a-7), (vi) the Program Fraud Civil Remedies Act (31 U.S.C. §§ 3801-3812), (vii) 42 U.S.C. § 1320a-7k(d), (viii) the regulations promulgated pursuant to each of the foregoing statutes, and (ix) applicable state Laws similar to any of the foregoing; (b) all Applicable Laws related to medical records and patient privacy and security, including the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act of 2009 (42 U.S.C. §§ 1320d-1320d-9), and its implementing regulations, including the Standards for Electronic Transaction and Code Set (45 C.F.R. Parts 160 and 162), the Standards for Privacy of Individually Identifiable Health Information (45 C.F.R. Parts 160 and 164), the Security Standards for the Protection of Electronic Protected Health Information (45 C.F.R. Parts 160 and 164), and Breach Notification for Unsecured Protected Health Information Rules (45 C.F.R. Parts 164.402 through 164.408), and any similar state laws; (c) the Patient Protection and Affordable Care Act (Pub. L. 111−148), as amended by the Health Care and Education Reconciliation Act of 2010 (Pub. L. 111−152), and the regulations promulgated pursuant to each of the foregoing; (d) Medicaid (Title XIX of the Social Security Act), as amended and the regulations promulgated thereunder, including, without limitation, all conditions of participation; (e) all Applicable Laws related to the obtaining or maintenance of any License required for the operation of the Facility; and (f) Applicable Laws regulating the ownership and operation of an assisted living facility or assets used in connection therewith.

"Healthcore" shall mean Healthcore System Management, LLC.

"HIPAA" shall mean the Health Insurance Portability and Accountability Act of 1996.

"Hired Employees" shall mean all individuals hired and employed by Vincent New Operator to work at the Facility.

"Indemnified Party" shall have the meaning set forth in Section 3.14 of this Vincent OTA.

"Indemnifying Party" shall have the meaning set forth in Section 3.14 of this Vincent OTA.

"Liability" or "Liabilities" means, as to any Person, any debt, adverse claim, liability (including any liability that results from, relates to or arises out of tort or any other product liability claim), duty, responsibility, obligation, commitment, assessment, cost, expense, loss, expenditure, charge, fee, penalty, fine, contribution, or premium of any kind or nature whatsoever, whether known or unknown, asserted or unasserted, absolute or contingent, direct or indirect, accrued or

unaccrued, liquidated or unliquidated, or due or to become due, and regardless of when sustained, incurred or asserted or when the relevant events occurred or circumstances existed.

"Licenses" shall have the meaning set forth in Section 2.5(b)(v) of this Vincent OTA.

"Licensure Date" shall mean the date all Licenses are issued to Buyer or Buyer's designee to own and operate the Facility as an assisted living facility, and the Facility is no longer operated under the Seller's or Trustee's Licenses.

"Losses" means losses, damages, liabilities, deficiencies, Actions, judgments, interest, awards, penalties, fines, costs or expenses of whatever kind, including reasonable attorneys' fees and the cost of enforcing any right to indemnification hereunder and the cost of pursuing any insurance providers; *provided, however*, that "Losses" shall not include punitive damages, except in the case of fraud or to the extent actually awarded to a Governmental Entity or other third party.

"March 2019 Refinancing" shall have the meaning as set forth in the Recitals of this Vincent OTA.

"Material Adverse Effect" means the following: (i) the loss or material limitation of any Health Care License, (ii) the designation of the Facility as a Special Focus Nursing Home Facility as defined by the CMS Special Focus Nursing Home Facility Program, (iii) the decertification of the Vincent Existing Operator or the Facility from or under Medicaid or any other governmental health care program, (iv) the issuance of a level "G" or higher survey deficiency that is not deemed to be in substantial compliance by the Vincent Operation Transfer Date; or (v) if two weeks prior to the Vincent Operation Transfer Date ten percent (10%) or more of the residents at the Facility test positive for COVID-19, then the Vincent Operation Transfer shall be suspended until a date mutually agreeable to the Vincent Existing Operator and the Vincent New Operator but in no event more than thirty (30) days after the original Vincent Operation Transfer Date. For the avoidance of doubt, the following shall not constitute a "Material Adverse Effect": (v) any change in any Applicable Law or the interpretation thereof, (vi) any change in GAAP or the interpretation thereof, (vii) any events, changes, developments or occurrences generally affecting the industries in which Vincent Existing Operator operates, (viii) general economic, political or market conditions, (ix) any disasters, calamities, emergencies, acts of war, sabotage or terrorism, or comparable events, or pandemics (including SARS-CoV-2 novel coronavirus, except as otherwise specifically provided otherwise in section (v) above), or an escalation or worsening of any of the foregoing, or (x) any breach by Vincent New Operator of this Vincent OTA.

"Vincent New Operator" shall mean 4607 East California ABL I Operations, LLC, a Delaware limited liability company.

"Original Lender" shall mean Pender West Credit 1 REIT, L.L.C.

"Parties" shall mean 4607 East California ABL I Operations, LLC and Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living.

"Person" shall mean an individual, partnership, corporation, business trust, limited liability company, limited partnership, joint stock company, trust, unincorporated association, joint venture or other entity or a Governmental Entity.

"Petition Date" shall mean December 9, 2019.

"Pre-Vincent Operation Transfer Period" shall have the meaning as set forth in Section 3.1(b) of this Vincent OTA.

"Prepetition Loan Agreement" shall have the meaning ascribed to such term in the Recitals of this Vincent OTA.

"Prepetition Loan Documents" shall have meaning ascribed to such term in the Recitals of this Vincent OTA.

"Prepetition Loan Facility" shall have the meaning ascribed to such term in the Recitals of this Vincent OTA.

"Pre-Vincent Operation Transfer Tax Period" means any Tax period ending on or before the Effective Time and with respect to any taxable period that includes but does not end on the Effective Time, the portion thereof ending on the Effective Time.

"Property" shall mean the real property on which the Facility is located as identified on Schedule 1 to this Vincent OTA.

"Provider Agreements" shall have the meaning set forth in Section 3.7 of this Vincent OTA.

"Provider Numbers" shall have the meaning set forth in Section 5.9(f) of this Vincent OTA.

"Recorded Transfer Agreements" has the meaning ascribed to such term in the Recitals of this Vincent OTA.

"Release" means actual or threatened spilling, leaking, pumping, pouring, releasing, emitting, emptying, discharging, injecting, escaping, dumping, disposing, depositing, dispersing, leaching or migrating of any Hazardous Substance into or through the indoor or outdoor environment.

"REPA Closing Date" means the date of the closing of the transaction contemplated under the Tandy REPA.

"Resident Agreements" shall have the meaning set forth in Section 3.10(c) of this Vincent OTA.

"Resident Census Report" shall mean a true, correct and complete schedule (provided in accordance with all applicable Health Care Requirements related to privacy) which accurately and completely sets forth the occupancy status of the Facility, the average daily rate and other charges payable with respect thereto, the class of payment or reimbursement (i.e., private, third-party payor, Medicaid Waiver), the average monthly census of the Facility and its occupancy rate.

"Resident Trust Funds" shall mean the funds held in trust by Vincent Existing Operator for residents at the Facility, including any deposits or prepayments paid by or for any resident of the Facility.

"Romans" shall mean Romans House, LLC d/b/a Vincent Victoria Village Assisted Living.

"Recorded Transfer Agreements" shall have the meaning set forth in the Recitals of this Vincent OTA.

"THHS" shall mean Texas Health and Human Services.

"Tandy Interim Management Agreement" shall mean that certain *Interim Management Agreement* dated _____, 2021 by and between the Trustee for and on behalf of Romans, as existing operator, and 2601 Tandy ABL I Operations, LLC, as interim manager.

"Tandy Interim Sublease" shall mean that certain *Interim Sublease* dated _____, 2021 by and between the Trustee for and on behalf of Healthcore, as sublessee, and 2601 Tandy ABL I Operations, LLC, as sublessor.

"Tandy OTA" shall mean that certain *Operations Transfer Agreement (Tandy Village)*, dated _____, 2021, by and between the Trustee for and on behalf of Romans, as the Vincent Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the Vincent New Operator.

"Tandy REPA" shall mean that certain *Real Estate and Asset Purchase Agreement* dated _____, 2021.

"Tax" or "Taxes" means any and all (a) domestic or foreign, federal, state or local taxes, charges, fees, levies, imposts, escheat for unclaimed property, duties and governmental fees or other like assessments or charges of any kind whatsoever, including income taxes (whether imposed on or measured by net income, gross income, income as specially defined, earnings, profits, or selected items of income, earnings, or profits), capital taxes, gross receipts taxes, environmental taxes, sales taxes, use taxes, value added taxes, goods and services taxes, accumulated earnings taxes, fuel taxes, transfer taxes, franchise taxes, license taxes, withholding taxes or other withholding obligations, payroll taxes, employment taxes, excise taxes, severance taxes, social security premiums, workers' compensation premiums, employment insurance or compensation premiums, stamp taxes, occupation taxes, premium taxes, ad valorem taxes, property taxes, windfall profits taxes, alternative or add-on minimum taxes, franchise permit fee or "bed taxes," and customs duties, (b) interest, penalties, fines, additions to tax or additional amounts imposed by any taxing authority in connection with (i) any item described in clause (a) or (ii) the failure to comply with any requirement imposed with respect to any Tax Returns and (c) liabilities in respect of any items described in clause (a) or clause (b) payable by reason of contract, assumption, transferee liability, operation of law or otherwise.

"Tax Return" means any report, return, statement or other written information, including any schedules or attachments thereto and any amendment thereof, supplied or required to be supplied to a taxing authority in connection with Taxes.

"Texas Payday Law" means Chapter 61 of the Texas Labor Code.

"Transfer Agreement" shall mean that certain Transfer and Assignment of Note, Lien and Other Documents executed by the Original Lender dated December 15, 2020.

"Transfer Documents" shall have the meaning set forth in the Recitals of this Vincent OTA.

"Transfer Notice" shall have the meaning set forth in the Recitals of this Vincent OTA.

"Trustee" shall mean Michael A. McConnell, Chapter 11 Trustee.

"U.S. Trustee" has the meaning ascribed to such term in the Recitals of this Vincent OTA.

"Vincent Assignment and Assumption Agreement" identified in Section 2.6(c) of this Vincent OTA.

"Vincent Bill of Sale" identified in Section 2.6(b) as Exhibit A to this Vincent OTA.

"Vincent Existing Operator" shall mean Healthcore System Management, LLC.

"Vincent Existing Operator's Knowledge" or any other reference to the "Knowledge" of Vincent Existing Operator shall mean the actual knowledge of (a) the Trustee, or (b) Jason Quick or Denise Deapen of WesternCare Management, LLC.

"Vincent Interim Contract Date" means the date on which the Trustee for and on behalf of Healthcore and Vincent New Operator enter into the Vincent Interim Management Agreement and the Vincent Interim Sublease.

"Vincent Interim Management Agreement" means that certain *Interim Management Agreement* dated _____, 2021 by and between the Trustee for and on behalf of Healthcore, as existing operator, and Vincent New Operator, as interim manager.

"Vincent Interim Sublease" means that certain *Interim Sublease* dated _____, 2021 by and between the Trustee for and on behalf of Healthcore, as sublessee, and Vincent New Operator, as sublessor.

"Vincent Operation Transfer" means the closing of the transaction contemplated by this Vincent OTA.

"Vincent Operation Transfer Date" means the date of the Vincent Operation Transfer, which shall occur within 10 business days of the satisfaction or waiver of the conditions set forth in Section 2.5 of this Vincent OTA.

"Vincent OTA" means this Operations Transfer Agreement.

"Vincent RTF Assignment and Assumption Agreement" identified in Section 2.6(d) of this Vincent OTA.

**SCHEDULE 2.2(d)**

**OTHER ASSUMED LIABILITIES**

1.      [None]

**SCHEDULE 3.3(d)**

**EMPLOYEE SCHEDULE**

| Employee Name | Position | Hire Date | Full/Part Time | Pay | Status<br><br>**Medical disability/leave of absence** |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

## SCHEDULE 5.4

## LITIGATION

**[complete from SOFAs]**

**SCHEDULE 5.5**

**LABOR AND EMPLOYMENT MATTERS**

**SCHEDULE 5.7**

**TAXES**

**[to be completed]**

**Schedules 5.9(a-i)**

**HEALTHCARE REPRESENTATIONS**

**SCHEDULE 5.11**

**KNOWLEDGE OF CHANGES**

1.  Replacement of existing management with WesternCare in July 2021.

**SCHEDULE 5.12(A)(i)**

**CONTRACTS**

## EXHIBIT A

## BILL OF SALE

This Bill of Sale is made in connection with the Operations Transfer Agreement dated __, 2021 (the "Vincent OTA"), entered into by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living ("Vincent Existing Operator") and 4607 East California ABL I Operations, LLC ("Vincent New Operator").

In consideration of Ten Dollars ($10.00) and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Vincent Existing Operator does hereby convey and transfer to Vincent New Operator the Assets (as defined in the Vincent OTA). This Bill of Sale is made subject to all of the terms, conditions, representations and warranties set forth in the Vincent OTA.

Vincent Existing Operator covenants to execute and deliver to Vincent New Operator (or to its successors and assigns) such other and further reasonable instruments of transfer, assignment and conveyance as may be necessary to more fully transfer, assign and convey to and vest in Vincent New Operator the Assets hereby transferred, assigned and conveyed.

[SIGNATURES APPEAR ON FOLLOWING PAGE]

15065984 v3

This Bill of Sale is effective as of _____, 2021.

**VINCENT EXISTING OPERATOR:**

**Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By: Michael A. McConnel, as the Chapter 11 Trustee

By: _____

Name: Michael A. McConnell

 Title: Chapter 11 Trustee

**VINCENT NEW OPERATOR:**

**4607 East California ABL I Holdings, LLC**

By: _____

Name:

 Title:

[SIGNATURE PAGE TO OTA BILL OF SALE]

51

## EXHIBIT B

## ASSIGNMENT AND ASSUMPTION AGREEMENT

**THIS ASSIGNMENT AND ASSUMPTION AGREEMENT** ("Vincent Assignment and Assumption Agreement") is made as of the _____ day of _____, 202_ (the "Vincent Operation Transfer Date"), by Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living ("Assignor"), and 4607 East California ABL I Operations, LLC ("Assignee").

## RECITALS

A.    By Operations Transfer Agreement dated as of _____, 2021 (as amended, the "Vincent OTA"), by and between Assignor and Assignee, Assignor agreed to assign to Assignee, and Assignee agreed to accept and assume from Assignor, the Assigned Contracts. Capitalized terms used herein and not otherwise defined shall have the meaning ascribed to them in the Vincent OTA.

B.    Assignor and Assignee have agreed that the Assigned Contracts are those contracts identified on **Exhibit A** hereto.

**NOW, THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Assignor hereby agrees as follows:

1.    **Assignment.**  Assignor hereby assigns, sets over and transfers to Assignee all of its right, title and interest in and to and obligations under the Assigned Contracts arising from and after the Vincent Operation Transfer Date.

2.    **Assumption**.  Assignee hereby accepts the assignment of the Assigned Contracts and agrees to assume the rights and obligations of Assignor arising under the Assigned Contracts from and after the Vincent Operation Transfer Date.

3.    **No Representations or Warranties**. Except as may be expressly set forth in the Vincent OTA (and as limited thereby), Assignor makes no representations or warranties of any kind with respect to the Assigned Contracts assigned herein.

4.    **Relationship to Vincent OTA**.  Assignor and Assignee acknowledge and agree that the assignment and assumption provided for in this Vincent Assignment and Assumption Agreement shall in all respects be subject to the terms of the Vincent OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Vincent Assignment and Assumption Agreement shall contradict the Vincent OTA, the Vincent OTA shall control.

5.    **Miscellaneous**.  This Vincent Assignment and Assumption Agreement and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions set forth in the Vincent OTA, shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Texas and may not be modified or amended in any manner other than by a

15065984 v3

written agreement signed by the party to be charged therewith. This Vincent Assignment and Assumption Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. This Vincent Assignment and Assumption Agreement may be executed by any party by the delivery of such party by facsimile, by portable document format via electronic mail, or by other electronic means, a copy of the signature page of this Vincent Assignment and Assumption Agreement duly executed by such party. Any copy of this Vincent Assignment and Assumption Agreement so delivered by facsimile, by portable document format, or by other electronic means, shall be deemed to be an originally executed copy of this Assignment.

**IN WITNESS WHEREOF**, the parties hereto have executed this Vincent Assignment and Assumption Agreement as of the Vincent Operation Transfer Date.

**ASSIGNOR:**  **Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By: Michael A. McConnel, as the Chapter 11 Trustee

By:_____
Name: Michael A. McConnell
Title: Chapter 11 Trustee

**ASSIGNEE:**  **4607 East California ABL I Operations, LLC**

By:_____
Print Name:_____
Title:_____

15065984 v3

# EXHIBIT C

## ASSIGNMENT AND ASSUMPTION OF RESIDENT TRUST FUNDS AND DEPOSITS

This Assignment and Assumption Agreement (the "Vincent RTF Assignment and Assumption Agreement") is made as of the ____ day of _____, 202_ (the "Vincent Operation Transfer Date"), by Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living ("Assignor"), and 4607 East California ABL I Operations, LLC ("Assignee").

## RECITALS

A.    Assignor and Assignee are parties to an Operations Transfer Agreement (the "Vincent OTA") dated as of _____, 2021.

B.    It is a condition to the Vincent Operation Transfer under the Vincent OTA that Assignor assign all of its right, title and interest in, to, and under the Resident Trust Funds to Assignee, and that Assignee assume Assignor's obligations with respect to such Resident Trust Funds arising from and after the Vincent Operation Transfer Date.

Now, therefore, in consideration of the premises, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged by the parties hereto, the parties hereto, intending to be bound, hereby agree to incorporate the foregoing recitals into this Vincent RTF Assignment and Assumption Agreement and further agree as follows:

1.    Assignor hereby assigns, transfers and conveys all of its right, title and interest in, to, and under the Resident Trust Funds to Assignee.

2.    Assignee hereby accepts and assumes all liabilities arising from and after the Vincent Operation Transfer Date with respect to the Resident Trust Funds.

3.    Except as may be expressly set forth in the Vincent OTA (and as limited thereby), Assignor makes no representations or warranties of any kind with respect to the Resident Trust Funds assigned herein.

4.    Assignor and Assignee acknowledge and agree that the assignment and assumption provided for in this Agreement shall in all respects be subject to the terms of the Vincent OTA with regard to the rights and obligations of each of the parties hereto with respect to the items assigned hereunder, and in the event that any term of this Vincent RTF Assignment and Assumption Agreement shall contradict the Vincent OTA, the Vincent OTA shall control.

5.    This Vincent RTF Assignment and Assumption Agreement and the obligations of Assignor and Assignee hereunder shall survive the closing of the transactions referred to in the Vincent OTA, shall be binding upon and inure to the benefit of Assignor and Assignee and their respective successors and assigns, shall be governed by and construed in accordance with the laws of the State of Texas and may not be modified or amended in any manner other than by a written agreement signed by the party to be charged therewith.  This Vincent RTF Assignment and

14743143 v7
14743143 v11
15065984 v3

Assumption Agreement may be executed in counterparts, each of which shall be deemed to be an original, but all of which taken together shall constitute but one and the same instrument. This Vincent RTF Assignment and Assumption Agreement may be executed by any party by the delivery of such party by facsimile, by portable document format via electronic mail, or by other electronic means, a copy of the signature page of this Vincent RTF Assignment and Assumption Agreement duly executed by such party. Any copy of this Vincent RTF Assignment and Assumption Agreement so delivered by facsimile, by portable document format, or by other electronic means, shall be deemed to be an originally executed copy of this Vincent RTF Assignment and Assumption Agreement.

IN WITNESS WHEREOF, the undersigned, being duly authorized, have executed and delivered this Vincent RTF Assignment and Assumption Agreement as of the Vincent Operation Transfer Date.

**ASSIGNOR:**     **Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By:     Michael A. McConnel, as the Chapter 11 Trustee

By:_____
Name: Michael A. McConnell
Title: Chapter 11 Trustee

**ASSIGNEE:**     **4607 East California ABL I Operations, LLC**

By:_____
Print Name:_____
Title:_____

55

14743143 v7
14743143 v11
15065984 v3

# EXHIBIT D

## EXCLUDED ASSETS

(a)    All cash and cash equivalents, bank accounts, securities and accounts receivable/healthcare receivables of Vincent Existing Operator, including accounts receivable relating to residents' fees and rents and/or services provided prior to the Vincent Operation Transfer Date, whether from any Governmental Entity, resident or any other Person;

(b)    All refunds or reimbursements of whatever nature or description which relate to or are attributable to the period prior to the Vincent Operation Transfer Date;

(c)    All claims, disputes and litigation, and all amounts of any nature or description relating thereto, to the extent such dispute, claim or litigation is related to the period prior to the Vincent Operation Transfer Date;

(d)    All notes, bonds, debt instruments, financing agreements or other Contracts for borrowed money issued by Vincent Existing Operator or to which Vincent Existing Operator is a party;

(e)    All contracts other than the Assigned Contracts;

(f)    All leased equipment to the extent the underlying lease is not an Assigned Contract;

(g)    Vincent Existing Operator's National Provider Identifier ("NPI") numbers;

(h)    Vincent Existing Operator's rights to indemnification from third parties with respect to any liability that is not an Assigned Contract;

(i)    All of the insurance policies maintained by Vincent Existing Operator, and all claims, benefits, proceeds, or premium refunds paid or payable thereunder or with respect thereto;

(j)    All past, present or future claims and rights or actions by Vincent Existing Operator against third parties to the extent relating to any Excluded Asset or the operation of the Facility prior to the Vincent Operation Transfer Date;

(k)    Vincent Existing Operator's organizational documents, minute books and other books and records relating solely to the existence of Vincent Existing Operator as a legal entity; and

(l)    All post office box addresses associated solely with the Facility.

3417456

15065984 v3

**EXHIBIT E**

## INTERIM SUBLEASE AGREEMENT

**THIS INTERIM SUBLEASE AGREEMENT** (this "Tandy Interim Sublease") is effective as of the ___day of _____, 2021 ("Tandy Interim Sublease Date") by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Romans") and 2601 Tandy ABL I Operations, LLC ("Sublandlord").

## R E C I T A L S

A.      Sublandlord leases certain real and personal property (the "Premises") related to that certain assisted living facility (the "Facility"), located at 2601 Tandy Avenue, Fort Worth, Texas 76103 under the terms of that certain Operating Lease dated as of the Tandy Interim Sublease Date (as the same may be amended or modified from time to time in accordance with the terms thereof, the "Lease") by and between Sublandlord, as "Tenant," and 2601 Tandy ABL I Holdings, LLC ("Landlord"), as "Landlord".

B.      Romans currently holds those certain licenses more particularly described on Schedule I attached hereto (the "Current Licenses") issued by the applicable issuing State agency or Department listed on Schedule I attached hereto for the operation of the Facility.

C.      Trustee for and on behalf of Romans and Sublandlord have entered into that certain operations transfer agreement (the "Tandy OTA") providing for, among other things, the orderly transfer of operations of the Facility and sale of certain related assets to Sublandlord.

D.      Sublandlord will apply for either new licenses or a change of ownership for the operation of the Facility (the "New Licenses") upon the completion of that certain plan of correction submitted by Romans to the Texas Department of Health and Human Services on August 24, 2021 (the "Plan of Correction"). Pending the issuance of the New Licenses, Romans and Sublandlord wish to enter into arrangements whereby Romans will engage Sublandlord to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses.

C.      Romans and Sublandlord previously entered into an Interim Management Agreement dated as of _____, 2021 (the "Tandy Interim Management Agreement," and together with this Tandy Interim Sublease, the "Tandy Interim Agreements"), pursuant to which Romans has engaged Sublandlord to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses for the Facility.

D.      Landlord has consented to the sublease represented by this Tandy Interim Sublease.

NOW, THEREFORE, in consideration of the foregoing recitals, and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.      Sublease. Sublandlord does hereby sublease to Romans and Romans does hereby sublease from Sublandlord all of the real and personal property associated with the Facility (the "Leased Premises"). Romans hereby agrees to act as "subtenant" of the Leased Premises during the term hereof for the limited purpose of allowing the Facility to continue to operate under the Current

Licenses pending issuance of the New Licenses. Romans does not otherwise assume any obligations of Sublandlord under the Lease. Without limiting the foregoing, Sublandlord shall be solely responsible for maintaining the Facility and paying for all costs, expenses and charges relating to the Facility, including, without limitation, for any taxes, utilities and liability or other insurance required to be maintained by Sublandlord under the Lease and shall be solely responsible for any losses relating to the Facility which are not covered by such insurance. Sublandlord shall add Romans as an additional insured on all insurance policies relating to the Leased Premises (including, without limitation, Sublandlord's general and professional liability insurance policies), and Sublandlord shall deliver certificates of insurance to Romans prior to the Tandy Interim Sublease Date evidencing all insurance required under the Lease and this Tandy Interim Sublease. Sublandlord shall be solely responsible for the condition of the Facility, including without limitation, all repairs (whether or not structural), and Sublandlord shall bear the risk of any condemnation or eminent domain proceeding and shall bear the risk of any fire or other casualty or damage to or destruction of any or all of the Facility.

2.      Term of Sublease; Diligence in Obtaining New License. The term of this Tandy Interim Sublease shall commence on the Tandy Interim Sublease Date and shall expire automatically without the need for further action or the execution of any further documents by any of the parties hereto, upon the earliest of: (i) the date on which the New Licenses for the Facility are issued; (ii) the date on which the applications for the New Licenses for the Facility are denied, after expiration of any applicable appeal period; (iii) the date on which the Interim Management Agreement expires or is otherwise terminated; (iv) the six (6) month anniversary of the Tandy Interim Sublease Date; provided, however, that if the New Licenses have not been issued as of the six (6) month anniversary of the Tandy Interim Sublease Date due solely to an open survey violation existing as of the Tandy Interim Sublease Date, the term shall be extended for successive one (1) month terms until such survey violations have been cured but in no event shall the term extend beyond the twelve (12) month anniversary of the Tandy Interim Sublease Date; and (v) termination of the Interim Management Agreement. Upon expiration of the term with respect to the Facility, Romans shall surrender the applicable Leased Premises to Sublandlord; provided, however, in the event the term of this Tandy Interim Sublease expires for any reason other than the issuance of the New Licenses, Sublandlord and Romans shall, in conjunction with Landlord, develop and implement a plan for the orderly transition of operation and financial responsibility of the Facility to a third party designated by Sublandlord but reasonably acceptable to Romans. Romans shall cooperate in good faith, at no cost, expense or liability to Romans, with respect to the efforts of Sublandlord to secure the New Licenses.

3.      Rent. As full consideration for the use and occupancy of the Facility, Romans shall pay rent to Sublandlord in the amount of Ten and 00/100 Dollars ($10.00) per month (the "Sublease Rent"), which Sublease Rent shall be payable in arrears within ten (10) business days after the end of each calendar month during the Term.

4.      Subletting and Assignment. Romans shall not voluntarily assign, transfer, mortgage or pledge this Tandy Interim Sublease or sublease (which terms shall be deemed to include the granting of concessions and licenses and the like), all or any part of the Leased Premises, or permit this Tandy Interim Sublease or the leasehold estate hereby created to be assigned, transferred, or encumbered, in whole or in part, or permit to be offered or advertised for assignment or subletting without Sublandlord's prior consent, except as specifically provided herein.

5.      Relationship to Lease; Subordination. This Tandy Interim Sublease and Romans' rights under this Tandy Interim Sublease shall be subject and subordinate to the terms and conditions of the Lease. Notwithstanding the foregoing, in no event is Romans assuming any obligations under the Lease.

6.      Notices. All notices, demands, requests, and consents (hereinafter "notices") required to be given pursuant to the terms of this Tandy Interim Sublease shall be in writing and shall be served by personal delivery; certified mail, return receipt requested, postage prepaid; or nationally recognized overnight courier to the following addresses:

To Sublandlord:

> 2601 Tandy ABL I Operations, LLC
> 11766 Wilshire Boulevard, Suite 1460
> Los Angeles, CA 90025
> Telecopier:
> Telephone:

with a copy to (which shall not constitute notice to Sublandlord):

> Michael Barrie, Esq.
> Benesch, Friedlander, Coplan, & Aronoff, LLP
> 1313 North Market Street, Suite 1201
> Wilmington, DE 19801-1601
> Telecopier: 877.357.4933
> Telephone: 302.442.7068

To Romans:

> Romans House, LLC d/b/a Tandy Village Assisted Living
> c/o Michael A McConnell, Chapter 11 Trustee
> Kelly Hart & Hallman, LLP
> 201 Main Street, Suite 2500
> Fort Worth, TX 76102
> Telecopier: (817) 878-9280
> Telephone: (817) 878-3569

with a copy to (which shall not constitute notice to Romans):

> Nancy Ribaudo, Esq.
> Kelly Hart & Hallman, LLP
> 201 Main Street, Suite 2500
> Fort Worth, TX 878-9280
> Telecopier: (817) 878-9280
> Telephone: (817) 878-3569

All notices shall be deemed to be given upon the date of confirmed receipt, in the case of a notice

by e-mail, and, in all other cases, upon the date of receipt or refusal, except that whenever notice under this Tandy Interim Sublease is received on a day which is not a business day, the day of receipt shall be the next business day. Any party may change its notice address at any time by giving the other party notice of such change.

7.      General Provisions.

7.1      Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Tandy Interim Sublease and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

7.2      This Tandy Interim Sublease, together with the other agreements referred to herein and executed in conjunction herewith, constitutes the entire understanding between the parties with respect to the express subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Tandy Interim Sublease may not be modified or amended except in writing signed by the parties hereto. No waiver of any term, provision or condition of this Tandy Interim Sublease in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Tandy Interim Sublease. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder. In the event one or more non-material terms of this Tandy Interim Sublease is invalid, illegal or unenforceable under applicable law, the balance of this Tandy Interim Sublease shall be deemed valid, legal and enforceable.

7.3      Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.

7.4      The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

7.5      This Tandy Interim Sublease may be executed in one or more counterparts and all such counterparts taken together shall constitute a single original instrument.

7.6      This Tandy Interim Sublease shall be governed in accordance with the laws of the State of Texas.

7.7      For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Tandy Interim Sublease are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

7.8      EACH PARTY HERETO HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS TANDY INTERIM SUBLEASE, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THIS TANDY INTERIM SUBLEASE OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN AND/OR AMONGST THE PARTIES

HERETO.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

15023826 v3

IN WITNESS WHEREOF, the parties have executed this Tandy Interim Sublease by their duly authorized officers as of the Tandy Interim Sublease Date.

<u>SUBTENANT</u>:

**Romans House, LLC d/b/a Tandy Village Assisted Living**

By:    Michael A. McConnel, as Chapter 11 Trustee

By:    _____
       Name: Michael A. McConnel
       Title: Chapter 11 Trustee

<u>SUBLANDLORD</u>:

**2601 Tandy ABL I Operations, LLC**

By:    _____
       Name:
       Title:

3417479.1

## SCHEDULE I

| License Type | Licensee | License/Certification # | Capacity | Address | Issuing Agency |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

**EXHIBIT F**

# INTERIM MANAGEMENT AGREEMENT

**THIS INTERIM MANAGEMENT AGREEMENT** (this "Tandy Interim Management Agreement") is effective as of the ___ day of _____, 2021 ("Tandy Interim Contract Date") by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Romans House, LLC d/b/a Tandy Village Assisted Living ("Romans") and 2601 Tandy ABL I Operations, LLC ("Manager").

# R E C I T A L S

A.      Romans currently holds those certain licenses more particularly described on Schedule I attached hereto (the "Current Licenses") issued by the applicable issuing State agency or Department listed on Schedule I attached hereto for the operation of the Facility.

B.      Trustee for and on behalf of Romans and 2601 Tandy ABL I Holdings, LLC ("Buyer") have entered into that certain real estate and asset purchase agreement (the "Tandy REPA") for certain real and personal property (the "Premises") related to that certain assisted living facility (the "Facility"), located at 2601 Tandy Avenue Fort Worth, Texas 76103.

C.      Trustee for and on behalf of Romans and Manager have entered into that certain operation transfer agreement (the "Tandy OTA") providing for, among other things, the orderly transfer of operations of the Facility and the sale of certain related assets to Manager.

D.      Manager will apply for new licenses for the operation of the Facility (the "New Licenses") upon the completion of that certain plan of correction submitted by Romans to the Texas Department of Health and Human Services on August 24, 2021 (the "Plan of Correction"). Pending the issuance of the New Licenses, Romans and Manager wish to enter into arrangements whereby Romans will engage Manager to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses.

E.      Upon the closing of the transaction contemplated under the Tandy REPA, Romans and Manager will enter into an Interim Sublease Agreement dated as of the closing date under the Tandy REPA (the "Tandy Interim Sublease" and together with this Tandy Interim Management Agreement, the "Tandy Interim Agreements"), pursuant to which Manager will sublease the Premises to Romans subject to the terms of a lease to be entered into by Manager and Buyer on the closing date of the Tandy REPA (the "Lease"), for the sole purpose of providing for the continued operation of the Facility under the applicable Current Licenses until such time as the applicable New Licenses are issued.

NOW, THEREFORE, in consideration of the foregoing recitals, and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.      Engagement of Manager. Romans hereby engages Manager for the purpose of rendering management, administration, purchasing services and all other management, support and administrative services needed for the operation of the Facility, on the basis hereinafter set forth, and Manager hereby accepts such engagement. Throughout the term of this Tandy Interim

1

Management Agreement, Manager shall be vested, to the fullest extent permitted by law, with full authority over the business, policies, operations and assets of the Facility; provided, however, that by entering into this Tandy Interim Management Agreement, Romans does not delegate to Manager the power, duties and ultimate responsibilities vested in Romans as the operator of the Facility, and, during the term of this Tandy Interim Management Agreement, Romans is and will remain the responsible licensee of the Facility and, as such, shall be liable and legally accountable to residents and governmental agencies for resident care and funds, and for all other aspects of the operation and maintenance of the Facility, solely to the extent the then-current licensee must remain liable under applicable law, and, therefore, shall have the right to review Manager's activities as manager of the Facility at any and all normal business hours upon reasonable prior written notice.

      2.    <u>Responsibilities of Manager</u>.

      2.1    <u>Total Management Services</u>. Manager shall provide total management services for the Facility in a manner consistent with and subject to the responsibilities of Romans as licensee of the Facility. Certain of these management services are more specifically described in this Section 2. As Manager of the Facility, Manager shall have responsibility and commensurate authority to conduct, supervise and effectively manage the day-to-day operations of the Facility to the full extent allowed by applicable laws and excepting only those obligations imposed on an operator of a residential care apartment complex that cannot be lawfully delegated to Manager. Manager shall exercise reasonable judgment, based on industry practices and standards, in the performance of its management activities hereunder.

      2.2    <u>Oversight and Staffing</u>. Pursuant to its engagement, Manager shall have responsibility, subject to the proviso contained in Section 1 above, for the operations of the Facility, including, but not limited to, overseeing and staffing aspects of the Facility's departments, including, but not limited to, those departments performing the functions of resident care, human resources, administration, reimbursement, credit, collection, housekeeping, maintenance, asset management, dietary services, marketing, and business office and administrative matters, all to the extent applicable to the Facility and permitted under applicable law.

      2.3    <u>Employees</u>. Manager shall employ or retain such employees, consultants, or agents as shall be necessary to satisfy its obligations under this Tandy Interim Management Agreement. Manager shall establish, revise and administer all wage scales, compensation rates, employee benefits and conditions of employment, administer in-service training, seminars and conferences and establish staff schedules and job descriptions. Manager shall reimburse Romans for all expenses incurred in connection with personnel, if any, required by law to be employed by Romans in connection with the operations of the Facility to the extent such expenses are related to the period during which this Tandy Interim Management Agreement is in effect.

      2.4    <u>Specific Duties</u>. In furtherance of its responsibilities hereunder, Manager shall:

      (a)    Establish, maintain, administer, and modify as necessary the charge structure of the Facility and negotiate fee payment methods with any third-party payors, including, without limitation, federal and state health care programs, insurance companies, preferred provider

2

organizations, health maintenance organizations, and managed care organizations (collectively, "Payors").

(b)     Recruit, hire, train, promote, assign, supervise, manage and discharge all personnel required in connection with the operations of the Facility, provided, however, that any decisions to hire or discharge the executive director of the Facility will be made in consultation with Romans.

(c)     Pay from Facility revenues of trade accounts, all taxes, amounts due on indebtedness and leases of real and personal property and all other obligations incurred by Romans or Manager in connection with the operations of the Facility, including, without limitation, all amounts payable as rent by Romans under the Tandy Interim Sublease.

(d)     Establish and administer accounting procedures and controls, in accordance with sound industry practice, and establish a system for the development, preparation and safekeeping of books and records relating to the business and financial affairs of Romans as they relate to the Facility, including, but not limited to:

     i.     preparation and filing, from time to time, of such forms and reports as may be required under federal or state laws or programs applicable to wages, hours and prices; and

     ii.     preparation and submission periodically to Romans as required for timely payment of all returns relating to taxes imposed upon the operations of the Facility and all supporting data and other applicable materials pertaining to reimbursement by or from all Payors.

(e)     Periodic evaluation of all quality assurance and risk management aspects of the operations of the Facility.

(f)     Supervision and organization of the care of the residents and resident records of the Facility in accordance with all applicable laws and regulations, which shall be obtained and maintained with respect to all services rendered in or through the Facility.

(g)     Arrangement for the provision of such other services as may be required from time to time by federal, state and local law, the bylaws, rules and regulations of the governing bodies of the Facility and any accreditation or governmental agencies having jurisdiction over the Facility.

(h)     Procurement of such utilities, equipment, drugs, supplies, material and services reasonably necessary or desirable in connection with the operations of the Facility.

(i)     Without limiting the generality of the foregoing, satisfaction of all responsibilities and obligations of any kind whatsoever of Romans under the Tandy Interim Sublease, including, without limitation, Romans' responsibility for the payment of rent due under the Tandy Interim Sublease.

3

15023812 v8

2.5     Accounts; Billing. In furtherance of its responsibilities hereunder, Manager shall prepare invoices for services and collect accounts owed to Romans in respect thereof. Manager shall act as the agent of Romans with respect to billing and collecting, and billing shall be in the name of Romans for the account of Manager. Accordingly, Romans hereby appoints Manager, for the purposes of this Tandy Interim Management Agreement, as its true and lawful attorney-in-fact solely:

(a)     to bill residents and Payors on behalf of Romans;

(b)     to collect accounts receivable on behalf of Romans; and

(c)      to receive all payments on behalf of Romans from all residents and Payors or otherwise, and to take possession of, and endorse in the name of Romans any notes, checks or other payment in respect of such billings or otherwise (except as prohibited by federal or state law and regulations), and to deposit any of the foregoing into bank accounts established by Manager.

2.6     Licenses and Approvals.

(a)     Manager shall use its best efforts to assist Romans in obtaining and maintaining in effect at all times during the term hereof all certificates of need, accreditations, registrations, facility or other operating licenses and other consents of regulatory authorities respecting the conduct of the business of the Facility ("Licenses") which are necessary and appropriate to operate the Facility as operated as of the date of this Tandy Interim Management Agreement.

(b)     Manager has completed and filed all applications and made all payments, at Manager's sole cost and expense, that are necessary to obtain the New Licenses. Manager shall diligently pursue the issuance of the New Licenses as quickly and expeditiously as possible and keep Romans informed from time to time with respect to the status of all such applications. Romans may contact any applicable governmental or accreditation agencies with respect to the New Licenses. Notwithstanding the foregoing, the parties acknowledge that there are open survey violations with respect to Romans' operation of the Facility as of the Tandy Interim Contract Date (the "Open Violations") as set forth in the Plan of Correction, and that the New Licenses will not be issued unless and until the Open Violations are cured.  Manager shall be responsible for diligently curing all such Open Violations at its sole cost to permit the New Licenses to be issued.

2.7     Standards; Compliance

(a)     Manager shall act in good faith in the performance of its obligations hereunder. Manager shall at all times operate the Facility (a) in compliance with all applicable laws, including, without limitation, the requirements of the Licenses, and the standards of performance of all regulatory and accrediting agencies and authorities which exercise jurisdiction over the Facility, and (b) in a manner consistent with good and ethical business practices in the communities served by the Facility and the health care industry.

(b)     During the term of this Tandy Interim Management Agreement, Manager shall (i) take any necessary corrective action with respect to the Facility (including, without limitation, curing the Open Violations) with all costs therewith to be borne by Manager; (ii)

4

promptly report to Romans any noted deficiencies with respect to the licensing, certification or accreditation of the Facility as a result of any inspection by the applicable agency, along with the general steps to be taken to achieve compliance, and (iii) consult with Romans, and consider in good faith any views of Romans, with respect to developing any plan of correction or similar compliance plan intended to remedy such deficiencies. When a plan of correction or similar compliance plan is reported to the applicable agency, such plan shall simultaneously be sent to Romans.

2.8     Insurance. Manager shall apply for, obtain, and maintain as a facility expense all necessary insurance/risk programs/policies for all lines of coverage pertaining to the Facility and its operations (including, without limitation, general and professional liability insurance policies), which coverage and carriers shall be reasonably satisfactory to Romans. Manager shall add Romans as an additional insured on all insurance policies relating to the Facility, and Manager shall deliver certificates of insurance to Romans prior to the Tandy Interim Contract Date evidencing all insurance required under this Tandy Interim Management Agreement.

2.9     Costs and Expenses. Manager shall be responsible for, and shall pay when due, all the costs, expenses and liabilities incurred or accrued in connection with the operation of the Facility during the term of this Tandy Interim Management Agreement, including, without limitation, the cost to cure the Open Violations. Manager shall supply all of the working capital necessary for the operation of the Facility during the term of this Tandy Interim Management Agreement, and Romans shall have no obligation in connection therewith.

2.10    Repairs and Maintenance. During the term of this Tandy Interim Management Agreement, Manager shall administer a program of regular maintenance and repairs to keep the Facility in good and neat order and repair, in accordance with the terms and provisions of the Tandy Interim Sublease.

2.11    Consultation with Romans. From time to time as deemed necessary by either party, Manager and Romans shall confer regarding the operations of the Facility.

2.12    Reporting Requirements. During the term of this Tandy Interim Management Agreement, Manager shall prepare and make available to Romans monthly financial reports for the Facility. Such reports shall be prepared and delivered to Romans in the ordinary course of Manager's business, consistent with the manner and timing of Manager's delivery of such reports to its lender. In addition, at Romans' request at any time during the term of this Tandy Interim Management Agreement, Manager shall make available to Romans the following: (a) all required federal or state agency reports required in connection with the operation of the Facility; (b) all inspection reports, correspondence and notices from all state licensing agencies relating to the Facility; (c) all Facility-related reports regarding quality and patient safety; (d) all Facility-related credentialing and peer review reports and all other Facility-related reports as may be required under applicable law; and (e) draft monthly operating reports for Romans prepared in a manner substantially consistent with those filed by the Trustee for Romans prior to the Interim Contact Date ("Draft MORs"). The Trustee agrees to cooperate with Manager and its agents in the preparation of the Draft MORs. For the avoidance of doubt, the obligation to execute and file the Draft MORs shall remain exclusively with the Trustee and Romans."

5

2.13  <u>Authority and Capacity</u>. Manager hereby represents and warrants that Manager: (a) has the full power and authority to own its property and to carry on its business as now being conducted; (b) is duly qualified to do business in and is in good standing in the State of Texas; and (c) has the full power and authority to execute and deliver this Tandy Interim Management Agreement and to perform and comply with its terms, conditions and agreements, all of which have been duly authorized by all proper and necessary corporate or limited liability company action, as applicable. Manager hereby represents and warrants that this Tandy Interim Management Agreement has been duly executed and delivered by its proper and authorized officers and constitutes the valid and legally binding obligation of Manager, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors.

2.14  <u>Government Payment Programs; Excluded Individuals</u>. Manager hereby represents and warrants that: (a) Manager has not been suspended or excluded from participation in any federal or state health care programs or is otherwise subject to any restriction upon its participation therein; (b) no (i) corporate member or owner (as applicable) or (ii) director, manager, officer, employee, contractor or agent (collectively, "<u>Representatives</u>") of Manager is, or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (an "<u>Excluded Individual</u>"); (c) Manager has not been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; and (d) Manager is not currently operating in such a manner as to cause Romans, its affiliates or any of its Representatives to be an Excluded Individual, or otherwise to be ineligible to provide the services required to be provided by it hereunder.

2.15  <u>Romans Estate Funding During Interim Management Period</u>. Manager agrees to pay or reimburse, as applicable, the following obligations of Romans, its affiliate Health System Management, LLC, and their bankruptcy estate:

(a)  During the period commencing with the Tandy Interim Contract Date and continuing through the last date of the Term hereof determined pursuant to Section 5.1 of this Tandy Interim Management Agreement (the "<u>Tandy Interim Management Period</u>"), Manager shall pay Romans $12,000 per month, which the Trustee shall use ratably in the first instance for payment (i) of allowed compensation and reimbursement of expenses of the Trustee's counsel, Kelly, Hart & Hallman LLP, and (ii) allowed compensation and reimbursement of expenses of Susan N. Goodman, as the Health Care Ombudsman for Romans' Bankruptcy Case, and any professionals retained by Ms. Goodman in her capacity as the Health Care Ombudsman. Manager shall make the foregoing $12,000 payment on or before the third (3rd) business day of the calendar month; provided, however, that if the Tandy Interim Contract Date does not occur on the first day of the month, the initial $12,000 payment shall be made by the Manager within three (3) business days after the Tandy Interim Contract Date.

(b)  Trustee and Romans agree that with respect to any compensation under sections 326(a) and 330 of the Bankruptcy Code to which Trustee becomes entitled for his services as the chapter 11 trustee of Romans and/or Healthcore during the Tandy Interim Management Period ("<u>Trustee Compensation</u>"), the obligation of Manager or any other Pender Entity (as

defined in the Tandy REPA) to provide funding for or otherwise pay Trustee Compensation shall be capped at 10 hours per month and a maximm billable rate of $575 per hour.

(c)     Manager shall promptly pay all undisputed quarterly fees payable to the U.S. Trustee pursuant to 28 U.S.C. § 1930(a)(6) that accrue based on disbursements made during the Interim Management Period ("U.S. Trustee Fees"), whether such U.S. Trustee Fees become due or payable during the Interim Management Period or thereafter.

(d)     Manager's obligation to pay any amounts accrued under this Section 2.15 during the Tandy Interim Management Period shall survive the termination or expiration of this Tandy Interim Management Agreement.

3.     Responsibilities and Rights of Romans.

3.1     Maintenance of Licenses. Subject to and conditioned upon Manager's compliance with its obligations hereunder, Romans and Manager shall, at Manager's expenses, hold and maintain the necessary and appropriate Licenses to operate the Facility as presently operated. Manager shall prepare and deliver to Romans all routine applications, extensions and other filings necessary to maintain such Licenses for Romans' execution of the same and Manager shall timely file such applications, extensions and other filings, together with any filing fees or other charges (all of which shall be paid for by Manager), with the appropriate governmental or accreditation agencies.

3.2     Romans' Inspection. During the term of this Tandy Interim Management Agreement, upon reasonable prior written notice and during normal business hours, (a) Romans shall have the right to inspect the Facility, to inspect and/or audit all books and records of Manager pertaining to the operation of the Facility and to meet with the executive officers of Manager to discuss Manager's compliance with its obligations under this Tandy Interim Management Agreement, and (b) Manager shall have the right to review such information and records that pertain to the Facility and which are in the possession of Romans as Manager may reasonably require in connection with the performance of its duties hereunder. Such inspection rights shall be in addition to any rights of Romans under that certain Operation Transfer Agreement, dated as of _____, 2021, as amended from time to time, by and among Manager and Romans (among others) (the "Tandy OTA").

4.     Compensation. In consideration of the services provided by Manager under this Tandy Interim Management Agreement, Manager shall be entitled to receive and retain all revenues from, and proceeds of, operations of and services provided by the Facility during the term of this Tandy Interim Management Agreement. However, in no event shall Romans be required to make any cash or other payment to Manager for the services provided by Manager under this Tandy Interim Management Agreement or otherwise pursuant to this Tandy Interim Management Agreement.

5.     Term.

5.1     With respect to the Facility, this Tandy Interim Management Agreement shall terminate automatically without the need for further action or the execution of any further documents by any of the parties hereto, upon the earliest of: (i) the date on which the New Licenses

7

for the Facility are issued; (ii) the date on which the applications for the New Licenses for the Facility are denied, after expiration of any applicable appeal period; (iii) the six (6) month anniversary of the Tandy Interim Contract Date; provided, however, that if the New Licenses have not been issued as of the six (6) month anniversary of the Tandy Interim Contract Date due solely to the Open Violations, the term shall be extended for successive one (1) month terms until the Open Violations have been cured but in no event shall the term extend beyond the twelve (12) month anniversary of the Tandy Interim Contract Date; and (iv) the termination of the Tandy OTA.

       5.2    Upon the termination of this Tandy Interim Management Agreement, except as otherwise expressly set forth in this Tandy Interim Management Agreement, all further obligations of the parties shall terminate, and such termination shall be without prejudice to the rights and remedies that either may have against the other.

       6.    <u>Indemnification</u>. Manager shall indemnify Trustee and Romans, and Romans' shareholders, members, affiliates, directors, officers, representatives and advisers and hold each of them harmless from and against any and all demand, claim, loss, liability, damage and expense, including reasonable attorneys fees and costs of investigation, litigation, settlement and judgment (collectively, "<u>Losses</u>") which any of them sustains or suffers or to which any of them may become subject as a result of: (i) the non-performance or breach of any representation, warranty, covenant or agreement made or undertaken by Manager in this Tandy Interim Management Agreement, or (ii) the ongoing operations of the Facility from and after the Tandy Interim Contract Date, including, but not limited to, Losses due to the gross negligence or willful misconduct of Manager, or (iii) any and all actions, suits, proceedings, demands, assessments, judgments, settlement costs (to the extent approved by Manager, such approval not to be unreasonably withheld, delayed or conditioned), and legal and other expenses incident to any of the foregoing. This indemnification shall not extend to Losses due to the gross negligence or willful misconduct of Trustee or Romans.

       7.    <u>Confidentiality of Information</u>. Manager and Romans agree to keep confidential and not to use or to disclose to others, except (a) in the case of Manager, to any bona fide financier, investor, purchaser or prospective purchaser of the Facility, (b) in the case of either party, to any accountants, lawyers and other like professionals who agree to maintain confidentiality, (c) as expressly consented to in writing by the other party, or (d) required by law, any and all of their respective secrets or confidential technology, proprietary information, customer lists, or trade secrets, or any matter or items ascertained through their association with each other, and in any case only to the extent such disclosure is necessary for the purposes related thereto (for example, confidential technology is not to be disclosed to potential investors or lenders).

       8.    <u>HIPAA Compliance.</u> Romans and Manager will comply with all applicable laws, regulations, and ethical principles concerning privacy, security, and confidentiality of all resident records. Concurrently with the execution of this Agreement, Romans and Manager will enter into that certain HIPAA Business Associate Agreement in the form attached hereto as <u>Exhibit A</u>.

       9.    <u>Miscellaneous</u>.

       9.1    This Tandy Interim Management Agreement shall be governed in accordance with the laws of the State of Texas.

15023812 v8

9.2     This Tandy Interim Management Agreement (including any exhibits hereto), the Tandy Interim Sublease, the Tandy REPA, and the other documents and instruments specifically provided for herein and therein contain the entire understanding between the parties concerning the subject matter hereof and thereof and, except as expressly provided for herein or therein, supersede all prior understandings and agreements whether oral or written, between them with respect to the subject matter hereof and thereof. There are no representations, warranties, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Tandy Interim Management Agreement and such other documents and instruments which are not fully expressed herein or therein. This Tandy Interim Management Agreement may be amended or modified only by an agreement in writing signed by each of the parties hereto.

9.3     This Tandy Interim Management Agreement binds and inures to the benefit of each party hereto and its successors and proper assigns. Neither Romans nor Manager may assign their respective interests under this Tandy Interim Management Agreement to any other person or entity without the prior written consent of the other party hereto; provided, however, that the parties shall give such notice as required by applicable law or regulation prior to any such assignment.

9.4     This Tandy Interim Management Agreement is not intended to, and shall not, confer upon any other person any rights or remedies hereunder, except for Buyer as landlord under the Lease, who shall be a third-party beneficiary under Section 2.4(i).

9.5     This Tandy Interim Management Agreement may be executed in separate counterparts, each of which shall be considered an original, and all of which, when taken together, shall constitute one and the same instrument.

9.6     All notices, demands, requests, and consents (hereinafter "notices") required to be given pursuant to the terms of this Tandy Interim Management Agreement shall be in writing and shall be served by personal delivery; certified mail, return receipt requested, postage prepaid; or nationally recognized overnight courier to the following addresses:

To Manager:

> 2601 Tandy ABL I Operations, LLC
> 11766 Wilshire Boulevard, Suite 1460
> Los Angeles, CA 90025
> Telecopier:
> Telephone:

with a copy to (which shall not constitute notice to Manager):

> Michael Barrie, Esq.
> Benesch, Friedlander, Coplan, & Aronoff, LLP
> 1313 North Market Street, Suite 1201
> Wilmington, DE 19801-1601
> Telecopier: 877.357.4933

15023812 v8

Telephone: 302.442.7068

To Romans:

Romans House, LLC d/b/a Tandy Village Assisted Living
c/o Michael A McConnell, Chapter 11 Trustee
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telecopier: (817) 878-9280
Telephone: (817) 878-3569

with a copy to (which shall not constitute notice to Romans):

Nancy Ribaudo, Esq.
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 878-9280
Telecopier: (817) 878-9280
Telephone: (817) 878-3569

All such notices shall be deemed to have been given upon the date of confirmed receipt, in the case of a notice by e-mail, and, in all other cases, upon the date of receipt or refusal, except that whenever notice under this Tandy Interim Management Agreement is received on a day which is not a business day, the day of receipt shall be the next business day. Any party may change its notice address at any time by giving the other party notice of such change.

9.7     Nothing contained in the Tandy Interim Management Agreement shall constitute or be construed to be or create a partnership or joint venture between Romans and Manager.

9.8     This Tandy Interim Management Agreement cannot be changed or modified except by another agreement in writing signed by Romans and Manager.

9.9     The article and paragraph headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope of intent of any provision of this Tandy Interim Management Agreement.

9.10    Survival. The terms and provisions of Section 2.13, Section 2.14, Section 4, Section 6 and this Section 9 shall survive the expiration or earlier termination of this Tandy Interim Management Agreement.

9.11    For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Tandy Interim Management Agreement are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

9.12    EACH PARTY HERETO HEREBY UNCONDITIONALLY WAIVES

10

15023812 v8

ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS TANDY INTERIM MANAGEMENT AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THIS TANDY INTERIM MANAGEMENT AGREEMENT OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN AND/OR AMONGST THE PARTIES HERETO.

**[THE REMINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

11

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Tandy Interim Management Agreement effective as of the date and year first above written.

SUBTENANT:

**Romans House, LLC d/b/a Tandy Village Assisted Living**

By:     Michael A. McConnel, as Chapter 11 Trustee


By:     _____
          Name:  Michael A. McConnel
          Title:    Chapter 11 Trustee


MANAGER:

**2601 Tandy ABL I Operations, LLC**

By:     _____
          Name:
          Title:

[Signature Page to Interim Management Agreement]

Exhibit A

**Business Associate Agreement**

In accordance with the regulations set forth in 45 C.F.R. Parts 160 and 164 issued pursuant to the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act set forth in 42 U.S.C. §§ 17921, et seq. (collectively, "HIPAA"), Michael A. McConnell as the Chapter 11 Trustee ("Trustee") for **Romans House, LLC d/b/a Tandy Village Assisted Living** ("Covered Entity") and **2601 Tandy ABL I Operations, LLC** ("Business Associate"), hereby enter into this Business Associate Agreement ("Tandy Business Associate Agreement") as of the Tandy Interim Contract Date (as defined in the Tandy Interim Management Agreement). Business Associate and Covered Entity are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS**, HIPAA requires covered entities and business associates to protect "protected health information" ("PHI") by entering into agreements with persons and entities providing services for covered entities and business associates that involve the Use or Disclosure of PHI;

**WHEREAS**, Business Associate has been engaged by Covered Entity to provide certain services that may involve the Use or Disclosure of PHI pursuant to an Interim Management Agreement between the Parties ("Tandy Interim Management Agreement"); and

**WHEREAS**, the Parties desire to conduct their business relationship in a manner consistent with HIPAA.

**NOW, THEREFORE**, in exchange for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to incorporate the forgoing recitals as rewritten herein and further agree as follows:

1.       Definitions.

1.1       Generally. All capitalized terms used but not otherwise defined in this Tandy Business Associate Agreement shall have the same meaning as those terms in HIPAA.

(a)       "Breach" when capitalized, shall have the meaning set forth in 45 CFR § 164.402 (including all of its subsections); with respect to all other uses of the word "breach" in this Tandy Business Associate Agreement, the word shall have its ordinary contract meaning.

(b)       "Electronic Protected Health Information" or "EPHI" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to information that (i) is received by Business Associate from Covered Entity, (ii) Business Associate creates for its own purposes from Individually Identifiable Health Information that Business Associate received from Covered Entity, or (iii) is accessed, created, received, transmitted or maintained by Business Associate on behalf of Covered Entity.

(c)       "Tandy Interim Contract Date" means the date on which Business Associate was first engaged to provide services to Covered Entity under the Tandy Interim Management Agreement.

(d)       "Protected Health Information" or "PHI" shall have the meaning as the term in 45 CFR § 160.103, limited to information that (i) is received by Business Associate from Covered Entity, (ii) Business Associate creates for its own purposes from Individually Identifiable Health

Information that Business Associate received from Covered Entity, or (iii) is accessed, created, received, transmitted or maintained by Business Associate on behalf of Covered Entity. PHI includes EPHI.

2. Obligations and Activities of Business Associate.

2.1 Permitted Uses and Disclosures. Business Associate shall not Use or Disclose PHI other than as expressly permitted or required by this Tandy Business Associate Agreement or as Required By Law.

2.2 Services. Except as otherwise expressly limited in this Tandy Business Associate Agreement, Business Associate may Use and disclose PHI to perform the services pursuant to the Tandy Interim Management Agreement, provided that such Use or Disclosure would not violate HIPAA if done by Covered Entity.

2.3 Management and Administration. Except as otherwise expressly limited in this Tandy Business Associate Agreement, Business Associate may Use and disclose PHI as necessary for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate; provided, however, that any permitted Disclosure of PHI to a third party must be either Required By Law or subject to Business Associate obtaining reasonable assurances from the person to whom the information is disclosed that it shall remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

2.4 Disclosures Required By Law. Business Associate shall not, without the prior written consent of Covered Entity, disclose any PHI on the basis that such Disclosure is Required By Law without notifying Covered Entity so that Covered Entity will have an opportunity to object to the Disclosure and to seek appropriate relief. If Covered Entity objects to such Disclosure, Business Associate will refrain from disclosing the PHI until Covered Entity has exhausted all alternatives for relief. Business Associate shall require reasonable assurances from persons receiving PHI in accordance with this Section hereof that such persons shall provide Covered Entity with similar notice and opportunity to object before disclosing PHI on the basis that such Disclosure is Required By Law.

2.5 Minimum Necessary. Business Associate shall make reasonable efforts to limit the Use and Disclosure of PHI to perform or fulfill a function(s) required or permitted under this Tandy Business Associate Agreement to the Minimum Necessary to accomplish the intended purpose of such Use and Disclosure, as specified by HIPAA and any relevant guidance issued by the U.S. Department of Health and Human Services.

2.6 Safeguards. Business Associate shall comply with the HIPAA Security Rule with respect to EPHI and agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of EPHI and that prevent Use or Disclosure of such PHI other than as provided for by this Tandy Business Associate Agreement.

2.7 Mitigation. Business Associate shall immediately mitigate to maximum extent possible any harmful effect resulting from Use or Disclosure of Protected Health Information by Business Associate, or its Subcontractors or agents, in violation of the requirements of this Tandy

Business Associate Agreement.

2.8    Reporting Noncompliance. Business Associate shall report to Covered Entity any Use or Disclosure of Protected Health Information not expressly provided for by this Tandy Business Associate Agreement of which Business Associate becomes aware in accordance with HIPAA.

2.9    Reporting Security Incidents. Business Associate agrees to promptly report to Covered Entity any Security Incident or other the PHI not permitted by this Tandy Business Associate Agreement of which it becomes aware, in accordance with HIPAA. If Business Associate discovers that a Breach of Unsecured PHI has occurred, Business Associate shall notify Covered Entity in accordance with the requirements of 45 CFR § 164.410. Such notification shall include, to the extent possible, the identification of each Individual whose PHI has been or is reasonably believed to have been accessed, acquired, Used or Disclosed during the Breach, along with any other information that required to be included in notification to the Individual, the media and/or the Secretary as applicable, including, a description of the Breach, the date of the Breach and its discovery, the types of Unsecured PHI involved and a description of the Business Associate's investigation, mitigation and prevention efforts.

Business Associate shall cooperate fully with Covered Entity in Covered Entity's efforts to carry out any investigation, mitigation and notification related to any such Security Incident and shall indemnify and reimburse Covered Entity for all of Covered Entity's costs of complying with and carrying out such requirements including, but not limited to, costs related to notifying affected persons in the event of a Breach that arises from the actions or omissions of Business Associate or its employees, Subcontractors, agents, representatives or other members of its Workforce. Parties agree that Covered Entity, at is sole discretion, may so choose to have Business Associate carry out Covered Entity's notification obligations on Covered Entity's behalf, subject to Covered Entity's oversight and approval of any notice.

2.10    Subcontractors and Agents. In accordance with 45 C.F.R. §§ 164.502(e)(1)(ii) and 164.308(b)(2), Business Associate shall, if applicable, ensure that any Subcontractors or agents that create, receive, maintain, or transmit Protected Health Information on the Business Associate's behalf agree in writing to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information. Business Associate shall make such agreements with Subcontractors available to Covered Entity upon Covered Entity's request.

2.11    Access/Amendment. Business Associate shall make available PHI in a Designated Record Set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. § 164.524. In the event that Business Associate receives a request from an individual to access or amend PHI, such request shall be forwarded to Covered Entity. Business Associate shall make any amendment(s) to PHI in a Designated Record Set, or take other measures as necessary to satisfy Covered Entity obligations under 45 C.F.R. § 164.526.

2.12    Accounting. Business Associate agrees to document and make available to Covered Entity information required to provide an accounting of Disclosures to an Individual of PHI in accordance with 45 C.F.R. § 164.528 and the HITECH Act. Business Associate agrees to implement an appropriate record keeping process to enable it to comply with the requirements of this Section.

2.13   Forwarding Requests from Individual. In the event that any Individual requests access to, amendment of or accounting of PHI directly from Business Associate, Business Associate shall within two (2) business days forward such request to Covered Entity.

2.14   Books and Recordings. Business Associate shall make all internal practices, books, records, and agreements with Subcontractors and agents relating to the Use and Disclosure of Protected Health Information received or maintained pursuant to this Tandy Business Associate Agreement available to Covered Entity or the Secretary in the firm generally designated, for purposes of determining Business Associate's or Covered Entity's compliance with HIPAA.

2.15   Additional Restrictions. If Covered Entity notifies Business Associate that Covered Entity has agreed to be bound by additional restrictions on the Uses or Disclosures of PHI, Business Associate shall be bound by such additional restrictions and shall not disclose PHI in violation of such additional restrictions in accordance with 45 C.F.R. § 164.522.

2.16   Performance of a Covered Entity's Obligations. To the extent Business Associate is to carry out any obligation of Covered Entity under HIPAA, Business Associate shall agree to comply with the same requirements that apply to Covered Entity in the performance of such obligation.

2.17   Subpoenas. Business Associate shall notify Covered Entity within two (2) business days of Business Associate's receipt of any subpoena, discovery request, or other lawful process for Protected Health Information that is not accompanied by an order of a court or administrative tribunal. To the extent that Covered Entity decides to assume responsibility for challenging the validity of such request, Business Associate agrees to cooperate fully with Covered Entity in such challenge.

3.   Termination.

3.1   Term. The term of this Tandy Business Associate Agreement shall begin on the Tandy Interim Contract Date and shall terminate upon the termination or expiration of the Tandy Interim Management Agreement or other engagement for the services or on the date either Party terminates this Tandy Business Associate Agreement for cause as authorized in Paragraph (3.2) of this Section, whichever is sooner.

3.2   Termination. Upon either Party's (the "Non-Breaching Party") knowledge of a material breach by the other party (the "Breaching Party"), the Non-Breaching Party may provide a reasonable opportunity for the Breaching Party to cure the material breach within a reasonable time, and if the Breaching Party does not cure the material breach within such time, the Non-Breaching Party may terminate this Tandy Business Associate Agreement as the Tandy Interim Management Agreement, as appropriate. If the Breaching Party has violated a material term of this Tandy Business Associate Agreement and cure is not possible, the Non-Breaching Party may immediately terminate this Tandy Business Associate Agreement.

3.3   Effect of Termination. Upon termination of this Tandy Business Associate Agreement or the Tandy Interim Management Agreement, for any reason, Business Associate shall return or, if agreed to by Covered Entity, destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall also apply to PHI that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

Notwithstanding the foregoing, in the event that Business Associate determines that returning or destroying the PHI is not feasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction not feasible. Upon mutual agreement of the Parties that return or destruction of PHI is not feasible, Business Associate shall extend the protections of this Tandy Business Associate Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction not feasible, for so long as Business Associate maintains such PHI. Business Associate shall return to Covered Entity or, if agreed to by Covered Entity, destroy the PHI retained by Business Associate when it is no longer infeasible to do so.

3.4　　Survival. The obligations of the Parties under this Section and Section 4 shall survive the termination or expiration of this Tandy Business Associate Agreement.

4.　　Indemnification.

4.1　　Indemnification of Covered Entity by Business Associate. Business Associate shall indemnify, hold harmless and defend Covered Entity and its directors, officers, affiliates, employees, agents, and permitted successors from and against any and all claims, losses, liabilities, costs and other expenses (including Covered Entity's reasonable attorney's fees in defending itself against third party claims) they may suffer as the result of third party claims, demands, actions, investigations, settlements or judgments against them arising out of, or relating to, the acts or omissions of Business Associate in connection with the representations, duties and obligations of Business Associate under this Tandy Business Associate Agreement, including, but not limited to a Breach of Unsecured PHI by Business Associate or its employees, directors, officers, Subcontractors, agents or other members of its Workforce. The Parties' respective rights and obligations under this Section shall survive termination of the Tandy Business Associate Agreement.

5.　　Miscellaneous.

5.1　　Regulatory References. A reference in this Tandy Business Associate Agreement to a section in HIPAA means that section as in effect or as amended.

5.2　　Primacy. To the extent that any provisions of this Tandy Business Associate Agreement conflict with the provisions of the Tandy Interim Management Agreement or any other agreement or understanding between the Parties, this Tandy Business Associate Agreement shall control with respect to the subject matter of this Tandy Business Associate Agreement.

5.3　　Amendment. The Parties agree to take such action as is necessary to amend this Tandy Business Associate Agreement from time to time as is necessary or appropriate for the Parties to comply with the requirements of HIPAA.

5.4　　Remedies. Business Associate hereby agrees that Covered Entity shall suffer irreparable damage upon Business Associate's breach of this Tandy Business Associate Agreement and that such damages will be difficult to quantify. Business Associate hereby agrees that, in addition to all other available remedies at law or in equity, Covered Entity may file an action for an injunction to enforce the terms of this Tandy Business Associate Agreement against Business Associate, in addition to any other remedy Covered Entity may have.

5.5　　Interpretation. Any ambiguity in this Tandy Business Associate Agreement shall be resolved in favor of a meaning that permits compliance with HIPAA.

5.6 <u>Injunctions</u>. Covered Entity and Business Associate agree that any violation of the provisions of this Tandy Business Associate Agreement may cause irreparable harm to Covered Entity. Accordingly, in addition to any other remedies available to Covered Entity at law, in equity, or under this Tandy Business Associate Agreement, in the event of any violation by Business Associate of any of the provisions of this Tandy Business Associate Agreement, or any explicit threat thereof, Covered Entity shall be entitled to an injunction or other decree of specific performance with respect to such violation or explicit threat thereof, without any bond or other security being required and without the necessity of demonstrating actual damages. The Parties' respective rights and obligations under this Section shall survive termination of the Tandy Business Associate Agreement.

5.7 <u>Counterparts</u>. This Tandy Business Associate Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

5.8 <u>No Third Party Rights</u>. Nothing in this Tandy Business Associate Agreement is intended or shall be construed to confer any rights or entitlements to remedy on any person or entity other than Covered Entity and Business Associate.

5.9 <u>Independent Contractors</u>. No provision of this Tandy Business Associate Agreement is intended to create, nor shall be deemed or construed to create, any employment, agency or joint venture relationship between Covered Entity and Business Associate other than that of independent entities contracting with each other hereunder solely for the purpose of effectuating the provisions of this Tandy Business Associate Agreement. None of the Parties or any of their respective representatives shall be construed to be the agent, employer, or representative of the other. The Parties have reviewed the factors to determine whether an agency relationship exists under the federal common law of agency and it is not the intention of either Covered Entity or Business Associate that Business Associate constitutes an "agent" under such common law.

5.10 <u>References to Trustee</u>. For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Tandy Business Associate Agreement are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

*[SIGNATURE PAGE TO FOLLOW]*

3417482

**IN WITNESS WHEREOF**, the Parties have entered into this Tandy Business Associate Agreement as of the Tandy Interim Contract Date.

**2601 Tandy ABL I Operations, LLC**          **Romans House, LLC d/b/a Tandy Village Assisted Living**

By: Michael A. McConnell, as Chapter 11 Trustee

By: _____          By: Michael A. McConnell
Its: _____          Its: Chapter 11 Trustee

SCHEDULE I

| License Type | Licensee | License/Certification # | Capacity | Address | Issuing Agency |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

## INTERIM SUBLEASE AGREEMENT

**THIS INTERIM SUBLEASE AGREEMENT** (this "Vincent Interim Sublease") is effective as of the ___day of _____, 2021 ("Vincent Interim Contract Date") by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living ("Healthcore") and 4607 East California ABL I Operations, LLC ("Sublandlord").

## R E C I T A L S

A.     Sublandlord leases certain real and personal property (the "Premises") related to that certain assisted living facility (the "Facility"), located at 4607 East California Parkway, Fort Worth, Texas 76103 under the terms of that certain Operating Lease dated as of the Vincent Interim Contract Date (as the same may be amended or modified from time to time in accordance with the terms thereof, the "Lease") by and between Sublandlord, as "Tenant," and 4607 East California ABL I Holdings, LLC ("Landlord"), as "Landlord".

B.     Healthcore currently holds those certain licenses more particularly described on Schedule I attached hereto (the "Current Licenses") issued by the applicable issuing State agency or Department listed on Schedule I attached hereto for the operation of the Facility. Sublandlord has applied for either new licenses or a change of ownership for the operation of the Facility (the "New Licenses"). Pending the issuance of the New Licenses, Healthcore and Sublandlord wish to enter into arrangements whereby Healthcore will engage Sublandlord to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses.

C.     Healthcore and Sublandlord are concurrently entering into an Interim Management Agreement dated as of the Vincent Interim Contract Date (the "Vincent Interim Management Agreement," and together with this Vincent Interim Sublease, the "Vincent Interim Agreements"), pursuant to which Healthcore has engaged Sublandlord to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses for the Facility.

D.     Landlord has consented to the sublease represented by this Vincent Interim Sublease.

NOW, THEREFORE, in consideration of the foregoing recitals, and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.     Sublease. Sublandlord does hereby sublease to Healthcore and Healthcore does hereby sublease from Sublandlord all of the real and personal property associated with the Facility (the "Leased Premises"). Healthcore hereby agrees to act as "Healthcore" of the Leased Premises during the term hereof for the limited purpose of allowing the Facility to continue to operate under the Current Licenses pending issuance of the New Licenses. Healthcore does not otherwise assume any obligations of Sublandlord under the Lease. Without limiting the foregoing, Sublandlord shall be solely responsible for maintaining the Facility and paying for all costs, expenses and charges relating to the Facility, including, without limitation, for any taxes, utilities and liability or other insurance required to be maintained by Sublandlord under the Lease and shall be solely responsible for any losses relating to the Facility which are not covered by such insurance. Sublandlord shall add Healthcore as an additional insured on all insurance policies relating to the Leased Premises

(including, without limitation, Sublandlord's general and professional liability insurance policies), and Sublandlord shall deliver certificates of insurance to Healthcore prior to the Vincent Interim Contract Date evidencing all insurance required under the Lease and this Vincent Interim Sublease. Sublandlord shall be solely responsible for the condition of the Facility, including without limitation, all repairs (whether or not structural), and Sublandlord shall bear the risk of any condemnation or eminent domain proceeding and shall bear the risk of any fire or other casualty or damage to or destruction of any or all of the Facility.

2. <u>Term of Sublease; Diligence in Obtaining New License</u>. The term of this Vincent Interim Sublease shall commence on the Vincent Interim Contract Date and shall expire automatically without the need for further action or the execution of any further documents by any of the parties hereto, upon the earliest of: (i) the date on which the New Licenses for the Facility are issued; (ii) the date on which the applications for the New Licenses for the Facility are denied, after expiration of any applicable appeal period; (iii) the date on which the Interim Management Agreement expires or is otherwise terminated; (iv) the six (6) month anniversary of the Vincent Interim Contract Date; provided, however, that if the New Licenses have not been issued as of the six (6) month anniversary of the Vincent Interim Contract Date due solely to an open survey violation existing as of the Vincent Interim Contract Date, the term shall be extended for successive one (1) month terms until such survey violations have been cured but in no event shall the term extend beyond the twelve (12) month anniversary of the Vincent Interim Contract Date; and (v) termination of the Interim Management Agreement. Upon expiration of the term with respect to the Facility, Healthcore shall surrender the applicable Leased Premises to Sublandlord; provided, however, in the event the term of this Vincent Interim Sublease expires for any reason other than the issuance of the New Licenses, Sublandlord and Healthcore shall, in conjunction with Landlord, develop and implement a plan for the orderly transition of operation and financial responsibility of the Facility to a third party designated by Sublandlord but reasonably acceptable to Healthcore. Healthcore shall cooperate in good faith, at no cost, expense or liability to Healthcore, with respect to the efforts of Sublandlord to secure the New Licenses.

3. <u>Rent</u>. As full consideration for the use and occupancy of the Facility, Healthcore shall pay rent to Sublandlord in the amount of Ten and 00/100 Dollars ($10.00) per month (the "<u>Sublease Rent</u>"), which Sublease Rent shall be payable in arrears within ten (10) business days after the end of each calendar month during the Term.

4. <u>Subletting and Assignment</u>. Healthcore shall not voluntarily assign, transfer, mortgage or pledge this Vincent Interim Sublease or sublease (which terms shall be deemed to include the granting of concessions and licenses and the like), all or any part of the Leased Premises, or permit this Vincent Interim Sublease or the leasehold estate hereby created to be assigned, transferred, or encumbered, in whole or in part, or permit to be offered or advertised for assignment or subletting without Sublandlord's prior consent, except as specifically provided herein.

5. <u>Relationship to Lease; Subordination</u>. This Vincent Interim Sublease and Healthcore's rights under this Vincent Interim Sublease shall be subject and subordinate to the terms and conditions of the Lease. Notwithstanding the foregoing, in no event is Healthcore assuming any obligations under the Lease.

15065991 v2

6. Notices. All notices, demands, requests, and consents (hereinafter "notices") required to be given pursuant to the terms of this Vincent Interim Sublease shall be in writing and shall be served by personal delivery; certified mail, return receipt requested, postage prepaid; or nationally recognized overnight courier to the following addresses:

To Sublandlord:

> 4607 East California ABL I Operations, LLC
> 11766 Wilshire Boulevard, Suite 1460
> Los Angeles, CA 90025
> Telecopier:
> Telephone:

with a copy to (which shall not constitute notice to Sublandlord):

> Michael Barrie, Esq.
> Benesch, Friedlander, Coplan, & Aronoff, LLP
> 1313 North Market Street, Suite 1201
> Wilmington, DE 19801-1601
> Telecopier: 877.357.4933
> Telephone: 302.442.7068

To Healthcore:

> Healthcore System Management, LLC d/b/a Vincent Victoria Village
Assisted Living
> c/o Michael A McConnell, Chapter 11 Trustee
> Kelly Hart & Hallman, LLP
> 201 Main Street, Suite 2500
> Fort Worth, TX 76102
> Telecopier: (817) 878-9280
> Telephone: (817) 878-3569

with a copy to (which shall not constitute notice to Healthcore):

> Nancy Ribaudo, Esq.
> Kelly Hart & Hallman, LLP
> 201 Main Street, Suite 2500
> Fort Worth, TX 878-9280
> Telecopier: (817) 878-9280
> Telephone: (817) 878-3569

All notices shall be deemed to be given upon the date of confirmed receipt, in the case of a notice by e-mail, and, in all other cases, upon the date of receipt or refusal, except that whenever notice under this Vincent Interim Sublease is received on a day which is not a business day, the day of receipt shall be the next business day. Any party may change its notice address at any time by giving the other party notice of such change.

15065991 v2

7.      General Provisions.

7.1      Each of the parties hereto agrees to execute and deliver any and all further agreements, documents or instruments necessary to effectuate this Vincent Interim Sublease and the transactions referred to herein or contemplated hereby or reasonably requested by the other party to perfect or evidence their rights hereunder.

7.2      This Vincent Interim Sublease, together with the other agreements referred to herein and executed in conjunction herewith, constitutes the entire understanding between the parties with respect to the express subject matter hereof, superseding all negotiations, prior discussions and preliminary agreements. This Vincent Interim Sublease may not be modified or amended except in writing signed by the parties hereto. No waiver of any term, provision or condition of this Vincent Interim Sublease in any one or more instances, shall be deemed to be or be construed as a further or continuing waiver of any such term, provision or condition of this Vincent Interim Sublease. No failure to act shall be construed as a waiver of any term, provision, condition or rights granted hereunder. In the event one or more non-material terms of this Vincent Interim Sublease is invalid, illegal or unenforceable under applicable law, the balance of this Vincent Interim Sublease shall be deemed valid, legal and enforceable.

7.3      Nothing contained herein shall be construed as forming a joint venture or partnership between the parties hereto with respect to the subject matter hereof.

7.4      The section headings contained herein are for convenience only and shall not be considered or referred to in resolving questions of interpretation.

7.5      This Vincent Interim Sublease may be executed in one or more counterparts and all such counterparts taken together shall constitute a single original instrument.

7.6      This Vincent Interim Sublease shall be governed in accordance with the laws of the State of Texas.

7.7      For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Vincent Interim Sublease are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

7.8      EACH PARTY HERETO HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS VINCENT INTERIM SUBLEASE, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THIS VINCENT INTERIM SUBLEASE OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN AND/OR AMONGST THE PARTIES HERETO.

**[THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

3417457

15065991 v2

IN WITNESS WHEREOF, the parties have executed this Vincent Interim Sublease by their duly authorized officers as of the Vincent Interim Contract Date.

HEALTHCORE:

**Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By:     Michael A. McConnel, as Chapter 11 Trustee

By:     _____
          Name: Michael A. McConnel
          Title: Chapter 11 Trustee

SUBLANDLORD:

**4607 East California ABL I Operations, LLC**

By:     _____
          Name:
          Title:

SCHEDULE I

| License Type | Licensee | License/Certification # | Capacity | Address | Issuing Agency |
|---|---|---|---|---|---|
|  |  |  |  |  |  |

EXHIBIT H

## INTERIM MANAGEMENT AGREEMENT

**THIS INTERIM MANAGEMENT AGREEMENT** (this "Vincent Interim Management Agreement") is effective as of the ___ day of _____, 2021 ("Vincent Interim Contract Date") by and between Michael A. McConnell, as the Chapter 11 Trustee (the "Trustee") for Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living ("Healthcore") and 4607 California ABL I Operations, LLC ("Manager").

## R E C I T A L S

A.        Manager leases certain real and personal property (the "Premises") related to that certain assisted living facility (the "Facility"), located at 4607 East California Parkway, Fort Worth, Texas 76103, under the terms of that certain Operating Lease dated as of the Vincent Interim Contract Date (as the same may be amended or modified from time to time in accordance with the terms thereof, the "Lease") by and between Manager, as "Tenant," and 4607 California ABL I Holdings, LLC ("Landlord"), as "Landlord". The Premises are more particularly described in the Lease.

B.        Healthcore currently holds those certain licenses more particularly described on Schedule I attached hereto (the "Current Licenses") issued by the applicable issuing State agency or Department listed on Schedule I attached hereto for the operation of the Facility. Manager has applied for the new licenses for the operation of the Facility (the "New Licenses"). Pending the issuance of the New Licenses, Healthcore and Manager wish to enter into arrangements whereby Healthcore will engage Manager to manage the Facility for the sole purpose of providing for the continued operation of the Facility under the Current Licenses.

C.        Healthcore and Manager are concurrently entering into an Interim Sublease Agreement dated as of the Vincent Interim Contract Date (the "Vincent Interim Sublease" and together with this Vincent Interim Management Agreement, the "Vincent Interim Agreements"), pursuant to which Manager is subleasing the Premises to Healthcore subject to the terms of the Lease, for the sole purpose of providing for the continued operation of the Facility under the applicable Current Licenses until such time as the applicable New Licenses are issued.

D.        Trustee, for and on behalf of Romans House, LLC d/b/a Tandy Village assisted living ("Romans") and 2601 Tandy ABL I Operations, LLC ("Tandy New Operator") are concurrently entering into an Interim Management Agreement (the "Tandy Interim Management Agreement") for the sole purpose of providing for the continued operation of the Tandy Village assisted living facility.

NOW, THEREFORE, in consideration of the foregoing recitals, and the agreements herein contained, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, do hereby agree as follows:

1.        Engagement of Manager. Healthcore hereby engages Manager for the purpose of rendering management, administration, purchasing services and all other management, support and administrative services needed for the operation of the Facility, on the basis hereinafter set forth, and Manager hereby accepts such engagement. Throughout the term of this Vincent Interim

1

Management Agreement, Manager shall be vested, to the fullest extent permitted by law, with full authority over the business, policies, operations and assets of the Facility; provided, however, that by entering into this Vincent Interim Management Agreement, Healthcore does not delegate to Manager the power, duties and ultimate responsibilities vested in Healthcore as the operator of the Facility, and, during the term of this Vincent Interim Management Agreement, Healthcore is and will remain the responsible licensee of the Facility and, as such, shall be liable and legally accountable to residents and governmental agencies for resident care and funds, and for all other aspects of the operation and maintenance of the Facility, solely to the extent the then-current licensee must remain liable under applicable law, and, therefore, shall have the right to review Manager's activities as manager of the Facility at any and all normal business hours upon reasonable prior written notice.

2. <u>Responsibilities of Manager</u>.

2.1 <u>Total Management Services</u>. Manager shall provide total management services for the Facility in a manner consistent with and subject to the responsibilities of Healthcore as licensee of the Facility. Certain of these management services are more specifically described in this Section 2. As Manager of the Facility, Manager shall have responsibility and commensurate authority to conduct, supervise and effectively manage the day-to-day operations of the Facility to the full extent allowed by applicable laws and excepting only those obligations imposed on an operator of a residential care apartment complex that cannot be lawfully delegated to Manager. Manager shall exercise reasonable judgment, based on industry practices and standards, in the performance of its management activities hereunder.

2.2 <u>Oversight and Staffing</u>. Pursuant to its engagement, Manager shall have responsibility, subject to the proviso contained in Section 1 above, for the operations of the Facility, including, but not limited to, overseeing and staffing aspects of the Facility's departments, including, but not limited to, those departments performing the functions of resident care, human resources, administration, reimbursement, credit, collection, housekeeping, maintenance, asset management, dietary services, marketing, and business office and administrative matters, all to the extent applicable to the Facility and permitted under applicable law.

2.3 <u>Employees</u>. Manager shall employ or retain such employees, consultants, or agents as shall be necessary to satisfy its obligations under this Vincent Interim Management Agreement. Manager shall establish, revise and administer all wage scales, compensation rates, employee benefits and conditions of employment, administer in-service training, seminars and conferences and establish staff schedules and job descriptions. Manager shall reimburse Healthcore for all expenses incurred in connection with personnel, if any, required by law to be employed by Healthcore in connection with the operations of the Facility to the extent such expenses are related to the period during which this Vincent Interim Management Agreement is in effect.

2.4 <u>Specific Duties</u>. In furtherance of its responsibilities hereunder, Manager shall:

(a) Establish, maintain, administer, and modify as necessary the charge structure of the Facility and negotiate fee payment methods with any third-party payors, including,

2

15065990 v3

without limitation, federal and state health care programs, insurance companies, preferred provider organizations, health maintenance organizations, and managed care organizations (collectively, "<u>Payors</u>").

(b)    Recruit, hire, train, promote, assign, supervise, manage and discharge all personnel required in connection with the operations of the Facility, provided, however, that any decisions to hire or discharge the executive director of the Facility will be made in consultation with Healthcore.

(c)    Pay from Facility revenues of trade accounts, all taxes, amounts due on indebtedness and leases of real and personal property and all other obligations incurred by Healthcore or Manager in connection with the operations of the Facility, including, without limitation, all amounts payable as rent by Healthcore under the Vincent Interim Sublease.

(d)    Establish and administer accounting procedures and controls, in accordance with sound industry practice, and establish a system for the development, preparation and safekeeping of books and records relating to the business and financial affairs of Healthcore as they relate to the Facility, including, but not limited to:

        i.    preparation and filing, from time to time, of such forms and reports as may be required under federal or state laws or programs applicable to wages, hours and prices; and

        ii.    preparation and submission periodically to Healthcore as required for timely payment of all returns relating to taxes imposed upon the operations of the Facility and all supporting data and other applicable materials pertaining to reimbursement by or from all Payors.

(e)    Periodic evaluation of all quality assurance and risk management aspects of the operations of the Facility.

(f)    Supervision and organization of the care of the residents and resident records of the Facility in accordance with all applicable laws and regulations, which shall be obtained and maintained with respect to all services rendered in or through the Facility.

(g)    Arrangement for the provision of such other services as may be required from time to time by federal, state and local law, the bylaws, rules and regulations of the governing bodies of the Facility and any accreditation or governmental agencies having jurisdiction over the Facility.

(h)    Procurement of such utilities, equipment, drugs, supplies, material and services reasonably necessary or desirable in connection with the operations of the Facility.

(i)    Without limiting the generality of the foregoing, satisfaction of all responsibilities and obligations of any kind whatsoever of Healthcore under the Vincent Interim Sublease, including, without limitation, Healthcore's responsibility for the payment of rent due under the Vincent Interim Sublease.

15065990 v3

2.5 <u>Accounts; Billing</u>. In furtherance of its responsibilities hereunder, Manager shall prepare invoices for services and collect accounts owed to Healthcore in respect thereof. Manager shall act as the agent of Healthcore with respect to billing and collecting, and billing shall be in the name of Healthcore for the account of Manager. Accordingly, Healthcore hereby appoints Manager, for the purposes of this Vincent Interim Management Agreement, as its true and lawful attorney-in-fact solely:

     (a)     to bill residents and Payors on behalf of Healthcore;

     (b)     to collect accounts receivable on behalf of Healthcore; and

     (c)     to receive all payments on behalf of Healthcore from all residents and Payors or otherwise, and to take possession of, and endorse in the name of Healthcore any notes, checks or other payment in respect of such billings or otherwise (except as prohibited by federal or state law and regulations), and to deposit any of the foregoing into bank accounts established by Manager.

2.6   <u>Licenses and Approvals</u>.

     (a)     Manager shall use its best efforts to assist Healthcore in obtaining and maintaining in effect at all times during the term hereof all certificates of need, accreditations, registrations, facility or other operating licenses and other consents of regulatory authorities respecting the conduct of the business of the Facility ("<u>Licenses</u>") which are necessary and appropriate to operate the Facility as operated as of the date of this Vincent Interim Management Agreement.

     (b)     Manager has completed and filed all applications and made all payments, at Manager's sole cost and expense, that are necessary to obtain the New Licenses. Manager shall diligently pursue the issuance of the New Licenses as quickly and expeditiously as possible and keep Healthcore informed from time to time with respect to the status of all such applications. Healthcore may contact any applicable governmental or accreditation agencies with respect to the New Licenses.

2.7   <u>Standards; Compliance</u>

     (a)     Manager shall act in good faith in the performance of its obligations hereunder. Manager shall at all times operate the Facility (a) in compliance with all applicable laws, including, without limitation, the requirements of the Licenses, and the standards of performance of all regulatory and accrediting agencies and authorities which exercise jurisdiction over the Facility, and (b) in a manner consistent with good and ethical business practices in the communities served by the Facility and the health care industry.

     (b)     During the term of this Vincent Interim Management Agreement, Manager shall (i) take any necessary corrective action with respect to the Facility with all costs therewith to be borne by Manager; (ii) promptly report to Healthcore any noted deficiencies with respect to the licensing, certification or accreditation of the Facility as a result of any inspection by the applicable agency, along with the general steps to be taken to achieve compliance, and (iii) consult with Healthcore, and consider in good faith any views of Healthcore, with respect to developing any

4

plan of correction or similar compliance plan intended to remedy such deficiencies. When a plan of correction or similar compliance plan is reported to the applicable agency, such plan shall simultaneously be sent to Healthcore.

2.8     Insurance. Manager shall apply for, obtain, and maintain as a facility expense all necessary insurance/risk programs/policies for all lines of coverage pertaining to the Facility and its operations as required under the Lease (including, without limitation, general and professional liability insurance policies), which coverage and carriers shall be reasonably satisfactory to Healthcore. Manager shall add Healthcore as an additional insured on all insurance policies relating to the Facility, and Manager shall deliver certificates of insurance to Healthcore prior to the Vincent Interim Contract Date evidencing all insurance required under this Vincent Interim Management Agreement.

2.9     Costs and Expenses. Manager shall be responsible for, and shall pay when due, all the costs, expenses and liabilities incurred or accrued in connection with the operation of the Facility during the term of this Vincent Interim Management Agreement. Manager shall supply all of the working capital necessary for the operation of the Facility during the term of this Vincent Interim Management Agreement, and Healthcore shall have no obligation in connection therewith.

2.10    Repairs and Maintenance. During the term of this Vincent Interim Management Agreement, Manager shall administer a program of regular maintenance and repairs to keep the Facility in good and neat order and repair, in accordance with the terms and provisions of the Vincent Interim Sublease.

2.11    Consultation with Healthcore. From time to time as deemed necessary by either party, Manager and Healthcore shall confer regarding the operations of the Facility.

2.12    Reporting Requirements. During the term of this Vincent Interim Management Agreement, Manager shall prepare and make available to Healthcore monthly financial reports for the Facility. Such reports shall be prepared and delivered to Healthcore in the ordinary course of Manager's business, consistent with the manner and timing of Manager's delivery of such reports to its lender. In addition, at Healthcore's request at any time during the term of this Vincent Interim Management Agreement, Manager shall make available to Healthcore the following: (a) all required federal or state agency reports required in connection with the operation of the Facility; (b) all inspection reports, correspondence and notices from all state licensing agencies relating to the Facility; (c) all Facility-related reports regarding quality and patient safety; (d) all Facility-related credentialing and peer review reports and all other Facility-related reports as may be required under applicable law; and (e) draft monthly operating reports for Healthcore prepared in a manner substantially consistent with those filed by the Trustee for Healthcore prior to the Interim Contact Date ("Draft MORs"). The Trustee agrees to cooperate with Manager and its agents in the preparation of the Draft MORs. For the avoidance of doubt, the obligation to execute and file the Draft MORs shall remain exclusively with the Trustee and Healthcore."

2.13    Authority and Capacity. Manager hereby represents and warrants that Manager: (a) has the full power and authority to own its property and to carry on its business as now being conducted; (b) is duly qualified to do business in and is in good standing in the State of

5

Texas; and (c) has the full power and authority to execute and deliver this Vincent Interim Management Agreement and to perform and comply with its terms, conditions and agreements, all of which have been duly authorized by all proper and necessary corporate or limited liability company action, as applicable. Manager hereby represents and warrants that this Vincent Interim Management Agreement has been duly executed and delivered by its proper and authorized officers and constitutes the valid and legally binding obligation of Manager, enforceable against it in accordance with its terms, except as enforceability may be limited by bankruptcy, insolvency, reorganization, moratorium or similar laws of general application affecting the rights and remedies of creditors.

2.14  <u>Government Payment Programs; Excluded Individuals</u>. Manager hereby represents and warrants that: (a) Manager has not been suspended or excluded from participation in any federal or state health care programs or is otherwise subject to any restriction upon its participation therein; (b) no (i) corporate member or owner (as applicable) or (ii) director, manager, officer, employee, contractor or agent (collectively, "<u>Representatives</u>") of Manager is, or is proposed to be, suspended, excluded from participation in, or sanctioned under, any federal or state health care program (an "<u>Excluded Individual</u>"); (c) Manager has not been convicted of any criminal offense related to the delivery of any medical or health care services or supplies, or related to the neglect or abuse of patients; and (d) Manager is not currently operating in such a manner as to cause Healthcore, its affiliates or any of its Representatives to be an Excluded Individual, or otherwise to be ineligible to provide the services required to be provided by it hereunder.

2.15  <u>Healthcore Estate Funding During Interim Management Period</u>.  Tandy New Operator has agreed to pay or reimburse, as applicable, certain obligations of Romans, Healthcore and their bankruptcy estate under the Tandy Interim Management Agreement.

3.  <u>Responsibilities and Rights of Healthcore</u>.

3.1  <u>Maintenance of Licenses</u>. Subject to and conditioned upon Manager's compliance with its obligations hereunder, Healthcore and Manager shall, at Manager's expenses, hold and maintain the necessary and appropriate Licenses to operate the Facility as presently operated. Manager shall prepare and deliver to Healthcore all routine applications, extensions and other filings necessary to maintain such Licenses for Healthcore's execution of the same and Manager shall timely file such applications, extensions and other filings, together with any filing fees or other charges (all of which shall be paid for by Manager), with the appropriate governmental or accreditation agencies.

3.2  <u>Healthcore's Inspection</u>. During the term of this Vincent Interim Management Agreement, upon reasonable prior written notice and during normal business hours, (a) Healthcore shall have the right to inspect the Facility, to inspect and/or audit all books and records of Manager pertaining to the operation of the Facility and to meet with the executive officers of Manager to discuss Manager's compliance with its obligations under this Vincent Interim Management Agreement, and (b) Manager shall have the right to review such information and records that pertain to the Facility and which are in the possession of Healthcore as Manager may reasonably require in connection with the performance of its duties hereunder. Such inspection rights shall be in addition to any rights of Healthcore under that certain Operation

6

Transfer Agreement, dated as of _____, 2021, as amended from time to time, by and among Manager and Healthcore (among others) (the "<u>Vincent OTA</u>").

      4.    <u>Compensation</u>. In consideration of the services provided by Manager under this Vincent Interim Management Agreement, Manager shall be entitled to receive and retain all revenues from, and proceeds of, operations of and services provided by the Facility during the term of this Vincent Interim Management Agreement. However, in no event shall Healthcore be required to make any cash or other payment to Manager for the services provided by Manager under this Vincent Interim Management Agreement or otherwise pursuant to this Vincent Interim Management Agreement.

      5.    <u>Term</u>.

      5.1    With respect to the Facility, this Vincent Interim Management Agreement shall terminate automatically without the need for further action or the execution of any further documents by any of the parties hereto, upon the earliest of: (i) the date on which the New Licenses for the Facility are issued; (ii) the date on which the applications for the New Licenses for the Facility are denied, after expiration of any applicable appeal period; (iii) the six (6) month anniversary of the Vincent Interim Contract Date; and (iv) the termination of the Vincent OTA.

      5.2    Upon the termination of this Vincent Interim Management Agreement, except as otherwise expressly set forth in this Vincent Interim Management Agreement, all further obligations of the parties shall terminate, and such termination shall be without prejudice to the rights and remedies that either may have against the other.

      6.    <u>Indemnification</u>. Manager shall indemnify Trustee and Healthcore, and Healthcore's shareholders, members, affiliates, directors, officers, representatives and advisers and hold each of them harmless from and against any and all demand, claim, loss, liability, damage and expense, including reasonable attorneys fees and costs of investigation, litigation, settlement and judgment (collectively, "<u>Losses</u>") which any of them sustains or suffers or to which any of them may become subject as a result of: (i) the non-performance or breach of any representation, warranty, covenant or agreement made or undertaken by Manager in this Vincent Interim Management Agreement, or (ii) the ongoing operations of the Facility from and after the Vincent Interim Contract Date, including, but not limited to, Losses due to the gross negligence or willful misconduct of Manager, or (iii) any and all actions, suits, proceedings, demands, assessments, judgments, settlement costs (to the extent approved by Manager, such approval not to be unreasonably withheld, delayed or conditioned), and legal and other expenses incident to any of the foregoing. This indemnification shall not extend to Losses due to the gross negligence or willful misconduct of Trustee or Healthcore.

      7.    <u>Confidentiality of Information</u>. Manager and Healthcore agree to keep confidential and not to use or to disclose to others, except (a) in the case of Manager, to any bona fide financier, investor, purchaser or prospective purchaser of the Facility, (b) in the case of either party, to any accountants, lawyers and other like professionals who agree to maintain confidentiality, (c) as expressly consented to in writing by the other party, or (d) required by law, any and all of their respective secrets or confidential technology, proprietary information, customer lists, or trade secrets, or any matter or items ascertained through their association with each other, and in any

15065990 v3

case only to the extent such disclosure is necessary for the purposes related thereto (for example, confidential technology is not to be disclosed to potential investors or lenders).

8.  <u>HIPAA Compliance.</u> Healthcore and Manager will comply with all applicable laws, regulations, and ethical principles concerning privacy, security, and confidentiality of all resident records. Concurrently with the execution of this Agreement, Healthcore and Manager will enter into that certain HIPAA Business Associate Agreement in the form attached hereto as <u>Exhibit A</u>.

9.  <u>Miscellaneous.</u>

9.1    This Vincent Interim Management Agreement shall be governed in accordance with the laws of the State of Texas.

9.2    This Vincent Interim Management Agreement (including any exhibits hereto), the Vincent Interim Sublease, the Tandy REPA, and the other documents and instruments specifically provided for herein and therein contain the entire understanding between the parties concerning the subject matter hereof and thereof and, except as expressly provided for herein or therein, supersede all prior understandings and agreements whether oral or written, between them with respect to the subject matter hereof and thereof. There are no representations, warranties, agreements, arrangements or understandings, oral or written, between the parties hereto relating to the subject matter of this Vincent Interim Management Agreement and such other documents and instruments which are not fully expressed herein or therein. This Vincent Interim Management Agreement may be amended or modified only by an agreement in writing signed by each of the parties hereto.

9.3    This Vincent Interim Management Agreement binds and inures to the benefit of each party hereto and its successors and proper assigns. Neither Healthcore nor Manager may assign their respective interests under this Vincent Interim Management Agreement to any other person or entity without the prior written consent of the other party hereto; provided, however, that the parties shall give such notice as required by applicable law or regulation prior to any such assignment.

9.4    This Vincent Interim Management Agreement is not intended to, and shall not, confer upon any other person any rights or remedies hereunder, except for Landlord, who shall be a third-party beneficiary under Section 2.4(i).

9.5    This Vincent Interim Management Agreement may be executed in separate counterparts, each of which shall be considered an original, and all of which, when taken together, shall constitute one and the same instrument.

9.6    All notices, demands, requests, and consents (hereinafter "notices") required to be given pursuant to the terms of this Vincent Interim Management Agreement shall be in writing and shall be served by personal delivery; certified mail, return receipt requested, postage prepaid; or nationally recognized overnight courier to the following addresses:

To Manager:

4607 California ABL I Operations, LLC

15065990 v3

11766 Wilshire Boulevard, Suite 1460
Los Angeles, CA 90025
Telecopier:
Telephone:

with a copy to (which shall not constitute notice to Manager):

Michael Barrie, Esq.
Benesch, Friedlander, Coplan, & Aronoff, LLP
1313 North Market Street, Suite 1201
Wilmington, DE 19801-1601
Telecopier: 877.357.4933
Telephone: 302.442.7068

To Healthcore:

Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living
c/o Michael A McConnell, Chapter 11 Trustee
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102
Telecopier: (817) 878-9280
Telephone: (817) 878-3569

with a copy to (which shall not constitute notice to Healthcore):

Nancy Ribaudo, Esq.
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 878-9280
Telecopier: (817) 878-9280
Telephone: (817) 878-3569

All such notices shall be deemed to have been given upon the date of confirmed receipt, in the case of a notice by e-mail, and, in all other cases, upon the date of receipt or refusal, except that whenever notice under this Vincent Interim Management Agreement is received on a day which is not a business day, the day of receipt shall be the next business day. Any party may change its notice address at any time by giving the other party notice of such change.

9.7     Nothing contained in the Vincent Interim Management Agreement shall constitute or be construed to be or create a partnership or joint venture between Healthcore and Manager.

9.8     This Vincent Interim Management Agreement cannot be changed or modified except by another agreement in writing signed by Healthcore and Manager.

9

9.9     The article and paragraph headings contained herein are for convenience of reference only and are not intended to define, limit, or describe the scope of intent of any provision of this Vincent Interim Management Agreement.

9.10     <u>Survival</u>. The terms and provisions of Section 2.13, Section 2.14, Section 4, Section 6 and this Section 9 shall survive the expiration or earlier termination of this Vincent Interim Management Agreement.

9.11     For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Vincent Interim Management Agreement are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

9.12     EACH PARTY HERETO HEREBY UNCONDITIONALLY WAIVES ITS RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS VINCENT INTERIM MANAGEMENT AGREEMENT, ANY OF THE DOCUMENTS RELATED HERETO, ANY DEALINGS BETWEEN OR AMONG THEM RELATING TO THE SUBJECT MATTER OF THIS VINCENT INTERIM MANAGEMENT AGREEMENT OR ANY RELATED TRANSACTIONS, AND/OR THE RELATIONSHIP THAT IS BEING ESTABLISHED BETWEEN AND/OR AMONGST THE PARTIES HERETO.

**[THE REMINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK]**

15065990 v3

IN WITNESS WHEREOF, the parties hereto have executed and delivered this Vincent Interim Management Agreement effective as of the date and year first above written.

HEALTHCORE:

**Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By:    Michael A. McConnel, as Chapter 11 Trustee


By:    _____
        Name:  Michael A. McConnel
        Title:   Chapter 11 Trustee


MANAGER:

**4607 California ABL I Operations, LLC**

By:    _____
        Name:
        Title:

[Signature Page to Interim Management Agreement]

Exhibit A

**Business Associate Agreement**

In accordance with the regulations set forth in 45 C.F.R. Parts 160 and 164 issued pursuant to the Health Insurance Portability and Accountability Act of 1996 and the Health Information Technology for Economic and Clinical Health Act set forth in 42 U.S.C. §§ 17921, et seq. (collectively, "HIPAA"), Michael A. McConnell as the Chapter 11 Trustee ("Trustee") for **Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living** ("Covered Entity") and **4607 California ABL I Operations, LLC** ("Business Associate"), hereby enter into this Business Associate Agreement ("Vincent Business Associate Agreement") as of the Vincent Interim Contract Date (as defined in the Vincent Interim Management Agreement). Business Associate and Covered Entity are sometimes hereinafter referred to individually as a "Party" and collectively as the "Parties."

**WHEREAS**, HIPAA requires covered entities and business associates to protect "protected health information" ("PHI") by entering into agreements with persons and entities providing services for covered entities and business associates that involve the Use or Disclosure of PHI;

**WHEREAS**, Business Associate has been engaged by Covered Entity to provide certain services that may involve the Use or Disclosure of PHI pursuant to an Interim Management Agreement between the Parties ("Vincent Interim Management Agreement"); and

**WHEREAS**, the Parties desire to conduct their business relationship in a manner consistent with HIPAA.

**NOW, THEREFORE**, in exchange for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties agree to incorporate the forgoing recitals as rewritten herein and further agree as follows:

1.    Definitions.

1.1    Generally. All capitalized terms used but not otherwise defined in this Vincent Business Associate Agreement shall have the same meaning as those terms in HIPAA.

(a)    "Breach" when capitalized, shall have the meaning set forth in 45 CFR § 164.402 (including all of its subsections); with respect to all other uses of the word "breach" in this Vincent Business Associate Agreement, the word shall have its ordinary contract meaning.

(b)    "Electronic Protected Health Information" or "EPHI" shall have the same meaning as the term "electronic protected health information" in 45 CFR § 160.103, limited to information that (i) is received by Business Associate from Covered Entity, (ii) Business Associate creates for its own purposes from Individually Identifiable Health Information that Business Associate received from Covered Entity, or (iii) is accessed, created, received, transmitted or maintained by Business Associate on behalf of Covered Entity.

(c)    "Vincent Interim Contract Date" means the date on which Business Associate was first engaged to provide services to Covered Entity under the Vincent Interim Management Agreement.

(d)    "Protected Health Information" or "PHI" shall have the meaning as the term in 45 CFR § 160.103, limited to information that (i) is received by Business Associate from Covered Entity, (ii) Business Associate creates for its own purposes from Individually Identifiable Health

Information that Business Associate received from Covered Entity, or (iii) is accessed, created, received, transmitted or maintained by Business Associate on behalf of Covered Entity. PHI includes EPHI.

2.      Obligations and Activities of Business Associate.

2.1      Permitted Uses and Disclosures. Business Associate shall not Use or Disclose PHI other than as expressly permitted or required by this Vincent Business Associate Agreement or as Required By Law.

2.2      Services. Except as otherwise expressly limited in this Vincent Business Associate Agreement, Business Associate may Use and disclose PHI to perform the services pursuant to the Vincent Interim Management Agreement, provided that such Use or Disclosure would not violate HIPAA if done by Covered Entity.

2.3      Management and Administration. Except as otherwise expressly limited in this Vincent Business Associate Agreement, Business Associate may Use and disclose PHI as necessary for the proper management and administration of Business Associate or to carry out the legal responsibilities of Business Associate; provided, however, that any permitted Disclosure of PHI to a third party must be either Required By Law or subject to Business Associate obtaining reasonable assurances from the person to whom the information is disclosed that it shall remain confidential and used or further disclosed only as Required By Law or for the purpose for which it was disclosed to the person, and the person notifies the Business Associate of any instances of which it is aware in which the confidentiality of the information has been breached.

2.4      Disclosures Required By Law. Business Associate shall not, without the prior written consent of Covered Entity, disclose any PHI on the basis that such Disclosure is Required By Law without notifying Covered Entity so that Covered Entity will have an opportunity to object to the Disclosure and to seek appropriate relief. If Covered Entity objects to such Disclosure, Business Associate will refrain from disclosing the PHI until Covered Entity has exhausted all alternatives for relief. Business Associate shall require reasonable assurances from persons receiving PHI in accordance with this Section hereof that such persons shall provide Covered Entity with similar notice and opportunity to object before disclosing PHI on the basis that such Disclosure is Required By Law.

2.5      Minimum Necessary. Business Associate shall make reasonable efforts to limit the Use and Disclosure of PHI to perform or fulfill a function(s) required or permitted under this Vincent Business Associate Agreement to the Minimum Necessary to accomplish the intended purpose of such Use and Disclosure, as specified by HIPAA and any relevant guidance issued by the U.S. Department of Health and Human Services.

2.6      Safeguards. Business Associate shall comply with the HIPAA Security Rule with respect to EPHI and agrees to implement administrative, physical and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of EPHI and that prevent Use or Disclosure of such PHI other than as provided for by this Vincent Business Associate Agreement.

2.7      Mitigation. Business Associate shall immediately mitigate to maximum extent possible any harmful effect resulting from Use or Disclosure of Protected Health Information by Business Associate, or its Subcontractors or agents, in violation of the requirements of this Vincent

Business Associate Agreement.

2.8    <u>Reporting Noncompliance</u>. Business Associate shall report to Covered Entity any Use or Disclosure of Protected Health Information not expressly provided for by this Vincent Business Associate Agreement of which Business Associate becomes aware in accordance with HIPAA.

2.9    <u>Reporting Security Incidents</u>. Business Associate agrees to promptly report to Covered Entity any Security Incident or other the PHI not permitted by this Vincent Business Associate Agreement of which it becomes aware, in accordance with HIPAA. If Business Associate discovers that a Breach of Unsecured PHI has occurred, Business Associate shall notify Covered Entity in accordance with the requirements of 45 CFR § 164.410. Such notification shall include, to the extent possible, the identification of each Individual whose PHI has been or is reasonably believed to have been accessed, acquired, Used or Disclosed during the Breach, along with any other information that required to be included in notification to the Individual, the media and/or the Secretary as applicable, including, a description of the Breach, the date of the Breach and its discovery, the types of Unsecured PHI involved and a description of the Business Associate's investigation, mitigation and prevention efforts.

Business Associate shall cooperate fully with Covered Entity in Covered Entity's efforts to carry out any investigation, mitigation and notification related to any such Security Incident and shall indemnify and reimburse Covered Entity for all of Covered Entity's costs of complying with and carrying out such requirements including, but not limited to, costs related to notifying affected persons in the event of a Breach that arises from the actions or omissions of Business Associate or its employees, Subcontractors, agents, representatives or other members of its Workforce. Parties agree that Covered Entity, at is sole discretion, may so choose to have Business Associate carry out Covered Entity's notification obligations on Covered Entity's behalf, subject to Covered Entity's oversight and approval of any notice.

2.10    <u>Subcontractors and Agents</u>. In accordance with 45 C.F.R. §§ 164.502(e)(1)(ii) and 164.308(b)(2), Business Associate shall, if applicable, ensure that any Subcontractors or agents that create, receive, maintain, or transmit Protected Health Information on the Business Associate's behalf agree in writing to the same restrictions, conditions, and requirements that apply to the Business Associate with respect to such information. Business Associate shall make such agreements with Subcontractors available to Covered Entity upon Covered Entity's request.

2.11    <u>Access/Amendment</u>. Business Associate shall make available PHI in a Designated Record Set to the Covered Entity as necessary to satisfy Covered Entity's obligations under 45 C.F.R. § 164.524. In the event that Business Associate receives a request from an individual to access or amend PHI, such request shall be forwarded to Covered Entity. Business Associate shall make any amendment(s) to PHI in a Designated Record Set, or take other measures as necessary to satisfy Covered Entity obligations under 45 C.F.R. § 164.526.

2.12    <u>Accounting</u>. Business Associate agrees to document and make available to Covered Entity information required to provide an accounting of Disclosures to an Individual of PHI in accordance with 45 C.F.R. § 164.528 and the HITECH Act. Business Associate agrees to implement an appropriate record keeping process to enable it to comply with the requirements of this Section.

2.13 _Forwarding Requests from Individual_. In the event that any Individual requests access to, amendment of or accounting of PHI directly from Business Associate, Business Associate shall within two (2) business days forward such request to Covered Entity.

2.14 _Books and Recordings_. Business Associate shall make all internal practices, books, records, and agreements with Subcontractors and agents relating to the Use and Disclosure of Protected Health Information received or maintained pursuant to this Vincent Business Associate Agreement available to Covered Entity or the Secretary in the firm generally designated, for purposes of determining Business Associate's or Covered Entity's compliance with HIPAA.

2.15 _Additional Restrictions_. If Covered Entity notifies Business Associate that Covered Entity has agreed to be bound by additional restrictions on the Uses or Disclosures of PHI, Business Associate shall be bound by such additional restrictions and shall not disclose PHI in violation of such additional restrictions in accordance with 45 C.F.R. § 164.522.

2.16 _Performance of a Covered Entity's Obligations_. To the extent Business Associate is to carry out any obligation of Covered Entity under HIPAA, Business Associate shall agree to comply with the same requirements that apply to Covered Entity in the performance of such obligation.

2.17 _Subpoenas_. Business Associate shall notify Covered Entity within two (2) business days of Business Associate's receipt of any subpoena, discovery request, or other lawful process for Protected Health Information that is not accompanied by an order of a court or administrative tribunal. To the extent that Covered Entity decides to assume responsibility for challenging the validity of such request, Business Associate agrees to cooperate fully with Covered Entity in such challenge.

3. Termination.

3.1 _Term_. The term of this Vincent Business Associate Agreement shall begin on the Vincent Interim Contract Date and shall terminate upon the termination or expiration of the Vincent Interim Management Agreement or other engagement for the services or on the date either Party terminates this Vincent Business Associate Agreement for cause as authorized in Paragraph (3.2) of this Section, whichever is sooner.

3.2 _Termination_. Upon either Party's (the "Non-Breaching Party") knowledge of a material breach by the other party (the "Breaching Party"), the Non-Breaching Party may provide a reasonable opportunity for the Breaching Party to cure the material breach within a reasonable time, and if the Breaching Party does not cure the material breach within such time, the Non-Breaching Party may terminate this Vincent Business Associate Agreement as the Vincent Interim Management Agreement, as appropriate. If the Breaching Party has violated a material term of this Vincent Business Associate Agreement and cure is not possible, the Non-Breaching Party may immediately terminate this Vincent Business Associate Agreement.

3.3 _Effect of Termination_. Upon termination of this Vincent Business Associate Agreement or the Vincent Interim Management Agreement, for any reason, Business Associate shall return or, if agreed to by Covered Entity, destroy all PHI received from Covered Entity, or created or received by Business Associate on behalf of Covered Entity. This provision shall also apply to PHI that is in the possession of Subcontractors or agents of Business Associate. Business Associate shall retain no copies of the PHI.

Notwithstanding the foregoing, in the event that Business Associate determines that returning or destroying the PHI is not feasible, Business Associate shall provide to Covered Entity notification of the conditions that make return or destruction not feasible. Upon mutual agreement of the Parties that return or destruction of PHI is not feasible, Business Associate shall extend the protections of this Vincent Business Associate Agreement to such PHI and limit further Uses and Disclosures of such PHI to those purposes that make the return or destruction not feasible, for so long as Business Associate maintains such PHI. Business Associate shall return to Covered Entity or, if agreed to by Covered Entity, destroy the PHI retained by Business Associate when it is no longer infeasible to do so.

3.4     <u>Survival</u>. The obligations of the Parties under this Section and Section 4 shall survive the termination or expiration of this Vincent Business Associate Agreement.

4.     Indemnification.

4.1     <u>Indemnification of Covered Entity by Business Associate</u>. Business Associate shall indemnify, hold harmless and defend Covered Entity and its directors, officers, affiliates, employees, agents, and permitted successors from and against any and all claims, losses, liabilities, costs and other expenses (including Covered Entity's reasonable attorney's fees in defending itself against third party claims) they may suffer as the result of third party claims, demands, actions, investigations, settlements or judgments against them arising out of, or relating to, the acts or omissions of Business Associate in connection with the representations, duties and obligations of Business Associate under this Vincent Business Associate Agreement, including, but not limited to a Breach of Unsecured PHI by Business Associate or its employees, directors, officers, Subcontractors, agents or other members of its Workforce. The Parties' respective rights and obligations under this Section shall survive termination of the Vincent Business Associate Agreement.

5.     Miscellaneous.

5.1     <u>Regulatory References</u>. A reference in this Vincent Business Associate Agreement to a section in HIPAA means that section as in effect or as amended.

5.2     <u>Primacy</u>. To the extent that any provisions of this Vincent Business Associate Agreement conflict with the provisions of the Vincent Interim Management Agreement or any other agreement or understanding between the Parties, this Vincent Business Associate Agreement shall control with respect to the subject matter of this Vincent Business Associate Agreement.

5.3     <u>Amendment</u>. The Parties agree to take such action as is necessary to amend this Vincent Business Associate Agreement from time to time as is necessary or appropriate for the Parties to comply with the requirements of HIPAA.

5.4     <u>Remedies</u>. Business Associate hereby agrees that Covered Entity shall suffer irreparable damage upon Business Associate's breach of this Vincent Business Associate Agreement and that such damages will be difficult to quantify. Business Associate hereby agrees that, in addition to all other available remedies at law or in equity, Covered Entity may file an action for an injunction to enforce the terms of this Vincent Business Associate Agreement against Business Associate, in addition to any other remedy Covered Entity may have.

5.5     <u>Interpretation</u>. Any ambiguity in this Vincent Business Associate Agreement

shall be resolved in favor of a meaning that permits compliance with HIPAA.

5.6    <u>Injunctions</u>. Covered Entity and Business Associate agree that any violation of the provisions of this Vincent Business Associate Agreement may cause irreparable harm to Covered Entity. Accordingly, in addition to any other remedies available to Covered Entity at law, in equity, or under this Vincent Business Associate Agreement, in the event of any violation by Business Associate of any of the provisions of this Vincent Business Associate Agreement, or any explicit threat thereof, Covered Entity shall be entitled to an injunction or other decree of specific performance with respect to such violation or explicit threat thereof, without any bond or other security being required and without the necessity of demonstrating actual damages. The Parties' respective rights and obligations under this Section shall survive termination of the Vincent Business Associate Agreement.

5.7    <u>Counterparts</u>. This Vincent Business Associate Agreement may be executed in any number of counterparts, each of which shall be deemed an original.

5.8    <u>No Third Party Rights</u>. Nothing in this Vincent Business Associate Agreement is intended or shall be construed to confer any rights or entitlements to remedy on any person or entity other than Covered Entity and Business Associate.

5.9    <u>Independent Contractors</u>. No provision of this Vincent Business Associate Agreement is intended to create, nor shall be deemed or construed to create, any employment, agency or joint venture relationship between Covered Entity and Business Associate other than that of independent entities contracting with each other hereunder solely for the purpose of effectuating the provisions of this Vincent Business Associate Agreement. None of the Parties or any of their respective representatives shall be construed to be the agent, employer, or representative of the other. The Parties have reviewed the factors to determine whether an agency relationship exists under the federal common law of agency and it is not the intention of either Covered Entity or Business Associate that Business Associate constitutes an "agent" under such common law.

5.10    <u>References to Trustee</u>. For the avoidance of doubt, unless otherwise expressly provided herein, all references to "Trustee" (as such term is defined in this Vincent Business Associate Agreement are solely to Michael A. McConnell, in his capacity as the chapter 11 trustee for the bankruptcy estate of Romans or Healthcore, as applicable.

*[SIGNATURE PAGE TO FOLLOW]*

3417459.1

**IN WITNESS WHEREOF**, the Parties have entered into this Vincent Business Associate Agreement as of the Vincent Interim Contract Date.

**4607 California ABL I Operations, LLC**

**Healthcore System Management, LLC d/b/a Vincent Victoria Village Assisted Living**

By: Michael A. McConnell, as Chapter 11 Trustee

By: _____
Its: _____

By: Michael A. McConnell
Its: Chapter 11 Trustee

SCHEDULE I

| License Type | Licensee | License/Certification # | Capacity | Address | Issuing Agency |
|---|---|---|---|---|---|
| | | | | | |

EXHIBIT I

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROMANS HOUSE, LLC,<br>26-2917877<br>2601 Tandy Avenue<br>Fort Worth, TX 76103<br><br><div align="right">Debtor.</div> | Case No.: 19-45023-ELM-11<br>Case No.: 19-45024-ELM-11<br><br>Chapter: 11 |
| IN RE:<br><br>HEALTHCORE SYSTEM<br>MANAGEMENT, LLC, 20-2708191<br>4608 E. California Parkway<br>Fort Worth, TX 76103<br><div align="right">Debtor.</div> | JOINTLY ADMINISTERED UNDER:<br>Case No.: 19-45023-ELM-11 |

**NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE
ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF THE DEBTORS'
ASSETS AND THE PROPOSED CURE COSTS WITH RESPECT THERETO**

> **YOU ARE RECEIVING THIS NOTICE OF EXECUTORY CONTRACTS AND UNEXPIRED LEASES THAT MAY BE ASSUMED AND ASSIGNED IN CONNECTION WITH THE SALE OF THE DEBTORS' ASSETS AND THE PROPOSED CURE AMOUNT WITH RESPECT THERETO (THE "ASSUMPTION NOTICE") BECAUSE YOU MAY BE A COUNTERPARTY TO AN EXECUTORY CONTRACT OR UNEXPIRED LEASE WITH ONE OR MORE OF THE DEBTORS. PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS DESCRIBED HEREIN.**

   **PLEASE TAKE NOTICE** that, on July 14, 2021, Michael A. McConnell, the court-appointed chapter 11 trustee (the "Chapter 11 Trustee") for the above-captioned debtors (the "Debtors"), filed a motion (the "Motion") with the United States Bankruptcy Court for the Northern District of Texas (the "Court") seeking, among other things, entry of an order (the "Bid Procedures Order"):[1] (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Chapter 11 Trustee will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of the Debtors' assets (the "Assets") through one or more sales of the Assets (each, a "Transaction"); (ii) approving proposed procedures for the

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

assumption and assignment of executory contracts and unexpired leases, including notice of proposed Cure Costs (the "**Assumption and Assignment Procedures**"); (iii) authorizing and approving the Chapter 11 Trustee's selection of a stalking horse bidder (the "Stalking Horse Bidder"); (iv) scheduling (a) an auction, if the Chapter 11 Trustee receives one or more timely and acceptable Qualified Bids (the "Auction"), and (b) a final hearing to approve one or more Transactions, as necessary; (v) approving the form and manner of notice of all procedures, schedules, and agreements; and (vi) granting related relief.

PLEASE TAKE FURTHER NOTICE that, on October [ ● ], 2021, the Court entered the Bid Procedures Order [Docket No. [ ● ]].

PLEASE TAKE FURTHER NOTICE that the Bid Procedures Order, among other things, established procedures for the assumption and assignment of certain executory contracts and unexpired leases that the Chapter 11 Trustee may seek to assume and assign on the Debtors' behalf in connection with a Transaction (collectively, the "Available Contracts") to a purchaser and the determination of related Cure Costs (as defined below). The Debtors are parties to numerous Available Contracts and, in accordance with the Bidding Procedures Order, hereby file this notice ("Assumption Notice") identifying (i) the Available Contracts, which may be assumed and assigned to the Stalking Horse Bidder or such other Successful Bidder(s) in connection with the Transaction(s), and (ii) the proposed amounts, if any, the Chapter 11 Trustee believes are owed to the counterparties to the Available Contracts to cure any defaults or arrears existing under the Available Contracts (the "Cure Costs"), both as set forth on **Exhibit 1** attached hereto. Other than the Cure Costs listed on Exhibit 1, the Chapter 11 Trustee is not aware of any amounts due and owing under the Available Contracts listed therein.

PLEASE TAKE FURTHER NOTICE that the hearing to consider approval of a Sale Transaction(s) and the transfer of the Assets free and clear of all liens, claims, interests, and encumbrances, in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Edward L. Morris, United States Bankruptcy Judge for the Northern District of Texas, at 501 W. Tenth Street, 2nd Floor, Room 204, Fort Worth, Texas 76102 on **October ___, 2021 at ___ __.m. (Central Time)** (the "Sale Hearing"). At the Sale Hearing, only those Available Contracts (and the corresponding Cure Costs) listed on Exhibit 1 that have been selected to be assumed by the Successful Bidder(s) at the Auction (as may be amended in accordance with the terms of the applicable definitive documents) will be subject to approval by the Court, and the Debtors' rights with respect to all other contracts and leases are fully reserved. All objections to the Chapter 11 Trustee's proposed Cure Costs will be heard at the Sale Hearing or at a later hearing, as determined by the Chapter 11 Trustee. The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in these Cases.

PLEASE TAKE FURTHER NOTICE that the listing of an Available Contract on Exhibit 1 does not constitute an admission that the Available Contract is an executory contract or unexpired lease as contemplated by Bankruptcy Code section 365(a) or that the Debtors have any liability thereunder, and the Chapter 11 Trustee expressly reserves all rights, claims, causes of action, and defenses of the Chapter 11 Trustee and the Debtors with respect to the Available Contracts listed on Exhibit 1.

**PLEASE TAKE FURTHER NOTICE** that to the extent a counterparty to an Available Contract listed on Exhibit 1 to this Assumption Notice objects to the proposed assumption and assignment of the applicable Available Contract (other than an Adequate Assurance Objection (as defined below)) or the proposed Cure Amount, if any, such counterparty must file and serve an objection ("**Assumption Objection**").  All Assumption Objections must (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); (c) comply with the Bankruptcy Rules and the Local Rules; and (d) be filed and served on the Objection Recipients listed below by no later than no later than **___, 2021 at 4:00 p.m. (Central Time)** (the "**Assumption Objection Deadline**"), so as to actually be received by the Objection Recipients (defined below) on or before the Assumption and Assignment Objection Deadline.

**PLEASE TAKE FURTHER NOTICE** that the Objection Recipients are: (i) the Chapter 11 Trustee, Michael A. McConnell, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Michael A. McConnell; (ii) counsel to the Chapter 11 Trustee, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo; (iii) counsel to the Prepetition Lenders and Stalking Horse Bidder, Benesch Friedlander Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801-6101, Attn: Gregory Werkheiser and Michael Berrie;  (iv) co-counsel to the Prepetition Lenders and Stalking Horse Bidder, Ross and Smith, P.C., 700 N. Pearl Street, Suite 1610, Dallas, Texas 75201, Attn: Frances Smith (v) the U.S. Trustee, United States Department of Justice, Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75202, Attn: Erin Marie Schmidt (the "Objection Recipients").

**PLEASE TAKE FURTHER NOTICE** that if a counterparty to an Available Contract files an Assumption Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, the amount to be paid or reserved with respect to such objection will be determined at The Sale Hearing, such later hearing date that the Chapter 11 Trustee determines in his discretion, or such other date determined by the Court.  All other objections to the proposed assumption and assignment of the Debtors' right, title, and interest in, to, and under the Available Contracts will be heard at the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that any objections to the ability of the Successful Bidder or Backup Bidder to provide adequate assurance of future performance (each, a "Adequate Assurance Objection") must be filed with the Court [no later than **October __, 2021, at \* Central Time**, which is one day] prior to commencement of the Sale Hearing (the "**Adequate Assurance Objection Deadline**"); provided, that if you are receiving this Notice less than seven (7) days prior to the Sale Hearing, your deadline to assert an Assumption Objection is seven (7) days after the date of service of this Assumption Notice.  The identity of the Successful Bidder and Backup Bidder (if any) shall be disclosed in a subsequent notice to be delivered to counterparties to the Available Contracts following the Auction, if held.

**PLEASE TAKE FURTHER NOTICE** that if the counterparty to an Available Contract does not timely file and serve an Assumption Objection that is consistent with the requirements set forth above by the Assumption Objection Deadline (with respect to all objections other than

Adequate Assurance Objection or the Supplemental Assumption Notice with respect to additional Available Contracts only), (i) such counterparty will be deemed to have consented to the assumption and assignment of the Available Contract to any of the buyers of the Available Contract and the Cure Costs, if any, and shall be forever barred from asserting any objection with regard to such assumption and assignment, including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder; (ii) any and all defaults under such Available Contract and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B) upon payment of the Cure Costs set forth in the Assumption Notice for such Available Contract, and such counterparty shall be forever barred from asserting any objection with regard thereto; (iii) the Cure Amount set forth in the Assumption Notice for such Available Contract shall be controlling, notwithstanding anything to the contrary in such Available Contract, or any other related document, and such counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Available Contract against the Debtors and their estates or the Successful Bidder, or the property of any of them, that existed prior to the entry of the order resolving the Assumption and Assignment Objections and the Sale Order; and (iv) such counterparty shall be deemed to have consented to the Transaction and to any related relief.

**PLEASE TAKE FURTHER NOTICE** that although the Chapter 11 Trustee has made a good-faith effort to identify all Available Contracts that might be assumed and assigned in connection with a Transaction, the Chapter 11 Trustee may discover certain contracts inadvertently omitted from the Available Contract list or Successful Bidder(s) may identify other executory contracts or unexpired leases that they desire to assume and assign in connection with the Transaction. Accordingly, the Chapter 11 Trustee has reserved the right, at any time after the service of this Assumption Notice and before the date of the Sale Hearing, to (i) supplement the list of Available Contracts on this Assumption Notice with previously omitted Available Contracts in accordance with the definitive agreement for a Transaction, (ii) remove an Available Contract from the list of contracts ultimately selected as the Available Contracts that a Successful Bidder proposes be assumed and assigned to it in connection with a Transaction, and/or (iii) modify the previously stated Cure Costs associated with any Available Contract.

**PLEASE TAKE FURTHER NOTICE** that in the event that the Chapter 11 Trustee supplements the list of Available Contracts or modifies the previously stated Cure Amount for a particular Available Contract, the Chapter 11 Trustee will promptly file and serve a revised Assumption Notice ("Supplemental Assumption Notice") on each counterparty affected. Such counterparties shall file any Assumption Objection with respect to the Supplemental Assumption Notice not later than (a) the Assumption Objection Deadline, in the event that such Supplemental Assumption Notice was filed and served at least seven (7) days prior to the Assumption Objection Deadline, and (b) seven (7) days after the later of the date of service of the Supplemental Assumption Notice, in the event that such Supplemental Assumption Notice was filed and served less than seven (7) days prior to the commencement of the Sale Hearing.

**PLEASE TAKE FURTHER NOTICE** that this Assumption Notice is subject to the terms and conditions of the Motion and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Chapter 11 Trustee encourages parties in interest to review such documents in their entirety. Parties with questions regarding the

Assumption and Assignment Procedures contained herein should contact the Chapter 11 Trustee's counsel at Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo (email: nancy.ribaudo@kellyhart.com).

**PLEASE TAKE FURTHER NOTICE** that the inclusion of an Available Contract on this Assumption and Assignment Notice (or a Supplemental Assumption and Assignment Notice) will not obligate the Chapter 11 Trustee to assume any Available Contract listed thereon or the Successful Bidder(s) to take assignment of such Available Contract and, as set forth above, the Chapter 11 Trustee reserves the right to modify the list of Available Contracts in accordance with the Bid Procedures Order, including to remove executory contracts or unexpired leases from such list. Only those Available Contracts that are included on a schedule of assumed and assigned executory contracts and unexpired leases attached to the final purchase agreement with the Successful Bidder(s) will be assumed and assigned to the Successful Bidder(s), and the Chapter 11 Trustee's assumption and assignment of an Available Contract is subject to approval by the Court and consummation of the Transaction(s). Absent consummation of the Transaction(s) and entry of a Sale Order approving the assumption and assignment of an Available Contract, such contract will be deemed neither assumed nor assigned, and will in all respects be subject to subsequent assumption or rejection by the Chapter 11 Trustee.

Dated: [ ● ], 2021

By:  */s/ DRAFT*_____
Nancy Ribaudo, Texas Bar No. 24026066
Joseph D. Austin, Texas Bar No. 24101470
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 878-9377
Facsimile (817) 878-9280
Nancy.Ribaudo@gmail.com
Joseph.Austin@kellyhart.com

*Counsel to Michael A. McConnell,*
*Chapter 11 Trustee*

3361470.3

**Exhibit 1**

**Available Contracts List**

| Counterparty | Debtor | Contract | Cure Amount |
|---|---|---|---|
| Cigna f/k/a Bravo Health Texas, Inc. | Romans House LLC | Ancillary Service Provider Agreement | $0 |
| Amerigroup Texas, Inc. d/b/a Amerigroup Community Care | Romans House, LLC | Participating Provider Agreement for Ancillary Providers for Tandy Village | $0 |
| Amerigroup Texas, Inc. d/b/a Amerigroup Community Care | Healthcore Management LLC | Participating Provider Agreement for Ancillary Providers for Vincent Victoria | $0 |
| Texas Health and Human Services | Romans House LLC | Texas Department of Aging and Disability Services Community Services Contract | $0 |
| Residents at Tandy Village | Romans House, LLC | Resident Admission Agreements | $0 |
| Residents at Vincent Victoria | Healthcore Management LLC | Resident Admission Agreements | $0 |
| WesternCare Management, LLC | Romans House, LLC and Healthcore Management LLC | Management Services Agreement | $0 |
| E&S Solutions LLC | Tandy Village Assisted Living | Integrated Pest Management Contract | $0 |
| Balboa Capital | Romans House LLC | Lease Agreement | $0 |
| A-1 Image, Inc. | Tandy Village Assisted Living | Services Contract Agreement | $0 |
| A-1 Image, Inc. | Tandy Village Assisted Living | Purchase & Service Agreement | |
| A-1 Image, Inc. | Vincent Victoria Village | Purchase & Service Agreement | $0 |
| American Ice Machines | Romans House LLC | October 4, 2011 Lease | $0 |
| American Ice Machines | Healthcore Management LLC | February 10, 2015 Lease | $0 |
| Procare Building Services | Tandy Village #1 | Procare Maintenance Agreement | $0 |
| Procare Building Services | Vincent Victoria Village Assisted Living No. 2 | Procare Maintenance Agreement | |

| Proliant | Romans House LLC, dba Tandy Village | Payroll | $0 |
|----------|-------------------------------------|---------|-----|
| Proliant | Healthcore Management LLC dba Vincent Victoria Village | Payroll | $0 |

**EXHIBIT J**

## IN THE UNITED STATES BANKRUPTCY COURT
### NORTHERN DISTRICT OF TEXAS
### FORT WORTH DIVISION

| | |
|---|---|
| IN RE: | Case No.: 19-45023-ELM-11 |
| | Case No.: 19-45024-ELM-11 |
| ROMANS HOUSE, LLC, | |
| 26-2917877 | Chapter: 11 |
| 2601 Tandy Avenue | |
| Fort Worth, TX 76103 | |
| Debtor. | |
| IN RE: | JOINTLY ADMINISTERED UNDER: |
| | Case No.: 19-45023-ELM-11 |
| HEALTHCORE SYSTEM | |
| MANAGEMENT, LLC, 20-2708191 | |
| 4608 E. California Parkway | |
| Fort Worth, TX 76103 | |
| Debtor. | |

**NOTICE TO RESIDENTS OF TANDY VILLAGE ASSISTED LIVING
FACILITY AND VINCENT VICTORIA VILLAGE ASSISTED LIVING
FACILITY CONCERNING PROPOSED ASSUMPTION AND ASSIGNMENT OF
RESIDENT ADMISSION AGREEMENTS IN CONNECTION WITH THE SALE
OF THE DEBTORS' ASSETS AND PROPOSED CURE COSTS**

**YOU ARE RECEIVING THIS NOTICE BECAUSE YOU MAY BE A RESIDENT OF THE TANDY VILLAGE ASSISTED LIVING FACILITY OR THE VINCENT VICTORIA VILLAGE ASSISTED LIVING FACILITY (OR MAY BE THE POWER OF ATTORNEY HOLDER OR OTHER AUTHORIZED REPRESENTATIVE OF A RESIDENT IN ONE OF THE FOREGOING ASSISTED LIVING FACILITIES). THIS NOTICE IS BEING PROVIDED TO RESIDENTS AND OTHER NOTICE PARTIES UNDER RESIDENT ADMISSION AGREEMENTS WITH EITHER ROMANS HOUSE, LLC (D/B/A TANDY VILLAGE) OR HEALTHCORE SYSTEM MANAGEMENT, LLC (D/B/A VINCENT VICTORIA VILLAGE) TO PROVIDE NOTICE OF (A) THE PROPOSED ASSUMPTION AND ASSIGNMENT OF THEIR RESIDENT ADMISSION AGREEMENTS, AND PROPOSED CURE AMOUNT OF $0; AND (B) YOUR OPPORTUNITY TO OBJECT TO THE FOREGOING.**

**PLEASE READ THIS NOTICE CAREFULLY AS YOUR RIGHTS MAY BE AFFECTED BY THE TRANSACTIONS AND COURT ACTIONS DESCRIBED HEREIN AND/OR IN THE COURT DOCUMENTS REFERENCED HEREIN.**

**PLEASE TAKE NOTICE** that on December 9, 2019, Romans House, LLC d/b/a Tandy House Village Assisted Living, and Healthcore System Management, LLC, d/b/a Vincent Victoria Village Assisted Living (the "Debtors"), each filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code, in the United States Bankruptcy Court for the Northern District of Texas ("Court"), which cases are being jointly administered under Case No. 19-45023-ELM (the "Chapter 11 Cases"). On May 17, 2021, the Court approved the appointment of Michael A. McConnell as chapter 11 trustee ("Chapter 11 Trustee").

**PLEASE TAKE NOTICE** that on October __, 2021, the Trustee filed a motion (the "Motion") with the Court seeking, among other things, entry of an order (the "Bid Procedures Order"):[1] (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Chapter 11 Trustee will solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of the Debtors' assets (the "Assets"), including the Romans House and Vincent Victoria Assisted Living facilities ("Facilities") and all operations through a proposed sale of the Assets; (ii) approving proposed procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed Cure Costs (the "Assumption and Assignment Procedures"); (iii) authorizing the Chapter 11 Trustee on behalf of the Debtors to enter into the Stalking Horse Purchase Agreements with the respective Stalking Horse Purchasers (each as defined below); (iv) scheduling an auction of the Assets (the "Auction") and a final hearing to consider approval of the sale of the Assets (the "Sale Hearing").

**PLEASE TAKE FURTHER NOTICE** that in connection with the Motion, the Chapter 11 Trustee, subject to Court approval and consideration of competing bids, if any, pursuant to the proposed Bidding Procedures, has entered into the following agreements (collectively, the "Stalking Horse Purchase Agreements"): (a) that certain *Real Estate and Asset Purchase Agreement (Tandy Village),* dated October __, 2021, by and between Romans House, LLC, as Seller, and 2601 Tandy ABL I Holdings, LLC, as Buyer; (b) that certain *Operations Transfer Agreement (Tandy Village),* dated October __, 2021, by and between Romans House, LLC, as Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the New Operator; and (c) that certain *Operations Transfer Agreement (Vincent Victoria Village),* dated October __, 2021 attached as Exhibit [__] to the Motion, by and between Healthcore System Management, LLC, as Existing Operator, and 4607 East California ABL I Operations, LLC, as New Operator (collectively, the "Stalking Horse Bidders"). A copy of the Stalking Horse Agreements are attached to the Motion as Exhibits.

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

**PLEASE TAKE FURTHER NOTICE** that, on October [ ● ], 2021, the Court entered the Bid Procedures Order [Docket No. [ ● ], which, among other things, established procedures on for the assumption by the Debtors and assignment to the applicable Stalking Horse Bidder or other successful bidder(s) of: (a) the Resident's Admission Agreements for residents of the Tandy Village Assisted Living Facility (collectively, the "Tandy Resident Agreements"); and (b) the Resident's Admission Agreements for residents of the Vincent Victoria Village Assisted Living Facility (collectively, the "Vincent Victoria Resident Agreements," and together with the Tandy Resident Agreements, the "Resident Agreements"). The Assumption and Assignment Procedures approved by the Court also include procedures for the determination of the amounts, if any, required to cure any defaults or arrears existing under the Resident Agreements (the "Cure Costs"). Base on the Chapter 11 Trustee's review of the Debtors' books and records, the Chapter 11 Trustee believes that no Cure Costs are owed under any of the Resident Agreements and **HEREBY PROVIDES NOTICE TO ALL RESIDENTS AND OTHER NOTICE PARTIES UNDER SUCH RESIDENT AGREEMENTS THAT THE PROPOSED CURE COSTS UNDER EACH SUCH RESIDENT AGREEMENT IS $0.00.**

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing, at which the Chapter 11 Trustee will request the Court to approve the sale and assumption and assignment of the Resident Agreements and certain other executory contracts and unexpired leases, will be held before the Honorable Edward L. Morris, United States Bankruptcy Judge for the Northern District of Texas, at 501 W. Tenth Street, 2nd Floor, Room 204, Fort Worth, Texas 76102 on **October ___, 2021 at ___ __.m. (Central Time)**. All objections to the Chapter 11 Trustee's proposed assumption and assignment of the Resident Agreements and the proposed Cure Costs will be heard at the Sale Hearing. The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in these Cases.

**PLEASE TAKE FURTHER NOTICE** that any counterparty to a Resident Agreement that wishes to object to the Chapter 11 Trustee's proposed Cure Costs or assumption and assignment of their Resident Agreement to the proposed purchaser on any basis (except objections solely related to adequate assurance of future performance by a Successful Bidder other than a Stalking Horse Bidder) must file such Assumption Objection and cause it to be served so as to be received by the Objection Recipients listed below by no later than **___, 2021 at 4:00 p.m. (Central Time)** (the **"Assumption Objection Deadline"**). In addition, all Assumption Objections must (a) be in writing; (b) state with specificity the basis for the objection as well as any Cure Costs that the objector asserts to be due, including each and every asserted default in the applicable contract or lease (in all cases with appropriate documentation in support thereof); and (c) comply with the Bankruptcy Rules and the Local Rules.

**PLEASE TAKE FURTHER NOTICE** that the Objection Recipients are: (i) the Chapter 11 Trustee, Michael A. McConnell, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Michael A. McConnell; (ii) counsel to the Chapter 11 Trustee, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo; (iii) counsel to the Pender Entities, Benesch Friedlander Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801-6101, Attn: Gregory Werkheiser and Michael Barrie; (iv) co-counsel to the Pender Entities, Ross and Smith, P.C., 700 N. Pearl Street, Suite 1610, Dallas, Texas 75201, Attn: Frances Smith; and (v) the U.S. Trustee,

United States Department of Justice, Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75202, Attn: Erin Marie Schmidt (the "Objection Recipients").

**PLEASE TAKE FURTHER NOTICE** that if a counterparty to a Resident Agreement files an Assumption Objection in a manner that is consistent with the requirements set forth above, and the parties are unable to consensually resolve the dispute prior to the Sale Hearing, such Assumption Objection will be adjudicated at the Sale Hearing, or such later hearing date that the Chapter 11 Trustee determines in his discretion (subject to the consent of the Stalking Horse Bidders), or such other date determined by the Court.

**PLEASE TAKE FURTHER NOTICE** that any objections to the ability of the Successful Bidder (or Backup Bidder), other than any of the Stalking Horse Bidders, to provide adequate assurance of future performance (each, an **"Adequate Assurance Objection"**) must be filed with the Court [no later than **October __, 2021, at \* Central Time**, which is one day] prior to commencement of the Sale Hearing (the **"Adequate Assurance Objection Deadline"**); provided, that if you are receiving this Notice less than seven (7) days prior to the Sale Hearing, your deadline to assert an Assumption Objection is seven (7) days after the date of service of this Notice. The identity of the Successful Bidder and Backup Bidder (if any) shall be disclosed in a subsequent notice to be filed with the Court following the Auction, if held.

**PLEASE TAKE FURTHER NOTICE** that if the counterparty to a Resident Agreement does not timely file and serve an Assumption Objection that is consistent with the requirements set forth above by the Assumption Objection Deadline (with respect to all objections other than Adequate Assurance Objections), (i) such counterparty will be deemed to have consented to the assumption and assignment of the Resident Agreement to any of the buyers of such Resident Agreements and with $0.00 Cure Costs and shall be forever barred from asserting any objection with regard to such assumption and assignment, including, without limitation, with respect to adequate assurance of future performance by the Successful Bidder(s); (ii) any and all defaults under such Resident Agreement and any and all pecuniary losses related thereto shall be deemed cured and compensated pursuant to Bankruptcy Code section 365(b)(1)(A) and (B), and such counterparty shall be forever barred from asserting any objection with regard thereto; (iii) the Cure Amount set forth in this notice shall be controlling, notwithstanding anything to the contrary in such Resident Agreement, or any other related document, and such counterparty shall be deemed to have consented to the Cure Amount and shall be forever barred from asserting any other Claims related to such Resident Agreement against the Debtors and their estates or the Successful Bidder(s), or the property of any of them, that existed prior to the entry of the order resolving the Assumption Objections and the Sale Order; and (iv) such counterparty shall be deemed to have consented to the Transaction and to any related relief.

**PLEASE TAKE FURTHER NOTICE** that this notice is subject to the terms and conditions of the Motion and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Chapter 11 Trustee encourages parties in interest to review such documents in their entirety. Parties with questions regarding the Assumption and Assignment Procedures contained herein should contact the Chapter 11 Trustee's counsel at Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo (email: nancy.ribaudo@kellyhart.com).

**PLEASE TAKE FURTHER NOTICE** that the inclusion of a Resident Agreement on this Notice will not obligate the Chapter 11 Trustee to assume such Resident Agreement or the Successful Bidder(s) to take assignment of such Resident Agreement.  Only those Resident Agreements that are included on a schedule Resident Agreements to be acquired by a Successful Bidder and  attached to the final purchase agreement with the Successful Bidder(s) will be assumed and assigned to the Successful Bidder(s), and the Chapter 11 Trustee's assumption and assignment of a Resident Agreement is subject to approval by the Court and consummation of the Transaction(s).

**PLEASE TAKE FURTHER NOTICE** that provision of this notice concerning the Resident Agreements does not constitute an admission that any Resident Agreement is an executory contract or unexpired lease as contemplated by Bankruptcy Code section 365(a) or that the Debtors have any liability thereunder, and the Chapter 11 Trustee expressly reserves all rights, claims, causes of action, and defenses of the Chapter 11 Trustee and the Debtors with respect to the Resident Agreements.

Dated: [ ● ], 2021

By:  */s/ DRAFT*
  Nancy Ribaudo, Texas Bar No. 24026066
  Joseph D. Austin, Texas Bar No. 24101470
  KELLY HART & HALLMAN LLP
  201 Main Street, Suite 2500
  Fort Worth, Texas 76102
  Telephone (817) 878-9377
  Facsimile (817) 878-9280
  Nancy.Ribaudo@gmail.com
  Joseph.Austin@kellyhart.com

  *Counsel to Michael A. McConnell,*
  *Chapter 11 Trustee*

3399161

**EXHIBIT K**

IN THE UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| IN RE:<br><br>ROMANS HOUSE, LLC,<br>26-2917877<br>2601 Tandy Avenue<br>Fort Worth, TX 76103<br><br>                                   Debtor. | Case No.:        19-45023-ELM-11<br>Case No.:        19-45024-ELM-11<br><br>Chapter:        11 |
| IN RE:<br><br>HEALTHCORE SYSTEM MANAGEMENT,<br>LLC, 20-2708191<br>4608 E. California Parkway<br>Fort Worth, TX 76103<br><br>                                   Debtor. | JOINTLY ADMINISTERED UNDER:<br>Case No.:        19-45023-ELM-11 |

**NOTICE OF PROPOSED SALE,
BIDDING PROCEDURES, AUCTION, AND SALE HEARING**

**PLEASE TAKE NOTICE** that the above-captioned debtors (the "Debtors") filed voluntary petitions under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code") on December 9, 2019, in the United States Bankruptcy Court for the Northern District of Texas (the "Court"), thereby commencing the above-captioned chapter 11 cases (the "Cases").

**PLEASE TAKE FURTHER NOTICE** that, on July ___, 2021, Michael A. McConnell, the court-appointed chapter 11 trustee for the Debtors (the "Chapter 11 Trustee"), filed a motion [Docket No. ___] (the "Motion")[1] in the Court seeking, among other things, entry of an order (the "Bid Procedures Order"): (i) approving proposed bidding procedures (the "Bidding Procedures") by which the Chapter 11 Trustee will solicit and select the highest or otherwise best offer for the sale ("Sale") of substantially all or a portion of the Debtors' assets (the "Assets") through one or more sales of the Assets (each, a "Transaction"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "Assumption and Assignment Procedures"); (iii) authorizing and approving the Chapter 11 Trustee's selection of the stalking horse bidders (the "Stalking Horse Bidders"); (iv) scheduling (a) a date for an auction if the Chapter 11 Trustee receives one or more timely and acceptable Qualified Bids (the "Auction") and (b) a final hearing (the "Sale

_____

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bid Procedures Order. Any summary of the Bid Procedures Order or the Bidding Procedures contained herein is qualified in its entirety by the actual terms and conditions thereof. To the extent that there is any conflict between any such summary and such actual terms and conditions, the actual terms and conditions shall control.

Hearing") to approve one or more Transactions, as necessary; (v) approving the form and manner of notice of all procedures, schedules, and agreements; and (vi) granting related relief.

**PLEASE TAKE FURTHER NOTICE** that, on [ ● ], 2021, the Court entered the Bid Procedures Order [Docket No. [ ● ]], which among other things approved the proposed bid and auction procedures and the Chapter 11 Trustee's selection of the Stalking Horse Bidders under the Stalking Horse Purchase Agreements by and between the Chapter 11 Trustee on behalf of each Debtor and Stalking Horse Bidder, dated October [ ● ], 2021 (the "Stalking Horse Purchase Agreements").

**PLEASE TAKE FURTHER NOTICE** that any party that wishes to take part in the sale process contemplated by the Bid Procedures Order and submit a Bid for the Assets must submit its Bid in accordance with the terms and conditions of the Bidding Procedures, including the requirements for submitting a Qualified Bid, **by 12:00 noon (Central Time) on October __, 2021 (the "Bid Deadline")**, except as otherwise provided in the Bidding Procedures with respect to the Stalking Horse Bidders**.**

**PLEASE TAKE FURTHER NOTICE** that pursuant to the Bid Procedures Order, if the Chapter 11 Trustee receives more than one timely and acceptable Qualified Bid, the Chapter 11 Trustee will conduct the **Auction on October __, 2021 at 12:00 noon (Central Time)**, or at such later date and time as selected by the Chapter 11 Trustee. The Auction shall be held via Zoom or other videoconference platform, and all entities entitled to attend the Auction shall receive instructions on attending the Auction via videoconference on or before the date of the Auction. **All interested or potentially affected parties should carefully read the Bidding Procedures and the Bid Procedures Order.**

Only the Trustee, the Debtors, Qualified Bidders, the U.S. Trustee, Susan Goodman (in her capacity as the Patient Care Ombudsman), the Texas Health and Human Services Commission, and each of their respective legal and financial advisors shall be entitled to attend the Auction. Only Qualified Bidders (including, for the avoidance of doubt, the Stalking Horse Bidders) will be entitled to Bid at the Auction. Other creditors of the Debtors and parties in interest in the Chapter 11 Cases may observe the Auction (collectively, "Other Interested Parties"), but only if such other Interested Party has made a timely written request (which request shall identify the Other Interested Party seeking to observe the auction and provide names, titles, and email addresses for its proposed auction attendees) to the Trustee so that such request is received by the Trustee's counsel (at the contact information listed above) at least three (3) business days prior to the initial scheduled date and time of the Auction. Each such Other Interested Party shall be limited to a maximum of two Auction attendees on its behalf.

**PLEASE TAKE FURTHER NOTICE** that the Chapter 11 Trustee has the right, to adjourn or cancel the Auction at or prior to the Auction.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of a Transaction(s) and the transfer of the Assets free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f) will be held before the Honorable Edward L. Morris, United States Bankruptcy Judge for the Northern District of Texas, at 501 W. Tenth Street, 2nd Floor, Room 204, Fort Worth, Texas 76102 on ___, **2021 at ___:00**

**p.m. (Central Time) ("Sale Hearing").** The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in these Cases.

**PLEASE TAKE FURTHER NOTICE** that any objections to the Transaction(s) (each, a "Sale Objection") must be filed and served so as to be actually received by the Objection Recipients no later than **October__, 2021 at 4:00 p.m. (Central Time)** (the **"Sale Objection Deadline"**). The Objection Recipients are: (i) the Chapter 11 Trustee, Michael A. McConnell, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Michael A. McConnell; (ii) counsel to the Chapter 11 Trustee, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo; (iii) counsel to the Prepetition Lenders and Stalking Horse Bidder, Benesch Friedlander Coplan & Aronoff LLP, 1313 North Market Street, Suite 1201, Wilmington, DE 19801-6101, Attn: Gregory Werkheiser and Michael Berrie; (iv) co-counsel to the Prepetition Lenders and Stalking Horse Bidder, Ross and Smith, P.C., 700 N. Pearl Street, Suite 1610, Dallas, Texas 75201, Attn: Frances Smith (v) the U.S. Trustee, United States Department of Justice, Office of the United States Trustee, 1100 Commerce Street, Room 976, Dallas, Texas 75202, Attn: Erin Marie Schmidt (collectively, the "Objection Recipients").

## CONSEQUENCES OF FAILING TO TIMELY ASSERT A SALE OBJECTION

**ANY PARTY OR ENTITY WHO FAILS TO TIMELY FILE AND SERVE A SALE OBJECTION ON OR BEFORE _____ THE SALE OBJECTION DEADLINE IN ACCORDANCE WITH THE ENTERED BID PROCEDURES ORDER WILL BE FOREVER BARRED FROM ASSERTING ANY SALE OBJECTION TO THE SALE, INCLUDING WITH RESPECT TO THE TRANSFER OF THE TRANSFERRED ASSETS OF THE DEBTORS' ESTATES FREE AND CLEAR OF LIENS, CLAIMS, ENCUMBRANCES AND OTHER INTERESTS EFFECTED THEREUNDER.**

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Motion, the Bidding Procedures and the Bid Procedures Order, with such Bid Procedures Order controlling in the event of any conflict, and the Chapter 11 Trustee encourages parties in interest to review such documents in their entirety. Parties interested in receiving more information regarding the sale of the Assets and/or copies of any related document, including the Motion or the Bid Procedures Order, may make a written request to: counsel to the Chapter 11 Trustee, Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo (nancy.ribaudo@kellyhart.com).

*[The remainder of this page is intentionally left blank.]*

Dated: [ ● ], 2021

By:    _____

Nancy Ribaudo, Texas Bar No. 24026066
Joseph D. Austin, Texas Bar No. 24101470
Kᴇʟʟʏ Hᴀʀᴛ & Hᴀʟʟᴍᴀɴ LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 878-9377
Facsimile (817) 878-9280
Nancy.Ribaudo@gmail.com
Joseph.Austin@kellyhart.com

*Counsel to Michael A. McConnell,*
*Chapter 11 Trustee*

3361460.2

**EXHIBIT L**

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **IN RE:** | **Case No.:** **19-45023-ELM-11** |
| | **Case No.:** **19-45024-ELM-11** |
| **ROMANS HOUSE, LLC,** | |
| 26-2917877 | **Chapter:** **11** |
| 2601 Tandy Avenue | |
| Fort Worth, TX 76103 | |
| Debtor. | |
| **IN RE:** | **JOINTLY ADMINISTERED UNDER:** |
| | **Case No.:** **19-45023-ELM-11** |
| **HEALTHCORE SYSTEM MANAGEMENT, LLC,** 20-2708191 | |
| 4608 E. California Parkway | |
| Fort Worth, TX 76103 | |
| Debtor. | |

### NOTICE OF SUCCESSFUL [AND BACKUP] BIDDER
### WITH RESPECT TO THE AUCTION OF THE DEBTORS' ASSETS

    **PLEASE TAKE NOTICE** that, on [ ● ], 2021, the United States Bankruptcy Court for the Northern District of Texas, Fort Worth Division (the "**Court**") entered an order [Docket No. [ ● ]] (the "**Bidding Procedures Order**"):[1] (i) approving proposed bidding procedures (the "**Bidding Procedures**") by which Michael A. McConnell, the Court-appointed chapter 11 trustee (the "**Chapter 11 Trustee**") for the above-captioned debtors (the "**Debtors**"), was to solicit and select the highest or otherwise best offer for the sale of substantially all or a portion of the Debtors' assets (the "**Assets**") through one or more sales of the Assets (each, a "**Transaction**"); (ii) establishing procedures for the assumption and assignment of executory contracts and unexpired leases, including notice of proposed cure amounts (the "**Assumption and Assignment Procedures**"); (iii) approving the procedures governing the Chapter 11 Trustee's selection of the stalking horse bidders (the "**Stalking Horse Bidders**"); (iv) scheduling (a) a date for an auction if the Chapter 11 Trustee receives one or more timely and acceptable Qualified Bids (the "**Auction**") and (b) a final hearing (the "**Sale Hearing**") to approve one or more Transactions, as necessary; (v) approving the form and manner of notice of all procedures, schedules, and agreements; and (vi) granting related relief.

    [**PLEASE TAKE FURTHER NOTICE** that, on October ___, 2021, at 12:00 noon (Central Time), pursuant to the Bidding Procedures Order, the Chapter 11 Trustee conducted the Auction with respect to the Assets. // PLEASE TAKE FURTHER NOTICE that, as October__, 2021, at 4:00 p.m. (Central Time), the deadline for receipt of Bids by the Bid Notice Parties

---

[1] Capitalized terms used but not defined herein shall have the meanings ascribed to them in the Bidding Procedures Order.

under the provisions of the Bidding Procedures, the Chapter 11 Trustee had not received any Qualified Bids aside from the Stalking Horse Bid, and the Stalking Horse Bidder has therefore been deemed the Successful Bidder in accordance with the Bidding Procedures.]

**PLEASE TAKE FURTHER NOTICE** that, at the conclusion of the Auction, the Chapter 11 Trustee, in consultation with its professionals, selected [ ● ] as the Successful Bidder(s) [and [ ● ] as the Backup Bidder(s)] with respect to the Assets.

**PLEASE TAKE FURTHER NOTICE** that the Sale Hearing to consider approval of a Sale and the transfer of the Assets, including the assumption and assignment of certain contracts and leases, to the Successful Bidder(s), free and clear of all liens, claims, interests, and encumbrances in accordance with Bankruptcy Code section 363(f), will be held before the Honorable Edward L. Morris, United States Bankruptcy Judge for the Northern District of Texas, at 501 W. Tenth Street, 2nd Floor, Room 204, Fort Worth, Texas 76102 on **October __, 2021 at 1:30 p.m. (Central Time).** The Sale Hearing may be adjourned from time to time without further notice to creditors or other parties in interest other than by announcement of the adjournment in open court or by notice filed on the docket in the Cases.

**PLEASE TAKE FURTHER NOTICE** that any objections (a) to the manner in which the Auction was conducted, (b) to the identity of the Successful Bidder [or Backup Bidder], and/or (c) based on the ability of the Successful Bidder [or Backup Bidder] to provide adequate assurance of future performance to counterparties to executory contracts and unexpired leases contemplated to be assumed and assigned to the Successful Bidder [or Backup Bidder] must be filed with the Court no later than the start of the Sale Hearing on **October ___, 2021 ("Alternative Transaction Adequate Assurance Objection Deadline").**

**PLEASE TAKE FURTHER NOTICE** that, at the Sale Hearing, the Chapter 11 Trustee will seek Court approval of the Successful Bid [and the Backup Bid], and the assumption and assignment of Available Contracts to the Successful Bidder [and/or Backup Bidder (as applicable)]. Unless the Court orders otherwise, the Sale Hearing shall be an evidentiary hearing on matters relating to the Transaction(s) and there will be no further bidding at the Sale Hearing. [In the event that the Successful Bidder cannot or refuses to consummate the Transaction(s) because of the breach or failure on the part of the Successful Bidder, the Backup Bidder will be deemed the new Successful Bidder and the Chapter 11 Trustee shall be authorized, but not required, to close with the Backup Bidder on the Backup Bid without further order of the Bankruptcy Court.]

**PLEASE TAKE FURTHER NOTICE** that this Notice is subject to the terms and conditions of the Motion, the Bidding Procedures and the Bidding Procedures Order, with such Bidding Procedures Order controlling in the event of any conflict, and the Chapter 11 Trustee encourages parties in interest to review such documents in their entirety. Parties with questions regarding this Notice should contact the Chapter 11 Trustee's counsel at Kelly Hart & Hallman LLP, 201 Main Street, Suite 2500, Fort Worth, TX 76102, Attn: Nancy Ribaudo (email: nancy.ribaudo@kellyhart.com).

Dated: [ ● ], 2021

By:    */s/ Nancy Ribaudo*                
Nancy Ribaudo, Texas Bar No. 24026066
Joseph D. Austin, Texas Bar No. 24101470
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Telephone (817) 878-9377
Facsimile (817) 878-9280
Nancy.Ribaudo@gmail.com
Joseph.Austin@kellyhart.com

*Counsel to Michael A. McConnell,*
*Chapter 11 Trustee*

3361465

3

**EXHIBIT M**

## IN THE UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

| | |
|---|---|
| **IN RE:** | **Case No.:** **19-45023-ELM-11** |
| | **Case No.:** **19-45024-ELM-11** |
| **ROMANS HOUSE, LLC,** | |
| 26-2917877 | **Chapter:** **11** |
| 2601 Tandy Avenue | |
| Fort Worth, TX 76103 | |
| **Debtor.** | |
| **IN RE:** | **JOINTLY ADMINISTERED UNDER:** |
| | **Case No.:** **19-45023-ELM-11** |
| **HEALTHCORE SYSTEM** | |
| **MANAGEMENT, LLC,** 20-2708191 | |
| 4608 E. California Parkway | |
| Fort Worth, TX 76103 | |
| **Debtor.** | |

### ORDER (I) APPROVING THE SALE OF CERTAIN OF THE DEBTORS' ASSETS FREE AND CLEAR OF ALL LIENS, CLAIMS, ENCUMBRANCES, AND INTERESTS, (II) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS AND UNEXPIRED LEASES, AND (III) GRANTING RELATED RELIEF

Upon consideration of the motion (the "Sale Motion") of Michael A. McConnell, as chapter 11 trustee (the "Trustee") for Romans House, LLC ("Romans") and Healthcore System Management, LLC ("Healthcore" and, together with Romans, the "Debtors"), the above-captioned debtors, for, among other relief, the entry of an order (this "Order"),[1] pursuant to sections 105, 363, 365, 503, and 507 of title 11 of the United States Code (the "Bankruptcy Code") and Rules 2002, 6004, and 6006 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), seeking, among other things, entry of an order authorizing and approving the sale of substantially all of the Debtors' assets and the assumption and assignment of certain executory contracts and

---

[1] Capitalized terms not otherwise defined herein have the meanings ascribed to such terms in the Sale Motion.

unexpired leases of the Debtors in connection therewith; and this Court having held a hearing on [October __, 2021] (the "Bidding Procedures Hearing") and having taken into consideration this Court's prior order dated [October __, 2021] [Dkt. No. ___] (the "Bid Procedures Order"), approving bidding procedures for the sale of substantially all of the Debtors' assets (the "Bidding Procedures") and granting certain related relief; and the Buyers (as defined herein) having submitted the highest and best bid for the Acquired Assets (as defined herein); and this Court having conducted a hearing to consider the Sale Transactions (as defined herein) on [October 25], 2021 (the "Sale Hearing"), during which all interested parties were offered an opportunity to be heard with respect to the Sale Motion; and this Court having reviewed and considered: (i) the Sale Motion and the exhibits thereto; (ii) the Bid Procedures Order; (iii) each of the following substantially in the form attached to the Sale Motion:

(a) that certain *Real Estate and Asset Purchase Agreement (Tandy Village)*, dated October __, 2021, attached as Exhibit B to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy REPA"), by and between the Trustee for and on behalf of Romans, as Seller, and 2601 Tandy ABL I Holdings, LLC, as Buyer (the "Tandy Buyer");

(b) that certain *Operations Transfer Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit C to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy OTA"), by and between the Trustee for and on behalf of Romans, as Existing Operator, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy New Operator");

(c) that certain *Interim Management Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit F to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy IMA"), by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as the New Operator (the "Tandy Manager");

(d) that certain *Interim Sublease Agreement (Tandy Village),* dated October __, 2021, attached as Exhibit E to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "Tandy Sublease"), by and between the Trustee for and on behalf of Romans, and 2601 Tandy ABL I Operations, LLC, as Sublandlord (the "Tandy Sublandlord");

(e) that certain *Operations Transfer Agreement (Vincent Victoria Village)*, dated October __, 2021 attached as <u>Exhibit D</u> to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Vincent Victoria OTA</u>"), by and between the Trustee for and on behalf of Healthcore, as Existing Operator, and 4607 East California ABL I Operations, LLC, as New Operator (the "<u>Vincent Victoria New Operator</u>");

(f) that certain *Interim Management Agreement (Vincent Victoria Village)*, dated October __, 2021, attached as <u>Exhibit H</u> to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Vincent Victoria IMA</u>"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as the New Operator (the "<u>Vincent Victoria Manager</u>"); and

(g) that certain *Interim Sublease Agreement (Vincent Victoria Village)*, dated October __, 2021, attached as <u>Exhibit G</u> to the Sale Motion (together with its exhibits, schedules and related documents, each as may be amended from time to time, the "<u>Vincent Victoria Sublease</u>," and together with the Tandy REPA, the Tandy OTA, the Tandy IMA, the Tandy Sublease, the Vincent Victoria OTA, and the Vincent Victoria IMA, the "<u>Purchase Agreements</u>"), by and between the Trustee for and on behalf of Healthcore, and 4607 East California ABL I Operations, LLC, as Sublandlord (the "<u>Vincent Victoria Sublandlord</u>," and together with the Tandy Buyer, the Tandy New Operator, the Tandy Manager, the Tandy Sublandlord, the Vincent Victoria New Operator, and the Vincent Victoria Manager, each a "<u>Buyer</u>" and, collectively, the "<u>Buyers</u>");

(iv) the declaration of Michael A. McConnell, as chapter 11 trustee for the Debtors, filed in support of the Sale Motion [Dkt. No. _____] (the "<u>Sale Declaration</u>"); and (v) the arguments of counsel made, and the evidence proffered or adduced, at the Sale Hearing; and due notice of the Sale Motion, the Sale Hearing, and the form of this Sale Order having been provided; all objections to the Sale Transaction and the form of this Sale Order having been withdrawn, resolved, or overruled; and it appearing that the relief granted herein is in the best interests of the Debtors, their estates, creditors, and all parties in interest in the Debtors' above-captioned bankruptcy cases (the "<u>Bankruptcy Cases</u>"); and upon the record of the Sale Hearing and these Bankruptcy Cases; and after due deliberation and sufficient cause appearing therefor, it is hereby

**FOUND AND DETERMINED THAT:**

A.      **Fed. R. Bankr. P. 7052**.  The findings and conclusions set forth herein constitute this Court's findings of fact and conclusions of law pursuant to Bankruptcy Rule 7052, made applicable to this proceeding pursuant to Bankruptcy Rule 9014. To the extent any of the following findings of fact constitute conclusions of law, they are adopted as such. To the extent any of the following conclusions of law constitute findings of fact, they are adopted as such. The Court's findings shall also include any oral findings of fact and conclusions of law made by this Court during or at the conclusion of the Sale Hearing. This Order shall constitute the findings of fact and conclusions of law and shall take immediate effect upon execution hereof.

B.      **Jurisdiction and Venue**.  This Court has jurisdiction over the Sale Motion, the Purchase Agreements, the Sale Transaction and the property of the Debtors' estates, including the Acquired Assets, pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2) that this Court can decide by final order under the United States Constitution. Venue of these Bankruptcy Cases and the Sale Motion in this district is proper under 28 U.S.C. §§ 1408 and 1409.

C.      **Statutory and Rule Predicates**.  The statutory and other legal predicates for the relief granted herein are sections 105, 363, 365, 503, and 507 of the Bankruptcy Code, Bankruptcy Rules 2002, 6004, 6006, 9007, and 9014 and the applicable Local Bankruptcy Rules of the United States Bankruptcy Court for the Northern District of Texas (the "Local Rules").

D.      **Notice and Opportunity to Be Heard**.  As evidenced by the affidavits and declarations of service regarding the Sale Motion and the relief requested therein (*see* Dkt. Nos. [_____]) previously filed with the Court, a fair and reasonable opportunity to object to, and be heard with respect to, the Sale Motion and the Sale Transactions has been given to all

persons entitled to notice pursuant to the Bid Procedures Order, including, but not limited to, the following: (i) all Contract Counterparties (as defined herein); (ii) all persons and entities known by the Trustee to have asserted any lien, claim (as defined in 11 U.S.C. § 101(5)), Encumbrance, or other interest in any Acquired Asset; (iii) all affected federal, state and local regulatory and taxing authorities; (iv) all persons or entities known by the Trustee and his advisors to have recently expressed an interest in a transaction with respect to any of the Acquired Assets; (v) all of the Debtors' known creditors (for whom identifying information and addresses are available to the Trustee); and (vi) all parties that have requested notice in these Bankruptcy Cases pursuant to Bankruptcy Rule 2002.

E. **Final Order**. This Order constitutes a final order within the meaning of 28 U.S.C. § 158(a). The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transaction as contemplated by the Purchase Agreements. In the absence of a stay pending appeal, the Buyers, being good faith purchasers under section 363(m) of the Bankruptcy Code, may close the Sale Transactions contemplated by the Purchase Agreements at any time after the entry of this Order and shall not be subject to the stay provided by Bankruptcy Rules 6004(h) and 6006(d).

F. **Sound Business Purpose**. The Trustee has demonstrated good, sufficient, and sound business purposes and justifications for approval of and entry into the Purchase Agreements, and the other agreements, documents, and instruments deliverable thereunder or attached thereto or referenced therein (collectively, the "Transaction Documents"), and approval of the sales and related transactions described in and contemplated by the Purchase Agreements and other Transaction Documents (collectively, the "Sale Transactions"). The entry into and performance under the Transaction Documents by the Debtors and the Trustee, as applicable, (i) constitute a

sound and reasonable exercises of the Trustee's business judgment consistent with his fiduciary duties, (ii) provides value to and are beneficial to the Debtors' estates, and are in the best interests of the Debtors and their stakeholders, and (iii) are reasonable and appropriate under the circumstances. Business justifications for the Sale Transactions include, but are not limited to, the following: (i) the consideration offered by the Buyers pursuant to the Purchase Agreements (collectively, the "Purchase Price") and the other terms set forth in the Purchase Agreements constitute the highest and best offer received for all of the Debtors' right, title and interest in the property and interests in property to be acquired by the respective Buyers under the Purchase Agreements (each, an "Acquired Asset" and collectively, the "Acquired Assets"); and (ii) the Sale Transactions on the terms set forth in the Transaction Documents present the best opportunity to maximize the value of the Acquired Assets on a going concern basis and avoids a liquidation of the Acquired Assets, which would result in significantly less value for all stakeholders of the Debtors.

G.    **Compliance with Bid Procedures Order**.  The Bidding Procedures provided a full, fair, and reasonable opportunity for any entity or person to make an offer to purchase the Acquired Assets. The Trustee, the Debtors and Buyers complied with the Bidding Procedures and the Bid Procedures Order in all respects except as properly waived in the exercise of the Trustees fiduciary duties in accordance with the Bidding Procedures. Buyers subjected their bid to competitive bidding in accordance with the Bidding Procedures and were designated the Successful Bidder (as defined in the Bidding Procedures) for the Acquired Assets in accordance with the Bidding Procedures and the Bid Procedures Order.

H.    **Marketing Process**.  In light of the exigent circumstances presented, (i) the Trustee and his advisors have engaged in an appropriate marketing and sale process in accordance with the

Bid Procedures Order and the Bidding Procedures, (ii) the Trustee and his advisors conducted a fair and open sale process, (iii) the sale process, the Bidding Procedures, [and the Auction] were non-collusive, duly noticed, and provided a full, fair, and reasonable opportunity for any entity to make an offer to purchase the Acquired Assets, and (iv) the process conducted by the Trustee pursuant to the Bid Procedures Order and the Bidding Procedures obtained the highest and best value for the Acquired Assets for the Debtors and their estates, and there was no other transaction available or presented that would have yielded as favorable an economic result for the Acquired Assets.

I.      **Fair Consideration; Highest or Best Value**.  The consideration to be provided by Buyers under the Purchase Agreements is fair and reasonable consideration for the Acquired Assets and constitutes (i) reasonably equivalent value under the Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia. Such consideration constitutes the highest and best bid for the Acquired Assets. No other person or entity, or group of persons or entities, has offered to purchase the Acquired Assets for an amount that would provide greater value to the Debtors than the Buyers. Prompt approval of the Sale Transactions is the only means to preserve and maximize the value of the Acquired Assets.

J.      **No Successor or Other Derivative Liability.**  Upon Closing, and to the greatest extent allowed by applicable law, the Buyers shall not have any liability (including, but not limited to, any successor liability) or other obligation of any of the Debtors arising under or related to the sale and transfer of the Acquired Assets to the Buyers or with respect to the Excluded Liabilities (as defined in such Buyer's Purchase Agreement), *provided* that, upon Closing, each Buyer shall

remain liable for the Assumed Liabilities (as defined in such Buyer's Purchase Agreement). Without limiting the generality of the foregoing, and except as otherwise expressly provided herein or in the Purchase Agreement of such Buyer, Buyers shall not be liable for any Encumbrances (as defined herein) in, to or against, as applicable, the Debtors, the Trustee, any of their respective predecessors or affiliates, or any property or interests in property of any of the foregoing entities, and Buyers shall have no successor or vicarious liabilities of any kind or character, including, without limitation, under any theory of antitrust, environmental, successor, or transfer reliability, labor law, de facto merger, mere continuation, or substantial continuity, whether known or unknown as of Closing under such Buyer's Purchase Agreement, now existing, or hereafter arising, whether fixed or contingent, whether asserted or unasserted, whether legal or equitable, whether liquidated or unliquidated, including, without limitation, liabilities on account of warranties, intercompany loans, receivables among the Debtors and their affiliates, environmental liabilities, and any taxes arising, accruing, or payable under, out of, in connection with, or in any way relating to the operation of any of the Acquired Assets prior to such Closing. For the avoidance of doubt, the Debtors are deemed to release and forever discharge the Buyers and any of their respective affiliates, successors, and assigns from any and all Encumbrances, claims, causes of action, obligations, liabilities, demands, losses, costs, and expenses of any kind, character, or nature whatsoever, known or unknown, fixed or contingent, relating to the Sale Transactions or operation of the Acquired Assets prior to Closing of the applicable Buyer's Purchase Agreement, except for the Assumed Liabilities assumed pursuant to such Buyer's Purchase Agreement. The Buyers are not, and the consummation of the Sale Transactions will not render any Buyer, a mere continuation, and the Buyers, individually or collectively, are not holding themselves out as a mere continuation, of any of the Debtors or their respective estates, enterprise, or operations, and there

is no continuity or common identity between any Buyer and the Debtors. Accordingly, the Sale Transactions, individually or collectively, do not amount to a consolidation, merger, or de facto merger of any Buyer with or into any of the Debtors or their estates and the Buyers are not, and shall not be deemed to be, a successor to any of the Debtors or their estates as a result of the consummation of the Sale Transactions.

**K.** **Good Faith**. The Transaction Documents and the Sale Transactions were negotiated, proposed, and entered into, and are being undertaken by the Trustee, the Debtors and the Buyers in good faith, without collusion, and from arm's-length bargaining positions. Likewise, the value that the relevant Debtors and their estates will receive on consummation of the Sale Transactions is the product of arm's-length negotiations between the Trustee, the Buyers and their respective representatives and advisors. Each Buyer is a "good faith purchaser" within the meaning of section 363(m) of the Bankruptcy Code and, as such, is entitled to all the protections afforded thereby. The Buyers have proceeded in good faith in all respects in that, among other things, (i) the Buyers agreed to subject the Acquired Assets to higher or better offers, (ii) the Buyers complied with the provisions of the Bid Procedures Order, including compliance with confidentiality obligations and restrictions under the Bidding Procedures and any applicable non-disclosure or confidentiality agreement, (iii) the Buyers' bid was subjected to competitive Bidding Procedures as set forth in the Bid Procedures Order, and (iv) all consideration to be provided by Buyers and all other material agreements or arrangements entered into by Buyers and the Debtors (or the Trustee on the Debtors' behalf) in connection with the Sale Transactions have been disclosed and are appropriate. The Purchase Price in respect of the Acquired Assets was not controlled by any agreement among potential bidders. Neither the Trustee, the Debtors, nor any Buyer has engaged in any conduct that would cause or permit any Purchase Agreement to be avoided or costs and

damages to be imposed under section 363(n) of the Bankruptcy Code. The Transaction Documents were not entered into and the Sale Transactions are not being consummated for the purpose of hindering, delaying, or defrauding present or future creditors of the Debtors. All consideration to be provided by Buyers in connection with the Sale Transactions has been disclosed. Neither the Trustee, nor the Debtors, nor any Buyer is entering into the Transaction Documents, or proposing to consummate the Sale Transactions, fraudulently, for the purpose of statutory and common law fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, possession thereof, or the District of Columbia.

L. **Notice of Assumption**. As evidenced by the applicable affidavits and declarations of service filed with this Court in accordance with the Assumption and Assignment Procedures contained in the Bid Procedures Order [Dkt. Nos. _____], the Trustee has served, on or before the applicable Assumption Notice Date, the Notice of Assumption, which provides notice of the Debtors' executory contracts and unexpired leases available for assumption and assignment to Buyers (the "Available Contracts") and of the related proposed Cure Costs upon each non-Debtor counterparty to such Available Contract (each, a "Contract Counterparty"). The service of the Notice of Assumption was timely, good, sufficient, and appropriate under the circumstances and no further notice need be given with respect to the Cure Costs for the assumption and assignment of the Available Contracts. All Contract Counterparties to the Available Contracts have had a reasonable opportunity to object both to the Cure Costs for their respective Available Contracts on the Notice of Assumption, as applicable, and to the assumption and assignment of any Available Contract to any Buyer. No defaults exist in the performance of the Debtors (or to the extent applicable, the Trustee) under the Available Contracts as of the date of this Order other than the failure to pay the Cure Costs, as may be required, or such defaults that are not required to be cured.

Pursuant to Rule 6006(c) of the Bankruptcy Rules, the Court finds that the service of the Notice of Assumption was adequate, sufficient, and appropriate under the circumstances and in compliance with the Assumption and Assignment Procedures and other requirements of the Bid Procedures Order, and, except as expressly provided in this Sale Order, no further or other notice need be given in respect of the proposed assumption and assignment to any Buyer of any Assumed Contract.

**M.** **Satisfaction of Section 363(f) Standards**. The Trustee, for and on behalf of the Debtors, is authorized to sell the Acquired Assets to the Buyers in accordance with the terms of this Sale Order and each Buyer's Purchase Agreement, free and clear of all liens, claims (including those that constitute a "claim" as defined in section 101(5) of the Bankruptcy Code), property interests, rights, liabilities, encumbrances, pledges, and other interests of any kind or nature whatsoever against the Debtors or the Acquired Assets, including, without limitation, any debts, claims, rights, causes of action, and/or suits arising under or out of, in connection with, or in any way relating to, any acts, omissions, obligations, demands, guaranties, rights, contractual commitments, restrictions, product liability claims, environmental liabilities, employee retirement or benefit plan claims, workers' compensation claims, severance claims, retiree healthcare or life insurance claims, and/or claims for taxes of or against the Debtors and/or the Acquired Assets to the maximum extent available under applicable law, and any derivative, vicarious, transferee, or successor liability claims, rights, or causes of action (whether in law or in equity, under any law, statute, rule, or regulation of the United States, any state, territory, or possession thereof or the District of Columbia), whether arising prior or subsequent to the commencement of these Bankruptcy Cases, whether known or unknown, whether fixed or contingent, whether anticipated or unanticipated, whether yet accrued or not, and whether imposed by agreement, understanding,

law, equity or otherwise arising under or out of, in connection with, or in any way related to the Debtors, the Debtors' interests in the Acquired Assets, the operation of Debtors' businesses before the Closing, or the transfer of the Acquired Assets to any Buyer, all Excluded Assets and all Excluded Liabilities (each as defined in the applicable Purchase Agreement) (collectively, all such liens, claims, interests and other matters described above in this Paragraph M, the "Encumbrances"), other than the Assumed Liabilities and Permitted Encumbrances (as defined under the applicable Purchase Agreement), because, in each case, one or more of the standards set forth in section 363(f)(1)-(5) of the Bankruptcy Code have been satisfied. Those holders of Encumbrances who did not object (or who ultimately withdrew their objections, if any) to the Sale Transactions or the Sale Motion have either consented to or are deemed to have consented to the Sale Transactions pursuant to section 363(f)(2) of the Bankruptcy Code. In addition, one or more of the other subsections of section 363(f) of the Bankruptcy Code apply and, therefore, holders of Encumbrances with an interest in the Acquired Assets are adequately protected by having their Encumbrances that constitute interests in such Acquired Assets attach solely to the proceeds of the Sale Transactions in the same order of priority and with the same extent, validity, force, and effect that such holders had prior to the Sale Transactions and by providing for the distributions provided for herein. Except as provided in this Sale Order, all entities having Encumbrances of any kind or nature whatsoever against the Debtors or the Acquired Assets shall be forever barred, estopped, and permanently enjoined from pursuing or asserting such Encumbrances against any Buyer or any of its assets, property, affiliates, successors, assigns, or the Acquired Assets.

N.      The Buyers would not have entered into their respective Transaction Documents and would not consummate the transactions contemplated thereby, thus adversely affecting the Debtors and their estates and their creditors, (i) if the sale of the Acquired Assets was not free and

clear of all Encumbrances and other interests, including, without limitation, any rights or Encumbrances based on any successor or transferee liability (other than, in each case, the Assumed Liabilities and Permitted Encumbrances, as defined under the applicable Purchase Agreement), or (ii) if any Buyer would, or in the future could, be liable for any such Encumbrances, including, without limitation, any rights or Encumbrances based on any successor or transferee liability (other than, in each case, the Assumed Liabilities and the Permitted Encumbrances). The Buyers will not consummate the Sale Transactions unless this Court expressly orders that none of the Buyers, their respective affiliates, their present or contemplated members or shareholders, or the Acquired Assets will have any liability whatsoever with respect to, or be required to satisfy in any manner, whether at law or equity, or by payment, setoff, or otherwise, directly or indirectly, any Encumbrances and other interests, including rights or claims based on any successor or transferee liability, other than as expressly provided herein or in such Buyer's Purchase Agreement. A sale of the Acquired Assets, other than one free and clear of all Encumbrances, would yield substantially less value for the Debtors' estates.

O.     The total consideration to be provided under the Purchase Agreements reflects the Buyers' reliance on this Sale Order to provide them with title to and possession of the Acquired Assets free and clear of all Encumbrances pursuant to sections 105(a) and 363(f) of the Bankruptcy Code.

P.     **Assumption and Assignment of Available Contracts**. The assumption and assignment of the Available Contracts is integral to the Sale Transactions, is in the best interests of the Debtors and their estates, and represent the valid and reasonable exercise of the Trustee's sound business judgment. Specifically, the assumption and assignment of the available Contracts (i) is necessary to sell the applicable Acquired Assets to respective Buyers, (ii) is an integral part

of the Acquired Assets being purchased by the Buyers, (iii) limit the losses suffered by non-Debtor counterparties to the Available Contracts, and (iv) maximize the recoveries to other creditors of the Debtors by limiting the amount of claims against the Debtors' estates by avoiding the rejection of the Available Contracts; and, in light of the foregoing, such assumption and assignment of the Available Contracts is reasonable, enhance the value of the relevant Debtors' estates.

**Q.** With respect to each of the Available Contracts, the Debtors and Trustee have met all requirements of section 365(b) of the Bankruptcy Code because applicable Buyer has agreed to cure or will cure on or before the closing under its Purchase Agreement any monetary default required to be cured with respect to the Available Contracts under section 365(b)(1) of the Bankruptcy Code and such Buyer has provided adequate assurance of future performance under the Available Contracts in satisfaction of sections 365(b) and 365(f) of the Bankruptcy Code to the extent that any such assurance is required.

**R.** Accordingly, the Available Contracts may be assumed by the Debtors and assigned to any Buyer as provided for in such Buyer's Purchase Agreement and herein. The assumption and assignment of each Available Contract is approved notwithstanding any provision in such Available Contract or other restrictions prohibiting its assignment or transfer. The applicable Notice of Assumption provided by the Trustee is sufficient to advise the Contract Counterparties that, pursuant to its Purchase Agreement, each Buyer's decision on which Available Contracts will be assumed and assigned to such Buyer may not be made until after the entry of this Sale Order.

**S.** The authority hereunder for the Debtors to assume and assign any Available Contract to any Buyer includes the authority to assume and assign an Available Contract, as amended.

**T.** The assignments by the applicable Debtors of each of the Available Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

**U.** **Validity of Transfer**. As of the Closing, the transfer of a Buyer's Acquired Assets to each Buyer will be a legal, valid, and effective transfer of its Acquired Assets, and will vest such Buyer with all any legal, equitable and beneficial right, title, and interest of the applicable Debtors in and to such Buyer's Acquired Assets, free and clear of all Encumbrances (other than Assumed Liabilities and Permitted Encumbrances). The consummation of the Sale Transactions is legal, valid, and properly authorized under all applicable provisions of the Bankruptcy Code, including, without limitation, sections 105(a), 363(b), 363(f), 363(m), 365(b), and 365(f) of the Bankruptcy Code, and all of the applicable requirements of such sections have been complied with in respect of the Sale Transactions.

**V.** The Transaction Documents are valid and binding contracts between the Debtors and the Trustee and each Buyer and shall be enforceable pursuant to their terms. None of the Transaction Documents were entered into and none of the Debtors, the Trustee, or any Buyer has entered into any Purchase Agreement or proposed to consummate the Sale Transactions for the purpose of hindering, delaying, or defrauding creditors under the Bankruptcy Code or under laws of the United States, any state, territory, possession, or the District of Columbia. The Transaction Documents, the Sale Transactions itself, and the consummation thereof, shall be specifically enforceable against and binding upon (without posting any bond) the applicable Debtors, and any chapter 7 or chapter 11 trustee appointed or elected in these Bankruptcy Cases for any Debtor, and shall not be subject to rejection or avoidance by the foregoing parties or any other entity. None of the Trustee, nor the Debtors nor any Buyer entered into any Purchase Agreement or proposed to consummate the Sale Transactions fraudulently for the purpose of statutory and common law

fraudulent conveyance and fraudulent transfer claims whether under the Bankruptcy Code or under the laws of the United States, any state, territory, or possession thereof, or the District of Columbia, or any other applicable jurisdiction with laws substantially similar to any of the foregoing.

**W.** The sale of the acquired Assets does not constitute a *de facto* or *sub rosa* plan of reorganization or liquidation because it does not propose to (i) impair or restructure existing debt of, or equity interests in, the Debtors, (ii) impair or circumvent voting rights with respect to any plan proposed by the Trustee, the Debtors, or any other entity, (iii) circumvent chapter 11 safeguards, including those set forth in sections 1125 and 1129 of the Bankruptcy Code, or (iv) classify claims or equity interests.

**X.** **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. The sale of the Acquired Assets (including the assumption and assignment of those Available Contracts that are acquired by any Buyer at the Closing) must be approved and consummated promptly in order to preserve the value of the Acquired Assets. Therefore, time is of the essence in consummating the Sale Transactions, and the Trustee and the Buyers intend to close the Sale Transactions as soon as reasonably practicable. The Trustee has demonstrated compelling circumstances and a good, sufficient, and sound business purpose and justification for the immediate approval and consummation of the Sale Transactions as contemplated by the Purchase Agreements. Accordingly, there is sufficient cause to lift the stay contemplated by Bankruptcy Rules 6004(h) and 6006(d) with regard to the transactions contemplated by this Order.

**Y.** **Legal and Factual Bases**. The legal and factual bases set forth in the Sale Motion, the Sale Declaration, and at the Sale Hearing establish just cause for the relief granted herein.

**Z.** **Necessity of Sale Order**. The Buyers would not consummate the Sale Transactions absent the relief provided by this Sale Order.

**NOW THEREFORE, IT IS HEREBY ORDERED THAT:**

1.     **Sale Motion is Granted**.  To the extent not already approved pursuant to the Bid Procedures Order, the Sale Motion is granted and approved as set forth herein.

2.     **Objections Overruled**.  Subject to Paragraph 3 below, all objections, if any, and any and all joinders thereto, to the Sale Motion or the relief granted herein that have not been previously overruled, withdrawn with prejudice, waived, or settled as announced to this Court at the Sale Hearing, by stipulation filed with this Court, or as provided in this Sale Order, and all reservations of rights included therein, are hereby overruled on the merits and with prejudice.

3.     **Cure Objections**.  If a Contract Counterparty to any Available Contract timely and properly filed an objection to the assumption and assignment of such Available Contract to any Buyer, then such Available Contract shall be deemed a "Disputed Contract."  Prior to the date that is thirty (30) days following the closing under a Buyer's Purchase Agreement, such Buyer shall have the option to (x) pay the Cure Cost for such Disputed Contract and the applicable Debtor shall be permitted to assume the Disputed Contract and assign such contract to the Buyer in accordance with the terms of such Buyer's Purchase Agreement or (y) designate the Disputed Contract not to be acquired such Buyer as part of the Sale Transactions (such a contract or lease, an "Excluded Contract") and shall not be responsible for such Cure Cost.

4.     **Notice**.  Notice of the Sale Motion and Sale Hearing was adequate, appropriate, fair and equitable under the circumstances and complied in all respects with section 102(1) of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 6006 and the Bid Procedures Order.

5.     **Fair Purchase Price**.  The consideration provided by each Buyer under its respective Purchase Agreement is fair and reasonable, is the highest and best offer for the Acquired Assets to be acquired by such Buyer, and constitutes (i) reasonably equivalent value under the

Bankruptcy Code and the Uniform Fraudulent Transfer Act, (ii) fair consideration under the Uniform Fraudulent Conveyance Act, and (iii) reasonably equivalent value, fair consideration and fair value under any other applicable laws of the United States, any state, territory or possession or the District of Columbia.

6.      **Approval of the Purchase Agreements**.   The Transaction Documents, the transactions contemplated thereby, including the Sale Transactions and all of the terms and conditions thereof, are hereby approved in their entirety. The failure specifically to include any particular provision of the Transaction Documents in this Sale Order shall not diminish or impair the effectiveness of such provision, it being the intent of this Court that the Transaction Documents, and the relevant Debtor's or Trustee's, as applicable, entry therein, be authorized and approved in their entirety.

7.      **Consummation of Sale Transactions**.  Pursuant to sections 105(a), 363(b), 363(f), and 365 of the Bankruptcy Code, the Trustee and the Debtors are authorized and empowered to transfer the Acquired Assets in accordance with the terms of the Purchase Agreements and the terms of this Sale Order. The Trustee, the Debtors, as well as their respective managers, officers, employees, professionals, and agents (in each case as to such managers, officers, employees, professionals, and agents, subject to the control and supervision of the Trustee), are authorized to execute, deliver, and perform their obligations under and comply with the terms of the Transaction Documents and to consummate the Sale Transactions, including by taking any and all actions as may be reasonably necessary or desirable to implement the Sale Transactions and each of the transactions contemplated thereby pursuant to and in accordance with the terms and conditions of the Transaction Documents and this Sale Order. For the avoidance of doubt, all persons and entities are prohibited and enjoined from taking any action to adversely affect or interfere with the ability

of the Trustee and the Debtors to transfer the Acquired Assets to the respective Buyers in accordance with the terms of each such Buyer's Purchase Agreement and this Sale Order.

8.     The Trustee, the Debtors, their respective affiliates, and their respective managers, officers, employees, professionals, and agents (in each case as to the Debtors' respective managers, officers, employees, professionals, and agents, subject to the control and supervision of the Trustee), are authorized to execute and deliver, and authorized to perform under, consummate, and implement all additional notices, assumptions, conveyances, releases, acquittances, instruments and documents that may be reasonably necessary or desirable to implement the Transaction Documents, including the transfer and, as applicable, the assignment of all the Acquired Assets, the assumption of the Assumed Liabilities, and the assumption and assignment of all the Available Contracts, and to take all further actions as may be (i) reasonably requested by any Buyer for the purpose of assigning, transferring, granting, conveying, and conferring to such Buyer, or reducing to such Buyer's possession, its Acquired Assets and/or (ii) necessary or appropriate to the performance of the obligations contemplated by the Transaction Documents, if any, pursuant to which such Buyer would provide to the Debtors certain ordinary course services and services necessary for the Debtors' ongoing administration of these Bankruptcy Cases, all without further order of this Court.

9.     All entities that are currently in possession of some or all of the Acquired Assets are hereby directed to surrender possession of such Acquired Assets to the applicable Buyer immediately upon the occurrence of the closing under such Buyer's Purchase Agreement or at such later time as such Buyer reasonably requests.

10.     All entities are prohibited from taking any action to adversely affect or interfere with the ability of the Trustee and the Debtors to transfer the Acquired Assets to the respective

Buyers in accordance with each such Buyer's Purchase Agreement and this Sale Order, provided that the foregoing restriction shall not prevent any party from appealing this Sale Order in accordance with applicable law or opposing any appeal of this Sale Order.

11. The Buyers have provided or will provide, as applicable, adequate assurance of future performance of and under the Available Contracts, within the meaning of 365(b)(1) and 365(f)(2) of the Bankruptcy Code. Debtors' creditors and the holders of any Encumbrances are authorized and directed to execute such documents and take all other actions as may be necessary to terminate, discharge or release their Encumbrances in the Acquired Assets, if any, as such Encumbrances may otherwise exist.

12. Each and every federal, state, local, or foreign government or governmental or regulatory authority, agency, board, bureau, commission, court, department, or other governmental entity is hereby authorized to accept any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by the Transaction Documents.

13. **Transfer of Acquired Assets Free and Clear**. Pursuant to sections 105(a), 363(b), 363(f) and 365 of the Bankruptcy Code, the Trustee and the Debtors are authorized to transfer the Acquired Assets in accordance with the terms of the Purchase Agreements and this Sale Order. Upon the closing of each Purchase Agreement, the transfer of the Acquired Assets subject to such Purchase Agreement to applicable Buyer shall: (i) be valid, legal, binding, and effective; (ii) vest such Buyer with all right, title, and interest of the Debtors in and to the Acquired Assets; and (iii) be free and clear of all Encumbrances against the Debtors and the Acquired Assets (including Encumbrances of any "governmental unit," as defined in section 101(27) of the Bankruptcy Code) in accordance with section 363(f) of the Bankruptcy Code and subject to any claims and defenses

the Debtors may possess with respect thereto, in each case immediately before the closing under each Purchase Agreement (other than Assumed Liabilities and Permitted Encumbrances).

14. Except as otherwise provided in a Purchase Agreement or herein, all entities (and their respective successors and assigns) including, without limitation, the Trustee, the Debtors, the Debtors' estates, all debt security holders, equity security holders, governmental tax and regulatory authorities, lenders, customers, vendors, employees, former employees, litigation claimants, trustees, trade creditors, and any other creditors (or agent of any of the foregoing) who may or do hold Encumbrances (whether legal or equitable, secured or unsecured, matured or unmatured, contingent or noncontingent, senior or subordinated) against the Debtors or the Acquired Assets arising under or out of, in connection with, or in any way relating to, the Debtors, the Acquired Assets, the operation of the Acquired Assets by the Trustee or the Debtors prior to the closing under such Buyer's Purchase Agreement, or the Sale Transactions, are hereby forever barred, estopped, and permanently enjoined from asserting or pursuing such Encumbrances against any Buyer, its affiliates, successors, assigns, its property or the Acquired Assets, including, without limitation, taking any of the following actions with respect to any Encumbrances: (a) commencing or continuing in any manner any action, whether at law or in equity, in any judicial, administrative, arbitral, or any other proceeding, against any Buyer, its affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (b) enforcing, attaching, collecting, or recovering in any manner any judgment, award, decree, or order against any Buyer, its affiliates, successors, assigns, assets (including the Acquired Assets), and/or properties; (c) creating, perfecting, or enforcing any Claim against any Buyer, its affiliates, any of their respective successors, assigns, assets (including the Acquired Assets), and/or properties; (d) asserting a Encumbrance as a setoff, right of subrogation, or recoupment of any kind against any obligation

due against Buyer, its affiliates, any of their respective successors or assigns; or (e) commencing or continuing any action in any manner or place that does not comply, or is inconsistent, with the provisions of this Sale Order or the agreements or actions contemplated or taken in respect thereof. No such entity shall assert or pursue against any Buyer or its affiliates, successors or assigns any such Encumbrances.

15. This Sale Order (a) shall be effective as a determination that, as of the closing under each Purchase Agreement, except as otherwise expressly provided in such Purchase Agreement as to Permitted Encumbrances or Assumed Liabilities (each as defined therein), all Encumbrances have been unconditionally released, discharged and terminated as to the applicable Buyer and the Acquired Assets being acquired by such Buyer, and that the conveyances and transfers described herein have been effected, and (b) is and shall be binding upon and govern the acts of all entities, including all filing agents, filing officers, title agents, title companies, recorders of mortgages, recorders of deeds, registrars of deeds, administrative agencies, governmental departments, secretaries of state, federal, state, county and local officials and all other entities who may be required by operation of law, the duties of their office, or contract, to accept, file, register or otherwise record or release any documents or instruments that reflect that such Buyer is the assignee and owner of such Acquired Assets, and ownership of the Acquired Assets is free and clear of all Encumbrances or who may be required to report or insure any title or state of title in or to any lease (all such entities being referred to as "Recording Officers"). All Recording Officers are authorized to strike recorded Encumbrances, claims, liens, and other interests against the Acquired Assets recorded prior to the date of this Sale Order. A certified copy of this Sale Order may be filed with the appropriate Recording Officers to evidence cancellation of any recorded Encumbrances, claims, liens, pledges, and other interests against the Acquired Assets recorded

prior to the date of this Order. All Recording Officers are hereby authorized to accept for filing any and all of the documents and instruments necessary, advisable, or appropriate to consummate the transactions contemplated by the Purchase Agreements or any of them.

16.     Following the closing under a Purchase Agreement, except as otherwise expressly provided in such Purchase Agreement as to Permitted Encumbrances or Assumed Liabilities (each as defined therein), no holder of any Encumbrances shall interfere with any Buyer's title to or use or enjoyment of the Acquired Assets acquired by such Buyer based on or related to any Encumbrance or based on any actions or omissions by the Debtors or the trustee, including any actions or omissions the Debtors or the Trustee may take in these Bankruptcy Cases.

17.     Except as expressly set forth in a Buyer's Purchase Agreement as to Permitted Encumbrances or Assumed Liabilities (each as defined therein), each Buyer and each of its affiliates, successors, assigns, members, partners, officers, directors, principals, and shareholders shall have no liability whatsoever for any Encumbrances, whether known or unknown as of the closing under such Purchase Agreement, now existing or hereafter arising, whether fixed or contingent, whether liquidated or unliquidated, whether asserted derivatively or vicariously, whether asserted based on such Buyer's status as a transferee, successor, or otherwise, of any kind, nature, or character whatsoever, including Encumbrances based on, relating to, and/or arising under, without limitation: (a) any employment or labor agreement; (b) any pension, welfare, compensation or other employee benefits or retirement plan, agreements, practices, and programs, including, without limitation, any pension or employee benefits or retirement plan of or related to any of the Debtors or any Debtor's affiliates or predecessors or any current or former employees of any of the foregoing; (c) the Debtors' business operations or the cessation thereof; (d) any litigation involving one or more of the Debtors; (e) any employee, workers' compensation,

occupational disease or unemployment or temporary disability related law, including, without limitation, any claims, rights, or causes of action that might arise under or pursuant to (i) the Employee Retirement Income Security Act of 1974, as amended, (ii) the Fair Labor Standards Act, (iii) Title VII of the Civil Rights Act of 1964, (iv) the Federal Rehabilitation Act of 1973, (v) the Worker Adjustment and Retraining Notification Act of 1988, (vi) the Age Discrimination and Employee Act of 1967 and Age Discrimination in Employment Act, as amended, (vii) the Americans with Disabilities Act of 1990, (viii) the Consolidated Omnibus Budget Reconciliation Act of 1985, (ix) state and local discrimination laws, (x) state and local unemployment compensation laws or any other similar state and local laws, (xi) state workers' compensation laws, and/or (xii) any other state, local, or federal employee benefit laws, regulations or rules or other state, local or federal laws, regulations or rules relating to, wages, benefits, employment, or termination of employment with any or all Debtors or any of their predecessors; (f) any antitrust laws; (g) any product liability or similar laws, whether state, federal, or otherwise; (h) any environmental laws, rules, or regulations, including, without limitation, under the Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. §§ 9601, et seq., or similar state statutes (subject to Paragraph 19); (i) any bulk sales or similar laws; (j) any federal, state, or local tax statutes, rules, regulations, or ordinances, including, without limitation, the Internal Revenue Code of 1986, as amended; and (k) any common law doctrine of *de facto* merger, successor, transferee, or vicarious liability, substantial continuity liability, successor-in- interest liability theory, and/or any other theory of or related to successor liability.

18.     To the extent provided by section 525 of the Bankruptcy Code, no governmental unit may deny, revoke, suspend, or refuse to renew any permit, license, or similar grant relating to the operation of the Acquired Assets sold, transferred, or conveyed to any Buyer on account of the

filing or pendency of these Bankruptcy Cases or the consummation of the Sale Transaction contemplated by any Purchase Agreement and the Transaction Documents.

19.    Nothing in this Sale Order or any Transaction Documents releases, nullifies, precludes or enjoins the enforcement of any police or regulatory liability to a governmental unit that any entity would be subject to as the post-sale owner, lessor, lessee, or operator of a property after the date of entry of this Sale Order. Nothing in this Sale Order or the Transaction Documents authorizes the transfer or assignment of any governmental (a) license, (b) permit, (c) registration, (d) authorization, or (e) approval, or the discontinuation of any obligation thereunder, without compliance with all applicable legal requirements and approvals under police or regulatory law. Nothing in this Sale Order divests any tribunal of any jurisdiction it may have under police or regulatory law to interpret this Sale Order or to adjudicate any defense asserted under this Sale Order.

20.    Upon the occurrence of the closing under each Purchase Agreement, as to the Acquired Assets subject to such Purchase Agreement, this Sale Order shall be considered and constitute for any and all purposes a full and complete general assignment, conveyance and transfer of the Acquired Assets acquired by such Buyer, transferring good and marketable, indefeasible title and interest in all of such Acquired Assets to the applicable Buyer with effect at such closing in accordance with the Transaction Documents.

21.    To the maximum extent available under applicable law and to the extent provided for under each Purchase Agreement, the applicable Buyer under such Purchase Agreement shall be authorized, as of the closing under such Purchase Agreement, to operate under any license, permit, registration, and governmental authorization or approval of the Debtors with respect to the Acquired Assets acquired pursuant to such Purchase Agreement and, to the maximum extent

available under applicable law and to the extent provided for under the Transaction Documents, all such licenses, permits, registrations, and governmental authorizations and approvals are deemed to have been transferred to such Buyer as of the closing under such Purchase Agreement. All existing licenses or permits applicable to the Debtors' businesses shall remain in place for such Buyer's benefit until either new licenses and permits are obtained or existing licenses and permits are transferred in accordance with applicable administrative procedures.

22. **No Successor or Other Derivative Liability**. By virtue of the Sale Transactions, no Buyer nor any of such Buyer's affiliates shall be deemed to: (a) be a legal successor, or otherwise deemed to be a successor, to any of the Debtors under any theory of law or equity; (b) have, de facto or otherwise, merged with or into any or all Debtors or their estates; (c) have a common identity or a continuity of enterprise with the Debtors; or (d) be a mere continuation or substantial continuation, or be holding itself out as a mere continuation, of the Debtors or any business, enterprise, or operation of the Debtors. Upon the closing under a Purchase Agreement, to the maximum extent available under applicable law, such Buyer's acquisition of the Acquired Assets pursuant to such Purchase Agreement shall be free and clear of any "successor liability" claims and other types of transferee liability of any nature whatsoever, whether known or unknown and whether asserted or unasserted at the time of such Liabilities (other than, to the extent applicable, any Assumed Liabilities or Permitted Encumbrances), and the Acquired Assets shall not be subject to any Claims arising under or in connection with any Excluded Asset, including any Excluded Contract or Excluded Liability. The operations of any Buyer and its affiliates shall not be deemed a continuation of the Debtors' businesses as a result of the acquisition of the Acquired Assets.

23. **Assumption and Assignment of Assumed Contracts**. The Debtors are hereby authorized in accordance with sections 105(a) and 365 of the Bankruptcy Code to assume and assign the Available Contracts to the respective Buyers pursuant to the terms of each such Buyer's Purchase Agreement, free and clear of all Claims, and to execute and deliver to each such Buyer such documents or other instruments as may be necessary to assign and transfer the Available Contracts to such Buyer as provided in its Purchase Agreement. Upon the closing under such Purchase Agreement, the Buyer thereunder shall be fully and irrevocably vested with all right, title, and interest of the relevant Debtors in, to, and under the Available Contracts acquired pursuant to such Purchase Agreement and, pursuant to section 365(k) of the Bankruptcy Code, the Debtors shall be relieved from any further liability with respect to such Available Contracts.

24. All Cure Costs that have not been waived shall be determined in accordance with the Bid Procedures Order or this Order and paid by the applicable Buyer in accordance with the terms of its Purchase Agreement. Assumption and payment of the Cure Costs by a Buyer shall be in full satisfaction and cure of any and all defaults under the Assumed Contracts acquired by such Buyer and is deemed to fully satisfy the Debtors' obligations under sections 365(b) and 365(f) of the Bankruptcy Code. Upon the assumption by a Debtor and the assignment to Buyer of any Available Contract, and the payment of any applicable Cure Costs, each Contract Counterparty to such Available Contract is forever barred, estopped, and permanently enjoined from (a) asserting against the Debtors or the Buyers, their affiliates, successors, or assigns, or the property of any of them, any default existing as of the date of the Sale Hearing if such default was not raised or asserted prior to or at the Sale Hearing, and (b) exercising any rights or remedies against any Debtor or any Buyer based on an asserted default that occurred on, prior to, or as a result of, the closing under such Purchase Agreement, including the type of default specified in section

365(b)(1)(A) of the Bankruptcy Code. Each Buyer has provided adequate assurance of future performance under the Available Contracts within the meaning of sections 365(b)(1)(c) and 365(f)(2)(B) of the Bankruptcy Code. Accordingly, all of the requirements of sections 365(b) and 365(f) of the Bankruptcy Code have been satisfied for the assumption by the Debtors, and the assignment by the Debtors to applicable Buyer, of each of the Available Contracts.

25. To the extent a Contract Counterparty fails to timely object to a Cure Cost, such Cure Cost has been and shall be deemed to be finally determined and any such Contract Counterparty shall be prohibited from challenging, objecting to, or denying the validity and finality of the Cure Cost at any time. Consistent with the Bid Procedures Order, the Contract Counterparty to an Available Contract is forever bound by the applicable Cure Cost and, upon payment of such Cure Cost as provided herein and in the applicable Purchase Agreement, is hereby enjoined from taking any action against any Buyer with respect to any claim for cure under the Available Contract. To the extent no timely Cure Objection or Adequate Assurance Objection (as defined in the Bidding Procedures has been filed and served with respect to an Available Contract, the Contract Counterparty to such Available Contract is deemed to have consented to the assumption and assignment of the Available Contract to any Buyer.

26. The assignments of each of the Available Contracts are made in good faith under sections 363(b) and (m) of the Bankruptcy Code.

27. **Ipso Facto Clauses**. Except as otherwise specifically provided for by order of this Court, the Available Contracts shall be transferred to, and remain in full force and effect for the benefit of, applicable Buyer in accordance with their respective terms, including all rights of such Buyer as the assignee of the Available Contracts acquired under its Purchase Agreement, notwithstanding any provision in any Available Contract (including, without limitation, those of

the type described in sections 365(e)(1) and (f) of the Bankruptcy Code) that prohibits, restricts, or conditions such assignment or transfer, including any provision that prohibits or conditions the assignment or sublease of an Available Contract (including without limitation, the granting of a lien therein) or allows the Contract Counterparty thereto to terminate, recapture, impose any penalty, condition on renewal or extension, or modify any term or condition upon such assignment or sublease, which shall constitute an unenforceable anti-assignment provision that is void and of no force and effect.

28. There shall be no, and all Contract Counterparties are forever barred and permanently enjoined from raising or asserting against the Debtors, the Trustee or any Buyer any default, breach, termination, claim, penalty, pecuniary loss, rent or other acceleration of amount due thereunder, escalation, assignment fee, increase, or any other fee charged to any Buyer or the Debtors as a result of (a) any Debtor's financial condition, bankruptcy, or failure to perform any of its obligations under the relevant Available Contracts; or (b) the assumption or assignment of the Available Contracts.

29. The failure of the Trustee, the Debtors or any Buyer to enforce at any time one or more terms or conditions of any of the Available Contracts shall not be a waiver of such terms or conditions, or of the Trustee, any Debtor's or any Buyer's rights to enforce every term and condition of the Available Contracts.

30. **Texas HHS Matters**. Nothing in this Sale Order authorizes the transfer or assignment of any governmental license, permit, registration, authorization, or approval over which Texas Health and Human Services Commission ("HHSC") has authority without compliance with all applicable legal requirements and approvals under police and regulatory law. Further, notwithstanding any provision in the Sale Motion or this Sale Order to the contrary,

nothing shall impair HHSC's right of recoupment under the Medicaid Program, which shall remain unaffected.

31. **Statutory Mootness**. The transactions contemplated by the Purchase Agreements and the other Transaction Documents are undertaken by respective Buyers without collusion and in good faith, as that term is used in section 363(m) of the Bankruptcy Code, and were negotiated by the parties at arm's-length and, accordingly, the reversal or modification on appeal of the authorization provided herein of the Sale Transactions shall neither affect the validity of the Sale Transactions nor the transfer of the Acquired Assets to the respective Buyers free and clear of Encumbrances, unless, as to a specific Buyer, such authorization is duly stayed before the occurrence of the closing under such Buyer's Purchase Agreement pending such appeal. Each Buyer is a good faith purchaser of the Acquired Assets being acquired under its Purchase Agreement and is entitled to all of the benefits and protections afforded by section 363(m) of the Bankruptcy Code. The Trustee, the Debtors and Buyers will be acting in good faith if they proceed to consummate the Sale Transactions at any time after entry of this Sale Order.

32. **No Avoidance of Purchase Agreement**. Neither the Trustee, nor the Debtors, nor any Buyer has engaged in any conduct that would cause or permit any Purchase Agreement to be avoided or costs and damages to be imposed under section 363(n) of the Bankruptcy Code. Accordingly, the Purchase Agreements and the Sale Transactions shall not be avoidable under section 363(n) of the Bankruptcy Code, and no party shall be entitled to any damages or other recovery pursuant to section 363(n) of the Bankruptcy Code in respect of the Purchase Agreements or the Sale Transactions.

33. **Modification of Purchase Agreements**. Subject to the terms of the Transaction Documents, the Transaction Documents, including the Purchase Agreements, and any related

agreements, documents, or other instruments, may be modified, amended, or supplemented by the parties thereto, in a writing signed by the party against whom enforcement of any such modification, amendment, or supplement is sought, and in accordance with the terms thereof, without further order of this Court; *provided* that notwithstanding any such modification, amendment, or supplement, the sale of the Acquired Assets to Buyer will still comply with the requirements of section 363 of the Bankruptcy Code.

34. **Waiver of Bankruptcy Rules 6004(h) and 6006(d)**. Notwithstanding the provisions of Bankruptcy Rules 6004(h) and 6006(d) or any applicable provisions of the Local Rules, this Sale Order shall not be stayed after the entry hereof, but shall be effective and enforceable immediately upon entry, and the 14-day stay provided in Bankruptcy Rules 6004(h) and 6006(d) is hereby expressly waived and shall not apply. Time is of the essence in closing the Sale Transactions and the Trustee and the Buyers intend to close the Sale Transactions as soon as practicable. Any party objecting to this Sale Order must exercise due diligence in filing an appeal and pursuing a stay within the time prescribed by law and prior to the closing under any Purchase Agreement, or risk its appeal will be foreclosed as moot.

35. **Binding Effect of this Sale Order**. The terms and provisions of the Purchase Agreements and this Sale Order shall be binding in all respects upon, or shall inure to the benefit of the Trustee, the Debtors, the Debtors' estates and their creditors, the Buyers and their respective affiliates, successors, and assigns, and any affected third parties, including all entities asserting Encumbrances, notwithstanding any subsequent appointment of any trustee, examiner, or receiver under any chapter of the Bankruptcy Code or any other law, and all such provisions and terms shall likewise be binding on such trustee, examiner, or receiver and shall not be subject to rejection or avoidance by the Trustee, the Debtors, the Debtors' estates or creditors, or any trustee, examiner,

or receiver. Any trustee appointed for the Debtors under any provision of the Bankruptcy Code, whether the Debtors are proceeding under chapter 7 or chapter 11 of the Bankruptcy Code, shall be authorized to (a) operate the businesses of the Debtors to the fullest extent necessary to permit compliance with the terms of the Transaction Documents and (b) perform under the Transaction Documents without the need for further order of this Court.

36.     **Conflicts; Precedence**.  In the event that there is a direct conflict between the terms of this Sale Order and the terms of the Transaction Documents, the terms of this Sale Order shall control.

37.     **Automatic Stay**.  No Buyer shall be required to seek or obtain relief from the automatic stay under section 362 of the Bankruptcy Code to enforce any of its remedies under the Transaction Documents or any other sale-related document. The automatic stay imposed by section 362 of the Bankruptcy Code is modified solely to the extent necessary to implement the provisions of this Sale Order.

38.     **Provisions Non-Severable**.  The provisions of this Order are nonseverable and mutually dependent.

39.     **Discharge of Indebtedness**.  Any discharge of indebtedness that might otherwise be recognized for U.S. income tax purposes as income from discharge of indebtedness by the Debtors as a result of the performance of any obligation or taking of any other action contemplated by any Purchase Agreement, and any discharge or release of indebtedness as result of any Purchase Agreement, is hereby granted by the Court.

40.     **Retention of Jurisdiction**.  This Court shall retain jurisdiction to, among other things, (a) interpret, enforce, and implement the terms and provisions of this Sale Order and the Purchase Agreements (including all amendments thereto, any waivers and consents thereunder,

and of each of the agreements executed in connection therewith) and (b) adjudicate disputes related to this Sale Order and the Purchase Agreements (including all amendments thereto, any waivers and consents thereunder, and each of the agreements executed in connection therewith).

3417333.2